W.H.Hawley
Assistant Attorney General
Office of Special Prosecutions
and Appeals
310 K Street, Suite 308
Anchorage, Alaska 99501
Telephone: (907) 269-6250
Facsimile: (907) 269-6270
Email: William_Hawley@law.state.ak.us

Attorney for Respondent
John (Craig) Turnbull

### IN THE UNITED STATES DISTRICT COURT

### DISTRICT OF ALASKA

| | |
|---|---|
| JON ARNOLD WOODARD, )<br>)<br>Petitioner, )<br>)<br>vs. )<br>)<br>JOHN (CRAIG) TURNBULL, )<br>)<br>)<br>Respondent. )<br>_____ ) | Case No. 3:05-cv-0089-TMB-JDR<br><br>RESPONSE (ANSWER) TO ORDER<br>TO SHOW CAUSE |

1.    Introduction

        Jon Arnold Woodard, an Alaska prisoner convicted of second-degree

murder and robbery and sentenced to serve a term of 66 years, has filed a

petition for habeas corpus.  [Exh. 1]  This court has directed the respondent,

John Turnbull, the warden of the Spring Creek Correctional Center in Seward, to file an answer or other responsive pleading.  This is respondent's answer.  Many of Woodard's claims are not properly exhausted.  The claims that are properly exhausted are identified.  The state is separately moving to dismiss claims that have not been properly exhausted as they are procedurally barred.

Respondent denies that Woodard is entitled to any relief on the merits of any of his claims.  In order to avoid any claims of waiver, the state denies both the properly exhausted claims and the claims that are procedurally barred.

The evidence produced at trial is set forth so that Woodard's claims may be considered in the context of the evidence as a whole.  The procedural history of the case in state court is set forth so that the claims may be viewed in proper perspective.

2.    The evidence at trial

A.    *The murder and the robbery:*

On June 8, 1992 at approximately 8:33 a.m., Terrence Becker, a Loomis security officer, riding in an armored car, arrived at the Aurora Village shopping center.  [Tr. 3015, 3264-74][1]  Becker, who was delivering small bills for

---

[1]    The state is lodging the transcripts of the grand jury proceeding, the trial, the sentencing, and the post-conviction evidentiary hearing.  There are two separately numbered post-conviction transcripts.  The main volume will be cited [PCR Tr. ___]  The volume containing the testimony of John Murtagh will be

John A. Woodard v John (Craig) Turnbull, 3:05-cv-00089-TMB-JDR
Page 2

use as change and planning to pick up the previous day's receipts for deposit,
exited the Loomis truck and walked to the customer service booth, where he met
Kimberly Giddings.  [Tr. 3014-15, 3274]  The customer service booth was an
open cubicle topped with glass panels.  [Tr. 3065-67, 3489] The booth contained
a drop safe where money, checks, and other receipts were deposited after being
counted.  [Tr. 2298-3005]  Loomis employees carried the key to the drop safe into
the store daily.  [Tr. 3000, 3005-06]  Cash trays prepared with bills and change
for use by cashiers were stored in a second safe.  [Tr. 3001-05]

Giddings took the key from Becker and unlocked the drop safe.  [Tr.
3011, 3016]  She then put the money and other receipts from the drop safe into
two blue, zippered bank deposit bags which were in turn placed in a canvas bag
provided by Becker.  [Tr. 3012-17]  Becker then gave Giddings a number of $1
and $5 bills.  [Tr. 3017-20]

In the meantime, Woodard, on his knees and pretending to look at
frozen food in an aisle near the customer service booth, and already wearing
sunglasses and gloves, put on his mask. [Tr. 3028, 3048, 3058-59, 3082-83, 3086,
3107, 3116, 3245-46, 3250, 3524, 3532, 3544-45, 4457, 5278]

---

cited [PCRM Tr. ___]  In this answer, the state is relying on and has cited the
decision of the Alaska Court of Appeals on direct appeal to support its factual
assertions.  The state will file additional state court transcripts, pleadings, and
orders if and when it is appropriate to do so and of course at any time this court
so requests.

Woodard got up and ran down the aisle to the customer service booth. [*Id.*]
Woodard demanded that someone in the booth open the door. [*Id.*] None of the
several persons in the booth heeded his request, so Woodard hoisted himself up
on the wooden door of the booth, held himself there with one arm, pointed a .10-
millimeter Glock semi-automatic at the back of the booth, and said: "I want the
money." [Tr. 3022, 3052, 3076, 3101, 3126-27, 3246, 4297] Becker, who was still
in the booth, told Giddings to get down, unsnapped his holster, and began to
draw his gun. [Tr. 3023, 3077, 3101, 4455]

      Woodard shouted: "Don't do it; don't do it," chambered a round into
his gun, and shot Becker. [Tr. 3023, 3054-55, 3078, 3102, 3152-53, 3289, 4298,
4455, 5278] Becker collapsed and fell on Giddings. [Tr. 3023] A Carrs employee
opened the door to the booth for Woodard after he made additional threats. [Tr.
3079, 3103, 4455] Woodard took the Loomis bag, full of money and other
receipts, from Giddings. [Tr. 3018-22, 3024, 4455-56] Woodard also took money
from the second safe and some of the $1 and $5 bills that Becker had delivered.
[Tr. 3024-25, 3056, 3079-80, 3104, 3179, 4456, 5278] Woodard warned the
persons in the booth not to do anything because he had people "watching." [Tr.
3056, 3080-81, 3104] As he left the booth, Woodard said, "Fuck you sons-of-a-
bitches." [Tr. 5279] Woodard stole $127,669.41; $51,228.29 was in cash. [Tr.
6767-68]

Woodard went down an aisle, into a rear area of Carrs, and out a back door, and then took off his mask. [Tr. 3180-82, 3195, 3290, 3520-21, 3541-42, 3713, 5281] Robin Conaway, a Carrs employee who had run out of another rear door during the robbery, saw Woodard walking away from the store, and later identified him in a photographic lineup and at trial. [Tr. 3704, 3710-13, 3742-44, 3749-50, 3803-04]

Becker's gun was found by his foot. [Tr. 3157] Becker's wound bled profusely. [Tr. 3291-93] Paramedics took Becker to the hospital where he died. [Tr. 3295, 3607] During the autopsy that followed, it was determined that the fatal bullet had entered Becker's head in the outside corner of his left eye, traveled towards the middle of his head and slightly downward, and fragmented. [Tr. 3608]

2.    *The Murder Weapon – the .10-Millimeter Glock:*

Woodard, who lived in Penland Park with Sara Wiggers, his girlfriend, had purchased a .10-millimeter Glock semi-automatic handgun (serial no. UH 929) on March 23, 1991. [Tr. 4063-70, 4253-55, 4310-11] Woodard pawned this .10-millimeter Glock on January 3, 1992, and redeemed it on March 5, 1992. [Tr. 7035-46]

The police found and seized the expended .10-millimeter round that had been ejected from the Glock when Woodard shot Becker in the customer

service booth.  [Tr. 3402, 3447, 3458-59]  The police then located 25 rounds of expended .10-millimeter ammunition that Woodard had fired in the presence of friends from the Glock in two separate locations shortly before the robbery.  [Tr. 3687-90, 4075-98, 4114-18, 5080-82]  The police also obtained a videotape which showed Woodard shooting the .10-millimeter Glock in one of the two locations. [*Id.*]  At one of the locations, a human hair like Woodard's was found attached to a burned ammunition box.  [Tr. 5088-89, 7331]

Robert Shem, a firearms expert, concluded that the 25 expended .10-millimeter shells and the expended .10 millimeter round found in the Carrs booth had all been fired from the same gun.  [Tr. 4206-12]  Shem also concluded the slug that had killed Becker was fired from a .10-millimeter Glock.  [Tr. 4132, 4136-61]

On the afternoon after the murder, Woodard dismantled the .10-millimeter Glock and threw the pieces into the Knik River; the pieces were never found.  [Tr. 5283, 7485-86]  Thus, the characteristics of the murder weapon themselves were not compared with the expended shell found at Carrs or the bullet fragments obtained from the victim.  Testing of a .10-millimeter Glock that Woodard purchased after the murder (serial no. WX 876) with money stolen from Carrs revealed that the shell found at Carrs had not been fired from it.  [Tr. 4161-64, 7068]

3.    *Events Leading up to the Murder and Robbery:*

Woodard first discussed the possibility of robbing the Carrs Aurora Village store and how easy it would be with his friend David VanHousen, the Carrs freezer food manager, in approximately 1987; a similar discussion occurred in early May of 1992. [Tr. 4234, 5231, 5242, 5244, 5346] In late May of 1992, Woodard again said he was thinking about robbing the Aurora Village Carrs store and that he had been watching the store from across the street. [Tr. 5247] Woodard asked VanHousen to confirm the Loomis armored-car schedule and to tell him how much money Carrs took in each day, and VanHousen did so. [Tr. 5247-51] Woodard showed VanHousen a ski mask he planned to wear, said he was going to wear mismatching tennis shoes, and said another unnamed friend would be posted as a lookout on the skywalk that crosses Northern Lights Boulevard near the store. [Tr. 5257-59]

A few days later, Woodard appeared at Carrs while VanHousen was working. [Tr. 5260] At Woodard's request, VanHousen accompanied Woodard to the back of the store where Woodard opened a door to determine whether it could be used as an escape route. [Tr. 5261-62] The alarm on the door did not sound. [*Id.*]

Also, in May of 1992, Woodard also approached a second friend, Sean Pierce, and asked him to help him with the robbery. [Tr. 4319] Woodard told

Pierce he had another, unnamed friend who worked at Carrs, and that this person had provided information concerning the receipts and Loomis armored-car arrival times and procedures. [Tr. 4319-24, 4338] Woodard and Pierce made specific plans for the robbery. [Tr. 4325, 4333-35] Woodard told Pierce he was going to wear a flak vest during the robbery and discussed the Loomis deliveries. [Tr. 4319-20, 4333, 4352, 4354] Pierce then went to Carrs and watched the inside the customer service booth while Loomis personnel made a pick up and delivery. [Tr. 4324, 5263-66]

Woodard and Pierce agreed that Pierce would station himself on the skywalk, that Pierce would signal Woodard when the Loomis van approached Carrs, and that Pierce would also signal Woodard if police were in the area. [Tr. 4331-33] Woodard and Pierce obtained the transmitter Pierce was to use during the robbery and a scanner-type receiver which Pierce programmed for his transmitter. [Tr. 4327, 4330, 5030] Woodard and Pierce tested the transmitter and receiver on two occasions – once while Pierce was on the skywalk and Woodard was in Carrs. [Tr. 4330-32]

On the night of June 7, 1992, which was the night before the robbery, Woodard telephoned VanHousen, discussed his plan to rob Carrs, and told VanHousen to meet him at the tennis courts on Minnesota Boulevard near Aurora Village when his shift ended at eight the next morning. [Tr. 5266-57]

Woodard also telephoned Pierce, told him to be ready, and said he would pick him up first thing in the morning. [Tr. 4339-40] In addition, Woodard called another friend, Karl Bohlin, and told him that he would be able to repay him $1,800 he had borrowed for a trailer payment soon because he and Pierce planned to rip off some drug dealers. [Tr. 5943-44, 5951-52, 6495]

On the morning of June 8th, Woodard, driving Sara Wigger's white Honda, picked up Pierce and his bicycle and drove to a park near the Carrs store where he gave Pierce the transmitter and a pair of binoculars. [Tr. 4340, 4343-46] Pierce left the park on his bike and stationed himself, as planned, on the Northern Lights skywalk. [Tr. 4341-46]

Woodard, still driving the white Honda, then met VanHousen at the tennis courts. [Tr. 5267-69] By this time Woodard had changed into the dark clothing he was planning to wear during the robbery. [Tr. 4332, 5271-72] He was also wearing sunglasses and gloves. [Tr. 5272] VanHousen tried to talk Woodard out of the robbery, but Woodard told VanHousen he had been waiting to commit the robbery and that he (VanHousen) should relax. [Tr. 5269-70] Woodard told VanHousen that he had a friend on the skywalk serving as a lookout, and VanHousen heard the lookout's (Pierce's) voice testing the transmitter and receiver system ("check, 1, 2, 3") at 8:15 that morning. [Tr. 5270] Woodard then asked VanHousen to remain in the area to provide an

alternate escape route. [Tr. 5271] VanHousen told Woodard he would do so, but then stayed close to his father's nearby home rather than at the park. [Tr. 5273]

After Woodard left VanHousen, he parked the white Honda behind Carrs near the Piedmont Apartments. [Tr. 4456-57] Woodard then entered the Carrs store, heard a transmission from Pierce stating that the Loomis armored car was in the area, and waited for Becker in the freezer aisle. [Tr. 4355]

　　　4.　　*Events Occurring After the Murder and Robbery:*

After Woodard was seen by Robin Conaway as he left the area of Carrs, he walked towards the Piedmont Apartments, climbed some stairs over a fence, walked to the white Honda, got in, and drove home. [Tr. 3503, 4456-57]

When Pierce, standing on the skywalk, saw the police cars arriving, he transmitted a warning to Woodard. [Tr. 4356-57] Pierce then descended from the skywalk and hid the binoculars and transmitter in some bushes. [Tr. 4359-62] He then bicycled to Woodard's trailer. [Tr. 4365]

When Pierce arrived at the trailer, he and Woodard went to a separate room in order to avoid Wiggers. [Tr. 4366] Woodard told Pierce he had fired at the guard. [*Id*.] They then counted the money Woodard said he had obtained during the robbery. [Tr. 4371-72] The counting was interrupted when Wiggers received a telephone call from the Palmer hospital stating that her mother had been in an accident. [*Id*.] Wiggers took her car and drove to Palmer.

[*Id*.] Woodard told Pierce that VanHousen had said the robbery would net at least $50,000 in cash, but the money Pierce saw totaled only $16,000. [Tr. 4430]

Woodard and Pierce decided at this juncture to dispose of incriminating items that could tie Woodard to the robbery. [Tr. 4434-37] They took a cab to Pierce's home where Pierce changed clothes. [Tr. 4267-71, 4275-76, 4435] The cab then took the two men to a rental car agency. [Tr. 4271, 4435-36] Woodard paid the cab driver with a $20 bill and two $5 bills and then gave approximately $600 in cash to Pierce so that he could rent a car. [Tr. 4272, 4434]

Woodard and Pierce then returned to Woodard's trailer in the rental vehicle (a white Subaru), and picked up three bags containing the clothes and tennis shoes Woodard had worn during the robbery, the non-cash items that were stolen (food stamps, checks, etc.), and Woodard's Glock, extra clips, and ammunition. [Tr. 4436-39] They then drove to a gravel pit near Eklutna where they burned the clothing and non-cash items in an old car frame. [Tr. 4440-42, 5283] Woodard and Pierce next drove to the Knik River where Woodard dismantled the .10-millimeter Glock and threw the pieces, extra ammunition, and clips into the river. [Tr. 4443-45, 5283] Woodard told Pierce he was going to purchase another .10-millimeter Glock as soon as possible so no one would think it was strange that his was missing. [Tr. 4445-46] Woodard then drove Pierce

back to the trailer and gave him $500 from the proceeds. [Tr. 4447] Woodard said VanHousen would be very upset that the guard had been murdered, and said he planned to contact VanHousen and pay him $3,000. [*Id*.] During the day, Woodard fully described the events of the murder and robbery to Pierce. [Tr. 4454-57]

Woodard met VanHousen outside his home later on June 8th, told him he obtained only $14,000 to $16,000 in the robbery, gave him $3,000 from the proceeds, and said the $3,000 ought to be enough for VanHousen to keep his mouth shut. [Tr. 5283-85] Woodard described the murder and robbery in detail to VanHousen, said that he and Pierce had burned the physical evidence, that he had thrown the murder weapon in a river, and that he was buying a new .10-millimeter Glock and other weapons. [Tr. 5284]

On June 9, 1992 between 5:50 a.m. and 7:45 a.m., Woodard telephoned eight weapons dealers. [Tr. 7671-77] He then went to the post office, obtained five money orders, and mailed them to four gun dealers. [*Id*.] One of the weapons he ordered was the replacement .10-millimeter Glock. [*Id*.] He and Pierce then picked up the binoculars, transmitter, and scanner from the location where Pierce had stashed them. [Tr. 4460]

Later on June 9th, Woodard purchased a big screen TV and speakers from Magnum Electronics with $3,097 in cash. [Tr. 7004-09] He then went to

the Sun Factory, Karl Bohlin's business, where he repaid the $1,800 loan with currency in large denominations.  [Tr. 5922, 5924, 5930, 5957, 6495]  Woodard then paid $241 in cash to redeem a shotgun he had pawned on May 30, 1992. [Tr. 7046-47]

On June 11th, Woodard ordered several additional guns.  [Tr. 7004-09] At approximately 9:00 p.m. that night, VanHousen, who had been contacted by the police and was ostensibly cooperating with them (but had not revealed the extent of his own involvement in the crimes), telephoned Woodard in an attempt to set up a meeting with him.  [Tr. 5355-56]  VanHousen told Woodard that he needed to talk with him and, while the officers were recording their conversation, asked if they could meet somewhere:

> Woodard:    Just a second, hold on – is this super bad, Dave?
>
> VanHousen:      I'd rather not talk about it over the phone.
>
> Woodard:    Does it have to do with this?
>
> VanHousen:      Oh what?
>
> Woodard:    The thing.
>
> VanHousen:      What thing's that?
>
> Woodard:    Oh, the thing.
>
> VanHousen:      What thing?
>
> Woodard:    You know –

> VanHousen:        No I don't know – tell me.
>
> Woodard:     Hn – OK.

[Exh. 6 at 30-31]

When VanHousen, wearing a recording device ("wire"), met Woodard on the evening of June 11th behind the Northway Mall in Woodard's car.  [Tr. 5355, 5727-30]  VanHousen signaled Woodard that he was "wired" by gesturing and by mouthing the word "wired."  [Tr. 5355, 5727-30]  While VanHousen was in Woodard's car, Woodard engaged in "counter surveillance driving."  [Tr. 7242-46]   He drove across an open field, across curbs, retraced his path, and alternately drove fast and slow.  [*Id.*]

After Woodard dropped VanHousen off at the Northway Mall, he drove to Karl Bohlin's house in Stuckagain Heights.  [Tr. 5969-73, 7246-48]  Woodard told Bohlin he thought the drug dealers he had ripped off were watching him, that he needed to hide the proceeds for awhile, and that he needed guns.  [Tr. 5969-73]   Bohlin agreed to go to Woodard's trailer to get Woodard's money and guns for him, and Woodard drew a map of the room in his trailer showing the location of the money.  [Tr. 5971]

Bohlin then drove from his Stuckagain Heights home to Woodard's Penland Park trailer in his (Bohlin's) car.  [Tr. 5973, 7248-49]  Woodard, who by this time was aware that a Maroon van parked near his home was likely

conducting surveillance, hid in the back of Bohlin's car. [Tr. 5974] Bohlin entered Woodard's trailer, told Sara Wiggers that he needed to borrow a gun because he and Woodard were going shooting the next day, and picked up the money and guns. [Tr. 5975] Bohlin took the money, which was in two white plastic Safeway bags, and the guns, which he placed in a gun case, and left the trailer. [Tr. 5975] As Bohlin drove away from the trailer, Woodard asked him whether the maroon van was still parked near the trailer. [Tr. 5976] Bohlin saw the van and told Woodard it was there. [*Id.*]

When Bohlin and Woodard returned to Bohlin's home, Woodard borrowed a gun case from Bohlin, placed $1,500 under the foam lining in the case, and placed the guns he had asked Bohlin to retrieve in the case. [Tr. 5978-79, 7248-49] He told Bohlin to hide the rest of the money and not to look at it. [Tr. 5980] Bohlin hid the money. [Tr. 5981-82] Woodard then drove home and entered his trailer carrying two gun cases. [Tr. 6688, 7250]

On June 12, 1992, Woodard purchased four new tires for Wigger's white Honda from Johnson's Tire Service and had them installed for a total of $322 in cash. [Tr. 7012-18, 7088-90]

On Monday, June 15th, Woodard visited Bohlin at the Sun Factory. Woodard patted Bohlin on the chest as if he was looking for a wire, told Bohlin that a Ramcharger, which he believed was an undercover police vehicle, had

followed him to Wasilla the previous weekend, and asked Bohlin to identify people who walked past the tanning business.  [Tr. 5997-6002, 6076]

On Tuesday, June 16th, Woodard gave Pierce $500 in cash.  [Tr. 4466]  Woodard said the $500 would have to hold Pierce for awhile because he no longer had access to the cash – that he had hidden it.  [*Id*.]  Later that day Woodard received some of the guns he ordered including the new .10-millimeter Glock.  [Tr. 6048]

At six o'clock p.m., the police went to Woodard's home.  [Tr. 7486-88]  Woodard made arrangements to meet them at the station later.  [*Id*.]  When Woodard went to the station, the police searched the white Honda and Woodard and seized two pairs of sunglasses.  [Tr. 7488-90]  Woodard had $253 in currency in his wallet.  [Tr. 7488]  The police searched Woodard's home and found the binoculars, the scanner-receiver, and the transmitter that had been used in the crimes.  [Tr. 4420-21, 6811]

After the police searched Woodard's home, they searched Bohlin's home.  The money Woodard gave Bohlin to hide – $30,297.89 in currency and coins – was found in a crawl space.  [Tr. 6026, 7050-62, 7175-7189]  Woodard's fingerprint was found on a $100 bill, and a hair similar to Woodard's was with the money.  [Tr. 7190-92, 7195, 7327, 7329]  Bohlin, who was cooperating, gave the police the videotape that showed Woodard shooting the Glock.  [Tr. 6027-31]

On June 17, 1992, the police, who had learned that they overlooked an area underneath the trailer, searched Woodard's home a second time. [Tr. 6813]  The police found plastic Safeway grocery bags and located a trap door which led to a crawl space which contained a marijuana grow operation, a flak vest, and the gun case Bohlin had lent Woodard. [Tr. 6813-14, 6816, 7262-66] Woodard was arrested by the FBI for drug and weapons offenses. [Tr. 4498]

On June 20, 1992 Pierce went to Eklutna with police officers and showed where he and Woodard had set fire to and burned Woodard's clothing and the non-cash items. [Tr. 4041-42, 4501-02]  Remnants of the tread pattern of a shoe or sneaker, zipper parts, possible canvas remnants, and paper that was not completely burned was recovered. [Tr. 5068-80]  Portions of a Loomis book, food stamps, and portions of two Carrs customers' checks dated June 7, 1992, were also identified in the ashes. [Tr. 5124-47]

3.    Proceedings in state court

Woodard was indicted for first-degree murder, second-degree felony murder, and one count of first-degree robbery for the June 8, 1992 offenses at Carrs. [Exh. 2]  In the same indictment, Woodard was charged with first-degree robberies of the Fireweed Theatre on April 26, 1992, and Chilkoot Charlie's on May 24, 1992. [Exh. 2; GJ Tr. 12, 542]  The Fireweed and Chilkoot charges were severed.

At a jury trial, which began on March 25, 1993, and ended two months later on June 7, 1993, Woodard was acquitted of first-degree murder but convicted of second-degree felony murder and first-degree robbery. [Tr. 9084-85] Woodard was sentenced to an unsuspended term of 66 years for the second-degree murder but he was not sentenced for the first-degree robbery. [Exhs. 1, 5; Tr. 9658] At this time, the Fireweed Theatre and Chilkoot charges were dismissed.

On direct appeal, Woodard advanced several grounds for relief. [Exh. 3, 4] The Alaska Court of Appeals affirmed and directed Judge Hunt to impose a separate sentence on Woodard for first-degree robbery. [Exh. 5 at ] Judge Hunt imposed a concurrent sentence. [Exh. 1]

Woodard filed a petition for hearing in the Supreme Court of Alaska. [Exh. 6] The petition was considered by four justices and denied. [Exh. 7] (Justice Bryner, who had sat on the case in the court of appeals and dissented from that court's decision, was excused.) Two justices voted to consider Woodard's claim that he should have been permitted to introduce the surreptitiously recorded conversations of Woodard's protestations of innocence after VanHousen had told him that he was wired. [*Id.*] One justice voted to consider Woodard's claim that Judge Hunt had erred in excluding evidence that VanHousen and Pierce flunked polygraph examinations. [*Id.*]

Woodard next filed a post-conviction application claiming, among other things, that the state had improperly failed to provide exculpatory information concerning William Turlington, the informant whose lawyer told the police to check out David VanHousen.  [Exh. 8]  Judge Joel Bolger held an evidentiary hearing to resolve the claims in the petition, made factual findings adverse to Woodard's claims, and denied relief.  [Exh. 9]  Woodard appealed. [Exh. 10, 11]  The Alaska Court of Appeals affirmed.  [Exh. 12]  Woodard again filed a petition for hearing with the Supreme Court of Alaska.  [Exh. 13]  It was denied.  [Exh. 14]

        4.      Proceedings in federal court

Woodard's petition for writ of habeas corpus includes 11 claims. [Docket No. 1]  (The petition lists 12 grounds for relief, but it does not include a ninth Ground.  [*Id*.])  Counsel was appointed to represent Woodard.  [Docket No. 5]  Appointed counsel filed an amended petition which advances all of the claims filed by Woodard and asserts in addition that Woodard was restrained with visible shackles during the trial.  [Docket No. 33]  Counsel also filed Woodard's affidavit and the affidavit of a family friend, M.J. Shorthill.  These affidavits assert that the restraints were visible to the jury.  [Docket Nos. 34-37]

        5.      Answer to Woodard's individual claims

        *1.      Ground one*

***The claim:*** In his first claim, Woodard alleges that his conviction was obtained in violation of his "right to due process" on account of the testimony at his trial of Robin Conaway, a Carrs employee, who identified him at trial as the perpetrator of the robbery and murder. [Docket No. 1 at 3-4; Tr. 3503, 4456-57] Woodard alleges that Conaway was an "unreliable" witness. He claims in particular that (1) Conaway had an insufficient opportunity to view him, (2) Conaway's original description did not match him, (3) Conaway's description matched Woodard only after she saw his photograph and read his description in the newspaper, and (4) the photographic lineup presented to her by the police was suggestive and shown to her after television and newspaper stories had been published concerning Woodard. [Docket No. 1 at 3-4]

To state a cognizable claim for federal habeas review, a prisoner must allege that he is in custody "in of the Constitution or laws . . . of the United States," 28 U.S.C. § 2254(a), because "federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (internal quotation marks omitted). Woodard's allegation that his right to "due process" was violated is problematic as it does not identify the provision in the federal constitution upon which he relies. *See Duncan v. Henry,* 513 U.S. 364, 366, 115 S.Ct. 887, 888 (1995) ("If a habeas petitioner wishes to claim that [a ruling in a state court] violated the Fourteenth

Amendment, *he must say so . . . in federal court*" (emphasis supplied)).

**Exhaustion:**  If Woodard's petition is viewed as asserting a violation of his Fourteenth Amendment right to due process, he did exhaust a portion of his present claim: factual claims (1), (2), and (3) listed above were included in his first petition for hearing in the Supreme Court of Alaska.  [Exh. 6 at 11-12] Woodard cited decisions of the United States Supreme Court applying the Due Process Clause to eyewitness identification.  [*Id.*]

But Woodard did not allege in the petition for hearing that the photographic lineup was suggestive or that it was shown to Conaway after she had seen Woodard's photograph and description in the media or that he was entitled to relief for that reason.  [Exh. 6 at 11-12]  The claim the lineup was suggestive accordingly has not been properly exhausted but is procedurally barred because Alaska will no longer consider it.  (It should also be noted that Judge Hunt suppressed Conaway's identification of Woodard in the lineup.)

**Merits:**  Respondent denies that Woodard is entitled to relief on this claim.  The trial judge, Karen Hunt, determined that Conaway's photographic identification of Woodard was tainted because a photograph Conaway had seen of Woodard in the Anchorage newspaper suggested that he was guilty, and because she had read the accompanying article which said he was a suspect in the Carrs robbery/murder and that Woodard matched the physical

characteristics of the shooter.  [*See* Exh. 5 at 19]   However, Judge Hunt concluded that Conaway's in-court identification of Woodard was reliable despite her exposure to the news coverage.  [*Id.*]

In reaching her conclusion that Conaway could make an in-court identification, Judge Hunt applied the five factors listed in *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct.  2243, 2253  (1977), and determined that the identification was reliable and admissible under due process standards despite the news coverage.  [*See* Exh. 5 at 19-20]

The Alaska Court of Appeals[2] then independently and correctly determined that Conaway's identification was sufficiently reliable to be admitted at trial.  [Exh. 5 at 21]  All pertinent factual findings are presumed to be correct; Woodard cannot show by clear and convincing evidence that any pertinent factual finding is incorrect.  *See* 28 U.S.C. § 2254(e)(1).  Further, he cannot show the decisions of the Alaska courts were "based on an unreasonable determination of the facts in light of the evidence presented in the Sate court proceeding.  28 U.S.C. § 2254(d)(2).

In order to obtain habeas relief on this (or any other) claim, Woodard must demonstrate that the state court's decision was "contrary to, or involved an

---

[2]      Habeas courts reviewing a state court's summary denial of a habeas petition, "look through" the summary disposition to the last reasoned decision. *See Shackleford v. Hubbard,* 234 F.3d 1072, 1079 n. 2 (9th Cir.2000) (citing *Ylst*

unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court's decision involves an "unreasonable application" of Supreme Court precedent if the state court "identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 1523 (2000); *see also Lockyear v. Andrade*, 538 U.S. 63, 71-77, 123 S.Ct. 1166, 1172-75 (2003). A state court's decision is "contrary to" Supreme Court precedent only "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 412-13, 120 S.Ct. at 1523.

Woodard has not shown, and cannot show that the decision of the Alaska Court of Appeals was contrary to, or involved an unreasonable application of Supreme Court precedent. In addition, Woodard cannot satisfy his burden to show that the alleged due process violation resulted in "actual prejudice" – that it would had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795, 121 S.Ct.

v. *Nunnemaker*, 501 U.S. 797, 804-05, 111 S.Ct. 2590, 2595 (1991)).

1910, 1919-20 (2001); *Brecht v. Abrahamson*, 507 U.S. 619, 637-38, 113 S.Ct. 1710, 1722 (1993).

    2.    *Ground two*

    ***The claim:***    Woodard's second claim is that exclusion of five surreptitiously recorded conversations between himself and VanHousen (after VanHousen told Woodard that he was "wired") violated his rights to "due process, confrontation, and compulsory process." [Docket No. 1 at 5-6] He claims the five tape recordings "would have been used at trial" (1) to put his reference to "the thing" (during the surreptitiously recorded telephone call that occurred before VanHousen told Woodard he was wired) "into a non-incriminating context," (2) to impeach police testimony indicating Woodard's conduct (*e.g.* counter-surveillance driving) displayed a consciousness of guilt, (3) and to impeach VanHousen's testimony that he "tipped off" Woodard during the second conversation that he was wired. The allegations are again problematic because Woodard has failed to identify the specific provisions in the federal constitution that he contends were violated.

    ***Exhaustion:***    Woodard did not properly exhaust this claim because he did not raise it as a federal claim in the Supreme Court of Alaska. However, since the Alaska courts will no longer consider it, it is procedurally barred.

    ***Merits:***    The respondent denies that Woodard is entitled to relief on

this claim. Woodard argued at trial that he should be permitted to summarize the Woodard/VanHousen statements on the tapes; he asserted that the summary, if not the statements, were admissible as "verbal acts" and to show his state of mind. [*See* Exh. 5 at 32, 63-66] Woodard also filed a memorandum arguing that the details of the conversations – VanHousen's repeated assertions that Woodard was guilty – were admissible to explain his conduct, *i.e.*, to negate the state's claim that he had been acting "guilty" during the time that VanHousen was attempting to elicit admissions from him. [*See* Exh. 5 at 65]

Judge Hunt permitted Woodard to show through cross-examination of VanHousen that Woodard had not given VanHousen "a dime" despite his request for some of the stolen money in order to leave town (which was made during the last "wired" VanHousen/Woodard conversation). [*See* Exh. 5 at 32, 65] However, Judge Hunt excluded Woodard's statements because they were not spontaneous and excluded VanHousen's statements because they were not verbal acts. [Exh. 5 at 63, 65-66] Judge Hunt found that Woodard "had time to reflect and a motive to fabricate before he made the statements" and found that the statements were not verbal acts. [Exh. 5 at 33, 65-66] She relied upon *Brannen v. State*, 798 P.2d 337, 340 (Alaska App. 1990), where the court had ruled that a defendant's self-serving statements are hearsay and inadmissible. [*Id.*]

In the majority opinion, Judge Coats concluded that the exclusion of the statements was not an abuse of discretion and that Woodard had failed to show that the statements were admissible for a non-hearsay purpose or that they were admissible under a hearsay exception.  [Exh. 5 at 33]

In his concurring opinion, Judge Mannheimer said that Judge Hunt should have permitted Woodard to show that Vanhousen had failed to elicit an admission from Woodard that he knew of or participated in the robbery and murder.  [Exh. 5 at 64]  Judge Mannheimer agreed that Woodard's protestations of innocence were inadmissible to show his innocence and that they were not verbal acts.   [Exh. 5 at 66-67]   However, he concluded that VanHousen's statements were admissible to show how the accusations might have affected Woodard's behavior – that VanHousen's accusations were relevant to explain why Woodard "acted guilty."  [Exh. 5 at 67-68]

Judge Mannheimer also concluded that the exclusion of VanHousen's statements was harmless error.  First, Woodard was allowed to show that he "was peculiarly unresponsive" when VanHousen, his friend and accomplice, asked for money to leave town.  [Exh. 5 at 68]  Second, Woodard was able to elicit exactly the same statements that Woodard made through Sean Pierce during a telephone call after the police searched Woodard's house.  Pierce testified Woodard told him, "I haven't done anything," "I'm innocent of the Carrs

robbery," and he "was innocent."  [Exh 5 at 68-69]  Third, Woodard's trial attorney was able to argue plausibly that VanHousen's attempts to obtain admissions from Woodard had made him suspicious and that Woodard's suspicion was a perfectly natural reaction to what VanHousen had been saying to him.  [Exh. 5 at 68-69]

All pertinent factual findings are presumed to be correct; Woodard cannot show by clear and convincing evidence that any pertinent factual finding is incorrect.  *See* 28 U.S.C. § 2254(e)(1).  Further, he cannot show the decisions of the Alaska courts were "based on an unreasonable determination of the facts in light of the evidence presented in the Sate court proceeding.  28 U.S.C. § 2254(d)(2).

The state denies that exclusion of the five tapes violated Woodard's federal constitutional rights.  Woodard has not shown and cannot show that the decision of the Alaska Court of Appeals was contrary to, or involved an unreasonable application of United States Supreme Court precedent.

In addition, exclusion of this evidence was at most harmless error. Woodard cannot satisfy his burden to show that the alleged due process violation resulted in "actual prejudice" – that it would had a substantial and injurious effect or influence in determining the jury's verdict.

3.    *Ground three*

*The claim:*  Woodard's third claim is that Judge Hunt's refusal to permit him to use evidence that VanHousen and Pierce had taken polygraph examinations violated his rights to "due process, confrontation, and compulsory process."  [Docket No. 1 at 7-8]  He states that he was precluded from questioning VanHousen's and Pierce's demeanor, conduct, reactions and statements made in response to questions before, during, and after the examinations, all of which he asserts would have been used to impeach the credibility of those witnesses and to show their bias.  [Docket No. 1 at 8]  He alleges the evidence would show (1) VanHousen's and Pierce's bias and impeach their credibility, (2) impeach the credibility and expose the bias of state investigators and prosecutors who condoned VanHousen's and Pierce's dishonesty so long as they continued to incriminate Woodard, (3) show the prosecutors' conduct of "redrafting or not violating the plea/cooperation agreements of VanHousen or Pierce for failing to pass polygraph exams as agreed in their plea/cooperation agreements."  [Docket No. 1 at 8-9]

The allegations are again problematic because Woodard has failed to identify the specific provisions in the federal constitution that he contends were violated.

*Exhaustion:*  In the Supreme Court of Alaska, Woodard asserted the jury was not informed that Pierce (1) flunked polygraphs and (2) violated his

agreement and risked a maximum 224-year sentence. [Exh. 5 at 7] He asserted that VanHousen's first agreement required him to pass a polygraph and that he flunked it and that the state then rewrote the agreement omitting the requirement that he pass the polygraph. [Exh. 5 at 7] He claimed the jury was not told VanHousen "only came up with a new story which incriminated Woodard to a much greater extent after he had flunked the polygraph and risked losing his deal." [*Id.*] Woodard cited *Braham v. State*, 571 P.2d 631 (Alaska 1977), and asserted: "Exclusion denied Woodard his right to confront and cross examine them. It was error of constitutional dimension. *See, United States v. Lynn*, 856 F.2d 430 (1st Cir. 1988)."

The claims asserted in the petition for hearing are probably exhausted as Woodard not only identified his right to confront and cross-examine witnesses but also cited *Lynn*, a federal case, which holds that "cutting off all cross-examination into a relevant and not fully-explored area" impaired the constitutional right to confront and cross examine witnesses. *Lynn*, 856 F.2d at 434 (citing *Delaware v. VanArsdall*, 475 U.S. 673, 678-80, 106 S.Ct. 1431, 1435 (1986)).

***Merits:*** The respondent denies that Woodard is entitled to relief on this claim. In the trial court, Woodard presented authority holding that a failure of a polygraph examination could be admissible if the taking of a test was part of

an agreement. [See Exh. 5 at 71-73]  Judge Hunt chose not to follow it as Woodard had numerous other ways of attacking Pierce's and VanHousen's credibility and because polygraph evidence is more prejudicial than probative. [*Id*.]

Judge Coats concluded that "Judge Hunt fully allowed Woodard to establish Pierce's and VanHousen's bias." [Exh. 5 at 37]  The judge pointed out that polygraph examinations are generally inadmissible, that Woodard was able to show Pierce had not fulfilled all the conditions of his agreement and that VanHousen had failed to fulfill a condition of his first agreement, and that both men were worried about staying in the state's good graces. [Exh. 5 at 37]

In his concurring opinion, Judge Mannheimer analyzed the question of whether Judge Hunt erred in refusing to grant Woodard's request to admit the polygraph results.  After thoroughly exploring Woodard's arguments, Judge Mannheimer concluded that Judge Hunt did not abuse her discretion in excluding the evidence. [Exh. 5 at 70-80]

Woodard had argued Pierce's failure of the test was relevant because his plea agreement required him to pass the test so he was at the mercy of the state. [Exh. 5 at 70-71]  He argued that VanHousen's failure was admissible because he was free to modify his testimony at will as his plea agreement had been modified so he was not required to take a polygraph. [*Id*.]

Judge Mannheimer found that Woodard had clearly made the point both in cross-examination and in final argument that the police could accuse Vanhousen and Pierce of lying and force them to change their stories and that this goal was accomplished without mentioning the polygraph results. [Exh. 5 at 74-75] The judge pointed out the parties had stipulated that both Pierce and VanHousen had failed to fulfill an unspecified condition of their plea agreements, that Woodard had shown while cross-examining Pierce that he could be incarcerated for the rest of his life if the state revoked its agreement with him, and that the state could revoke Pierce's agreement at any time because he had already breached it. [Exh. 5 at 76]

The situation was basically the same with respect to VanHousen. VanHousen admitted on cross-examination that he had violated his plea agreement by lying to the police so the state had the power to unilaterally revoke his plea agreement as well. [Exh. 5 at 76-77]

Judge Mannheimer then pointed out that *United States v. Lynn*, 856 F.2d 430 (1st Cir. 1988) (which holds that failure to pass a polygraph was admissible when an informant is required to take and pass one) was both wrongly decided and distinguishable: (1) it was wrongly decided because *Lynn* rests on the mistaken premise that polygraph evidence is admissible to show a person is lying (polygraph evidence is not admissible for that purpose); (2) it was

wrongly decided because *Lynn* rests on the mistaken factual premise that it is fundamentally unfair for the government to inform a jury of the requirement that the informant pass the polygraph and then prevent the defense from showing the informant had flunked it (the *Lynn* defense had in fact introduced the plea agreement); and (3) it was distinguishable because Woodard had delved deeply into all the possible reasons why Pierce and VanHousen might have lied about Woodard's involvement.  [Exh. 5 at 78-79]

In sum, Woodard has not shown, and cannot show that the Alaska Court of Appeal's rejection of his argument that the polygraph evidence was admissible was contrary to or involved an unreasonable application of United States Supreme Court precedent.

In addition, exclusion of this evidence was at most harmless error. Woodard cannot satisfy his burden to show that the alleged constitutional violation resulted in actual prejudice – that it would have had a substantial and injurious effect or influence in determining the jury's verdict.

4.    *Ground four*

**The claim:** Woodard's fourth claim is that Judge Hunt's refusal to permit him to use all four rather than one of the Anchorage newspaper photographs of Woodard to impeach and confront Conaway's testimony violated his right to due process, confrontation, and compulsory process. [Docket No. 1 at

10]  Woodard asked that the three additional photographs be admitted after Conaway denied she had viewed close-up photographs of him before the photographic lineup was shown to her.  [*Id*.]  Woodard alleges that Conaway was a Daily News home delivery subscriber and that she had access to the photographs at work because they were in open view in the break room at Carrs. [*Id*.]  Woodard alleges that Conaway's description of him was initially different than Woodard's appearance and that it changed after her exposure to the pictures.  [Docket No. 1 at 10-11]  Woodard's allegation that his rights to due process, confrontation, and  compulsory process were violated is problematic as it does not identify the provisions in the federal constitution upon which he relies.

　　　　*Exhaustion:*  Woodard failed to assert this claim as a federal constitutional claim in either the Alaska Court of Appeals or in the Alaska Supreme Court.  The claim is not properly exhausted.  Alaska courts will no longer consider this claim.  In addition, the claim is procedurally barred.

　　　　*Merits*:  The respondent denies that Woodard is entitled to relief on this claim.  Conaway admitted seeing the full-body profile of Woodard that was published on June 19, 1992.  [*See* Exh. 5 at 38]  She denied that she had seen the June 24, July 8, and July 21, 1992 head-on photographs that were available in the Carrs break room.  [*Id*.]

　　　　Judge Coats concluded the exclusion of the three photographs was

not error because they were of marginal relevance and cumulative. [Exh. 5 at 39] He stated Woodard was able to effectively show the shakiness of Conaway's identification, that it had been tainted by at least one photograph in the paper, and that Conaway may have seen the other photographs so that the three additional photographs themselves would have had little additional value. [*Id.*]

Judge Mannheimer concluded that Judge Hunt had erred in excluding the three photographs as Woodard has established a reasonable inference that Conaway might have seen the photographs. [Exh. 5 at 84-85] However, Judge Mannheimer concluded that the error was harmless (1) because the jury knew the other photographs had appeared in the newspaper and were potentially available to Conaway, (2) Conaway had tentatively identified Woodard from the June 19th photograph which had been published in conjunction with a story about Woodard's arrest for growing marijuana (so that it was clear that the text in the newspaper did not influence her identification), (3) the defense had "plenty of evidence to attack Conaway's identification, and (4) Woodard's attorney argued convincingly that Conaway's identification was tainted. [Exh. 5 at 85-88]

Woodard has not shown, and cannot show that Judge Coats' conclusion that exclusion of the evidence was not error or that Judge Mannheimer's conclusion that the exclusion of this evidence was harmless was

contrary to, or involved an unreasonable application of, United States Supreme Court precedent.

In addition, Woodard cannot satisfy his burden to show that the alleged constitutional violation resulted in actual prejudice – that it would had a substantial and injurious effect or influence in determining the jury's verdict.

5.   *Ground five*

***The claim:***  Woodard claims that exclusion of the June 25, 1992 videotaped police interview of VanHousen violated his right to due process, confrontation, and compulsory process.  [Docket No. 1 at 12-13]  Woodard alleges the tape would show that police threatened and pressured VanHousen to incriminate Woodard and thereby impeached his credibility and exposed his bias.  [Docket No. 1 at 13]  Woodard's allegation that his right to "due process" was violated is problematic as it does not identify the provision in the federal constitution upon which he relies.

***Exhaustion:***  In the Alaska Court of Appeals and in the Supreme Court of Alaska, Woodard argued that the exclusion of this evidence violated Alaska evidence law, not any federal constitutional provision.  [Exh. 3 at 79-82; Exh. 6 at 10-11]  The claim was not properly exhausted.  In addition, Alaska courts will no longer consider this claim.  As a result, the claim is procedurally barred.

**Merits**:  The respondent denies that Woodard is entitled to relief on this claim.  Judge Coats, joined by the two other members of the court,[3] pointed out that VanHousen fully admitted in his testimony that he felt pressured and intimidated during the interview and that he confessed his involvement when told he might be charged with murder if he did not cooperate.  [Exh. 5 at 34-35] The court concluded that the Judge Hunt did not abuse her discretion in ruling VanHousen's admission that the police had pressured and intimidated him was sufficient to show his bias.  [Exh. 5 at 36]

Woodard cannot show that exclusion of VanHousen's police interview was contrary to, or involved an unreasonable application of, United States Supreme Court precedent.

In addition, Woodard cannot satisfy his burden to show that the alleged constitutional violation resulted in actual prejudice – that it would had a substantial and injurious effect or influence in determining the jury's verdict.

6.    *Ground six*

**The claim:**  Woodard claims that his conviction was obtained by use of evidence gained pursuant to unconstitutional searches and seizures by state and federal authorities and that he was denied a full and fair opportunity to present the issue in state court.  [Docket No. 1 at 14]  He argues that the

---

[3]    Woodard mistakenly asserts that Chief Judge Bryner dissented on this issue.  [Docket No. 1 at 13]

evidence – including the surreptitious tape recording of the telephone conversation between VanHousen and Woodard (Woodard's incriminating use of the words, "the thing"), firearms, clothing, and his military flak vest was improperly admitted at trial. [*Id.*] He claims the police made numerous "intentional and/or reckless misstatements or omissions" in order to secure search warrants used to seize the foregoing evidence, that he was denied an evidentiary ("*Franks*") hearing, that the state government intentionally or recklessly failed to disclose they knew VanHousen lied about his role in the murder and robbery in that they knew he had set it up, and that the state's knowledge of VanHousen's role could have led to suppression of the evidence listed above. [Docket No. 1 at 15] (The latter claim attempts to incorporate the claim (made in post-conviction proceedings in state court) that the state improperly failed to disclose various matters concerning the informant (William Turlington) who tipped off the police that VanHousen was possibly involved in the murder and robbery.)

The allegations in this ground are again problematic because Woodard has again failed to identify the specific provisions in the federal constitution that he contends were violated.

**Exhaustion:** The claims included in this ground for relief are were not properly exhausted since Woodard did not adequately assert a federal claim

in state court.    Alaska courts will no longer consider them.    They are procedurally barred.

      ***Merits:*** The respondent denies that Woodard is entitled to relief on this claim. Woodard contended in the trial court that VanHousen lied at two search-warrant application hearings when he said that he was a well-intentioned citizen and when he denied and minimized his personal involvement in the murder and robbery. [*See* Exh. 5 at 9] Judge Hunt found that VanHousen was not a government agent so that his false testimony at the search-warrant application hearings was not grounds for invalidating any of the search warrants that had been issued. [*See* Exh. 5 at 10] She also found that none of the alleged false statements or alleged material omissions by the state – the prosecutor and police – were designed to mislead the issuing judge (Superior Court Judge Elaine Andrews) and that the statements and alleged omissions were also immaterial. [*See* Exh. 5 at 10-11] Judge Hunt concluded that Woodard had not made the requisite showing to require an evidentiary hearing. [*See* Exh. 5 at 10]

      Judge Costs concluded that Judge Hunt's findings were supported by the record and that the findings supported Judge Hunt's decision to deny Woodard's request for an evidentiary hearing. [Exh. 5 at 10] Judge Coats agreed that the fact that the state had given VanHousen immunity before the second search-warrant application hearing did not make him a "state agent" and

pointed out the state had nothing to gain from VanHousen's false statements. [Exh. 5 at 12]  The judge pointed out that VanHousen's lies concerning his knowledge and involvement weakened the state's showing of probable cause while truthful testimony strengthened the state's case.  [*Id.*]  Judge Coats concluded Judge Hunt could properly find that Woodard's other claims concerning alleged misconduct by the state had little merit and concluded that she did not err in denying Woodard's motion without holding an evidentiary hearing.  [Exh. 5 at 13]

Judge Mannheimer concurred.  He concluded that when a defendant alleges the police have intentionally misrepresented the facts in search warrant application, the trial court need not hold an evidentiary hearing unless the defendant presents a *prima facie* case (some good reason to believe) (1) the officer's statements were false, (2) the officer knew the statements were false, and (3) the false assertions are material to the finding of probable cause.  [Exh. 5 at 61]  Judge Mannheimer pointed out that Judge Hunt had found the alleged misstatements were not material to the finding of probable cause and that all three judges of the court of appeals agreed.  [*Id.*]  As Judge Mannheimer further explained, Woodard "failed to present a *prima facie* case that the challenged statements were material to the finding of probable cause."  [*Id.*]

Moreover, in *Stone v. Powell*, 428 U.S. 465, 98 S.Ct. 3037 (1976), the

United States Supreme Court held that a state prisoner is not entitled to habeas relief based on an unconstitutional search or seizure claim if the prisoner had an opportunity to fully and fairly litigate his Fourth Amendment claim in state court. *See Powell*, 428 U.S. at 494 & n.37, 96 S.Ct. at 3052-53 & n.37; *Woolery v. Arave*, 8 F.3d 1235, 1328 (9th Cir. 1993) (burden on petitioner to show he did not have a full and fair hearing on a Fourth Amendment claim in state court). The *Powell* Court concluded that the costs associated with the application of the exclusionary rule outweighed whatever marginal benefit might result from application of the rule on a collateral review that would take place after at least two levels of state-court review. *Powell*, 428 U.S. at 489-94, 96 S.Ct. at 3050-52. *See also Withrow v. Williams*, 507 U.S. 680, 687, 113 S.Ct. 1745, 1750, 123 L.Ed.2d 407 (1993) ("costs of applying the exclusionary rule on collateral review outweighed any potential advantage to be gained by applying it there"). Thus, under *Powell*, if Woodard had the opportunity for full and fair litigation of his Fourth Amendment claim in state court, habeas review is unavailable to him.

A review of the proceedings in state court indisputably establishes that Woodard had a full and fair opportunity to litigate his Fourth Amendment claim. Woodard filed motions to suppress and appealed the denial of his claims. Woodard's claim was then presented, in the form he chose, to the Alaska Court of Appeals and to the Supreme Court of Alaska. The Alaska courts held that he

had not made the required *prima facie* showing in order to obtain an evidentiary hearing despite a full opportunity to do so. Since Woodard was given the appropriate opportunity this claim is not cognizable in this proceeding unless he can show his opportunity to show he was entitled to an evidentiary hearing was unfair.

Finally, the fourth Amendment does not require that police obtain a warrant, as was the case here, when one party consents to a surreptitious recording. *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122 (1971); *Lopez v. United States*, 373 U.S. 427, 83 S.Ct. 1381 (1963).

In sum, Woodard has not shown, and cannot show that the Alaska Court of Appeal's rejection of his arguments that he was entitled to an evidentiary hearing was contrary to, or involved an unreasonable application of, United States Supreme Court precedent.

7.    *Ground seven*

**The claim:** Woodard claims that his conviction was obtained by use of evidence including firearms seized pursuant to unconstitutional searches and seizures by police. [Docket No. 1 at 17] However, Woodard does not identify in this claim what firearms were improperly seized. [*Id*.] Woodard contends seizures of firearms were based on an interpretation of 18 U.S.C. § 924(c)(1) that was "clarified" (in his favor) while his case was pending. [*Id*.]

The pertinent statute, 18 U.S.C. 924(c)(1), created the offense of "us[ing] or carr[ying]" a firearm "during and in relation to . . . drug trafficking crime . . . ." In *Bailey v. United States*, 516 U.S. 137, 147-51, 116 S.Ct. 501, 508-09 (1995), the Court construed "use" to require proof of active employment of a firearm.

Woodard's allegations are problematic because he has not identified what provision in the federal constitution was violated.

**Exhaustion:** Woodard did not argue in the Alaska Court of Appeals that 18 U.S.C. § 924(c)(1) should be construed to require proof of active employment of a firearm or that it violated the federal constitution. [Exh. 3 at 38-39] In the Alaska Supreme Court, Woodard did not mention 18 U.S.C. § 924(c)(1), much less argue that "use" required proof of active employment of a firearm so that the seizure of the evidence at issue violated the federal constitution. [Exh. 5] Woodard did not properly exhaust this claim. Woodard can no longer bring this claim in state court. Accordingly, it is procedurally barred.

**Merits:** Since Woodard never made the claim he is making here in the state courts, neither the Alaska Court of Appeals nor the Supreme Court of Alaska passed on the merits. The state would point out that the evidence was in any event legitimately seized as evidence of a violation of 18 U.S.C. §1951 which

prohibits the obstruction of commerce by robbery and violence.

Moreover, in *Stone v. Powell*, 428 U.S. 465, 98 S.Ct. 3037 (1976), the United States Supreme Court held that a state prisoner is not entitled to habeas relief based on an unconstitutional search or seizure claim if the prisoner had an opportunity to fully and fairly litigate his Fourth Amendment claim in state court. *See Powell*, 428 U.S. at 494 & n.37, 96 S.Ct. at 3052-53 & n.37; *Woolery v. Arave*, 8 F.3d 1235, 1328 (9th Cir. 1993) (burden on petitioner to show he did not have a full and fair hearing on a Fourth Amendment claim in state court). The *Powell* Court concluded that the costs associated with the application of the exclusionary rule outweighed whatever marginal benefit might result from application of the rule on a collateral review that would take place after at least two levels of state-court review. *Powell*, 428 U.S. at 489-94, 96 S.Ct. at 3050-52. *See also Withrow v. Williams*, 507 U.S. 680, 687, 113 S.Ct. 1745, 1750, 123 L.Ed.2d 407 (1993) ("costs of applying the exclusionary rule on collateral review outweighed any potential advantage to be gained by applying it there"). Thus, under *Powell*, if Woodard had the opportunity for full and fair litigation of his Fourth Amendment claim in state court, habeas review is unavailable to him.

Woodard had a full and fair opportunity to litigate this Fourth Amendment claim in the Alaska appellate courts. He did not do, and the claim is barred by *Powell*.

In sum, respondent denies that Woodard is entitled to relief on this claim.

8.      *Ground eight*

***The claim:*** Woodard's feet were restrained by chains and one hand was handcuffed to a waist belt, over his objection, at his trial. [*See* Exh. 5 at 45, 91]  Extensive precautions were taken so that the jury could not see the restraints and would be unaware of them.  Both counsel tables were skirted, the foot chain was wrapped in cloth so it could not be heard, and the parties remained seated when the court recessed and reconvened. [*See* Exh. 5 at 90-92] Despite contentious and repeated objections to the judge's order requiring the restraints, neither Woodard nor his trial attorney voiced any claim whatsoever during or after trial that any juror had seen the restraints or that he was otherwise prejudiced.  Further, there was no motion for a mistrial or other request for relief in the trial court nor any claim on direct appeal or in the petition for hearing that the restraints had been seen by a member of the jury. [Exh. 3 at 96-97; Exh. 6 at 1-4]

Woodard's *pro se* habeas application asserts the shackling violated his right to due process, to a fair and impartial trial, to be presumed innocent, and to participate in his defense.  [Docket No. 1 at 19]  He also asserts that he was denied a full and fair opportunity to present the issue in state court.  [*Id.*]

Page 44

The *pro se* application asserts Judge Hunt ordered his restraint "in the presence of jurors," in spite of (1) his lack of a criminal record, record of resisting arrest, threats of violence, or flight, and (2) his attorney's request for a hearing (where he would have shown the restraints were, for copious reasons, unwarranted). [Docket No. 1 at 19-20]  He also appears to request "a hearing" in this court.  [Docket No. 1 at 20]

The amended petition filed by counsel alleges that Woodard was denied due process by being restrained "which was observed and realized by the jury." [Docket No. 33 at 3]  Counsel has also filed Woodard's affidavit and the affidavit of a family friend (Shorthill) purporting to show the jury was aware of the restraints.  [Docket Nos. 31, 32]

The allegations in this ground are again problematic because Woodard has again failed to identify the specific provision or provisions in the federal constitution that he contends were violated.  The respondent denies that Woodard is entitled to relief on this claim.

In particular, the state denies that the federal constitution precludes a state from restraining a defendant when the restraints are not visible to the jury.  If Woodard desires an evidentiary hearing, he should request one in the proper manner.  If the request is based on the information in the affidavits Woodard has presently filed, the state will oppose the request because the state

does not believe he is entitled to one.  The state also denies that any juror saw the restraints.

**Exhaustion:**   In state court Woodard argued only that the information available to Judge Hunt was insufficient to warrant the restraints. He never claimed that the restraints were visible to the jury.  Woodard's present claim that the jurors *saw* his restraints has not been properly exhausted and is procedurally barred because he can no longer make this claim in state court.

**Merits:**  Judge Hunt, who had access to the substantial testimony adduced at the grand jury, found that Woodard had been accused of planning and executing several armed robberies, that he is a bodybuilder with an extensive background in using paramilitary weaponry, that he faced a 99-year sentence for murder, and that the number of charges he faced made him a flight risk.  *See* Exh. 5 at 46.

Judge Coats concluded that Judge Hunt gave sufficient reasons to justify the restraints.  *Id*.  He relied upon *Stern v. State*, 827 P.2d 442, 448 (Alaska App. 1992), where the court had said a judge may order a defendant restrained if convinced that it is reasonably necessary to do so to forestall escape or to protect the safety of trial participants and spectators.  *See* Exh. 5 at 46.

Judge Mannheimer, concurring, said that the record did not adequately justify Judge Hunt's decision to restrain Woodard, but that Woodard

was not entitled to relief because he failed to demonstrate that he had been prejudiced – i.e., that is, that any juror had seen the restraints.  [Exh. 5 at 92]  Judge Mannheimer found there was nothing in the record to suggest Judge Hunt's precautions were inadequate and concluded "the jury did not know that Woodard was shackled."  [Exh. 5 at 97]  Accordingly, he found that the use of restraints was harmless.  [Exh. 5 at 98]

        In his amended petition, Woodard relies heavily on *Deck v. Missouri*, 544 U.S. 622, 125 S.Ct. 2007 (2005), which holds that visible restraints during trial violate due process in the absence of circumstances that justify their use as well as upon several Ninth Circuit decisions discussing the use of restraints during a trial.  Woodard's reliance on *Deck* and Ninth Circuit law is improper and mistaken.  The opinion in *Deck* was issued long after Woodard's 1992 trial and Ninth Circuit decisions – especially those issued prior to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 – are of no moment.  *Lockyear v. Andrade*, 538 U.S. 63, 71, 72, 123 S.Ct. 1166 (2003) ("clearly established federal law under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision").

        In addition, this ground for relief, as stated in the amended complaint, is barred by the statute of limitations.  Woodard had one year in

which to file his petition for habeas corpus. *See* 28 U.S.C. § 2254(d)(1)(A). That limitations period is tolled, however, while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." § 2244(d)(2). Woodard's first petition for hearing was denied on September 17, 1999. [Exh. 7] The first application for post-conviction relief was filed on May 3, 2000. [Exh. 8] Seven months and sixteen days of the one-year time period ran between these two dates. The petition for hearing from the denial of relief on the second petition for hearing was denied on December 29, 2004. [Exc. 14] The application for habeas corpus was filed on April 27, 2005. [Docket No. 1] Three months and additional 30 days of the one-year time period ran between these two dates. In sum, a total of eleven months and 15 days ran before Woodard filed his application.

The amended application was filed on May 15, 2006, more than a year after the original application was filed and about a year after the statute of limitations expired.

In these circumstances, Woodard's amendment of his habeas claim must "relate back" to the first *pro se* claim in order to be considered. *Mayle v. Felix*, 545 U.S. 644, ___, 125 S.Ct. 2562, 2570 (2005). Application of the relation back doctrine is in order in habeas actions so long as the original and amended petitions "are tied to a common core of operative facts" – "when the new claim is

based on the same facts as the original pleading." *Id.* at 2574 & n.7 (quoting 3 J. Moore, et.al., Moore's Federal Practice § 15.19[2], p. 15-82 (3d ed. 2004)).  The two claims here are premised on critically different sets of operative facts.  The original complaint did not allege that the jury had seen the restraints.  The amended complaint does so allege.  Therefore, while Woodard's second application stated that the jury saw the restraints, Woodard's first petition did not state this allegation as part of the operative set of facts.

        In sum, even if Woodard can show he was entitled to amend his complaint, he has not shown and cannot show that the Alaska Court of Appeal's rejection of his claim that he was unconstitutionally restrained was contrary to, or involved an unreasonable application of, United States Supreme Court precedent.   In addition, Woodard cannot satisfy his burden to show that the alleged constitutional violation resulted in actual prejudice – that the jurors saw his restraints.

    *9.*    *Ground ten[4]*

    ***The claim:*** Woodard alleges the state unconstitutionally failed to disclose evidence from and about the informant, William Turlington, who had indicated through his attorney, John Murtagh, that VanHousen was involved in the robbery/murder, and that he was denied a full and fair opportunity to

---

[4]    As aforesaid, Woodard's petition does not include a ninth ground.

present this claim in state court.  [Docket No. 1 at 22]  He claims that the state failed to disclose Turlington's past prior convictions for robbery and theft, his drug conviction, his probation violations, his plea bargain, the favorable treatment he received from the state, and his relationship with VanHousen's father.  [*Id.*]  Woodard alleges the evidence could have been used (1) to show that VanHousen and Turlington committed the robbery and murder, (2) to find other favorable evidence, and (3) to impeach the investigation.  [*Id.*]  He also states that he did not have a full and fair opportunity to present this evidence to Judge Bolger in the post-conviction action that followed his direct appeal.  [*Id.*]

The allegations in this ground are again problematic because Woodard has again failed to identify the specific provision or provisions in the federal constitution that he contends were violated.

**Exhaustion:**  The Alaska Court of Appeals rejected the claim that Judge Bolger had abused his discretion by declining to continue the post-conviction evidentiary hearing so that Woodard, who had subpoenaed the Turlington case files the night before trial, could examine the prosecutor about the files (if they were still in existence).  [Exh. 12 at 8-9]

Woodard did not claim in the state post-conviction trial court that denial of a continuance to obtain additional information from the state's archives would violate any federal constitutional right.  [*See* PCR Tr. 4-5, 139-43]

Woodard's claim that he was denied a full and fair opportunity to present evidence concerning Turlington is exhausted because the Alaska courts will no longer consider it. Accordingly, it is procedurally barred.

If Woodard is claiming alternatively and separately that the failure to disclose the information about Turlington violated his federal constitutional rights, that claim is problematic as Woodard has not identified the provision in the federal constitution that was violated.

***Merits:*** The respondent denies that Woodard is entitled to relief on any aspect of this claim. Specifically, the state denies the claim that failure to disclose more information about Turlington violated any federal constitutional right of Woodard's. Judge Bolger found that additional information at issue concerning Turlington and his plea agreement with the state did not constitute exculpatory evidence. [*See* Exh 12 at 4-5] The Alaska Court of Appeals concluded that Woodard had failed to show that Judge Bolger's findings were erroneous and rejected his claim that the further information about Turlington would have enabled him (Woodard) to show at his trial that Turlington was the perpetrator of the murder. [Exh. 12 at 4-5] The court also found Woodard had failed to show that Turlington had any material knowledge or evidence. [*Id.*]

The court of appeals ruled in addition that Turlington was a mere tipster so that the state could have properly refused to disclose his identity and

the details of his case under *Rovario v. United States*, 353 U.S. 53, 77 S.Ct. 623 (1957) (and *Schmid v. State*, 615 P.2d 565, 573 (Alaska 1980)).  [Exh. 12 at 5-8]

Woodard has not shown, and cannot show that the decision of the Alaska Court of Appeals was contrary to, or involved an unreasonable application of, United States Supreme Court precedent.  In addition, Woodard cannot satisfy his burden to show that the alleged constitutional violation resulted in actual prejudice – that it would had a substantial and injurious effect or influence in determining the jury's verdict.

10.    *Ground eleven*

***The claim:*** Woodard alleges the state failed to disclose favorable evidence – Turlington's statement that Woodard "set up" the robbery/murder and claims the information could have been used to "in search warrant proceedings, the grand jury, or trial" to exculpate Woodard, impeach VanHousen, and to support his defense that VanHousen committed or planned the murder/robbery, could have led to other admissible evidence, and could have been used to impeach the investigation.  [Docket No. 1 at 24-25]  Woodard claims again that the denial of his request for a continuance of the post-conviction action so the Turlington files could be retrieved from archives meant that he was not given a full and fair opportunity to present this evidence.  [*Id.*]

The allegations in this ground are again problematic because

Woodard has again failed to identify the specific provision or provisions in the federal constitution that he contends were violated.

**Exhaustion:** Woodard's claim that he was denied a full and fair opportunity to present evidence concerning Turlington was not make as a federal constitutional claim to Judge Bolger when Woodard asked for the continuance to obtain information from the state's archives. [PCR Tr. 4-5, 139-43] This claim is therefore not properly exhausted. Alaska courts can no longer consider this claim. The claim is procedurally barred because the request for a continuance was not based on the federal constitution.

The claim that Woodard could have used information concerning Turlington "in search warrant proceedings" was not advanced before Judge Bolger in the post-conviction action and that claim was denied on direct appeal because it had not been presented to Judge Bolger. [Exh. 12 at 4] Alaska courts will no longer consider this claim. Thus, the claim is exhausted. It is also procedurally barred.

Woodard never claimed in state court that the information could have been used to his benefit at the grand jury. This claim is not properly exhausted as it was never made in state court and in addition because Alaska courts will no longer consider it, it is procedurally barred.

The claim that the information could have been used at trial is

exhausted.

      ***Merits:*** The respondent denies that Woodard is entitled to relief on this claim. The state would first point out that Woodard has no federal constitutional right to indictment by a grand jury. *Hurtado v. California*, 110 U.S. 516, 4 S.Ct. 111 (1884). Thus a habeas claim that proceedings in a state court violated the Fifth Amendment right to be indicted by a grand jury does not allege a cognizable habeas claim. *Bae v. Peters*, 950 F.2d 469, 477-80 (7th Cir. 1991).

      The state's answer on the merits is the same as its answer to the tenth ground. Judge Bolger properly found that the information at issue was not exculpatory and Woodard was unable to show on appeal the finding that the state had not failed to disclose exculpatory evidence was erroneous. Further, as the Alaska court of Appeals found, Woodard failed to show Turlington had material information. In addition, the Court's decision in *Rovario* permitted the state not to disclose anything about Turlington to Woodard.

      Woodard has not shown, and cannot show, that the decision of the Alaska Court of Appeals was contrary to, or involved an unreasonable application of, United States Supreme Court precedent. In addition, Woodard cannot satisfy his burden to show that the alleged constitutional violation resulted in actual prejudice – that it would had a substantial and injurious effect

or influence in determining the jury's verdict.

   11.   *Ground twelve:*

   ***The claim:***   Woodard claims that the admission of a "highly prejudicial" videotape depicting him firing a shotgun during target practice violated his right to due process, confrontation, and compulsory process.  [Docket No. 1 at 26]   The allegations in this ground are again problematic because Woodard has again failed to identify the specific provision or provisions in the federal constitution that he contends were violated.

   ***Exhaustion:***   In the Alaska Court of Appeals, Woodard argued that the videotape (actually, a portion of the videotape) was improperly admitted in evidence.  [Exh. 3 at 91-93]   He made the same argument in the Supreme Court of Alaska.  [Exh. 6 at 9, 10, 14]   Woodard did not argue that admission of this evidence violated the federal constitution, much less a specific provision of it. [*Id*.]   Thus, this claim has not been properly exhausted, and since Alaska courts will no longer consider this claim, it is procedurally barred.

   ***Merits:***   The respondent denies that Woodard is entitled to relief on this claim.  In addition, Woodard cannot satisfy his burden to show that the alleged constitutional violation resulted in actual prejudice – that it would had a substantial and injurious effect or influence in determining the jury's verdict.

DATED December 4, 2006, at Anchorage, Alaska.

CRAIG J. TILLERY
ACTING ATTORNEY GENERAL

<u>s/ W. H. Hawley, Jr.</u>
   Assistant Attorney General
   State of Alaska, Dept. of Law
   Office of Special Prosecutions
     and Appeals
   310 K St., Suite 308
   Anchorage, Alaska 99501
   Telephone: (907) 269-6250
   Facsimile: (907) 269-6270
   e-mail: William_Hawley@law.state.ak.us
   Alaska Bar. No. 6702008

### Certificate of Service

I certify that on December 4, 2006, a copy of the foregoing **Response (answer) to order to show cause** was served electronically on **Hugh W. Fleischer**.

<u>s/ **W. H. Hawley, Jr.**</u>