hindering charges for his involvement in the Carrs crimes. That was further proof the court had that his earlier testimony was perjury. R. 1551. Overwhelming evidence that Mr. VanHousen lied at the search warrant hearing came through his own admissions at trial. Tr. 5314-15, 5352-55, 5519-30, 5543-48. All the defense requested was an opportunity to present that testimony at a Franks/Malkin hearing.

The court also summarily rejected the defense claim that at the time of the two hearings police and prosecutors knew or should have known about Mr. VanHousen's lies and misled the search warrant judge by presenting him as a "citizen witness." R. 1530-33. The court also decided that no hearing was required because even if misstatements were made, they were not material to a finding of probable cause.

The court's decision was wrong. First, if police recklessly withheld material evidence bearing on an informant's truthfulness, the warrant was invalid. Latham v. State, 790 P.2d at 720; citing State v. Malkin, 722 P.2d at 946. Moreover, decisions as to the mental state of those who made the misstate-ments should not be decided without a hearing. Finally, if the misstatements were intentional, suppression is required even if they were not material.

The court also denied the defense a hearing because it concluded the defense offered no evidence that Investigator Reeder's omissions and misstatements about witness descriptions of the shooter would have "altered the issuing judge's determination

- 23 -

of probable cause." R. 1535. Mr. Woodard made sufficient showing through the affidavit of defense investigator Taylor that the newspaper's description of the shooter did not match the witnesses' descriptions of the shooters. R. 1554, citing R. 271-275. See testimony of Chief Investigator Reeder admitting that what were purportedly witness descriptions in the newspaper matching Mr. Woodard did come from witnesses. Tr. 165-170. See also his trial testimony at Tr. 7608. Mr. Woodard was entitled to question at the evidentiary hearing the extent of the omissions and misstatements about the witness descriptions and whether they were intentional or made with reckless disregard for the truth.

The court made the same error in regard to the other misstatements and omissions alleged by the defense. Repeatedly, the court denied a hearing because it concluded the misinformation was not material. In so ruling, the court ignored the Malkin rule that if intentional, it was grounds for suppression even if not material. See Defendant's Response at R. 1555, citing the court's Notice at R. 1522-23, 1533, 1535, 1537, 1538, and 1541.

As Mr. Woodard pointed out in his response, at a status hearing on January 12, 1993, the parties agreed that an evidentiary hearing was required, and the court scheduled an omnibus hearing on S-1 for February 18th. At no time did the court indicate an intention to decide the portion of S-1 relating to the Franks/ Malkin issue prior to the hearing. R. 1547. Mr. Woodard was entitled to have an evidentiary hearing on this issue before the court decided it just like he was entitled to a hearing before the

Ex. 3, p. 42

court decided the other pretrial motions.

The court placed too great a burden on the defense before it would hold a hearing. Even under federal law which places the burden of proof as to the mental state of those who testified on the defense, all a defendant need do to obtain a <u>Franks</u> hearing is make a substantial preliminary showing of a violation. Repeatedly courts have reversed the refusals of lower courts to hold hearings on these kind of allegations. <u>U.S. v. Kiser</u>, 716 F.2d 1268 (9th Cir. 1983); <u>U.S. v. Stanert</u>, 762 F.2d 775 (9th Cir. 1985), <u>amended</u>, 769 F.2d 1410 (9th Cir. 1985); <u>U.S. v. Johns</u>, 851 F.2d 1131 (9th Cir. 1988); <u>U.S. v. Chesher</u>, 678 F.2d 1353 (9th Cir. 1982).

Under <u>Malkin</u>, all Mr. Woodard was required to do was make "allegations of deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." <u>Id</u>. at 946 n.5. <u>Davis v. State</u>, 766 P.2d 41, 43 (Alaska App. 1988), explained the requirements for an evidentiary hearing:

> To the extent that verified pleadings or other documents filed by the defendant in support of a motion to suppress, when coupled with opposing pleadings and documents filed by the state, leave issues of fact to be decided, an evidentiary hearing will be required.

Mr. Woodard made the requisite showing. He was not required to show the motive of those who testified for making the misstatements and omissions. That was the state's burden.

Alternative grounds for denying a <u>Franks/Malkin</u> hearing stated by the trial court was its conclusion that this type of analysis did not apply to testimony of Mr. VanHousen, a "nongovernment" witness. R. 1518-22, 1524-28. This alternative grounds was

- 25 -

incorrect for two reasons.  First, as set out above, if the state, through its prosecutors or testifying police officers, knew at the time of the hearings or, recklessly disregarded information, that Mr. VanHousen was a participant in the crimes when they held him out to be a "citizen witness", then under Latham and Malkin, suppression was required.  Second, testimony by Mr. VanHousen should have been subjected to the same scrutiny as testimony by any of the police officer witnesses.

LaFave recognized that false statements made by private persons who serve as affiants in search warrant applications "comes within...the holding in Franks."  2 LaFave, Search and Seizure, §4.4(b), at 193 (2nd Ed. 1987).  A person who testifies in person, like Mr. VanHousen, should be treated the same as someone who testifies by affidavit.  They, unlike nontestifying informants, must be held to the Franks/Malkin standard.  See People v. Born, 447 N.E.2d 426, 428-29 (Ill. App. 1983); State v. Moves Camp, 286 N.W.2d 333, 338 (S.D. 1979); Mason v. State, 375 So.2d 1125, 1129 (Fla. App 1979).

While LaFave stated that caselaw requires that all people who testify in person are subject to the Franks requirements, he questioned the wisdom of that claim.  However, he did not question, but approved of, cases where an informant's ties with the police were so substantial that, for purposes of the Franks rule, the informant was treated as if he were another officer rather than a private citizen.  2 LaFave, supra, supp., at 55 (1995).

- 26 -

In <u>United States v. McAllister</u>, 18 F.3d 1421 (7th Cir. 1994), the court decided that when a private citizen acts as a state agent, and his statements are relied on to secure a search warrant, his statements are subject to scrutiny for intentional or reckless misstatements just like the statements of police officers. <u>McAllister</u> explained that an analysis of whether, in the context of a <u>Franks</u> hearing, a private citizen should be treated as a state agent is the same analysis that is applied in other Fourth Amendment contexts to decide whether a private citizen should be treated as a state agent. <u>Id</u>. at 1417. The test is whether at the time the private citizen gave his incriminating information to the authorities, he was acting as an agent of the state. <u>Id</u>. at 1417. Federal courts deciding this issue consider whether the government knew of and acquiesced in the conduct, whether it was done to assist law enforcement, whether it was done at the request of the government, and whether the government offered a reward. <u>United States v. Walther</u>, 652 F.2d 788 (9th Cir. 1981); <u>United States v. Koenig</u>, 856 F.2d 843 (7th Cir. 1988).

In <u>State v. Thetford</u>, 745 P.2d 496 (Wash. 1987), the Washington Supreme Court held that misstatements by an informant are subject to a <u>Franks</u> analysis where the police, "instigated, encouraged, counseled, directed, or controlled" the informant's activities. <u>Id</u>. at 500. The court reasoned that if the informant's relationship with the state would be sufficient to have his conduct imputed to the state for purposes of analyzing a purportedly "private" search, then he was sufficiently an agent of the state

for purposes of having his representations scrutinized under
<u>Franks</u>.

     Alaska has not decided whether to apply the requirements
of <u>Franks/Malkin</u> to someone like Mr. VanHousen, who was recruited
by the state to work as its agent.  However, Alaska has decided in
the context of "private" searches that searches or other investiga-
tive actions undertaken at the direction of, or in conjunction
with, law enforcement are subject to constitutional scrutiny as
state actions.  <u>McConnell v. State</u>, 591 P.2d 147 (Alaska 1979);
<u>Snyder v. State</u>, 585 P.2d 229, 231 (Alaska 1978); <u>J.M.A. v. State</u>,
542 P.2d 170, 174-75 (Alaska 1975); <u>Schikora v. State</u>, 652 P.2d
473, 476 (Alaska App. 1982).  This same test for whether someone is
a state agent should apply here.

     By the time he testified, certainly by the time of the
second hearing, after he entered into a plea/immunity agreement,
Mr. VanHousen was operating as a state agent actively participating
in the investigation, supervised by Inv. Reeder.  Among many
requirements, his agreement required him to testify for the state,
to give a recorded statement, "to follow, to the letter" all
instructions given to him by prosecutors or police, to pass a
polygraph, and to wear eavesdropping equipment.  Tr. 1415-1421.

     **b.**    **There was not probable
                  cause to support the warrant.**

    Probable cause to issue a search warrant requires
sufficient proof to warrant a person of reasonable caution to
believe that a crime has been committed and that evidence of the
crime will be found in the place to be searched.  <u>Chilton v. State</u>,

- 28 -

611 P.2d 53 (Alaska 1980).  Even making all reasonable inferences in favor of the decision to issue the warrant, that standard was not met here.  By the conclusion of the hearing on June 11, 1992, the court still did not know that Mr. VanHousen was an accomplice to the crimes and still did now know about the threats and promises made to him.  However, the court did know that the previous day he had lied under oath and been granted immunity from perjury for those lies.  The court's error was its refusal to consider the impact of this new information on Mr. VanHousen's credibility.  In view of his confession to perjury, his testimony in all aspects should have been rejected as unreliable.

In addition, much of what he said was merely a general-ized claim that he "knew" Mr. Woodard was the robber.  Probable cause cannot be based on generalized, conclusory claims like this one.  Chandler v. State, 830 P.2d 789, 795-96 (Alaska App. 1992); Kvasnikoff v. State, 804 P.2d 1302, 1307-09 (Alaska App. 1991).  See also Wright, Federal Practice and Procedure: Criminal, § 670 (2d ed. 1982).  Once the unreliable information is removed, all that remains is that Mr. Woodard, along with half the male population of Anchorage, met a generalized description of the robber and several months earlier possessed a gun like that used by the robber.  That is not probable cause.  Finally, there was not probable cause to believe that the conversations would result in Jon Woodard talking about the crimes.  Mr. VanHousen's insistence that he had nothing to do with the crimes went against any inference that the two would talk about the crimes privately.

- 29 -

B.   **ISSUANCE OF SW 92-131, 92-132, 92-133, 92-134, AND 92-135 WAS UNCONSTITUTIONAL.**

   1.   **The Facts.**

   On June 16, 1992, the state went back to court to obtain these warrants to search Mr. Woodard's person, his residence, the vehicle he used and his telephone.   At a hearing, the judge incorporated and relied on the testimony of June 10 and 11.   She listened to taped conversations seized under SW-915.   R. 798-99.

   Investigator Spadafora testified about a different robbery, of a restaurant on June 7, 1992.   He testified that a witness pointed to a photograph of Mr. Woodard as the one "most like" the robber and said Mr. Woodard's voice among the three tapes he heard most resembled the robber's.   R. 802-806.   Omitted from the officer's testimony was that the witness really said, in a tape-recorded interview, the following:

   Q.   Okay.   What did the uh, guy look like?

   A.   He was a, he was a tall ethnic gentleman, he was either Mexican or Alaskan.

R. 502.   Mr. Woodard is Caucasian.   R. 563.

   Investigator Reeder summarized the taped conversations between Mr. VanHousen and Mr. Woodard.   He made allegations about Mr. Woodard's supposedly erratic driving.   Finally, he told the court about two CrimeStoppers telephone calls.   One came from someone at a gym where Mr. Woodard worked out who stated that Mr. Woodard was upset when others at the gym said he resembled a description of the robber published in the Daily News on June 14, 1992.   R. 829-30.   One was an anonymous caller who said "every-

- 30 -

thing" pointed to Mr. Woodard.   R. 837.   The state knew, but withheld from the court, the fact the police had selected from among the descriptions of the robber the features most closely resembling Mr. Woodard, added some features which witnesses did not describe but which matched Mr. Woodard, and planted that information with the press for the specific purpose of focusing attention on Mr. Woodard.   They also added two "facts" of their own manufacture which were that the suspect was a bodybuilder and had facility with firearms.   R. 204, Tr. 146, 165-69.

The court incorporated its prior findings and indicated nothing material had been added to its prior finding of probable cause.   R. 850-51.   Police executed the warrants that same night.

   2.   **The Law**.

   a.   **The warrants were tainted
            by the prior illegality**.

Preceding pages of this brief (pp. 18-29) set out the reasons why issuance of SW 92-915 was unconstitutional.   Because the information on which SW 92-915 was based and the conversations tape-recorded pursuant to it were used to obtain these warrants, they were also unconstitutionally obtained.   Inclusion of this material into the application for the above warrants violated the fundamental principle of law that "the product of an unlawful search cannot provide probable cause for the later issuance of a search warrant." Schmid v. State, 615 P.2d 565, 575 (Alaska 1980); Wong Sun v. United Stated, 371 U.S. 471 (1963).   Evidence seized pursuant to these warrants was the illegal, derivative fruit of the earlier application and search.

- 31 -

b.  **Mr. Woodard was entitled to suppression
or, at least an evidentiary hearing,
based on Franks/Malkin violations.**

In addition to the fact that the false testimony and
omissions from the hearings on SW 92-915 were incorporated into and
tainted this hearing, new misstatements and omissions came out.
Inv. Spadafora provided all the descriptive details available about
the Little Caesar's robber, except the most important one, which
was that the victim stated that the robber was someone of a
different ethnicity than Jon Woodard.  In addition, Inv. Reeder
told about the CrimeStopper tips which pointed to Mr. Woodard, but
failed to tell that those tips came in response to, and/or
concurrently with, police planted newspaper descriptions intended
to point to Mr. Woodard.  Accordingly, under the authority cited at
pp. 18-28, supra, Franks/Malkin required that evidence seized
pursuant to these search warrants be suppressed.

In the Notice of Issues discussed above, the trial court
erroneously concluded that Inv. Spadafora's misstatement was not
material so no hearing was required.  R. 1537-38.  As to Inv.
Reeder's omission of the fact that the newspaper descriptions which
likely led to the Crimestoppers calls had been planted by the
police, the court concluded the defense failed to make an adequate
offer of proof for a hearing.  R. 1539.  In its Response, the
defense pointed out that the affidavit of defense investigator
Taylor showed the different witness descriptions.  Until the
defense had a chance to question the police officers at an
evidentiary hearing, the defense had no way to obtain additional

evidence. What the police did and why they did it was not information possessed by the defense. It was patently unfair to penalize the defense because it could not present before the hearing evidence it could only obtain during a hearing. R. 1554.

### c.   There was not probable cause to issue the warrants.

This court explained in State v. Witwer, 642 P.2d 828, 831 (Alaska App. 1982), what must be shown before a court can lawfully issue a warrant to search a place other than the place where the crime was committed.

> The test of probable cause has been articulated in a number of Alaska cases. For example, in Harrelson v. State, 516 P.2d 390, 396 (Alaska 1973), the court said, "probable cause is made out when reliable information is set forth in sufficient detail to warrant a reasonably prudent man in believing that a criminal offense has been or was being commit-ted." Citing, Berger v. New York, 388 U.S. 41, 55, 87 S.Ct. 1873, 18 L.Ed.2d 1040, 1050 (1967). Where, as here, the place to be searched is not the place at which the crimi-nal activity was or is to be consummated, it is also necessary to have probable cause to believe, (1) that items which are the objects of the search are seizable by virtue of their connection with criminal activity, and (2) that the items will be found in the place to be searched.

The court recognized at the hearing on these warrants that no material information was admitted which had not previously been admitted at the hearings on SW 92-915. The tape-recorded conversations were found by the court to contain not admissions, but statements consistent with innocence. Just as there was not probable cause to issue SW 92-915, and applying the Witwer standard, there was not probable cause to issue these warrants.

- 33 -

### C.   ISSUANCE OF SW 92-137 AND SW 92-138 WAS UNCONSTITUTIONAL.

#### 1.   The Facts.

In issuing these warrants, the court relied on all the information it had been provided with at the earlier search warrant hearings. R. 964, 1058. In addition to the information summarized above in connection with issuance of SW 92-915, 131, 132, 133, 134, and 135, the court also considered the information previously provided to it to obtain SW 92-919 which authorized a search of Karl Bohlin's house. In obtaining that search warrant, the state had told the court about a number of items it had seized from Mr. Woodard's residence, vehicle, and person when police executed the earlier search warrants. R. 896, 898-900. In obtaining the warrant for Mr. Bohlin's residence, police had also described what they claimed Mr. Woodard told them in an interrogation. R. 908-920.

The court also heard testimony from Karl Bohlin. He claimed that no promises or threats had been made to him. R. 973. He stated he had been friends with Mr. Woodard for five years. R. 574. In executing the search warrant for his house, police had found a large amount of money. Mr. Bohlin claimed that Mr. Woodard gave him the money to hide, and claimed that Mr. Woodard told him that he and Sean Pierce had stolen it from drug dealers. R. 975-78.

Mr. Bohlin stated his claimed suspicion that Mr. Woodard had really obtained the money from the Carrs robbery. R. 990. He told that when he met Mr. Woodard the day before, Mr. Woodard told him he was meeting with the police to clear his name. R. 992. Mr. Woodard also told him that he had not robbed Carrs. R. 1008.

- 34 -

Ex. 3, p. 52

After that meeting, Mr. Bohlin admitted he also met with Rob Kane who paid him $4,500. R. 993. According to Mr. Bohlin, this money was a repayment of amounts he had given to Mr. Kane for some unrealized counterfeit money scheme. R. 1029-31. He said that shortly after the robbery, Mr. Woodard repaid him $1,800 loaned earlier. Mr. Woodard explained that he received the money from a worker's compensation settlement. R. 1030. Mr. Bohlin also claimed that Mr. Woodard told him at some unidentified point that there was a hole under his trailer where he kept guns. R. 1010. When the court issued the warrants, it described Mr. Bohlin as "an exceptionally credible witness". R. 1058.

    2.   **The Law.**

        a.    **The Warrants were tainted by the prior illegalities.**

The illegalites which permeated the earlier hearings were incorporated into this hearing and tainted it. Included among the illegalities were testimony from prior hearings and evidence seized pursuant to prior searches. Under the holdings of <u>Wong Sun</u> and <u>Schmidt</u>, the evidence seized pursuant to these warrants (R. 1079-90) must be suppressed.

        b.    **Mr. Woodard was entitled to suppression or, at least an evidentiary hearing, based on Franks/Malkin violations.**

Mr. Bohlin's description of how he had only heard about a trap door leading down to a hole was totally false. The truth was that in early 1992 he had been a full partner with Mr. Woodard to grow marijuana in that area. At trial, Mr. Bohlin admitted that he had lied at the search warrant hearing about his involvement.

- 35 -

Tr. 6037-45.   At Mr. Woodard's sentencing, he admitted the operation was his idea and he provided the equipment.  Tr. 9539-42. Throughout his trial testimony he admitted he lied during his search warrant testimony about almost everything.   Tr. 6088, 6169-73, 6279-86, 6307-08, 6316, 6324-25, 6328-29.  At sentencing, Mr. Bohlin claimed to be a direct participant with Mr. Woodard and Mr. Pierce in the 1992 Mat-Su drug rip-off.  Tr. 9372-86.

Mr. Woodard was at least entitled to a hearing in which to show the extent to which prosecutors or police knew about or recklessly disregarded information that Mr. Bohlin was involved in other criminal activity and knew about his other lies.  See United States v. Rule, 594 F.Supp. 1223, 1239-41, 1247 (De. Me. 1984) (failure to advise magistrate that informant was involved in other criminal activity with target of investigation invalidated the warrant).   Had the court known that Mr. Bohlin was lying to it under oath about these matters the court certainly would not have called him "an exceptionally credible witness" and would not have relied upon his testimony to issue the warrant.

### c.   There was not probable cause to issue the warrants.

The probable cause analysis presented earlier at pages 28-29, supra, applies here to invalidate these search warrants.

### D.   ISSUANCE OF FEDERAL WARRANT A92-141MJ WAS UNCONSTITUTIONAL.

#### 1.   The Facts.

On June 19, 1992, the federal court issued a warrant to search Mr. Woodard's residence for the third time based solely on

the affidavit of FBI agent Niedringhaus. R. 305-09. The affidavit relied on evidence discovered during the two earlier searches to assert that evidence of the federal offense of interference with commerce by violence (18 U.S.C. § 1951) and evidence of unspecified firearms laws might also be discovered. ¶ 3, 8, and 11. The affidavit described the robbery/shooting at Carrs, but contained no evidence to link Mr. Woodard to that crime. ¶ 3, 9, and 11. It claimed that during the earlier search, officials seized evidence of a marijuana grow operation and seized several weapons in close proximity to a trapdoor leading down to the grow operation. ¶ 5. It alleged that some unnamed source of information at some unnamed time said Mr. Woodard possessed a firearm while he possessed cocaine. ¶ 6. The affidavit pointed out that Mr. Woodard possessed a Class 1 federal firearms license and sought records regarding whether his use of the license violated federal law. ¶ 8. The affidavit listed many of the items seized during the earlier searches as showing a preoccupation for guerilla tactics and police equipment and claimed they were probative of identity, intent and modus operandi. ¶ 10. The affidavit stated the amounts stolen from Carrs and related recent purchases by Mr. Woodard. ¶ 11.

    2.   **The Law**.

        a.   **The warrant was tainted
by the prior illegalities**.

The inclusion in the probable cause showing of evidence seized during the earlier illegal searches tainted this warrant for the reasons set out at pp. 31-32, supra.

- 37 -

      b.    **Mr. Woodard was entitled to suppression
or, at least an evidentiary hearing,
based on Franks/Malkin violations.**

The statements about weapons being found close to drugs
was an attempt to show a possible violation of 18 U.S.C. § 924,
which prohibits the use of a firearm during and in relation to a
drug offense.   Intentionally omitted from the affidavit were two
facts which went against the urged inference: first, the trapdoor
had been screwed shut and was under a tacked down carpet, so the
firearms were not readily accessible to the grow operation
(Tr. 345); second, the grow operation was abandoned (Tr. 537).

The agent set out just enough of Mr. Woodard's finances
to claim that he lacked legitimate funds from which he could have
made the described purchases.   Omitted was the information the
agent obtained during an interview with Mr. Woodard which set out
his lawful sources of funds.   R. 256-58.

The analysis set out at pp. 18-28, <u>supra</u>, results in the
same conclusion here; Mr. Woodard was entitled to suppression, or
at least to a <u>Franks/Malkin</u> hearing.

      c.    **There was not probable cause
to issue the warrant.**

The above-described claims, without any factual descrip-
tion to back them up, were, at most, generalized conclusions.   As
such, they did not constitute probable cause.   Instead,

> [S]ufficent information must be presented to
> the magistrate to allow that official to
> determine probable cause; his action cannot be
> a mere ratification of the bare conclusions of
> others.

<u>Illinois v. Gates</u>, 462 U.S. 212, 239 (1983).   <u>See</u> Wright, <u>Federal</u>

Practice & Procedure: Criminal, § 670 at 717 (2d ed. 1982).
Accord, Chandler v. State, 830 P.2d 789, 795-96 (Alaska App.
1992); Kvasnikoff v. State, 804 P.2d 1302, 1307-09 (Alaska App.
1991).

In addition, where no link was established between the
robbery/shooting and Mr. Woodard, there was no adequate reason to
believe that evidence of the crime would be found at the place to
be searched. See State v. Witwer, supra, at 831.

Finally, the assertion that an unidentified "reliable
source" claimed that Mr. Woodard possessed cocaine and a firearm
added nothing. This assertion failed the rule of State v. Jones,
706 P.2d 317 (Alaska 1985), that an informant's hearsay information
must demonstrate both basis of knowledge and veracity.


II.  **THE TRIAL COURT CAUSED REVERSIBLE ERROR WHEN
     IT DENIED MR. WOODARD'S S-3 MOTION TO SUPPRESS
     PRETRIAL AND IN-COURT IDENTIFICATION AS IT APPLIED
     TO IDENTIFICATION OF MR. WOODARD BY ROBIN CONAWAY.**

A.   **THE FACTS.**

On or before June 14, 1992, police gave the media a
detailed description which was purportedly taken from eyewitness
descriptions of the Carrs robber/shooter. In fact, by this time
police had focused on Mr. Woodard as their only suspect. What they
released was an exact description of him, not the witnesses'
descriptions of the shooter. See pp. 24, 32-33, supra.

The Anchorage Daily News published an article on June
14th that set out the police-manipulated description as a witness
description. It exactly matched Mr. Woodard. R. 130, 1361.

- 39 -

Channels 2 and 11 ran the same description on the same day. R. 70.
Channel 11 also ran the same description on June 17th. R. 71. Mr.
Woodard was arrested on June 17th for federal firearms charges. At
the same time the television channels reported his arrest, they
announced that he fit the description of the Carrs robber/shooter.
R. 71. In addition to releasing the description of June 14th,
police "probably" notified the press when Mr. Woodard was about to
be arrested and announced his arrest on federal charges to the
media. Tr. 1323-24.

　　　　Beginning on June 18th, the newspaper and television
coverage prominently featured Mr. Woodard in chains and handcuffs,
surrounded by law enforcement agents, being taken to and from
court. R. 71-72, 136-154. An article on June 18th contained
several quotes from Deputy Chief Udland of the Anchorage Police
Department who acknowledged making them. R. 137; Tr. 1327-29. An
article on June 19th quoted other officers. R. 138-39.

　　　　Police made no effort to show photographic or in-person
line-ups to the Carrs witnesses. They concluded that because the
witnesses did not have adequate opportunity to view the robber/
shooter and because he was wore a full mask, sunglasses and a hat,
such procedures might result in mistaken identifications.
Tr. 1177. According to Chief Investigator Reeder, another equally
important reason why they did no line-ups was because Mr. Woodard's
photograph had been in the newspaper and they thought any identifi-
cation might be nothing more than someone recognizing him because
they had previously seen his photo in the paper. Tr. 1194-96. A

- 40 -

third reason was because they already had Mr. Woodard as their suspect and they did not want to run a risk that someone would identify someone other than Mr. Woodard.  Tr. 1194-95.

When the defense filed S-3 on November 2, 1992, it was not aware that the state intended to call Robin Conaway or anyone else from Carrs as identification witnesses at trial.  Tr. 1077. Much of that pleading went to two other incidents which were subsequently severed and are not the subject of this appeal. R. 45-67.  However, the defense warned that should the state seek to call any identification witnesses as to the Carrs incident, the testimony should not be permitted because there was too great a risk of undue suggestivity and misidentification from police and media-generated influences.  R. 74-78.

The state's opposition to S-3 announced that it intended to call "Robin Conaway, a witness to the Carrs robbery/homicide, who observed a newspaper photograph of the defendant after he was arrested on unrelated federal charges."  R. 1244.  The state's pleading was an admission that Ms. Conaway's identification resulted from her exposure to a single photograph of the accused which showed him chained hand and foot.  The photo was part of the news article which appeared on June 19th.  The caption directly underneath the photo read, "Jon Woodard goes back to jail after his arraignment."  The photo accompanied a newspaper article which bore the subheading, "Investigators say Woodard linked to Carrs guard killing, but not how."  The article stated, "The man police suspect of killing an armored car guard in a supermarket last week was

- 41 -

formally charged with federal drug and firearms offenses on Thursday." The article described how Mr. Woodard matched the witnesses' description of the gunman [a "witness" description invented by the police because it was a description of Mr. Woodard]. R. 138-40.

Robin Conaway was working in the deli section of Carrs when the robbery/shooting occurred. Officer Hollingsworth interviewed her about two hours after the crime occurred. She told him that she saw the back of the shooter's head and his out-stretched arm just before she ducked down behind the deli counter. R. 1297. She and some other clerks ran outside. As she did, she turned around and saw the shooter again. He had a gun in his hand, was waving it back and forth, and was yelling at the people to get out of his way. R. 1298-99. She could not see the front of his face, but saw the side. She said he was as tall as the interview-ing officer, who was 6'4". She said he looked bigger than the officer, who weighed 220 pounds. She described the shooter as follows:

Q: Okay did he look muscular or just...

A: No he didn't...

Q: Okay.

A: ...look muscular.

Q: Okay. Now you say--can you tell me if he had glasses?

A: I don't know.

Q: Mustache or beard?

A: I don't know.

- 42 -

Q:    Okay.  Uh you say he had dark hair?

A:    Yes.

Q:    Can you tell me anything about the hair?

A:    It was not long hair.

Q:    Okay....

A:    I know it wasn't long hair.

R. 1300.  Ms. Conaway described the man as having very straight, very dark black hair.  She said the man was white and did not have a tan.  R. 1301.  He wore a jacket and a long sleeved shirt. R. 1301.

Then Ms. Conaway came upon the picture of Jon Woodard in the article detailed above.  R. 138-40.  She testified that she saw it in a break room at Carrs.  She said that when she saw it she said that it "looks like" the guy who robbed Carrs.  The others in the break room "all said well it is."  Then she read the article that went with the picture.  R. 1310-11.

Subsequently, Inv. Reeder interviewed her on December 9th, some six months after the crimes.  During that interview, Ms. Conaway's description of the shooter changed dramatically from her description to Officer Hollingsworth on the day of the crimes.

Contradicting her earlier statement, now she claimed that the man did not have a moustache and was clean shaven.  R. 1311. Contradicting her earlier statement, now she claimed the man had a muscular build "because I remember his arms looking so big to me...."  R. 1308.  Contradicting her earlier statement, she said the man had pulled back dark brown hair and a medium complexion,

- 43 -

not pale at all.  R. 1308.  She still said he was tall.  R. 1308.
She admitted that she never saw the shooter's face directly, but
only saw him from the side.  R. 1310-11.

Comparison of her two statements makes very clear that
her second description and her identification of Mr. Woodard as the
shooter was based on the newspaper coverage and the conversations
she had with her co-workers.  It was not based on her independent
memory of the shooter.  Wherever her earlier description did not
fit Mr. Woodard, she simply changed it to match the picture in the
article.  For instance, the shooter went from not muscular to
muscular after she saw the picture of Mr. Woodard in short sleeves
with clearly muscular arms and read an article which described him
as having "well-developed biceps".  R. 139.  Ms. Conaway went from
not knowing whether the shooter had facial hair to saying he was
clean shaven after she saw a picture of Mr. Woodard without a beard
or moustache.  The shooter went from having not long, very straight
hair to having smoothed back hair and sideburns after she saw the
picture of Mr. Woodard with that style hair.  The shooter's
complexion went from "no tan" and "light" to "medium" and not
"pale" after she saw a picture of an obviously tanned Mr. Woodard
who was described in the article as having a "year-round" tan.
R. 139.  About all that remained the same from one description to
the next was height and weight.

Robin Conaway testified at the S-3 evidentiary hearing.
She said that inside the store from behind the deli counter she saw
a gun go off and smoke in the air.  She testified, "I watched for

- 44 -

a second, I guess, and then I ducked down...." Tr. 1083. She ran out the back of the store, across Benson, to the parking lot of the Princess Restaurant. Tr. 1087. From there, a distance of over 100 feet (Tr. 1204), she watched the shooter outside Carrs. Tr. 1089. She described how she saw the photo and newspaper article described above in the break room at Carrs. She claimed she first saw the photo, "suggested" that it looked like the man at Carrs, and was told it was the picture of somebody who had been arrested. Tr. 1092. She said she then "skimmed over parts of the article". Tr. 1093. When asked why she had never told anyone about her claimed recognition of the photograph, she said that she didn't think it was important because police had the person. Tr. 1094.

Ms. Conaway had a subscription to the Daily News on weekends. The June 14, 1992, article which contained the police-planted description of Mr. Woodard, but which was supposedly a witness description, was in the Sunday paper. R. 130; Tr. 1103-04. Despite the fact that she subscribed to the newspaper, Ms. Conaway claimed she "never" read it, and did not read the June 14th article. Tr. 1104. Although she finally admitted that Carrs employees discussed what they had seen, she claimed she did not hear them in the break room discuss what they had seen. Tr. 1106. Although she did say she sometimes watched the news on TV, she said the only thing she saw about the robbery/shooting on TV was herself. Tr. 1107-08.

After her identification of Mr. Woodard from his picture in chains in the newspaper article and after reviewing the article,

- 45 -

she picked out another picture of Mr. Woodard from a photo line-up.
Tr. 1098-1100.  She called the person she claimed to identify by
name, Jon Woodard, not because she knew him but because someone
else had told her this person was Jon Woodard.  Tr. 1102-03.  Inv.
Reeder showed her the photos.  He said that when she first picked
it out she was a little hesitant.  Then, "I told her that she had
picked the right one.  That her comment after that to me, was a
positive identification."  Tr. 1204.

The defense had information that sometime after her first
police interview, Ms. Conaway had told her co-workers that the
shooter looked like a former Carrs employee named Billy Evans who
had left abruptly.  Tr. 1095, 1131-34.  Ms. Conaway remembered
Billy as 5'8" tall.  Sometime later Ms. Conaway had said, "...at
the time I thought it was him [Billy] because I...uh...just thought
about him a[s] the man at the booth...."  R.1312.  At the hearing
she attempted to explain away this identification by saying, "...he
[Billy] was shorter and stockier, but he had dark hair, and I just
ran it together."  Tr. 1096.

Linda Verfaillie, Ms. Conaway's co-worker and friend,
contradicted her testimony on a number of key points.  Although by
the time of the hearing she could not exactly recall the sequence
of events, she agreed that during an earlier police interview she
stated that Ms. Conaway told her that she first saw the newspaper
photo of Mr. Woodard at her home and that before the two of them
saw the photo again in the break room at Carrs, she told Ms.
Conaway someone had been arrested.  Subsequent to seeing the photo

- 46 -

in the break room, the two of them discussed whether "it really was him or not." Tr. 1214-15, 1220, 1222. Ms. Verfaillie could not remember whether she had read the earlier article with the planted description, but conceded she recognized the photo which accompanied it. Tr. 1224-26.

Despite this overwhelming showing that Ms. Conaway's claimed identification of Mr. Woodard was irreparably tainted by the news coverage of the crimes, including the photo and article on June 19, 1992, the trial court denied S-3 as it pertained to her testimony. R. 2319-46. Ms. Conaway then testified at trial. She was the only witness to the crimes who testified that she recognized Jon Woodard as the shooter. Tr. 3750.

**B.    CONSTITUTIONAL AND EVIDENTIARY REQUIREMENTS
       PROHIBITED ADMISSION AT TRIAL OF
       ROBIN CONAWAY'S IDENTIFICATION TESTIMONY.**

**1.    Admission Of This Testimony Denied
        Mr. Woodard Due Process Of Law.**

Fundamental principles of constitutional due process prohibit the introduction at trial of identification testimony which stems from undue pretrial suggestion which is conducive to irreparable misidentification. Stovall v. Denno, 388 U.S. 293, 301-02 (1967). In order to determine whether there is a substantial likelihood of misidentification, a court must look to the "totality of the circumstances." Neil v. Biggers, 409 U.S. 188, 198 (1972). To do that requires consideration of five factors; (1) the witness' opportunity to view, (2) the witness' degree of attention, (3) the accuracy of the description given by the witness

- 47 -

prior to the suggestive event, (4) the witness' level of certainty in making the identification, and (5) the amount of time which passed between the witness' observations and the witness' identification(s) of the accused. Manson v. Brathwaite, 432 U.S. 98, 114 (1977); Holden v. State, 602 P.2d 452, 456-57 (Alaska 1977).

The testimony established that Ms. Conaway saw the shooter for a brief second inside the store and then outside for less than a minute at an angle where she only saw the side of his face from over 100 feet. She was focused on assisting others get away from the shooter. Her description before she saw the photo did not match Mr. Woodard. She was not certain of her identification from the photographic array, which took place approximately six months after the event, until after Inv. Reeder assured her that she had picked out Mr. Woodard. Those circumstances must be considered in light of the highly suggestive manner in which she first saw Mr. Woodard's photo and identified him as the shooter.

Robin Conaway's pretrial identification resulted from her exposure to the photograph of Mr. Woodard handcuffed and in leg irons. That photograph was accompanied by an article which described him as the suspected Carrs shooter. There can be absolutely no doubt that had she been shown this one photo and article by a police officer seeking to have her identify the shooter, her identification would have been suppressed. In Holden, 602 P.2d at 456, the court stated that "the identification of one who becomes an accused by means of a single photograph is improper...." Similarly, in United States v. Duprey, 895 F.2d 303,

- 48 -

307 (7th Cir. 1989), <u>cert</u>. <u>denied</u>, 495 U.S. 906 (1989), the court held that a display of photos of suspects with their arms hand-cuffed behind their backs was "constitutionally intolerable". <u>See also</u> <u>Howe v. State</u>, 611 P.2d 16, 17-18 (Alaska 1980) (show up involving suspect in or next to police car is suggestive); <u>McCracken v. State</u>, 521 P.2d 499, 503 and n. 14 (Alaska 1974) (impermissible suggestivity where witnesses viewed defendant dressed in jail clothes and handcuffed during hearing); <u>State v. Schoffner</u>, 811 P.2d 548, 552 (Mont. 1991) (show up which stood suspect near uniformed officers and patrol car suggestive).

The fact that Robin Conaway saw the unduly suggestive photo in a newspaper article where the police provided the information which caused the photo and article to be printed requires the same result as if the police had directly handed her the photo and article for identification. The constitutional protections of due process are designed to guarantee a fundamentally fair trial. Due process is violated when unduly suggestive influences and the vagaries of the identification phenomenon combine to create a "substantial likelihood of irreparable mis-identification," <u>Holden v. State</u>, 602 P.2d at 455, regardless of how that occurs. The fact that here they combined in a newspaper article and in other cases they came in a police identification procedure such as a show-up does not matter. In both cases the result is the same, a likelihood of misidentification. In both cases there is a violation of due process.

In other similar cases where witnesses identified

- 49 -

suspects through unduly suggestive media images, the identifications were condemned. For example, in <u>State v. Ranieri</u>, 414 A.2d 1094, 1100-01 (R.I. 1991), the court required suppression on evidentiary grounds of a witness' identification of part of the defendant's face because it found the witness' exposure to a newspaper photo of the defendant tainted the subsequent identification. Similarly, in <u>State v. Campbell</u>, 711 P.2d 1357, 1362 (Mont. 1985), the court suppressed an identification which was reported to the police only after the witness viewed the suspect on television. <u>Accord</u>, <u>People v. Prast</u>, 319 N.W. 627, 635 (Mich. App. 1982) ("Where an identification of a defendant is based upon a newspaper photograph rather than the witness' own perceptions, it should be excluded."); <u>United States v. Monsour</u>, 893 F.2d 126, 127-28 (6th Cir. 1990) (display of accused's photo in news article concerning a different crime to bank teller in robbery investigation was unduly suggestive).

### 2. Admission Of This Testimony Violated The Alaska Rules Of Evidence.

Only relevant evidence is admissible at trial. Evidence Rule 401 defines relevant evidence as "that evidence which has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, under Evidence Rule 403, even relevant evidence may be excluded "if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative

Ex.3, p.68

evidence." The Alaska Supreme Court recognized that Evidence Rule 403 may preclude the testimony of an otherwise competent eyewitness concerning facts which are relevant to the issues at trial where the risk of prejudice outweighs the probative value of the evidence. <u>Contreras v. State,</u> 718 P.2d 129, 137-38 (Alaska 1986).

Evidence Rule 602 precludes witnesses from testifying where there is not sufficient evidence "to support a finding that he has personal knowledge of the matter." Under these rules, identification testimony of Robin Conaway should not have been admitted where she lacked sufficient opportunity to observe the shooter. <u>See</u> <u>State v. Ranieri</u>, <u>supra</u>.

**III. INTENSIVE PRETRIAL PUBLICITY SO PERMEATED THE COMMUNITY THAT A CHANGE OF VENUE WAS REQUIRED. THE FAILURE OF THE TRIAL COURT TO GRANT A CHANGE OF VENUE DENIED MR. WOODARD HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND REQUIRES REVERSAL. IN THE ALTERNATIVE THE TRIAL COURT'S REFUSAL TO GRANT MR. WOODARD'S CHALLENGES FOR CAUSE OR, IN THE ALTERNATIVE, TO GRANT MR. WOODARD'S REQUEST FOR ADDITIONAL PEREMPTORY CHALLENGES, VIOLATED MR. WOODARD'S RIGHT TO AN IMPARTIAL JURY AND REQUIRES REVERSAL OF THE CONVICTION IN THIS CASE.**

**A.    JURY PROCEEDINGS.**

On March 25, 1993 jury selection began in the trial. Tr. 1548. Both Mr. Woodard and the state agreed to a "struck" or "Texas" method of jury selection. Tr. 1575. Under this method of selection, jurors would be <u>voir</u> <u>dired</u> until thirty-two had been passed for cause. Tr. 1576.[4] After thirty-two jurors were passed

_____

[4]    Because the court had denied, without prejudice, Mr. Woodard's request for, <u>inter</u> <u>alia</u>, additional peremptory challenges, the parties agreed on thirty-two jurors based on the need for fourteen jurors to hear the trial (twelve plus two alternates), ten peremptory strikes for the defendant plus one peremptory strike as to an alternate, and six peremptory strikes for the State, plus

- 51 -

for cause, the jurors would be randomly called into the jury box
and the parties would exercise peremptory challenges.

Prior to the questioning of any jurors, the court pro-
vided counsel with copies of juror questionnaires.  Tr. 1625.
After reviewing them, Mr. Woodard noted 95% of the jurors had been
exposed to pretrial information and renewed his motion to change
venue.  Tr. 1628-29.  The state persisted in its objection to a
change of venue, arguing, in essence, the motion was premature.
Tr. 1631-32.  The trial court again denied Mr. Woodard's motion to
change venue.  Tr. 1633.  Voir dire of the jury pool then began.

Virtually every juror examined by the parties recalled
news stories regarding Mr. Woodard.[5]  At a minimum, the jurors
recalled the case involved the robbery of a Carrs and a shooting
which resulted in death.  The sources of this knowledge were either
the Anchorage Daily News or media broadcasts: Clark (Tr. 1644,
1645), Clayton (Tr. 1658), Rader (Tr. 1665), Gibb (Tr. 1693), Ord
(Tr. 1698), Symmes (Tr. 1729), Daley (Tr. 1764), Combs (Tr. 1807),
Hall (Tr. 1835), Strausser (Tr. 1847), Simcox (Tr. 1860), Bushnell-
Benson (Tr. 1866, 1867, 1877, 1879), Kennedy (Tr. 1890), Sculis
(Tr. 1923, 1924), Lenseth (Tr. 1953, 1954, 1955), Tisdale (Tr.
1983), Rouse (Tr. 2015), Young (Tr. 2031), Doerner (Tr. 2056,
2057), Wirbinske (Tr. 2077), Carmichael (Tr. 2095), Fifield (Tr.
2128), Stohl-Reiland (Tr. 2161, 2162), Morrison (Tr. 2237, 2239),

---

one strike as to the alternate.

[5] Only one juror, Mr. Livingstone, stated he recalled nothing
about the case.  Tr. 2144.

Ex. 3, p. 70

Doiel (Tr. 2267), Richerson (Tr. 2283, 2286), Takaki (Tr. 2363, 2366, 2367), Lapiad (Tr. 2381), Thomassen (Tr. 2393), Cusack (Tr. 2417), Maley (Tr. 2501, 2502), Ensminger (Tr. 2520), Bohmann (Tr. 2590), White (Tr. 2633, 2641), Beittel-Huff (Tr. 2650), Oxnam (Tr. 2706), Foreman (Tr. 2714), and Ashmore (Tr. 2730).[6]

Seventeen jurors recalled seeing Mr. Woodard's picture in connection with his arrest on murder and robbery charges: Ord (Tr. 1703), Symmes (Tr. 1730), Yates (Tr. 1813), Strasser (Tr. 1847), Simcox (Tr. 1861), Bushnell-Benson (Tr. 1867, 1877), Sculis (Tr. 1924, 1932-33), Doerner (Tr. 2057), Carmichael (Tr. 2095, 2114), Stohl-Reiland (Tr. 2161), Morrison (Tr. 2239), Thomassen (Tr. 2349), Takaki (Tr. 2363), Cusack (Tr. 2418), Maley (Tr. 2503), White (Tr. 2641), and Beittel-Huff (Tr. 2650-51).

Although exposure to these pictures occurred approximately nine months before trial in this case, a large number of jurors stated they recognized Mr. Woodard when they came into the courtroom: Ord (Tr. 1703), Daley (Tr. 1771), Yates (Tr. 1813), Bushnell-Benson (Tr. 1879), Takaki (Tr. 2369), Lapiad (Tr. 2378), Thomassen (Tr. 2394), Cusack (Tr. 2417), Bohmann (Tr. 2590), and White (Tr. 2641). Many jurors had conversations with others regarding the case: Tisdale (Tr. 1986), Young (Tr. 2030), Doerner (Tr. 2058), Carmichael (Tr. 2090, 2101), Hilde (Tr. 2156), Stohl-Reiland (Tr. 2162-2163), Lewis (Tr. 2170), Edwards (Tr. 2215),

---

[6] Significantly, a number of jurors who initially denied any recollection of the crime subsequently remembered details of the offense: Clark (Tr. 1644, 1645), Clayton (Tr. 1658), Lenseth (Tr. 1954, 1962, 1963), and Takaki (Tr. 2362, 2363, 2366, 2369).

Doiel (Tr. 2268), Takaki (Tr. 2368), Beittel-Huff (Tr. 2659), and Oxnam (Tr. 2706, 2708).

Finally, a number of jurors recalled Mr. Woodard based solely on his hair: Symmes (Tr. 1731), Strasser (Tr. 1848, 1855), Simcox (Tr. 1861), Morrison (Tr. 2240, 2248), and Cusack (Tr. 2427).

In addition to the matter set forth above, many jurors had very specific recollections regarding the facts and circumstances surrounding the offense. As a result of media exposure, Juror Clark recalled a look-out on one of the overpasses, and added, "If it was in the papers I probably saw it." Tr. 1645. Although Juror McDowell initially denied any specific recollection, after further inquiry McDowell recalled an employee had been involved in the crime and that the perpetrator of the crime had gone out through the back door. Tr. 1658. Juror Ord also recalled allegations of the involvement of a Carrs employee. Tr. 1698.

Juror Daley, who asserted he had obtained his information both from television and the newspaper, recalled the perpetrator of the crime had jumped over a fence while running away, and that the police had lost the trail of the perpetrator in a trailer court. Tr. 1764, 1765. Daley also recalled accomplices had been involved, including someone inside the store. Tr. 1766. Juror Simcox recalled accomplices had been involved, one of the accomplices had hidden the money, and one of the accomplices had turned himself in. Tr. 1860. Simcox also recalled allegations Mr. Woodard was a body builder and concluded, "Based on what I saw in the paper it was cut and dried." Tr. 1861, 1862.

Ex. 3, p. 72

Juror Bushnell-Benson recalled the robbery, a killing, and the involvement of three men, one of whom was alleged to have been a look-out. Tr. 1866. Juror Sculis recalled the burning of evidence, the involvement of accomplices, and the involvement of someone who had worked in Carrs. Likewise, Juror Pajak, in addition to the robbery and the killing, recalled the involvement of an in-store accomplice. Tr. 2537.

Furthermore, a number of jurors, in addition to recalling specific information about both the offense and Mr. Woodard, recalled the information in exactly the highly prejudicial fashion it had been reported. Juror Ensminger recalled Mr. Woodard as being proficient in martial arts and firearms, and asserted a reference to Steven Segal was tied to the martial arts and firearms. Tr. 2520, 2531. Juror Sculis recalled the media referring to Mr. Woodard as a Steven Segal type. Tr. 1933. Juror Thomassen advised the parties Mr. Woodard reminded her of Steven Segal, adding she remembered that description from the newspaper. (Tr. 2393, 2409). Juror Stohl-Reiland also recalled Mr. Woodard as a Steven Segal type, stating, in regard to Segal, she understood that to mean a "shoot-em up personality." Tr. 2163. Juror Symmes recalled Mr. Woodard's hair, that he wore dark clothing and that, at the time of his arrest, police had discovered an "arsenal." Tr. 1731, 1743.

A number of jurors believed, based upon media coverage, that the police had arrested the perpetrator of the crime when they arrested Woodard: Lenseth (Tr. 1963), Rouse (Tr. 2022), Stohl-

Reiland (Tr. 2167), Symmes[7] (1733, 1742), Simcox (Tr. 1862), Bohmann[8] (Tr. 2602, 2603), Beittel-Huff (Tr. 2660). Other jurors recalled the offense as "cruel," "cold-blooded," "a horrible incident," and "ruthless stuff." Tr. 2082, 2077, 1923. Juror Yates recalled allegations of other criminal conduct by Mr. Woodard. Tr. 1794.

Some of the jurors referred to above were excused for cause. However, the trial court denied Mr. Woodard's challenges for cause as to Jurors Young and Beittel-Huff. Juror Young indicated her information with regard to Mr. Woodard and the offense was second hand information from people who had read the paper. Tr. 2031. In addition, Juror Young indicated she had talked with friends at work about the case. Tr. 2030. Juror Young had, after being notified she was a member of the jury pool in Mr. Woodard's case, also inquired of an attorney with regard to the number of peremptory challenges which could be exercised by the defense. Tr. 2030. At the conclusion of her voir dire Mr. Woodard sought to challenge Ms. Young for cause, citing both Ms. Young's failure to adhere to the court's admonition not to discuss anything about the case with anyone, as well as Ms. Young's inability to be impartial. Tr. 2047-50. The court denied the challenge. Tr. 2052.

---

[7] Significantly, despite both her considerable exposure and her recollections, Juror Symmes continued to protest her ability to be balanced in her approach if she was selected as a juror. Specifically, Symmes asserted her recollections would be balanced based on information "given at the time the story broke." Tr. 1747.

[8] Juror Bohmann had previously expressed to others a belief that Mr. Woodard was guilty of the charges.

During the course of her <u>voir dire</u>, Juror Beittel-Huff recalled learning about Mr. Woodard's case from both television and the newspaper. Tr. 2650. She recalled "general facts" including the murder and pictures of Mr. Woodard at the time of his arrest. Tr. 2650. Ms. Beittel-Huff recalled the crime as a "horrible incident" and indicated she had discussed the case with others because it was one of the "more significant" crimes to have occurred in Alaska. Tr. 2659, 2652. Ms. Beittel-Huff further indicated her belief that, at the time of Mr. Woodard's arrest, she thought the police had caught the person who had done the crime.[9] Tr. 2659, 2660. In addition, Ms. Beittel-Huff generally believed people arrested were usually the ones who "did it," and advised the parties she was uncertain as to whether she could put her opinion aside. Tr. 2660, 2662. Despite Ms. Beittel-Huff's statements, the court, after its own inquiry, denied Mr. Woodard's challenge for cause. Tr. 2666, 2673.

After thirty-two jurors had been passed for cause, Mr. Woodard again renewed his Motion for Change of Venue, his Motion for Additional Peremptory Challenges, and his Motion for Sequestration of the Jury. Tr. 2743-44. In support of his Motion for Change of Venue, Mr. Woodard noted that 95% of the jurors questioned had familiarity with the case, and that eighteen or nineteen of the twenty-five jurors excused for cause had been biased against Mr. Woodard based on prejudicial pretrial publicity. Mr. Woodard

---

[9] Ms. Beittel-Huff was not alone in voicing her opinion the police had arrested "the right guy." Lenseth (Tr. 1963), Rouse (Tr. 2022) and Bohmann (Tr. 2603) voiced the same opinion.

also noted a number of jurors who had been passed for cause had been accepted even though "they not only saw the accused under arrest, but in secure custody as well." Tr. 2744. Mr. Woodard also noted to the court that, although publicity had abated since Mr. Woodard's arrest, media interest would be rekindled with the starting of the admission of evidence. Tr. 2744.

As to Jurors Young and Beittel-Huff, Mr. Woodard requested two additional peremptory challenges based on the court's refusal to excuse them for cause. Mr. Woodard noted to the court both jurors had discussions regarding the case with others. Tr. 2746-47. In addition, Ms. Beittel-Huff had equivocated on her ability to be fair and impartial if selected as a member of the jury. With regard to sequestration, Mr. Woodard again noted the strong possibility for "jury pollution" given the inevitability of continued prejudicial publicity due to the trial. Tr. 2744, 2745.

The court denied all Mr. Woodard's motions. Tr. 2747-53. The parties then proceeded to exercise their peremptory challenges. Mr. Woodard's first two peremptory challenges were exercised as to Ms. Beittel-Huff and Ms. Young. Tr. 2764-65. Both parties subsequently used all available peremptory challenges, including challenges to alternates. Tr. 2764-73. The jury was then sworn.

At the conclusion of the presentation of evidence and closing arguments, on June 3, 1993 the jury began its deliberations in the case. During the days in which the parties were giving closing arguments, counsel for Mr. Woodard was contacted by a reporter for the Anchorage Daily News and advised, <u>inter alia</u>, of

- 58 -

the intention of the Daily News to run a feature article on Mr.
Woodard describing in great detail other alleged criminal episodes
by Mr. Woodard.  R. 2759.  Defense counsel declined to make any
comment for the article and implored the reporter not to publish
the article until after the verdict.  R. 2759.  The reporter
responded it was not her decision.  R. 2760.  Counsel for Mr.
Woodard then spoke with an editor for the Anchorage Daily News who
advised the possible exposure of twelve jurors was an insufficient
reason to preclude 80,000 Daily News subscribers from reading what
the paper thought they needed to read.  R. 2760.  The editor then
advised defense counsel the paper would publish the article.  On
June 2, 1993, defense counsel reported the above to the court and
again requested sequestration before publication of the article.
R. 2933, 2942.  The court denied the request for sequestration.
R. 2946.  Subsequently, the trial court received two letters from
the Anchorage Daily News advising the court of the intention of
that newspaper to run the article on June 5, 1993.  R. 2761.  In
response, Mr. Woodard renewed his request for sequestration of the
jury prior to the publication of the article.  R. 2925.  The court
again denied the request.  R. 2926.

On June 5, 1993 the Anchorage Daily News published a
lengthy, highly prejudicial article on Mr. Woodard containing
allegations of numerous uncharged criminal acts including, inter
alia, armed robberies.  R. 2960.  Mr. Woodard requested inquiry of
the jury and, again, sequestration.  After some discussion, Mr.
Woodard and the State agreed to individual inquiry of each juror

- 59 -

with regard to exposure to the June 5 article. R. 2971. Although the court initially took the sequestration request under advisement, the court ultimately determined sequestration was, at that time, necessary. R. 2988. Beginning June 5th at approximately 8:30 p.m., the jury in Mr. Woodard's trial was sequestered.

On June 6, 1993, the court contacted counsel for Mr. Woodard and counsel for the State and requested they come to the courthouse at approximately 8:30 p.m. Upon arriving, the parties learned of contact with one of the jurors at the hotel where the jury was sequestered. Specifically, the court advised the parties an unidentified person had approached one of the jurors and made comments to the effect of, "What's taking you so long? Isn't robbery one enough?" R. 3025-27. After being so advised, the bailiff who was on duty at the time was summoned to the courtroom for inquiry as to the facts and circumstances surrounding the conduct. The court then recessed for the evening.

On June 7, 1993 Mr. Woodard stipulated to the excuse the two jurors involved in the contact and agreed to waive his right to trial by a jury of twelve. R. 3097.

Prior to permitting the jury to begin deliberating with him, the court required inquiry of Juror Workman.[10] R. 3108. Juror Workman indicated the comment had been either "Oh, you haven't reached a verdict yet?" or "Have you reached a verdict yet?" and "Don't you think first degree robbery is enough?" R. 3110. Ms.

_____

[10] Juror Workman was the juror to whom the comment was addressed.

Ex. 3, p. 78

Workman did not know the person and assumed he was a service person employed by the hotel. R. 3126.

After hearing from an additional juror, and accepting an agreed upon admonishment to the jury with regard to the excusal of the jurors, the court turned its attention to comments made in the media by Edward McNally in the June 5, 1993 newspaper article. R. 3160-62. Being quoted in the June 5, 1993 article, Mr. McNally made comments which were both inaccurate and unfavorable to the defense. R. 3161. In response, trial counsel for the State apologized for McNally's comments. R. 3161. The court then ordered that any further inquiry of Mr. McNally with regard to Mr. Woodard's case was to be answered as follows: "I don't know, I'm not the trial attorney." R. 3162. Court then recessed. R. 3163. Shortly after the recess, the jury rendered its verdicts.

**B.     <u>ARGUMENT</u>.**

The guarantee of a fair trial is a basic constitutional right. If the right is compromised by prejudicial publicity, a resulting conviction cannot stand. Art. I, §11, Alaska Constitution; <u>Oxereok v. State</u>, 611 P.2d 913 (Alaska 1980); <u>Mallott v. State</u>, 608 P.2d 737, 745 (Alaska 1980) (citations omitted); <u>Nickolai v. State</u>, 708 P.2d 1292 (Alaska App. 1985); Amendment VI, United States Constitution; <u>Sheppard v. Maxwell</u>, 384 U.S. 333 (1966); <u>Estes v. Texas</u>, 381 U.S. 532 (1964); <u>Rideau v. Louisiana</u>, 373 U.S. 723 (1963); <u>Irvin v. Dowd</u>, 366 U.S. 717 (1961).

In Alaska, if there is reason to believe an impartial trial cannot be had in the place of trial, the court in which an

Ex. 3, p. 79

action is pending may change the place of trial to another in the
same judicial district or to a designated place in another judicial
district.  <u>See</u> AS 22.10.040; Rule 18(g) and Rule 19, Alaska R.
Crim. P.  Although rulings on a motion to change venue are
reversible only for an abuse of discretion, the reviewing court has
a duty to "make an independent evaluation of the circumstances."
<u>Newcomb v. State</u>, 800 P.2d 935, 937 (Alaska App. 1990).

Although the general rule with regard to change of venue
requires the court to proceed with <u>voir dire</u> until such time as the
defendant is able to demonstrate actual prejudice, <u>Mallott v.
State</u>, 608 P.2d at 746, the rule must be relaxed when a case
generates "intensive pretrial publicity" and results in a substan-
tial number of venirepersons who appear to have been prejudiced
with regard to the case.  <u>Newcomb v. State</u>, 800 P.2d 935, 938
(Alaska App. 1990) citing <u>Mallott v. State</u>, 608 P.2d at 748.  As
the Alaska Supreme Court has noted, the <u>voir dire</u> process is not
"an infallible Geiger counter" of juror prejudice.  <u>Mallott v.
State</u>, 608 P.2d at 748.  In circumstances involving intensive
pretrial publicity, excessive reliance on the efficacy of <u>voir dire</u>
in uncovering "actual prejudice" places an unrealistic burden on
the defendant.  <u>Mallott v. State</u>, 608 P.2d at 748.

When the general rule does not apply, the Alaska Supreme
Court has adopted the A.B.A. Standard with regard to a change of
venue. <u>Mallott v. State</u>, 608 P.2d at 748.  Under the terms of that
Standard, a change of venue is required if the trial court
determines that, because of the dissemination of potentially

- 62 -