prejudicial material, there is a substantial likelihood that, in the absence of such relief, "a fair trial by an impartial jury cannot be had.... A showing of actual prejudice shall not be required." Id. When a juror is familiar with relevant information, a trial court should view that juror's claim of impartiality with skepticism. See, e.g., Mallott v. State, 608 P.2d at 748; Oxereok v. State, 611 P.2d at 919.

Relevant to the court's determination of whether to grant a change of venue is the nature of the pretrial publicity. Newcomb v. State, 800 P.2d at 939. In considering pretrial publicity, appellate courts focused on the exposure of jurors to highly prejudicial information. Nelson v. State, 781 P.2d 994, 997 (Alaska App. 1989) (citations omitted). The potential for unrevealed jury prejudice is increased when the publicity prior to trial is inherently inflammatory or prejudicial. This is particularly true when the publicity involves prejudicial accounts of the defendant's prior criminal history.[11] Newcomb v. State, 800 P.2d at 939, citing Nelson v. State, 781 P.2d 994, at 997-998.

The greatest concern for the possibility of unrevealed jury prejudice understandably arises where many prospective jurors have personal knowledge of the circumstances surrounding the offense, or are acquainted with the defendant, witnesses or complaining witnesses. Newcomb v. State, 800 P.2d at 939. When the media coverage about the offense has been extensive and highly

---

[11] By definition, prejudicial accounts of mere allegations of uncharged criminal activity is included in this type of publicity.

prejudicial, the trial court must also give substantial weight to
the obvious potential for prejudice which "might even be uncon-
scious but no less real...." Oxereok v. State, 611 P.2d at 919.

The court must also consider the timing of the publicity.
Mallott v. State, 608 P.2d at 747; Newcomb v. State, 800 P.2d at
939; Chase v. State, 678 P.2d 1347, 1351-1352 (Alaska App. 1984).
Other significant factors include the nature of the community in
which the trial will take place.  Oxereok v. State, 611 P.2d 913
(Alaska 1980).  The court should also look to the degree of the
coverage.  Patton v. Yount, 467 U.S. 1025, 1031-33 (1984); Rideau
v. Louisiana, 373 U.S. 723, 726-27 (1963).

At the time of jury selection in this case, Mr. Woodard
was entitled to ten peremptory challenges.  Rule 24(d), Alaska R.
Crim. P.  The requirements of Criminal Rule 24(d)(3) concerning
peremptory challengers in juror replacements may be relaxed by the
trial court if good cause exists.  See Ketzler v. State, 634 P.2d
561 (Alaska App. 1981).  Although Rule 24(d) does not contemplate
a challenge for cause on the basis of mere exposure to prejudicial
information, the trial court should allow an accused as many
additional peremptory challenges as are necessary for selection of
an impartial jury.  Mallott v. State, 608 P.2d 737 (Alaska 1980).

The trial court may decline to grant challenges for cause
in a liberal manner only so long as the court offers the defendant
additional peremptory challenges.  Jerrel v. State, 756 P.2d 301
(Alaska App. 1988).  In circumstances where substantial pretrial
publicity increases the likelihood the regularly allotted number of

- 64 -

peremptory challenges is insufficient, the court shall permit addi-
tional peremptory challenges to the extent necessary to impanel an
impartial jury. <u>Nelson v. State</u>, 781 P.2d at 997. Once an accused
exhausts his peremptory challenges, failure of the trial court to
grant either a challenge for cause or additional peremptory chal-
lenges when a juror gives an equivocal description of impartiality
violates the defendant's right to an impartial jury and constitutes
reversible error. <u>Jerrel v. State</u>, 756 P.2d 301 (Alaska App. 1988).

The Supreme Court has adopted the A.B.A. recommendation
regarding the acceptability of jurors exposed to pretrial publi-
city. <u>Mallott v. State</u>, 608 P.2d at 749-750.  If the juror
remembers information, that persons acceptability shall turn on the
credibility of testimony as to impartiality. <u>Id</u>.  If formation of
an opinion is admitted, the juror is subject to challenge for cause
unless the examination shows unequivocally the capacity to be
impartial. <u>Id</u>.  A juror who has been exposed to highly significant
information or substantial amounts of inflammatory material shall
be subject to challenge for cause without regard to testimony as to
the prospective juror's state of mind. <u>Id</u>.

The facts surrounding the robbery/shooting at the Carrs
Aurora Village, coupled with the intensive detailed media coverage
of both the crime and allegations regarding Mr. Woodard made this
offense, in the words of juror Beittel-Huff, "one of the more
significant crimes in Alaska."

Virtually the entire jury venire recalled both the crime
and events surrounding its commission.  Nearly all information

possessed by jurors with regard to both Mr. Woodard and the charges upon which he was tried was provided by the Anchorage media. The jurors received the information by direct exposure, through the statements of others or a combination of the two. These reports were both highly prejudicial and primarily consisted of inflammatory information ruled inadmissible by the trial court.

In addition to the prejudice demonstrated by the answers of the jurors, given the pervasive nature of the publicity, there is a high likelihood of unconscious or undetected prejudice on behalf of the jury pool. At the time of jury selection publicity about the case had abated from the level reached in the summer of 1993. Nonetheless, given that the information possessed by jurors came almost exclusively from media accounts, there is a substantial likelihood of undetected and/or unconscious prejudice by the jury.

State and federal constitutional law guarantees Mr. Woodard the right to a trial by an impartial jury. Viewed in its totality, the jury selection process as well as the events which occurred during deliberations establish that, due to publicity surrounding commission of the offense, both a substantial number of venirepersons were prejudiced and the probability that similar prejudices were shared by, but have not been extracted from impaneled jurors.

The Carrs robbery/homicide was one of the most notorious crimes in recent Anchorage history. The entire jury pool indicated knowledge of either Mr. Woodard, the offense, or both. To permit the convictions in this case to stand would, in effect, completely

Ex. 3, p. 84

insulate decisions of trial courts from appellate review and reduce an accused's right to trial by an impartial jury to nothing more than an abstract possibility subject to the whim of the trial court's discretion.  The facts demonstrate a substantial likelihood the jury in this case was not impartial and Mr. Woodard's convictions must be reversed.

Assuming, _arguendo_, this Court were to hold a change of venue was not required, Mr. Woodard's convictions must still be reversed based upon the failure of the trial court to either excuse jurors Young and Beittel-Huff for cause or grant Mr. Woodard additional peremptory challenges.  The degree of exposure and the states of mind of both jurors required the court to excuse them for cause.  In particular, Ms. Beittel-Huff indicated formation of an opinions i.e., that police had caught the man who "did it" and that the offense was a "horrible" crime which cannot be rebutted by her assertion, upon inquiry from the court, that she could follow the court's instructions.  Ms. Beittel-Huff's recollection of highly significant and prejudicial information mandated that she be excused for cause without regard to her claimed state of mind.

Under applicable law, the trial court had two options when faced with Mr. Woodard's challenges for cause, excuse Young and Beittel-Huff or grant Mr. Woodard additional peremptory challenges.  In light of the nature of the pretrial publicity surrounding this case, the failure of the trial court to exercise either option raises serious questions regarding the impartiality of the jury and requires reversal.

**IV.  RULINGS WHICH EXCLUDED EVIDENCE NECESSARY TO THE DEFENSE, TOGETHER WITH RULINGS WHICH IMPROPERLY ADMITTED EVIDENCE DAMAGING TO MR. WOODARD, DENIED HIM A FAIR TRIAL.**

**A.  INTRODUCTION.**

A defendant's rights to due process, compulsory process, and confrontation under the Alaska and United States Constitutions combine to insure that he has the right to present his defense at the time of his trial.  <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973).  The defense has a constitutional right to offer evidence of the state's influence upon its witnesses in order to show their bias or motive to testify in the state's favor.  <u>Davis v. Alaska</u>, 415 U.S. 308 (1974).  These rights override conflicting claims to non-constitutional privacy rights and privileges, and supersede mechanical application of evidentiary rules which would frustrate exercise of these rights.  <u>See</u> <u>also</u> <u>Keith v. State</u>, 612 P.2d 977, 981-84 (Alaska 1980); <u>Salazar v. State</u>, 559 P.2d 66, 79 (Alaska 1976); <u>Daniels v. State</u>, 767 P.2d 1163 (Alaska App. 1989).

Rule 613 of the Alaska Rules of Evidence authorizes admission of evidence, including extrinsic evidence, of a witness' bias or interest to impeach his or her credibility.  Accordingly, the defense is entitled to inquire into a witness' working relationship for the police, which could create the material inference that the witness might be biased for the prosecution.  <u>Braham v. State</u>, 571 P.2d 631, 647 (Alaska 1977).  Finally, otherwise inadmissible evidence can come into trial to rebut testimony offered by the other side.  <u>Salud v. State</u>, 630 P.2d 1008, 1010 (Alaska App. 1981).

Evidence Rules 401, 402, 403 and 404(b) limit admission of evidence to that which is relevant and is more probative than prejudicial.   Proof of prior conduct or bad character to prove criminal propensity is never legally relevant to the issue of guilt or innocence. Haakanson v. State, 760 P.2d 1030 (Alaska App. 1988). In addition, where extreme unfair prejudice would result from the admission against the defendant of other crimes/bad acts evidence, exclusion is constitutionally mandated.   Oksoktaruk v. State, 611 P.2d 521, 524 (Alaska 1980) (improper admission will "dilut[e] the requirement that present guilt be proved beyond a reasonable doubt"); Adkinson v. State 611 P.2d 528, 531 (Alaska 1980) (improper admission denies right to defend against particular crime charged).

Repeatedly, the trial court excluded evidence crucial to the defense needed to rebut evidence from the state.   Repeatedly during this trial, and in violation of this authority, the trial court admitted bad character evidence against Mr. Woodard. Reversal is necessary.

**B.   WHERE THE TRIAL COURT ADMITTED THE FIRST (EXHIBIT 143) OF SIX SURREPTITIOUSLY TAPE-RECORDED CONVERSATIONS BETWEEN MR. WOODARD AND DAVID VANHOUSEN TO SHOW MR. WOODARD'S STATE OF MIND AFTER THE ROBBERY/ HOMICIDE, IT SHOULD HAVE ADMITTED THE OTHER FIVE TAPES (EXHIBITS EY, EZ, FA, and FB) FOR THE SAME PURPOSE.**

Police executed SW 92-915 by surreptitiously tape-recording David VanHousen's conversations with Mr. Woodard.   On June 11, 1992, at approximately 8:35 p.m., Mr. VanHousen engaged Mr. Woodard in a recorded telephone conversation.   Later that same evening, police tape-recorded another conversation which took place

- 69 -

when the two met at the Northway Mall.  On June 12, 1992, at 6:33 p.m., and then later that evening, police tape-recorded two more conversations.  Finally, on June 14, 1992, at 2:05 p.m. and at 6:00 p.m., police tape-recorded two more face-to-face conversations.

In the first conversation on June 11th, Mr. VanHousen attempted to set up a meeting with Mr. Woodard.  In response, Mr. Woodard stated:

> [Jon]:    Is this super bad Dave?
>
> [Dave]:   I'd rather not talk about it over the phone.
>
> [Jon]:    Just say yes or no.
>
> [Dave]:   I'd rather not..no..yeah..it is.
>
> [Jon]:    Does it have to do with this?
>
> [Dave]:   Oh what?
>
> [Jon]:    The thing?
>
> [Dave]:   What thing's that?
>
> [Jon]:    Oh, the thing.
>
> [Dave]:   What thing?
>
> [Jon]:    You know...

R. 72.  The two agreed to meet later that day so they could discuss in person what Mr. VanHousen stated he did not want to talk about over the telephone.  During the conversation, Mr. VanHousen voiced his worry that Carrs security wanted to polygraph everyone and that he needed some advice from Mr. Woodard.  R. 730.  The clear implication of the conversation was that Mr. VanHousen wanted Mr. Woodard's advice on how to avoid getting found out in a polygraph about his involvement in the shooting.

- 70 -

Ex. 3, p. 88

When they met shortly afterwards, Mr. Woodard urged Mr. VanHousen to take the polygraph because "you know ... you didn't do it" (R. 736) and "you're totally innocent you know" (R. 738). See also R. 739, 741.   Mr. Woodard emphatically denied previously discussing with Mr. VanHousen how easy it would be to rob Carrs and denied committing the crimes.  R. 737, 740.

In the first conversation on June 12th, the two continued their previous conversation about the Carrs shooting and the police polygraphs.  Mr. Woodard said that he did not understand why the police would be coming down hard on Mr. VanHousen as he claimed. R. 745.  Mr. Woodard urged Mr. VanHousen to get a lawyer because the police were infringing on his rights by insisting that he take a polygraph.  R. 745-49.  Throughout the conversation Mr. Woodard emphasized that Mr. VanHousen should take the polygraph "because you have nothing to hide."  R. 749.  Despite Mr. VanHousen's insistence they had previously talked about robbing Carrs, Mr. Woodard consistently denied it.  R. 751.

In another telephone call that same day, Mr. VanHousen told Mr. Woodard he had finally talked to a lawyer and that Mr. Woodard would not like what the lawyer said.  When Mr. VanHousen continued by saying he did not want to talk about it on the telephone, Mr. Woodard called that "weird", asked him if he had been taking drugs, and finally agreed to meet Mr. VanHousen the next day.  R. 756.  Mr. Woodard again reassured Mr. VanHousen that he would breeze through a polygraph.  R. 757.

On June 14th, during a tape-recorded conversations at Mr.

- 71 -

Woodard's house, as he had earlier, Mr. VanHousen confronted Mr. Woodard with the fact that the media description of the shooter described Mr. Woodard. Unsuccessfully, he tried as he had before to obtain Mr. Woodard's admission that they had supposedly discussed robbing Carrs. R. 768-70, 772-73. Mr. Woodard again urged Mr. VanHousen to take a polygraph. R. 778. Mr. Vanhousen's request for a loan was turned down because Mr. Woodard said he did not have any money. R. 721.

During a second in-person meeting later on June 14th, similar discussions about the purported earlier conversation and Mr. VanHousen's worries about the polygraph were repeated. R. 783-85, 790. Mr. VanHousen switched the conversation to return to the first discussion, quoted above, about "the thing". Mr. VanHousen asked Mr. Woodard, who had just again denied talking about robbing Carrs, what he had meant by the thing. Mr. Woodard's answers made clear he was not talking about the Carrs robbery/shooting. R. 789, 792. When Mr. VanHousen asked him for $10,000 from the Carrs robbery, Mr. Woodard responded, "[I]s this kind of a sick joke?" R. 787-89.

During opening statements, both attorneys referred to these "wired" conversations. Assistant District Attorney Henry told the jury that Mr. VanHousen wore a wire. Tr. 2831. According to the state's version of events, immediately after the series of wired conversations, Mr. Woodard drove to Karl Bohlin's house and convinced Mr. Bohlin to hide the robbery proceeds by telling him the money was from a drug rip-off. Tr. 2831-32. Later

Ex. 3, p. 90

in her opening statement, Ms. Henry went over, line-by-line, portions of the first conversation about the "thing", and asserted that during the second conversation, Mr. VanHousen warned Mr. Woodard with hand signals that he was wired.  Tr. 2831, 40-41.

Defense Counsel McComas told the jury during opening statement that it would hear all the taped conversations, and summarized them for the jury.  He described how on tape Mr. Woodard acted like a very innocent person who was confronted by a bizarre acting friend.  Tr. 2888-90.

On direct examination, Mr. VanHousen testified that he went to court twice to obtain search warrants to record conversations with Mr. Woodard.  Tr. 5325.  The state elected to play only the first of the tape-recorded conversations.  Tr. 5328-31.  Then the state elicited answers emphasizing that Mr. VanHousen was desperately trying to warn Mr. Woodard that he was wired. Tr. 5326. Mr. VanHousen testified in response to the state's questions that he had subsequent tape-recorded conversations with Mr. Woodard and that he succeeded in mouthing the word "wired" at the start of the second conversation.  Tr. 5352-55.

The defense sought to question Mr. VanHousen about other wired conversations, starting with the second one.  The defense asserted the questions were relevant to rebut direct testimony that there was a warning during the second conversation and to show Mr. VanHousen's state of mind about why he is now falsely claiming that

- 73 -

he tipped off Mr. Woodard. Tr. 5573.[12]

The defense pointed out that the state extensively examined Mr. VanHousen on what he was thinking during the wire process and why he claimed he tipped off Mr. Woodard. The conversations showed different reasons and a different state of mind from that he claimed. They showed an increasingly belligerent person trying without success to elicit incriminating statements in order to save himself. Tr. 5573-87. The defense also argued the testimony was admissible to show Mr. Woodard's state of mind as an innocent person and to rebut the state's assertions made throughout Mr. VanHousen's testimony on direct examination, that Mr. Woodard was a robber trying to cover up his crime. Tr. 5577.

The defense also made its request in writing in TM-1, Trial Memo. R. 2546-99. Attached to the trial memo were redacted transcripts of the tapes which took out references to the polygraph and to Mr. VanHousen doing drugs. R. 2557-99. The trial court rejected this written request, as well as a request for reconsideration. R. 2627-34; Tr. 7940-49.

In the course of the state's case, the state elicited

---

[12] There was a sound evidentiary basis for the defense challenge to Mr. VanHousen's truthfulness of this matter. In addition to the proof that he had told lie after lie to protect himself, he was caught in inconsistencies in the manner in which he claimed he warned Mr. Woodard about the wire. Initially, in police interviews, he claimed he warned him with hand gestures, and that is how the prosecutor described the warning in opening statement. Tr. 2841. However when he found out police had watched the meeting and might have seen hand gestures, Mr. VanHousen changed his story and claimed he mouthed the warning. Tr. 5727-29. Mr. VanHousen had also told his employer in an interview on June 25th that he had not warned Mr. Woodard about the wire. Tr. 5691-92, 5727.

- 74 -

testimony from many witnesses that during the days between the shooting on June 8th and Mr. Woodard's arrest on June 17th, he acted like a guilty, nervous person afraid of being caught. <u>See</u> testimony of Inv. Reeder, FBI agent Niedringhaus, George Nickarz, Mr. VanHousen , Mr. Pierce, and Mr. Bohlin. Some of these claimed admissions by conduct took place at exactly the same time as the wired conversations. For example, FBI Agent Niedringhaus testified to Mr. Woodard's "counter surveillance driving" which took place during the second conversation. Tr. 7223-43. When Agent Niedringhaus testified about the claimed "countersurveillance" driving during the second conversation, the defense objected and pointed out how unfair it was to admit this testimony but not the tape necessary to rebut it. Tr. 7223-40. Some of the claimed admissions by conduct took place in response to what was said in the conversations. For example, Mr. Nickarz, owner of Nick's Gym, testified that during a workout on June 15th, Mr. Woodard became visibly nervous, very quiet, and left the gym over something someone said about him. Tr. 6966-71. Some of the claimed admissions by conduct took place throughout all the days of the wired conversations. For example, Mr. Bohlin testified that Mr. Woodard was acting "paranoid" throughout this entire period. Tr.-5997-6007.

The taped conversations set out, in a manner no other evidence could, Mr. Woodard's state of mind during those days and the reasons for that state of mind and for his actions. Only through those conversations could the jury understand the pressures

Ex. 3, p. 93

put on Mr. Woodard from what Mr. VanHousen was telling him. Only through the tapes could the jury understand the demands and accusations being thrown at him and understand why Mr. Woodard acted as he did in the other contemporaneous situations presented by the state to the jury. In addition, the tapes would give the jury the very words being spoken contemporaneously with Mr. VanHousen's claimed hand signals. Listening to the conversation would be the only reliable way for the jury to evaluate the credibility of Mr. VanHousen's claims. Finally, the words being spoken during the second conversation, and Mr. Woodard's demeanor, calm or upset, when he spoke them, would either rebut or substanti- ate the state's claims that during this conversations Mr. Woodard was doing everything he could to get away from the police he supposedly knew were following him.

The defense Memorandum first made clear that the defense was not seeking to admit this evidence under an exception to the hearsay rule. Instead, the defense sought admission of the tapes for a non-hearsay purpose. Rule 801(c) of the Alaska Rules of Evidence defines hearsay as follows:

> Hearsay is a statement, other than one made by
> the declarant while testifying at the trial or
> hearing, offered in evidence to prove the
> truth of the matter asserted.

Mr. Woodard did not seek to admit the tapes to prove the truth of the matters contained on them. Instead, as set out above, he needed them to explain the context in which his actions took place. They were relevant to show why he may have acted nervous or suspicious, to explain why he overreacted to claims he looked like

Ex. 3, p. 94

the shooter, and to explain why he thought the police were following him. In other words, the defense sought to use them as "verbal acts", a purpose clearly contemplated by the Commentary to the rule, at 497-98.

Caselaw supports use of out-of-court statements for this non-hearsay purpose, accompanied by a limiting instruction. See Drumbarger v. State, 716 P.2d 6, 10 (Alaska App. 1986) (child sex victim's statements asserting that defendant committed sexual act on her admitted not to prove the truth of the assertion, but to prove victim's understanding of the word "penis"); Putnam v. State, 629 P.2d 35, 40 (Alaska 1980) (evidence defendant's employee received many calls from creditors about bad debts admissible as verbal acts to show business' financial condition); Keith v. State, 612 P.2d 977, 981-84 (Alaska 1980) (decedent's journal admissible in murder trial to show his state of mind as likely aggressor); Frink v. State, 597 P.2d 154, 161-62 (Alaska 1979) (testimony about an anonymous call admissible to prove call was made and words were heard by person receiving call); Watson v. State, 387 P.2d 289, 293-94 (Alaska 1963) (testimony that reason for defendant's meeting and discussion with witness was witness' desire to discuss report that defendant shot at someone else admissible where defense claimed reason for meeting and discussion was defendant's fear of decedent).

Of particular relevance is the decision in United States v. Abascal, 564 F.2d 821 (9th Cir. 1977), cert. denied, 435 U.S. 942 (1977). In that case the trial court admitted one of a series

- 77 -

of wiretapped conversations. The prosecution claimed that terms used in the conversation were code words for drugs. Unsuccessfully, the defendant sought to introduce other taped conversations from the same wiretap. His purpose was to rebut the inference that the introduced conversation was about drugs. The appellate court reversed the defendant's conviction. It ruled the proffered tapes were not hearsay because they were admissible not to prove the truth of assertions on them but to show a pattern of verbal behavior between the parties that was consistent with the defendant's claim that the admitted conversation was about an innocent business deal. The same error was committed here.

Mr. Woodard's Trial Memorandum also made clear that even if technically hearsay, the taped conversations were still admissible as an exception to the hearsay rule. Evidence Rule 803(3) provides in relevant part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (3) **Then Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) offered to prove his present condition or future action. ...

The tapes, together with a limiting instruction, were admissible to show Mr. Woodard's state of mind at the time when the state claimed, and offered evidence to prove, that Mr. Woodard was acting nervous and suspicious, suspecting surveillance, and generally behaving as if he had a guilty conscience. The tapes

- 78 -

showed a different, innocent reason for Mr. Woodard's behavior, the five state-ordered confrontations with state agent VanHousen. The tapes showed that reasons why an innocent person might act like Mr. Woodard acted when confronted with the accusations made by Mr. VanHousen.

**C.    THE TRIAL COURT ERRED WHEN IT PROHIBITED THE DEFENSE FROM PRESENTING A PORTION OF A VIDEOTAPED INTERVIEW OF DAVID VANHOUSEN (EXHIBIT CJ) WHERE POLICE PRESSURED AND THREATENED HIM TO OBTAIN STATEMENTS FROM HIM INCRIMINATING MR. WOODARD.**

Cross-examination of Mr. VanHousen set out that he told lie after lie to the police, to the court, and to his employer.[13] Police first confronted Mr. VanHousen on June 10th because they had information he had made incriminating statements about the robbery/ shooting to his father. Tr. 5442. At first, Mr. VanHousen adamantly denied knowing anything about the incident. When that

---

[13] The extent to which lies permeated every statement made by Mr. VanHousen, under oath or not, is described in this exchange:

Q:    (Mr. VanHousen by Mr. McComas) Let me put it to you this way, Mr. VanHousen. Given all the statements you've made, and all the lies and false testimony you've admitted, did you find yourself, when you were making these statements and telling these lies about Carr's, that sometimes you just couldn't help yourself from telling those lies?

A:    It was hard, yes, sir.

Q:    It was hard to stop yourself from lying?

A:    No, sir. It was hard to tell what was the truth and what was not. What was the lies and what weren't.

    (Pause).

Tr. 5734.

- 79 -

did not work, he claimed that he was not involved but that years earlier his friend Jon Woodard had talked about robbing Carrs and he said he believed Mr. Woodard was the robber/shooter.

In police interview after interview between June 10th and June 19th, Mr. VanHousen spun a web of lies, but kept insisting that he had no personal involvement in the crimes.  Tr. 5442-5646. On June 23rd and 24th, police used Mr. Pierce to tape-record his conversations with Mr. VanHousen.  Because he had been used to tape-record Mr. Woodard, Mr. VanHousen suspected Mr. Pierce might be wired during them.  Tr. 5649-50.

On  June 25th, in a videotaped interview, police Inv. Grimes, head of the Homicide Unit, and Inv. Reeder again confronted Mr. VanHousen.  On direct examination, Mr. VanHousen described this interview as one where he did "not fully" admit his involvement, but did agree with the police as to what they were telling him they knew his part to be in the Carrs robbery.  Tr. 5358-59.

On cross-examination, the defense sought to play Exhibit CJ, a videotape of this interview.  It was crucial for the jury to see this tape because it was during this interview that Mr. VanHousen finally admitted some direct involvement in the crimes, and implicated Mr. Woodard as his co-conspirator, not just as someone whom he thought might be the perpetrator.  Before Mr. VanHousen switched his story during this videotaped interview, police put pressure on him and threatened him, including threaten-ing him with a murder charge.  Defense counsel explained:

> Under Rule 613, I have a right to intro-
> duce extrinsic evidence of bias, and motive

and interest. And the only foundation re-
quirement is he be afforded an opportunity to
explain, which ... he did ad infinitum on
direct, and I'm sure he will do again on
redirect.

This is not being offered because it is
a prior inconsistent statement, it's being
offered under ... the other provisions of
613(a), because it is evidence of bias or
interest on the part of a witness, and its
admissible.

Tr. 5400. Recognizing that the tape showed the pressures put on

Mr. VanHousen in a way testimony could not, the state fought to

keep the videotape out, claiming that it was only admissible if the

witness denied making the statements on the tape and claiming it

was more prejudicial than probative. Tr. 5401. The defense

responded that, "It is admissible, and it is highly relevant, not

because of the truth of anything that is said to Mr. VanHousen, but

because of the effect on his state of mind, so that the jury can

see how much he was pressured." Tr. 5402. At that point the court

deferred ruling on the request until after Mr. McComas had gone

over the same matters on cross. Tr. 5403. However, once he did so

and gave the witness another chance to explain, the court still

refused to admit the tape. Tr. 5652-60. The ruling was based on

the court's conclusion that because Mr. VanHousen did not deny

feeling threatened with the law or intimidated, the tape was

somehow irrelevant.

This ruling ignored the defense position that under the

right to confrontation and the best evidence rule, the defense "is

entitled to effectively demonstrate the bias and interest, and not

water it down through counsel's characterizations. But to show the

- 81 -

jury how this witness was threatened." Tr. 5657. The court's ruling meant that the jury was denied the opportunity to see the pressure put to Mr. VanHousen to force him to change his story.

The rule permitting admission of this evidence applies even where the witnesses admitted the prior statements. In both Bentley v. State, 397 P.2d 976, 978 (Alaska 1965), and Gordon v. United States, 344 U.S. 414, 420-21 (1953), courts held that the defendant was entitled to introduce a tape recording of prior statements made by a state's witness which were inconsistent with trial testimony. In both cases the witnesses admitted having made the prior statements. In Gordon, the court explained:

> We think that an admission that a contradiction is contained in a writing should not bar admission of the document itself in evidence. ... The elementary wisdom of the best evidence rule rests on the fact that the document is a more reliable, complete and accurate source of information as to its contents and meaning than anyone's description and this is no less true as to the extent and circumstances of a contradiction.

Id. at 420-21. Adopting this reasoning, in Bentley, the Alaska Supreme Court explained that the jury should have been permitted to hear the taped conversations rather than just hearing an admission of what was contained in the statement "because [the recording] would have best informed the jury as to the recording's impeaching weight and significance." Id. at 978.

Ex. 3, p. 100

**D.    EVIDENCE THAT WITNESSES SEAN PIERCE AND
DAVID VANHOUSEN FAILED TO PASS POLYGRAPHS
AS REQUIRED BY THEIR COOPERATION AGREE-
MENTS SHOULD HAVE BEEN ADMITTED AT TRIAL.**

Sean Pierce was a crucial prosecution witness. He claimed to be the "lookout" in the case and claimed that he had been recruited for that job by Mr. Woodard. Tr. 4296, 4319. He also claimed that he accompanied Mr. Woodard to a remote site where the two burned evidence tying them to the robbery/shooting and threw the weapon used off a bridge. Tr. 4436-43.

On June 22, 1992, Mr. Pierce entered into a formal plea/ cooperation agreement with the state. The parties explicitly con- ditioned his agreement on his passing a polygraph. It required him to tell the truth about the robbery/shooting on June 8th. If Mr. Pierce met all the terms of the agreement, the state agreed not to prosecute him for murder or armed robbery and agreed to a maximum sentence for his crimes of four years. R. 1100-06; Tr. 4702.

The state introduced this agreement as a trial exhibit. Tr. 4531-38. However, over objection, deleted from it when the jury saw the agreement, was the language which required Mr. Pierce to pass a polygraph.

The fact is that Mr. Pierce repeatedly flunked police polygraphs, violated his deal with the state, and was in danger of having it withdrawn. That meant that he was a risk of facing prosecution and sentencing to a maximum of 224 years imprisonment if convicted and sentenced to the maximum for all the crimes to which he confessed. Tr. 4697-4721. The trial court prohibited the defense from eliciting testimony about the pressure put on Mr.

- 83 -

Pierce to cooperate and to testify against Mr. Woodard when he repeatedly failed the polygraph and was threatened with loss of his deal. Officer Herrick operated the polygraph. When Mr. Pierce failed the polygraph, Officer Herrick took him to Investigator Reeder to be interviewed. On cross-examination Mr. Pierce claimed he could not remember if Inv. Reeder told him as a follow-up to his interview with Officer Herrick that he had concerns that Mr. Pierce was withholding information about the Carrs crimes. The court refused to permit the defense to impeach the obviously fabricated testimony with the fact that he surely remembered flunking Officer Herrick's polygraph and the risk to him of losing his deal that entailed. Tr. 4939-49.

John Salemi, Mr. Pierce's attorney, was also called as a witness by the state. On direct examination, the state took advantage of the fact that the defense had been denied the opportunity to have the jury know that the part of the plea agreement which required Mr. Pierce to take and pass a polygraph had been deleted, by eliciting testimony that the written plea agreement stated that it "represents the entire agreement". Tr. 5174-77. Then, unfairly and inaccurately, the state elicited testimony that the only addition to the plea agreement was an agreement not to prosecute Mr. Pierce for crimes he admitted subsequent to signing the written agreement.

David VanHousen was also a crucial state's witness. A Carrs employee, he claimed he participated in the Carrs robbery by feeding information about the store layout and the schedule for

Ex. 3, p. 102

money deliveries to Mr. Woodard. Tr. 5247-51, 5260-62. He claimed he did so because Jon Woodard offered him money. Tr. 5233.

On direct examination, the state offered and the court admitted his plea agreement of June 11, 1992 as exhibit 141. Then the state's attorney took Mr. VanHousen through the "benefits and requirements" it purportedly contained. Tr. 5348-52. Withheld from the jury was the requirement in the agreement that Mr. VanHousen pass a polygraph. The state's attorney took Mr. VanHousen through each police interview in late June where Mr. VanHousen said he first denied and then admitted his involvement. Tr.5357-60, 5368-71. The state also offered and the court admitted his second plea agreement dated June 30, 1992, as exhibit 146. Tr. As before, the state's attorney had him review for the jury the purported "benefits and requirements" of this plea agreement. Tr. 5364-67. This plea agreement had no polygraph requirement.

In light of this direct examination, the defense sought to elicit the fact that only the first agreement, not the second, required Mr. VanHousen to take a polygraph. R. 1734-40, 1779-86. The defense even offered to omit questioning as to whether Mr. VanHousen took the polygraph. The court rejected the request but instead instructed the jury simply that a condition in the first agreement which Mr. VanHousen did not fulfill was not included in the second agreement. Tr. 5395, 5706. The truth, withheld from the jury, was that after entering into the first agreement, Mr. VanHousen failed a polygraph. Confronted with the risk of losing his deal, he came up with a new story much more incriminating to

- 85 -

Mr. Woodard.  Then he got a new deal which did not even require him
to take a polygraph.

For each witness, the polygraph process had a fundamental
impact on his state-of-mind, his vulnerability to state pressure,
and his motive to incriminate Mr. Woodard.  The police use of the
polygraph to cause each one to incriminate Mr. Woodard was crucial
to the jury understanding of the stories each told against him.  As
to Mr. VanHousen, the absence of the polygraph requirement once he
incriminated Mr. Woodard as his claimed co-conspirator was crucial
to an understanding that what the state sought from him was not the
truth, but merely verification of its belief that Mr. Woodard was
the robber/shooter.  For both, the probative value of this evidence
was not the accuracy of the results obtained.

It is certainly true that ordinarily polygraph results
are not admissible at trial.  Pulakis v. State, 475 P.2d 474 (Alaska
1970); Haakanson v. State, 760 P.2d 1030 (Alaska App. 1988).  How-
ever, that general rule should not have applied here to allow the
state to mislead the jury as to its agreement with the witnesses
and mislead the jury as to pressures put on them to incriminate Mr.
Woodard. Instead, Mr. Woodard's fundamental trial rights to present
a defense and to fully cross-examine these witnesses for bias and
motive to lie, which are discussed at pp. 68-69, supra, of this
brief entitled him to admission of evidence about these polygraphs.

Like Alaska, the federal courts generally prohibit
admission of testimony about polygraphs.  However, under circum-
stances like those present here, exclusion of evidence about

- 86 -

polygraphs was held reversible error.  In <u>United States v. Lynn</u>, 856 F.2d 430 (1st Cir. 1988), the trial court prohibited cross-examination about a polygraph given to a government witness pursuant to a plea agreement.  That plea agreement, just like these, required the witness to pass a polygraph or risk losing his deal.  Reversing the conviction, the First Circuit explained that "broad latitude should be afforded the questioning of a government witness which concerns the nature of any agreement he had with the government...." <u>Id</u>. at 433.  Then the appellate court condemned the unfairness of keeping from the jury the strong motive of a witness who failed the polygraph to please the government in order to keep his deal by testifying as it wanted him to testify.  The court also condemned the unfairness of keeping from the jury the hold the government still had over the witness.  Exactly the same was true here.  <u>See</u> <u>also</u> <u>United States v. Estrada-Lucas</u>, 651 F.2d 1261 (9th Cir. 1980); <u>United States v. Barger</u>, 931 F.2d 359 (6th Cir. 1991); <u>United States v. Hart</u>, 344 F.Supp. 522 (E.D.N.Y. 1971).

**E.    THE TRIAL COURT SHOULD HAVE PERMITTED THE DEFENSE TO SHOW THE JURY NEWSPAPER PHOTOGRAPHS (EXHIBIT AD) OF MR. WOODARD AFTER HIS ARREST TO REBUT HIS POST-ARREST IDENTIFICATION BY WITNESS ROBIN CONAWAY.**

Robin Conaway's trial testimony added more evidence to the overwhelming evidence elicited pretrial that her in-court identification was impermissibly tainted by her exposure to the newspaper coverage of Mr. Woodard's arrest.  On cross-examination, she attempted to deny her initial description of the shooter. which was made before the police-planted description of Mr. Woodard and before his photos appeared in the press, was different from her

- 87 -

in-court description until confronted with her own words from the initial taped statement. Tr. 3819-28.

Throughout her testimony she very unconvincingly insisted that she had read or seen on television nothing about the robbery or about Mr. Woodard beyond the one photo on June 19th, which police already knew when they interviewed her in December she had seen and discussed with her co-workers. When shown the June 19th photo at trial by the state's attorney, she denied she had ever seen it before. Tr. 3729-34. On cross-examination she attempted to do the same thing. It was only when defense counsel showed her the exhibit sticker on the photo which proved it was used as an exhibit at the pretrial hearing where she had testified and confronted her with her testimony from that earlier hearing in which she admitted that she had seen the photo, that she finally admitted to the jury that she had seen the photo when it appeared in the newspaper. Tr. 3849-51. When reminded that previously she had stated that she had seen some coverage of the robbery on television, she finally admitted that she had seen the part where she appeared on television. Tr. 3837.

She insisted that while other employees might have discussed who the robber could have been, she only participated in such a discussion with her Deli manager when she mentioned that former employee Billy Evans might have been the robber. Tr.3839-40.

Contrary to these claims, Linda Verfaillie, a bakery worker at Carrs testified at the pretrial hearing on S-3 that the day the photo came out Mr. Conaway told her that she thought the

- 88 -

Ex. 3, p. 106

robber looked like a friend or relative from home named Billy. Tr.
1212. She said that she and Ms. Conaway discussed whether the
person in the photo was the robber. Tr. 1214. Ms. Verfaillie also
recalled that probably when she first saw Ms. Conaway before they
went in the break room on June 19th, she told her that someone was
being arrested or possibly being arrested. Tr. 1220.

    During direct examination the state elicited Ms. Conaway's
testimony that on December 29, 1992, Inv. Reeder showed her a photo
line-up from which she picked out someone she was "pretty sure" was
the shooter. Tr. 3742-43. In court she stated she picked out number
five. The line-up was admitted as exhibit 97-A. Tr. 3747-48.

    The line-up photo was a head-on photograph of Mr. Woodard.
Ms. Conaway had only seen the shooter from across Benson at a dis-
tance she estimated at trial to be 140 feet. She had only seen him
from the side while he was walking away from her. Tr. 3812-14,3826.

    Although she claimed she had not seen any other photos of
Mr. Woodard, she agreed that every day the newspaper was in the
Carrs break room. Tr. 3847-48. At that point the defense sought
to introduce the photos of Mr. Woodard which appeared in the
newspaper on June 24, July 8, and July 21, 1992 (Exhibit AD).
Tr. 3851. Defense counsel pointed out those photos were very much
like the head-on photo of Mr. Woodard that had appeared in the
line-up. Therefore, whether or not Ms. Conaway was willing to
admit it, there was evidence from which a jury could conclude that
Ms. Conaway saw the newspaper photos and/or discussed them with
others and that her ability to pick Mr. Woodard out of a photo

line-up came from the press photos and not from her recognition of his as the shooter. Tr. 3853-54, 3964-69. The trial court refused to admit the photos as exhibits. Tr. 3854.

The defense proved through her employment records that she worked on June 24, July 8, and July 21. Tr. 7702-03. Nonetheless, the court still refused to admit the photos as circumstantial evidence that Ms. Conaway saw them in the newspapers left in the break room and that they might have influenced her identification of Mr. Woodard in the photo line-up. Tr. 7705.

In Alaska, photographs are admissible where they are shown to be accurate representations, are relevant, and where their evidentiary value is not outweighed by prejudice. <u>Miller v. State</u>, 778 P.2d 593 (Alaska App. 1989). The defense proffer of these photographs met all these requirements for admission. Appellant could locate no cases in this or other jurisdictions with facts like those here. However, in cases where the defense was mistaken identification, appellate courts have reversed convictions where the defense was denied an opportunity to introduce photographs necessary to challenge the prosecution's evidence of the defendant's identity as the perpetrator. In <u>Kucki v. State</u>, 483 N.E.2d 788 (Ind. App. 1985), the appellate court reversed the conviction where the trial court excluded a newspaper article which told that police were seeking another man for a series of crimes in the area and the man's photo in the paper resembled the defendant. The court emphasized that the trial court's discretion in excluding this type of evidence must be balanced against a defendant's constitutional

right to present evidence.  Id. at 792.  Applying similar reason-
ing, courts in Hill v. State, 783 S.W.2d 257 (Tex. App. 1987), and
State v. Dunn, 246 S.E.2d 245 (W.V. App. 1978), reversed convic-
tions when the trial courts refused to admit photos essential to
rebut the state's eyewitness identifications.

### F.  THE TRIAL COURT SHOULD NOT HAVE ADMITTED A VIDEOTAPE (EXHIBIT 95) OF MR. WOODARD SHOWING HIM REPEATEDLY FIRING A SHOTGUN, WHICH WAS WHOLLY UNRELATED TO THIS TRIAL.

Exhibit 95 was a videotape which Jon Woodard and Chris
Presley, who were friends, made of each other sometime the last
week of May, 1992, which showed them shooting in the Eklutna area.
Tr. 2686-88.  The entire videotape showed Mr. Woodard taping Mr.
Presley shooting some weapons and showed Mr. Presley taping Mr.
Woodard shooting a Glock pistol, a pump shotgun, and an assault
weapon.  Tr. 3575-79.

Because prior to the time when the state sought to
introduce the videotape at trial the court had already ruled that
such "paramilitary" items were excluded (R. 2173), the state edited
the videotape to delete the portions where Mr. Woodard shot the
assault weapon.  Tr. 3579.  The defense agreed that the portions
where Mr. Woodard fired the Glock were admissible.  Tr. 3587.
However, the defense pointed out that the portions where Mr.
Woodard repeatedly fired a pump shotgun at trees, destroying and
chopping them off, should also be excluded.  Tr. 3575.  The defense
pointed out that the pump shotgun was a paramilitary type weapon
unconnected with the crimes charged, that the destructive manner in
which it was fired on tape was highly prejudicial, and that the

- 91 -

tape unfairly depicted Mr. Woodard as having an aggressive bad personality. Tr. 3575-76, 3587.

The state claimed that the damage to the trees in the area depicted on the tape was relevant because it showed Mr. Woodard shooting in the same area where the police had subsequently picked up some spent Glock casings which matched other casings connected to the Carrs crimes, and because the tape showed that Mr. Woodard, like the Carrs gunman, was a good shot. Tr. 3578-80. In response, the defense renewed a previously made offer to stipulate that the area on the tape was the same area where police later recovered the evidence. Tr. 3581-83. The defense also pointed out that because Mr. Woodard could hit trees with a shotgun did nothing to prove that he had the ability to shoot a pistol and hit a person who was a few feet away. Tr. 3584.

Over this objection, the trial court admitted the videotape showing Mr. Woodard firing the shotgun (Tr. 3587), and at the same time refused to admit the portions of the videotape which showed Mr. Presley firing the same shotgun. Tr. 3588. The defense pointed out that unless both people were shown so that the jury fairly understood that what was going on was two friends out shooting the same weapons, the state would be able to incorrectly and unfairly claim to the jury that what was going on during the tape was Mr. Woodard practicing to go out and commit a robbery. Tr. 358-90. Rejecting this argument, the jury saw only one of the two persons who fired the shotgun on tape. Tr. 3690.

Admission of this evidence violated the holding of <u>Brown</u>

- 92 -

v. State, 601 P.2d 221, 226-27 (Alaska 1979). That case determined that weapons which are not specifically proven to be connected to the offenses charged are irrelevant and inadmissible. Repeatedly, courts in other jurisdictions have reached the same conclusion. See People v. Johnson, 547 N.Y.S.2d 747, 749 (N.Y. App. Div. 1989); Huhn v. State, 511 So.2d 583, 589 (Fla. App. 1987); State v. Brash, 512 A.2d 1375, 1381-83 (R.I. 1986); Stringer v. State, 491 So.2d 2837, 2839-40 (Miss. 1986).

G.   **THE TRIAL COURT SHOULD HAVE GRANTED A MISTRIAL WHEN A CRITICAL STATE WITNESS VIOLATED A PROTECTIVE ORDER AND THE JURY HEARD MORE BAD CHARACTER EVIDENCE ABOUT MR. WOODARD.**

On April 19, 1993, during the state's case, the trial court emphasized that her ruling on E-4 meant that witnesses were prohibited from implicating Mr. Woodard in other criminal acts beyond those for which he was presently on trial. The court emphasized to the state's attorneys that no state's witness, including Sean Pierce, could testify to Mr. Woodard's alleged other criminal conduct for any reason including a claim he admitted to the police his own involvement in other crimes because Mr. Woodard knew about them, would tell his own attorneys, and his involvement would get back to the police. Tr. 4187-4200. Despite these instructions, on April 20, 1993, during direct examination, the state elicited answers which violated the protective order.

> Q:   And prior to giving that testimony, did you tell or inform the police of other criminal activities you had been involved in?
>
> A:   Yes.

Ex. 3, p. 111

> Q: And why is it that you provided that informa-
> tion to the police?
>
> A: In keeping with telling the truth, because Jon
> knew everything, and...

Tr. 4505. Recognizing that this testimony severely prejudiced the defendant in the eyes of the jury because it now had testimony that Mr. Woodard was involved in Mr. Pierce's other crimes, the defense sought dismissal with prejudice, a mistrial, or an evidentiary hearing to find out what instructions prosecutors and police had given the witness which caused his response. The court denied all this requested relief and the trial continued. Tr. 4505-4524. The court instructed the jury to disregard the testimony, but refused to give defense requested instructions that the testimony violated a court order. Tr. 4527-29.

Almost immediately after this improper testimony, the state increased the harm done by it when the state's attorney asked Mr. Pierce to describe his other criminal acts. He admitted to a felony conviction, (Tr. 4534), a robbery, felon in possession of a firearm, a burglary, and some federal crimes. Tr. 4541-47. The damage from the testimony increased when the court permitted the state on re-direct examination, over objection, to question him as to whether he was the "accomplice" in some of the other crimes, including the robbery and burglary he admitted. Tr. 5012-17.

The state's theory in the Carrs case was that Mr. Pierce was the "lookout" and Mr. Woodard's accomplice. Obviously, the inevitable conclusion the jury would draw from the testimony about other crimes was that Mr. Pierce was Mr. Woodard's accomplice in

Ex. 3, p. 112

the other crimes as well.

This testimony violated protective orders against admission of other crimes evidence. It was inadmissible under the caselaw cited at pp. 68-69, <u>supra</u>. Claims by an alleged accomplice that the principal was involved with him in other criminal activity are inadmissible, because they are nothing more than prohibited propensity testimony. In <u>Holmes v. United States</u>, 580 A.2d 1259 (D.C. App 1990), the court reversed convictions where such evidence was admitted and explained:

> Evidence designed to show that [the accomplice] and Holmes had a criminally-oriented relationship with one another is not so very different from proof that the two of them were predisposed to commit crimes together -- in this case, violent crimes.

<u>Id</u>. at 1268.

In <u>McBeth v. State</u>, 652 P.2d 120, 125-26 (Alaska App. 1982), this Court reversed the defendant's conviction because it concluded that a mistrial should have been granted when the prosecutor asked a witness whether he had committed a crime with the defendant. This court reached the same result in <u>Pruitt v. State</u>, 829 P.2d 1197 (Alaska App. 1992), where the prosecutor asked the defendant whether he had been charged with an unrelated crime, as well as in <u>Pinkerton v. State</u>, 784 P.2d 671 (Alaska App. 1989), where the prosecutor asked a defense witness whether he had been prosecuted for a crime. In both cases, this Court ruled that mistrials should have been granted. In both cases, this Court ruled that cautionary instructions were insufficient to cure the error. That ruling follows federal constitutional law that

limiting instructions are not always sufficient to cure the effect of potential prejudice. <u>Bruton v. United States</u>, 391 U.S. 123, 129-35 (1968).

**V.    THE TRIAL COURT DENIED MR. WOODARD HIS CONSTITUTIONAL RIGHT TO BE PRESUMED INNOCENT AND TO PARTICIPATE IN HIS DEFENSE WHEN IT REQUIRED HIM TO GO TO MULTIPLE <u>PRETRIAL HEARINGS AND TRIAL WHILE SHACKLED HAND AND FOOT</u>.**

The trial court's order denying virtually all of Mr. Woodard's P-2 Motion stated the following:

> 4.   Request: Defendant not to be restrained during trial in the courtroom - denied. Defendant will be restrained in the usual way during trial with ankle chains hidden from view by table skirting and be a belt chain to which his wrists are attached by chains.

R. 2174. Forcing this man who was presumed to be innocent to go though trial suffering the physical pain and the mental humiliation of being shackled hand and foot should not be the "usual way" in this state's courts. It totally disabled him from participation in his trial. He could not freely look though papers, make notes or even move without exposing his condition to the jury.

The court's decision violated the rule first stated in <u>Anthony v. State</u>, 521 P.2d 486, 495-96 (Alaska 1974), that, "[a] defendant is presumed innocent throughout the trial, and he should be permitted to face the jury with the appearance and dignity of a free and innocent man," and "without the badges of custody." <u>Stern v. State</u>, 827 P.2d 442, 448. <u>Anthony</u> also made clear that before heavy restraints are used, the court must hold a hearing and that even then, only the least intrusive physical restraints can be used. <u>Id</u>. at 496.

- 96 -

This Court most recently addressed the concerns with extreme physical restraints in Rae v. State, 884 P.2d 163 (Alaska App. 1994). This Court reversed the conviction of a disruptive defendant who was forced to go through a four-day trial bound and gagged. In Rae, this Court cited with approval the decision Spain v. Rushen, 883 F.2d 712 (9th Cir. 1989), which also condemned except as a last resort shackling a defendant because shackles "may confuse and embarrass the defendant, thereby impairing his mental faculties" and cause him pain. Rae at 166; citing Spain at 720-21. Spain also explained that a defendant may not be affected immediately by shackling and may break down on time. Thus, "the greater the intensity of shackling...the greater the extent of prejudice." Id. at 722. This court also cited with approval the decision in Holbrook v. Flynn, 475 U.S. 560 (1986), where the court stated that an "inherently prejudicial practice ... like shackling, should be permitted only where justified by an essential state interest specific to each trial." Rae at 166; citing Holbrook, at 568-69. There was absolutely no reason for the court to force Mr. Woodard through a 2 1/2 month trial shackled hand and foot.

**VI. THE TRIAL COURT ERRED BY DENYING THE POST-TRIAL DEFENSE MOTION FOR DISCLOSURE OR, ALTERNATIVELY, IN CAMERA REVIEW OF PSYCHOTHERAPY RECORDS OF CARRS EMPLOYEES TO DETERMINE WHETHER MR. WOODARD WAS ENTITLED TO A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE.**

Constitutional guarantees of due process and compulsory process require production of evidence which bears on the credibility of prosecution witnesses. United States v. Bagley, 473 U.S. 667 (1985); Sledge v. State, 763 P. 1364 (Alaska App. 1988). These

Ex. 3, p. 115

guarantees pierce claims of privacy or confidentiality. <u>Pennsylva-nia v. Ritchie</u>, 480 U.S. 39 (1987); <u>Braham v. State</u>, 571 P.2d 631 (Alaska 1977).

Mr. Woodard was quite willing to have the names of the witnesses produced initially for <u>in camera</u> review. That should have happened, even if it meant subpoenaing the records themselves. Because the court refused to disclose the records, the defense had no way to know for sure if key "eyewitness" Robin Conaway was among those who participated in these sessions. If the records were for key state witnesses, especially Ms. Conaway. they should have been produced. Such records of therapy before she identified Mr. Woodard would show if she suffered a mental disability which might have affected her ability to accurately testify, if she was on medication with such an effect, or if she made statements inconsistent with her trial testimony. Such records were discoverable and, if favorable to the defense, would have provided a basis for a new trial. <u>See</u>, <u>generally</u>, <u>Latham v. State</u>, 790 P.2d 717 (Alaska App. 1990); <u>Anderson v. State</u>, 749 P.2d 369 (Alaska App. 1988); <u>Chavis v. North Carolina</u>, 637 F.2d 213, 224 (4th Cir. 1980); <u>United States v. Partin</u>, 493 F.2d 750, 762-65 (5th Cir. 1974), <u>cert</u>. <u>denied</u>, 434 U.S. 903 (1977); <u>Wiman v. Powell</u>, 293 F.2d 605, 606 (5th Cir. 1961).

Ex. 3, p. 116

## CONCLUSION

For the reasons set out in this brief, Mr. Woodard respectfully requests this Court to reverse his conviction and remand his case for a new trial. In the alternative, for the reasons set out in Arguments I and VI, he requests this Court to remand his case for further proceedings at the trial court level.

DATED this 9th day of June, 1995, at Anchorage, Alaska.

RESPECTFULLY SUBMITTED,
JON A. WOODARD, Defendant

LAW OFFICE OF CHRISTINE SCHLEUSS

By _____
        Christine S. Schleuss

Ex. 3, p. 117