The court's ruling in <u>U.S. v. McAllister</u>, 18 F.3d 1412 (7th Cir. 1994), addressed this issue.  In that case, an informant told a police detective that the defendant was growing marijuana in his home.  The detective took this information to a magistrate who issued a warrant to search the defendant's house.  Moving to suppress evidence seized pursuant to the warrant, the defendant argued under <u>Franks</u> that the informant lied to the detective.  On appeal, the Seventh Circuit explained that for there to be a <u>Franks</u> violation based on lies told by an informant,

> [T]he question is not what evidence the court relied upon, but whether the appellant made a substantial preliminary showing that the CI was acting as an agent of the state when he provided his allegedly false information to Detective Blakley.

<u>Id.</u> at 1417.  Thus, the time in question was not the time when the informant supposedly saw the marijuana, but was when he told the detective what he saw.

Applying that analysis to this case, where the "informant" testified in person, results in a conclusion that the relevant time in question is the time when Mr. VanHousen told the police and told the judge what he supposedly saw and heard.  Those conversations and testimony, which occurred before the first search warrant was executed, took place <u>after</u> Mr. VanHousen had become a state agent by entering into his agreement with the state.  (<u>See also</u> Mr. Woodard's Br. at 26-28.)

Selection of the time when Mr. VanHousen gave his claimed information to the police and to the judge, and the police then

- 19 -

used him to execute the search warrant as the time pertinent to a determination whether Mr. VanHousen was a state agent, is in keeping with the unusual nature of a Glass warrant. Under the holding in State v. Glass, 583 P.2d 872 (Alaska 1982), as a matter of state constitutional law, electronic monitoring of oral conversations by police officers is illegal unless the police first obtain a search warrant even though one participant to the conversation consents to the monitoring. Subsequently, this Court explained in Thiel v. State, 762 P.2d 478 (Alaska App. 1988):

> Because Glass warrants deal with conversations
> that have not yet occurred, they are inher-
> ently anticipatory. They are frequently used
> in connection with ongoing criminal activities
> or investigations. . . .

Id. at 483 (emphasis in original). It follows from the anticipa-tory nature of a Glass warrant that concerns about protecting the integrity of the process whereby the warrant was obtained and executed, should focus the Franks/Malkin inquiry into the veracity of an informant on whether he was a state agent at the time he provided the information on which the warrant was issued. If an informant was acting as a state agent at the time when he provided information to police and courts for use in a determination whether to issue a search warrant, he should be subject to the same scrutiny as a police officer. Such a requirement would be consistent with traditional search and seizure law in Alaska which requires that a search and seizure by a private individual be scrutinized by the constitutional limitations on searches and seizures in a case where the private individual acted at the

direction of the police. (See cases cited by Mr. Woodard in his
opening brief at 28.)

Such a requirement would best serve the dual purposes of
the exclusionary rule, deterrence and preservation of judicial
integrity. Malkin, 722 P.2d at 946, citing Moreau v. State, 588
P.2d 275, 280 (Alaska 1978). It would deter law enforcement
officials from engaging in precisely the type of improper conduct
used here where they brought to court a person that experienced
prosecutors like Mr. Branchflower and experienced police officers
like Inv. Reeder undoubtedly knew, or at a minimum strongly
suspected, was lying because they wanted to use this liar to obtain
what they might otherwise not have -- statements from Jon Woodard.
Where police use a liar like this one in order to intrude into a
person's privacy, they should be held to answer for his misstate-
ments just as they are held to answer for their own. By the same
token, it would preserve judicial integrity to take every reason-
able step, including this one, to avoid the result of having judges
issue search warrants based on perjury. Because Mr. VanHousen was
acting at the direction of the police when he testified in court
and when he undertook the subsequent tape-recorded conversations
with Mr. Woodard, he should have been treated as a state agent for
purposes of Franks/Malkin.[12]

---

[12] Unlike Alaska, Title III of the Omnibus Crimes Control Act,
18 USC §2510-20, permits interception of a conversation with the
permission of one party to it, but only by those acting under
"color of law". Federal caselaw is that an informant who tape-
records a private conversation at the direct of government inves-
tigators is acting under "color of law". U.S. v. Haimowitz, 725

B.   **MR. WOODARD MADE AN ADEQUATE SHOWING OF MISSTATEMENTS BY LAW ENFORCEMENT OFFICIALS AT THE SEARCH WARRANT HEARINGS TO ENTITLE HIM TO A FRANKS/MALKIN EVIDENTIARY HEARING.**

1.   **Because There Were Disputed Facts As To The Other Misstatements Alleged by Mr. Woodard In His Pleadings and Supporting Documentation, He Was Entitled to a Hearing.**

Mr. Woodard's opening brief set out the facts from Mr. Woodard's pretrial pleadings which demonstrated a sufficient showing of misstatements and omissions to entitle him to a hearing. The falsehoods objected to by the defense included: (1) false claims by the prosecution that Mr. VanHousen was a "citizen witness," (R. 170); (2) misstatements and omissions in Inv. Reeder's summary of the witness descriptions and his false claim that most of the descriptions matched Mr. Woodard's known appearance, (R. 170-173, 271-273); (3) omission of evidence that a person not fitting Mr. Woodard's description had been seen lurking around the store, (R. 173); (4) omission of evidence that Mr. VanHousen had felt threatened by the police, (R. 179-80); (5) omission by Inv. Spadafora in his description of a robber at Little Caesar's that the robber, unlike Mr. Woodard, was ethnic, either Mexican or Alaskan [native], (R. 200); (6) testimony by Inv. Reeder that Crimestopper callers thought Mr. Woodard met the description of the robber, but omission of the fact that police planted a police-manufactured description in order to focus attention on Mr.

_____

F.2d 1561, 1582 (11th Cir. 1984); U.S. v. Shields, 675 F.2d 1152, 1156-57 (11th Cir. 1982); U.S. v. Mendoza, 574 F.2d 1373, 1377 (5th Cir. 1978), cert. den. 439 U.S. 988 (1978). A conclusion that an informant was acting under "color of law" is the same thing as a conclusion that he was a state agent.

Woodard, (R. 204); (7) Karl Bohlin's false testimony as to his connections with Mr. Woodard, (R. 239-244, 249-251); and (8) F.B.I. Agent Niedringhaus's omission of material exculpatory facts about a marijuana grow operation and weapons in Mr. Woodard's trailer, (R. 253-258). (See Mr. Woodard's Br. at 14-18, 30-32, 34-36, 38.)

The State disputed whether the above testimony amounted to misstatements and omissions. It also claimed that if there were misstatements and omissions, they were either negligent or else not material. (R. 413-543.) Resolution of the dispute required an evidentiary hearing.

The State claims that this Court's decision in Davis v. State, 766 P.2d 41, 43 (Alaska App. 1988), supports its argument that it was within the trial court's discretion to deny Mr. Woodard an evidentiary hearing. Review of the Davis opinion makes clear that the trial court has discretion to deny an evidentiary hearing only in cases where there is not a dispute as to the facts. Where the facts are disputed, there must be a hearing to resolve them and the court has no discretion to deny an evidentiary hearing. It is only in cases where the facts are not disputed that the court has discretion to deny a hearing. Id. at 43-44. Where the court fails to allow a defendant an opportunity to present his case and his witnesses at a hearing, the court violates the defendant's right to due process of law. Atkinson v. State, 869 P.2d 486, 492-93 (Alaska App. 1994), citing Smaker v. State, 695 P.2d 238, 240 (Alaska App. 1985). That is exactly what happened here, and Mr. Woodard was denied his due process right to an evidentiary hearing.

- 23 -

2. **Mr. Woodard Should Not Have Been Required To Prove The Misstatements Of Law Enforcement Officials At The Search Warrant Hearings Were Made Intentionally Or Recklessly.**

A critical mistake in Judge Hunt's reasoning which led to her conclusion that Mr. Woodard failed to make an adequate preliminary showing to entitle him to an evidentiary hearing came when she erroneously required the defense to make a substantial showing that any misstatements were made intentionally or recklessly. Her initial summary of the ruling in Malkin accurately stated that it required that once the defendant specified the statements alleged to be false, the burden shifted to the State to prove the misstatements were not made intentionally or with reckless disregard of the truth.  Notice of Issues at 9, (R. 1517). However, in her Order Denying Reconsideration, Judge Hunt made clear that she considered it to be the defendant's burden before he was entitled to a hearing to make a "substantial preliminary showing" not only that parts of the sworn testimony were false, but "that these false misstatements or omissions were deliberately made with the intention of misleading the court."  (R. 1663.)

The State's brief to this Court makes the same mistake. In it, the State argues that under Malkin, to get a hearing, a defendant must make a substantial showing that (1) there were falsehoods made to the search warrant judge and, (2) the falsehoods were made deliberately or at least with reckless disregard for the

Ex. 4, p. 31

truth.    (State's Br. at 30-32.)[13]   This is wrong.   Mr. Woodard
agrees that to be entitled to a hearing, he was required to make a
substantial showing of misstatements or omissions.   However, he was
not required to make a substantial showing of the mental state of
the law enforcement officials who made the misstatements. The most
he could do to show their mental state was to show the misstate-
ments they made, which he did.   Beyond that, he had no way of
proving their mental state without a hearing and an opportunity to
cross-examine under oath the prosecutor and the police officers.

Placing on a defendant the burden of making a substan-
tial showing of the mental state of those who testified falsely at
the search warrant hearing would defeat the reasoning of the Alaska
Supreme Court in Malkin that the State, not the defendant, must
prove the mental state of those who gave false testimony.   Any
shift of that burden back to the defendant as a requirement for a
hearing would contradict the following language from the Malkin
opinion:

> The rule we embrace is that once the defendant
> has pointed out specifically that statements
> in the affidavit are false, together with a
> statement of reasons in support of the asser-
> tion of falsehood, the burden then shifts to
> the state to show by a preponderance of the
> evidence that the statements were not made

---

[13]   The State makes the same mistake when it claims that the
defendant must show an intentionally false statement by a law
enforcement official to be entitled to automatic suppression.
(State's Br. at 25, n.4.)   To be entitled to automatic suppression,
the defendant must show misstatements.   The burden then shifts to
the State to show that the misstatements were not intentional.
Malkin, 722 P.2d at 946-48.

- 25 -

> intentionally or with reckless disregard for
> the truth.

Id. at 946.  It would contradict this language from the opinion as
well:

> It is consistent with traditional notions of
> placing burdens of proof that once the defen-
> dant has shown the affidavit contains material
> false statements, the burden should shift to
> the prosecution to justify these misstatements
> by showing that they were not made intention-
> ally or recklessly.  Since it is the police
> officer alone who knows the circumstances
> under which he made the statements in the
> affidavit, to make the defendant prove intent
> or recklessness would probably impose an
> insurmountable burden on him. . . .  Placing
> such a burden on defendant would render the
> test practically meaningless so as to have
> little deterrent effect.

Id. at 947-48.  Judge Hunt's refusal to grant an evidentiary

hearing for this reason is independent grounds for reversal.

### 3.  Mr. Woodard Should Not Have Been Required To Prove That Intentional Misstatements Were Material To The Finding Of Probable Cause.

Argument II.A.2. of this brief sets out the caselaw from

Alaska which, contrary to Judge Hunt's rulings below, makes clear

that intentional misstatements are automatic grounds for reversal

regardless of whether they were material to the search warrant

judge's finding of probable cause. (See also Mr. Woodard's Br. at

19-20.)  In addition to mistakenly requiring a finding of material-

ity for suppression of intentional misstatements of Mr. VanHousen,

Judge Hunt required a finding of materiality for suppression of

misstatements of the prosecutor who presented the case and the

police officers who testified.  Mistakenly, she concluded that any

- 26 -

intentional misstatements by the prosecutor or Inv. Reeder as to
the nature of Mr. VanHousen's involvement in the crimes were not
grounds for suppression because they were not material,[14] that
misstatements by Inv. Reeder as to witness descriptions and the
omission of information about another possible suspect were not
grounds for suppression because they were not material without any

---

[14]    Seeking to excuse Mr. Branchflower's presentation of Mr.
VanHousen as a "citizen witness", (R. 551), the State claims all
Mr. Branchflower meant was that he "was a citizen, as distinguished
from a police officer."  Then the State claims that the questions
Mr.  Branchflower asked Mr. VanHousen and the information Mr.
Branchflower provided the judge "explicitly and implicitly"
informed the judge that the prosecutor and police were suspicious
that Mr. VanHousen was Mr. Woodard's accomplice. (State's Br. at
34.)   Nothing could be further from the truth.  As an experienced
prosecutor like Mr. Branchflower well knew, "citizen witness" is a
term of law to distinguish someone from a "criminal informant."
The distinction between the two "turns on the nature of the
informant's involvement with the incident being investigated and
his or her motivation for coming to the authorities." Gustafson v.
State, 854 P.2d 751, 756 (Alaska App. 1993), citing Erickson v.
State, 507 P.2d 508, 517 (Alaska 1973).
        When  this  Court  reviews  the  transcript  of  the  first
search warrant hearing, it will find that police and prosecutors
presented Mr. VanHousen as someone they might have initially had
suspicions about, but who had eliminated any suspicions through his
exculpatory statements to them. (R. 556-81, 586-625.)  The false
presentation of Mr VanHousen as "citizen witness" misled Judge
Andrews to the erroneous conclusion that he was merely a "concerned
citizen," (R. 623), and was a "very credible" witness, (R. 630).
When this Court reviews the transcript of the second hearing, this
Court will see that the State presented Mr. VanHousen as a truth-
teller who had merely omitted a few items or misstated them in the
course of his earlier testimony.  (R. 693-716.)  In this section of
its brief, the State incorrectly claims that evidence was presented
to Judge Andrews that Mr. "Woodard had told his father that no one
was  supposed  to  get  hurt."   (State's  Br.  at  34.)    The  State
provides no reference to the record to support this claim.  There
has never been any testimony or evidence that Mr. Woodard made any
such statement to his father.  In any case, questions as to the
prosecution motive for offering Mr. VanHousen as, essentially, a
truthful witness and the extent of their contrary opinions of the
true  extent  of  his  involvement  should  not  have  been  resolved
without an evidentiary hearing.

- 27 -

discussion of whether they were intentional,[15] and that Inv. Spadafora's omission was not material.   As to all the prior misstatements, Judge Hunt lumped together "intentional and/or reckless misstatements" and concluded, "no material misstatements or omission[s] were made".  (R. 1541.)

The trial judge's requirement that all misstatements and omissions, intentional as well as reckless, had to be material to the probable cause determination before they were grounds for suppression was error.  It is separate grounds for reversal now.

**C.   ADMISSION OF THE EVIDENCE SEIZED PURSUANT
      TO THE SEARCH WARRANTS WAS NOT HARMLESS ERROR.**

The State makes no claim as to SW 92-915, SW 92-131, 132, 133, 134 and 135, SW 92-137 and 138, that evidence seized pursuant to those warrants was harmless.  The only harmless error claim made by the State on the search warrant issues was to evidence seized pursuant to Federal Warrant A92-141MJ.  Therefore, as to errors in

---

   [15]   The State claims that there was not evidence that Inv. Reeder misstated the witness descriptions.  (State's Br. at 39-41.) This is wrong for all the reasons set out in Mr. Woodard's opening brief at 23-24.   In addition, the pretrial affidavit of defense investigator Dee Taylor detailed Inv. Reeder's admissions to him that he did not even bother showing a photographic array to the Carrs witnesses because of the strong likelihood of misidentification.   (R. 36.)   At a pretrial hearing, Inv. Reeder acknowledged that he did not present photos to the Carrs witnesses because he did not think the witnesses had sufficient time to view to made a reliable identification.   (Tr. 1194; see also Tr. 1187-88.)   This information came out in the context of the S-3 motion.   It was further proof which the defense should have been given an opportunity to present evidence at an S-1 hearing that Inv. Reeder knew the witness descriptions were unreliable and knew they varied dramatically, but misstated these descriptions and misled the judge about their reliability when he testified at the search warrant hearing.

admission of evidence seized under the earlier warrants, reversal is automatic.  As to the federal warrant, the State claims in two sentences that the evidence, a flak vest, "the" scanner, two lists of scanner frequencies and express mail receipts was harmless in light of the "vast evidence" of guilt.  (State's Br. at 61.)

Admission of this evidence violated the Fourth Amendment to the United States Constitution and Art. I, § 14 of the Alaska Constitution.   Before admission of the evidence can be found harmless, the State must prove beyond a reasonable doubt that the evidence did not affect the jury verdict.  <u>Chapman v. California</u>, 386 U.S. 18 (1967); <u>Dorman v. State</u>, 622 P.2d 448, 459 (Alaska 1981); <u>Padgett v. State</u>, 590 P.2d 432, 434-35 (Alaska 1979).  The State has not proved this evidence harmless beyond a reasonable doubt.  A bald claim that there was "vast evidence" of guilt is insufficient. Here the jury obviously felt it was not an overwhelming case because it acquitted Mr. Woodard of first-degree murder, the most serious charge.  The evidence seized pursuant to this federal warrant was key evidence used by the State to link what it claims were instruments used in the crimes directly to Mr. Woodard. In light of the fact that the murder weapon and other clothing and instruments used by the perpetrator were never found and the robbery money was not found in Mr. Woodard's house but elsewhere, the evidence was crucial to the State's case against Mr. Woodard and its admission was not harmless beyond a reasonable doubt.

IV.

### THE TRIAL COURT CAUSED REVERSIBLE ERROR WHEN IT DENIED MR. WOODARD'S S-3 MOTION TO SUPPRESS PRETRIAL AND IN-COURT IDENTIFICATION AS IT APPLIED TO IDENTIFICATION OF MR. WOODARD BY ROBIN CONAWAY

In its brief, the State summarizes Robin Conaway's testimony in a manner to convince this court to disregard the uncontested evidence that her early description of the robber/shooter as someone who had a very different description from Mr. Woodard because she was "overwhelmed, upset and confused." (State's Br. at 64.) Similarly, it attempts to convince this Court to disregard her initial identification of the robber as her 5'8" to 5'10" former co-worker Billy as not a serious identification. (State's Br. at 66, n.8.) In fact, caselaw from the Alaska Supreme Court is that the more accurate the initial description and the closer in time to the crime that the witness identifies the defendant as the perpetrator, the more likely it is that the identification is reliable and admissible. Howe v. State, 611 P.2d 216, 218 (Alaska 1980). The fact that Ms. Conaway originally described and identified someone other than Mr. Woodard as the perpetrator of the crimes, together with the fact that she saw the perpetrator for less than one minute from over 100 feet away across a busy street is overwhelming evidence that her identification of Mr. Woodard as the perpetrator _after_ she had seen his photo in chains was the product of undue suggestion from the photo she saw. See Holden v. State, 602 P.2d 452, 456 (Alaska 1979).

- 30 -

As further support for its claim that her identification was reliable and not corrupted by the photo, the State points out that Ms. Conaway claimed that she was drawn to the photo because Mr. Woodard had the same physique and stride as the perpetrator. (State's Br. at 65 and 72.) However, until she saw this photo, she had described the shooter/robber as having a totally different physique from Mr. Woodard. Until she saw the photo, she described that the perpetrator "didn't look muscular." (R. 1300.) She described that he wore a jacket and a long sleeved shirt. (R. 1301.) After she saw the photo of Mr. Woodard, who wore short sleeves and had muscular arms, she changed her description to someone who had a muscular build. (R. 1308.) As to the "stride", Mr. Woodard was shackled in the photo. It is impossible to understand how her claim that the stride of a shackled man matched the stride of someone walking away from a robbery lends any credence to her identification.

The State claims that because the actual photo that Ms. Conaway admitted she saw in the newspaper was not arranged by law enforcement, Mr. Woodard was not entitled to exclusion of her identification at trial. (State's Br. at 69.) The State cites no authority for this argument. The law is otherwise. As Mr. Woodard pointed out in his opening brief, the police provided the information to the press which caused the press to publish the photo and the accompanying article. (Mr. Woodard's Br. at 39-41, 49.) That is certainly adequate "state action" to trigger due process protection. Cf. <u>D.R.C. v. State</u>, 646 P.2d 252 (Alaska App. 1982).

Moreover, while this precise issue has not been decided by the appellate courts in Alaska, courts in other jurisdictions have excluded identifications which were based on unduly suggestive media images even where the police had no involvement in publication of the media image.  (See Mr. Woodard's Br. at 50.)

V.

**FAILURE TO CHANGE VENUE REQUIRES REVERSAL. ALTERNATIVELY, REFUSAL TO GRANT CHALLENGES FOR CAUSE OR REQUESTS FOR ADDITIONAL PEREMPTORY CHALLENGES REQUIRES REVERSAL**

A.    **CHANGE OF VENUE.**

In response to Mr. Woodard's arguments the State asserts "the vast majority of venirepersons were not prejudiced by the media exposure."  (State's Br. at 78.)  In support, the State argues that (1) the 12 newspaper articles and 45 television reports attached in support of Woodard's motion occurred far enough in advance of trial that the jury was not prejudiced by the reports, (2) prejudice did not occur because the trial was conducted in Anchorage, and (3) because only three of the jurors challenged were expressly excused as a result of publicity no prejudice has been demonstrated.  (State's Br. at 78-79.)[16]

_____

[16] In the trial court the State, by virtue of its agreement to a five-month continuance in an effort to avoid problems created by pretrial publicity, implicitly agreed that the publicity was in fact prejudicial.  Likewise, argument in the appellate court that the passage of time removed any prejudice to the defendant from pretrial publicity also concedes the prejudicial nature of the publicity, i.e., if the publicity is not highly prejudicial, the passage of time is irrelevant.  The State cannot now be heard to argue that the content of the publicity was not prejudicial.

- 32 -

The State's factual contentions are flatly contradicted by the record in this case.   Virtually every juror examined recalled news stories regarding Mr. Woodard.   All jurors recalled the case involved the robbery of a Carrs and a shooting which resulted in death.   The sources of this knowledge were accounts contained either in the Anchorage Daily News or media broadcasts.[17] Even jurors who initially denied any recollection of the crime subsequently remembered details of the offense.[18] Approximately one third remembered seeing Mr. Woodard's picture in connection with his arrest on murder and robbery charges.[19]   A large number of jurors recognized Mr. Woodard when they came into the courtroom.[20]

---

[17]     Clark (Tr. 1644, 1645), Clayton (Tr. 1658), Rader (Tr. 1665), Gibb (Tr. 1693), Ord (Tr. 1698), Symmes (Tr. 1729), Daley (Tr. 1764), Combs (Tr. 1807), Hall (Tr. 1835), Strausser (Tr. 1847), Simcox (Tr. 1860), Bushnell-Benson (Tr. 1866, 1867, 1877, 1879), Kennedy (Tr. 1890), Sculis (Tr. 1923, 1924), Lenseth (Tr. 1953, 1954, 1955), Tisdale (Tr. 1983), Rouse (Tr. 2015), Young (Tr. 2031), Doerner (Tr. 2056, 2057), Wirbinske (Tr. 2077), Carmichael (Tr. 2095), Fifield (Tr. 2128), Stohl-Reiland (Tr. 2161, 2162), Morrison (Tr. 2237, 2239), Doiel (Tr. 2267), Richerson (Tr. 2283, 2286), Takaki (Tr. 2363, 2366, 2367), Lapiad (Tr. 2381), Thomassen (Tr. 2393), Cusack (Tr. 2417), Maley (Tr. 2501, 2502), Ensminger (Tr. 2520), Bohmann (Tr. 2590), White (Tr. 2633, 2641), Beitelhuff (Tr. 2650), Oxnam (Tr. 2706), Foreman (Tr. 2714), and Ashmore (Tr. 2730).

[18]     Clark (Tr. 1644, 1645), Clayton (Tr. 1658), Lenseth (Tr. 1954, 1962, 1963), and Takaki (Tr. 2362, 2363, 2366, 2369).

[19]     Ord (Tr. 1703), Symmes (Tr. 1730), Yates (Tr. 1813), Strasser (Tr. 1847), Simcox (Tr. 1861), Bushnell-Benson (Tr. 1867, 1877), Sculis (Tr. 1924, 1932-33), Doerner (Tr. 2057), Carmichael (Tr. 2095, 2114), Stohl-Reiland (Tr. 2161), Morrison (Tr. 2239), Thomassen (Tr. 2349), Takaki (Tr. 2363), Cusack (Tr. 2418), Maley (Tr. 2503), White (Tr. 2641), and Beitelhuff (Tr. 2650-51).

[20]     Ord (Tr. 1703), Daley (Tr. 1771), Yates (Tr. 1813), Bushnell-Benson (Tr. 1879), Takaki (Tr. 2369), Lapiad (Tr. 2378), Thomassen (Tr. 2394), Cusack (Tr. 2417), Bohmann (Tr. 2590), and

Many jurors had discussed the case with others.[21]  Some recalled Mr.

Woodard based solely on his hair.[22]

      Furthermore, as a result of media exposure many jurors

had specific recollections regarding the facts and circumstances

surrounding the offense.[23]  A number of jurors recalled the

information in exactly the prejudicial fashion reported.[24]  Based

---

White (Tr. 2641).

   [21]  Tisdale (Tr. 1986), Young (Tr. 2030), Doerner (Tr. 2058), Carmichael (Tr. 2090, 2101), Hilde (Tr. 2156), Stohl-Reiland (Tr. 2162-2163), Lewis (Tr. 2170), Edwards (Tr. 2215), Doiel (Tr. 2268), Takaki (Tr. 2368), Beitelhuff (Tr. 2659), and Oxnam (Tr. 2706, 2708).

   [22]  Symmes (Tr. 1731), Strasser (Tr. 1848, 1855), Simcox (Tr. 1861), Morrison (Tr. 2240, 2248), and Cusack (Tr. 2427).

   [23]  (Clark, Tr. 1645) (look-out on one of the overpasses; "If it was in the papers I probably saw it."); (McDowell, Tr. 1658) (initially denied any specific recollection, then recalled employee involved in the crime and the perpetrator had gone out through the back door.); (Ord, Tr. 1698) (involvement of a Carrs employee); (Daley, Tr. 1764, 1765, 1766) (obtained his information both from television and newspaper; perpetrator jumped over a fence while running away, police lost trail of the perpetrator in a trailer court, involvement of accomplices, including someone inside the store); (Simcox, Tr. 1860, 1861, 1862) (received his information from the Anchorage media; accomplices involved, one of the accomplices hid the money, one of the accomplices turned himself in, Mr. Woodard was a body builder, and "Based on what I saw in the paper it was cut and dried"); (Bushnell-Benson, Tr. 1866) (robbery, a killing, and involvement of three men, one of whom was a look-out); (Scalis, Tr. 1923, 1924, 1932, 1933) (obtained information from newspaper and television; referred to offense as "ruthless stuff", recalled burning of evidence, involvement of accomplices, charging of someone who had worked in Carrs, photo of handcuffed Woodard in paper, "Steven Seagal type"); (Pajak, Tr. 2537) (robbery, killing, involvement of an in-store accomplice.)

   [24]  (Ensminger, Tr. 2520, 2531) (Mr. Woodard proficient in martial arts and firearms, reference to Steven Seagal was tied to the martial arts and firearms); (Sculis, Tr. 1933) (Mr. Woodard a "Steven Seagal type"); (Thomassen, Tr. 2393, 2409) (Mr. Woodard reminded her of Steven Seagal, remembered that description from the

- 34 -

upon media coverage, jurors believed the police had arrested the perpetrator of the crime when they arrested Mr. Woodard.[25]    Other jurors had formed opinions of the offense as "cruel," "cold-blooded," "a horrible incident," and "ruthless stuff." [26]

Despite this factual record, the State asserts that because only three of the prospective jurors excused were expressly removed because of exposure to prejudicial publicity this court should decline to apply the more relaxed standard set forth in Newcomb v. State, 800 P.2d 935, 938 (Alaska App. 1990).[27]    Such an assertion ignores the nature of the inquiry at issue here and the applicable law.

A change of venue is required if, due to dissemination of potentially prejudicial material, there is a substantial likelihood that, in the absence of such relief, "a fair trial by an impartial

---

newspaper); (Stohl-Reiland, Tr. 2163) (Mr. Woodard as a Steven Seagal type, and that meant a "shoot-em up personality"); (Symmes, Tr. 1731, 1743) (recalled Mr. Woodard's hair, that he wore dark clothing and, at the time of his arrest, police had discovered an "arsenal"); (Yates, Tr. 1794) (allegations of other criminal conduct by Mr. Woodard).

[25]    Lenseth (Tr. 1963), Rouse (Tr. 2022), Stohl-Reiland (Tr. 2167), Symmes (1733, 1742), Simcox (Tr. 1862), Bohmann (Tr. 2602, 2603), Beitelhuff (Tr. 2660).

[26]    Tr. 2082, 2077, 1923.

[27]    To the extent the state's argument may be understood as suggesting that only those three jurors were exposed to pretrial publicity or had familiarity with the case, the argument is misleading.  Of the 21 jurors referred to by the state, only seven (Dobson, Lamoreaux, Scalis, Swanson, Biagiotti, Guernsey and Turner) did not indicate on the record either exposure to pretrial publicity or familiarity with the facts.  However, as to those seven, each was excused prior to any inquiry as to such knowledge.

- 35 -

jury cannot be had. . . . A showing of actual prejudice shall not be required." <u>Mallott v. State</u>, 608 P.2d 737, 748 (Alaska 1980). If a juror is familiar with relevant information, the court should view that juror's claim of impartiality with skepticism. <u>See</u> <u>Mallott</u>, 608 P.2d at 748; <u>Oxereok v. State</u>, 611 P.2d 913, 919 (Alaska 1980).

When a case generates "intensive pretrial publicity" and results in a substantial number of venirepersons who appear to have been prejudiced with regard to the case a change of venue is required. <u>Newcomb v. State</u>, 800 P.2d 935, 938 (Alaska App. 1990), citing <u>Mallott</u>, 608 P.2d at 748. Because the <u>voir</u> <u>dire</u> process is not "an infallible Geiger counter" of juror prejudice, excessive reliance on the efficacy of <u>voir</u> <u>dire</u> in uncovering "actual prejudice" places an unrealistic burden on the defendant. <u>Mallott</u> <u>v. State</u>, 608 P.2d at 748. When the media coverage has been extensive and highly prejudicial, the court must give substantial weight to the obvious potential for prejudice which "might even be unconscious but no less real. . . ." <u>Oxereok</u>, 611 P.2d at 919.

In this case, the relative size of the Anchorage community notwithstanding, the impact of the highly prejudicial pretrial publicity is both obvious and well-documented. As the state concedes, only one of the fifty six jurors called for service had heard nothing about the case. (State's Br. at 81; Tr. 2144.) Juror statements establish a detailed recollection of both the crime and Mr. Woodard's arrest. Opinions and recollections based upon reports in the Anchorage media, such as "ruthless stuff", the

- 36 -

discovery of an "arsenal", a "horrible incident" which was one of the "more significant" crimes to have occurred in Alaska,[28] a "shoot 'em up personality", "cold blooded" offense, "cruel" and "it was cut and dried" regarding Mr. Woodard's guilt establish both an impartiality which cannot be laid aside and a substantial likeli-hood of unrevealed juror bias. Jurors had far more than passing knowledge of both the commission of the offense and the state's theory of the case. No dispute exists that many had formed not only opinions about the case, but opinions as to Mr. Woodard's guilt.

The State concedes the entire jury had knowledge of the case. (State's Br. at 81.) The State further admits half of the jury recalled specific factual information regarding the offense. (Id.) The record in this case is void of indication that either the passage of time or the size of the community blunted the impact of the pretrial publicity. The pretrial publicity had a strong negative impact on the jury.

In addition to the prejudice demonstrated by the answers of the jurors, given the pervasive nature of the publicity, there is a high likelihood of unconscious or undetected prejudice on behalf of the jury pool. Independent review of the record in this case reveals the trial court abused its discretion both in declining to find a "partiality which could not be laid aside" and in declining to find the comments of the jurors gave rise to a

---

[28] Tr. 2659, 2652.

- 37 -

substantial likelihood of unrevealed juror prejudice.[29]  Mr. Woodard's conviction should be reversed.

B.  **CHALLENGES FOR CAUSE/ADDITIONAL CHALLENGES.**

With regard to the court's failure to grant the challenges for cause to Jurors Young and Beitelhuff, the state does no more than assert nothing in the record supports the contention they were exposed to prejudicial pretrial publicity.  The record rebuts this assertion with regard to both jurors.

As to Juror Young the record establishes she obtained information with regard to Mr. Woodard and the offense in discussions with people who had read the paper.  (Tr. 2031.)  Juror Young also talked with friends at work about the case.  (Tr. 2030.) After being notified she was a member of the jury pool in Mr. Woodard's case, despite a court order not to discuss the case with anyone, Juror Young inquired of an attorney with regard to the number of peremptory challenges which could be exercised by the defense.

Juror Beitelhuff learned about Mr. Woodard's case from both television and the newspaper.  (Tr. 2650.)  She recalled the

---

[29]  The State has also argued that publicity occurring after the jury was empaneled is not relevant to this issue.  (State's Br. at 77.)  The State cannot simultaneously argue that publicity had abated and then assert proof that it had not abated is "irrelevant."  The issue is not whether a fair and impartial jury could be empaneled but whether Mr. Woodard could be tried by a fair and impartial jury.  In light of the fact Mr. Woodard consistently voiced concerns regarding the possibility of juror taint due to publicity the trial was likely to precipitate, this information is indeed relevant to the inquiry as to whether the court should have granted a change in venue.

- 38 -

murder and pictures of Mr. Woodard at the time of his arrest.  (Tr. 2650.)  Ms. Beitelhuff described the crime as a "horrible incident" and discussed it with others because it was one of the "more significant" crimes to have occurred in Alaska.  (Tr. 2659, 2652.) At the time of Mr. Woodard's arrest, Ms. Beitelhuff was convinced the police had caught the person who had done the crime.[30]  (Tr. 2659, 2660.)  In addition, Ms. Beitelhuff generally believed people arrested were usually the ones who "did it," and advised the parties she was uncertain as to whether she could put her opinion aside.  (Tr. 2660, 2662.)

The Supreme Court has adopted the A.B.A. recommendation regarding the acceptability of jurors exposed to pretrial publicity.  Mallott v. State, 608 P.2d at 749-750.  If formation of an opinion is admitted, a juror is subject to challenge for cause unless the examination shows unequivocally the capacity to be impartial. Id.  Jurors exposed to highly significant information or substantial amounts of inflammatory material shall be subject to challenge for cause without regard to testimony as to the prospective juror's state of mind.  Id.

On the issue of challenges for cause, the only assertion offered by the State is rebutted by the record.  Not only did Juror Young have knowledge based upon pretrial publicity, she had discussions with people at work regarding the case.  The state's

---

[30]  Ms. Beitelhuff was not alone in voicing her opinion the police had arrested "the right guy"; Lenseth (Tr. 1963), Rouse (Tr. 2022) and Bohmann (Tr. 2603).

argument with regard to Juror Beitelhuff lacks all merit. Ms. Beitelhuff's information regarding the case came from the Anchorage media. Based upon what she had learned from the media, she described the offense as a "horrible incident", described it as one of the "more significant" crimes in Alaska, voiced an opinion the Mr. Woodard was guilty, and conveyed to the parties her misgivings regarding her ability to put her opinion aside. Regardless of the trial court's subsequent ability to gain an equivocal guarantee of impartiality from Ms. Beitelhuff,[31] the standard set forth in _Mallott_ mandated that she be excused for cause. The failure to grant the challenge for cause was error.

When good cause exists, a trial court should relax the limitations on peremptory challenges contained in Rule 24(d), Ak.R.Cr.P. See _Ketzler v. State_, 634 P.2d 531 (Alaska App. 1981). Where pretrial publicity increases the likelihood the allotted number of peremptory challenges is insufficient, the court shall permit additional peremptory challenges to the extent necessary to empanel an impartial jury. _Nelson v. State_, 781 P.2d 994, 997 (Alaska App. 1989). Failure of the trial court to grant either a challenge for cause or additional peremptory challenges when a juror gives an equivocal description of impartiality constitutes reversible error. _Jerrel v. State_, 756 P.2d 301 (Alaska App. 1988).

Beitelhuff and Young had discussed the case with others as a result of the media coverage the offense precipitated.

---

[31] "I think . . . I would have to dismiss that (her recollection) and concentrate on the facts at hand." (Tr. 2651.)

Ex. 4, p. 47

Young's responses established both the formation of an opinion regarding the case and a conscious refusal to follow the court's orders not to discuss the case.    Ms. Beitelhuff's responses established, beyond question, the basis of a "for cause" challenge. The comments of those two jurors as well as the statements of others demonstrates a substantial likelihood of unconscious or undetected prejudice on behalf of the jurors and establishes good cause for additional peremptory challenges.    Under the case law cited above, the failure of the trial court to grant Mr. Woodard's challenges for cause as to these two jurors, or in the alternative to grant two additional peremptory challenges constitutes error requiring reversal of his convictions.

C.    **CONCLUSION.**

The robbery of the Aurora Village Carrs, coupled with the intensive detailed media coverage of both the crime and allegations regarding Mr. Woodard, made this offense "one of the more significant crimes in Alaska."    The entire venire recalled both the crime and events surrounding its commission.    Nearly all information possessed by jurors was provided by the Anchorage media.    Jurors received the information by direct exposure, through the statements of others or a combination of the two.    These reports were both highly prejudicial and primarily consisted of inflammatory information ruled inadmissible by the trial court.

Viewed in its totality, the jury selection process as well as the events which occurred during deliberations establish both a substantial number of venirepersons were prejudiced and the

- 41 -

probability similar prejudices were shared by, but were not been extracted from impaneled jurors. To permit the convictions in this case to stand would, in effect, completely insulate decisions of trial courts from appellate review and reduce an accused's right to trial by an impartial jury to nothing more than an abstract possibility.

Mr. Woodard's convictions must also be reversed based upon the failure of the trial court to either excuse jurors Young and Beitelhuff for cause or grant Mr. Woodard additional peremptory challenges. The degree of exposure and the state of mind of both jurors required the court to excuse them for cause. Ms. Beitel-huff's statements mandated that she be excused for cause without regard to her testimony as to her state of mind.

The trial court had two options when faced with Mr. Woodard's challenges for cause: excuse Young and Beitelhuff or grant Mr. Woodard additional peremptory challenges. The failure of the trial court to exercise either option raises serious questions regarding the impartiality of the jury and requires reversal of Mr. Woodard's convictions.

## CONCLUSION

For the reasons set out in this Reply Brief and in his opening brief, Mr. Woodard respectfully requests this Court to reverse his conviction and grant a new trial. At a minimum, he is entitled to a <u>Franks/Malkin</u> hearing.

DATED this 17th day of November, 1995.

LAW OFFICES OF CHRISTINE SCHLEUSS
Attorney for Appellant Jon Woodard

By _____
Christine S. Schleuss

- 43 -

Ex. 4, p. 50