### NOTICE

*Memorandum decisions of this court do not create legal precedent. See Alaska Appellate Rule 214(d) and Paragraph 7 of the Guidelines for Publication of Court of Appeals Decisions (Court of Appeals Order No. 3). Accordingly, this memorandum decision may not be cited for any proposition of law, nor as an example of the proper resolution of any issue.*

## IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| JON ARNOLD WOODARD, ) <br> ) <br>     Appellant, ) <br> ) <br>   v. ) <br> ) <br> STATE OF ALASKA, ) <br> ) <br>     Appellee, ) <br> _____) | Court of Appeals No. A-5187 <br> Trial Court No. 3AN-S92-5238CR <br><br> <u>MEMORANDUM OPINION</u> <br><br> <u>AND JUDGMENT</u> |
| STATE OF ALASKA, ) <br> ) <br>     Cross-Appellant, ) <br> ) <br>   v. ) <br> ) <br> JON ARNOLD WOODARD, ) <br> ) <br>     Cross-Appellee. ) <br> _____) | Court of Appeals No. A-5217 <br> Trial Court No. 3AN-S92-5238CR <br><br><br> [No. 3933 - December 9, 1998] |

Appeal from the Superior Court, Third Judicial District, Karen L. Hunt, Judge.

Appearances: Christine S. Schleuss, Law Office of Christine Schleuss, Anchorage, for Appellant, Case No. A-5187, and for Cross-Appellee, Case No. A-5217. W.H. Hawley, Cynthia M. Hora, Assistant Attorneys General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee, Case No. A-5187, and Cross-Appellant, Case No. A-5217.

Before: Bryner, Chief Judge, Coats and Mannheimer, Judges.

COATS, Judge.
MANNHEIMER, Judge, concurring.
BRYNER, Chief Judge, dissenting.

Jon Arnold Woodard was convicted, following a jury trial, of murder in the second degree (felony murder) and robbery in the first degree. AS 11.41.110(a)(3); AS 11.41.500(a). Superior Court Judge Karen L. Hunt sentenced Woodard to a term of sixty-six years imprisonment on the second-degree murder conviction. However, Judge Hunt concluded that sentencing Woodard for both felony murder and robbery would constitute double jeopardy, and declined to sentence Woodard on the robbery conviction. Woodard appeals his conviction, alleging numerous errors. The state cross-appeals, contending that Judge Hunt erred in refusing to sentence Woodard on the robbery conviction as well as on the felony murder conviction. We affirm Woodard's conviction and remand for sentencing on the robbery conviction.

On June 8, 1992, a man armed with a .10 millimeter Glock semi-automatic handgun robbed the Aurora Village Carrs grocery store in Anchorage and killed Terrence Becker, a Loomis security guard. The robber approached the customer service booth in the grocery store shortly after 8:30 a.m., wearing a ski mask, sunglasses, and gloves. Loomis Security Guard Terrence Becker was in the booth picking up the previous day's proceeds and delivering small bills for change. A number of Carrs employees were also in the booth. As the robber approached the booth, he demanded that someone in the booth open the door. When no one heeded his demand, the robber hoisted himself up on the front door of the booth (six feet above the store floor), held himself there on one arm, pointed the .10 millimeter Glock at the back of the booth and said, "I want the money." Becker started to draw his own weapon. The robber

Ex. 5, p. 2

shouted, "Don't do it, don't do it," then fatally shot Becker. A Carrs employee opened the door to the booth after the robber made further threats. The robber went inside the booth, grabbed the money, including the Loomis bag, and fled the store. He ran out a back door of the store, pulled off his mask, and walked away from the store. He stole $127,669.41, of which $51,228.29 was in cash.

Within two days of the robbery/homicide, the police investigation focused on Jon Arnold Woodard. Statements made by a Carrs employee, David VanHousen, to his father that no one was supposed to get hurt led the police to VanHousen, who in turn identified Woodard. The police obtained numerous search warrants, which turned up a significant amount of evidence pointing to Woodard. In addition to finding substantial physical evidence, several friends of Woodard identified him as the robber and admitted to playing a role in the robbery: David VanHousen was the inside man who gave Woodard information about how to rob Carrs, Sean Pierce acted as a lookout and helped destroy evidence after the crime, and Karl Bohlin hid the robbery proceeds.

Woodard was ultimately indicted for first-degree murder, second-degree murder (felony murder), and first-degree robbery. After a two and one-half month jury trial, Woodard was convicted of second-degree felony murder and first-degree robbery.

## SEARCH WARRANTS

Woodard first contends that Judge Hunt erred in denying his motions to suppress evidence seized pursuant to several search warrants.

00000012

3933

Ex. 5, p. 3

<u>SW 92-915</u>

On June 10, 1992, at 8:40 p.m., two days after the robbery/homicide at Carrs, the police came before Judge Elaine M. Andrews to request a <u>Glass</u>[1] search warrant to record conversations between Woodard and David VanHousen.   Detective Bill Reeder testified to the witnesses' version of the events of the robbery and described the robber as being tall.  He stated most of the witnesses described the subject as "over six foot two, six foot three."  Reeder entered into evidence a copy of Woodard's driver's license which showed his height at six foot three inches and his weight at 240 pounds.

Reeder and Detective Greg Baker both testified that Bob Shem, the firearms expert at the Alaska State Crime Lab, had concluded that a cartridge casing found at the scene was likely fired from a .10 millimeter Glock handgun and that the bullet removed from the victim was a .10 millimeter bullet.  Baker further testified that pawn shop records showed that Woodard pawned a .10 millimeter Glock on January 3, 1992, and redeemed it on March 5, 1992.  Baker testified that the .10 millimeter Glock was a new product, expensive, and relatively rare.

Detective Reeder then testified about contacting VanHousen concerning the robbery.  Detective Reeder testified that he contacted VanHousen because he received a tip that VanHousen had told his father that no one was supposed to get hurt in the robbery and because VanHousen was a Carrs employee.  Reeder told Judge Andrews that the police had made no promises to VanHousen.  A tape

---

[1]   <u>State v. Glass</u>, 583 P.2d 872 (Alaska 1978).

3933

of VanHousen's conversation with the police earlier that day was then played for the record.

VanHousen also testified at the search warrant hearing. VanHousen asserted that he knew Woodard had committed the robbery and killing because of the descriptions of the suspect and his knowledge of Woodard. He stated that he had told Woodard four and one-half years previously how easy it would be to rob Carrs. He testified that Woodard had a gun collection, but he did not know if Woodard had a Glock. He denied having any other knowledge of Woodard planning or committing the robbery. He specifically stated that he did not plan the robbery with Woodard, did not give Woodard any information about when the Loomis truck was to arrive, did not give him any information about the layout of the store, did not meet with him after the crime, did not receive any stolen money from him, and did not know where the Glock was. He testified that the police had not made any threats or promises to him for his cooperation. VanHousen assured Judge Andrews that he was not directly involved in the crime and was testifying as a concerned citizen.

Following this testimony, Judge Andrews found probable cause to issue a _Glass_ warrant to allow the police to record conversations between VanHousen and Woodard.

The next day, June 11, 1992, the state learned that VanHousen had not been entirely truthful in his testimony the previous night. The state granted VanHousen immunity from perjury for his June 10 testimony in specific areas where it varied from his current version. The agreement provided that VanHousen agreed

Ex. 5, p. 5

to testify truthfully and as often as requested against anyone involved in the crime.

Judge Andrews convened a supplemental hearing on the search warrant on June 11 at 5:15 p.m. Detective Reeder explained the intervening events, namely that when the time came to plan how VanHousen would execute the search warrant, VanHousen did not want to participate in having his conversations recorded. Reeder explained that, after talking with his attorney, VanHousen had changed some of his statements, and had been granted immunity from perjury for his testimony the previous day. VanHousen then took the stand. He testified that on May 26, 1992, two weeks previously, Woodard had asked him if Carrs had been very busy. Woodard told VanHousen that he had checked out the store and thought it would be easy to rob. VanHousen testified that he had purchased a gun from Woodard in the third week of February, nearly four months earlier, and that while he was at Woodard's residence, he saw several guns, including a Glock, and hand grenades. He stated that Woodard also had a stun gun and a police scanner. Following this hearing, Judge Andrews concluded that probable cause still existed to issue the Glass warrant.

In his motion to suppress, Woodard alleged multiple false statements and material omissions at the June 10 and 11 hearings on probable cause. He argued that these false statements and material omissions required that the search warrants be invalidated, and any evidence seized as a result of the warrants be suppressed.

In <u>Franks v. Delaware</u>,[2] the United States Supreme Court announced that a defendant could, under some circumstances, challenge the veracity of a sworn statement used by police to secure a search warrant.[3] The Court then set out what a defendant had to establish in order for evidence seized as a result of a search warrant to be suppressed.

> [W]e hold that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.[4]

In <u>State v. Malkin</u>,[5] the Alaska Supreme Court adopted the <u>Franks</u> rule, but changed the allocation of the burden of proof.

> In order to carry out these constitutional safeguards we adopt, in part, the rule established by the United States Supreme Court in <u>Franks v. Delaware</u>, that only intentional or reckless misstatements may be excised from affidavits. We do not, however, follow <u>Franks</u> in placing the full burden of proof on the defendant. The rule we embrace is that once the defendant has pointed out

---

[2] 438 U.S. 154 (1978).

[3] <u>See id.</u> at 155.

[4] <u>Id.</u> at 155, 156.

[5] 722 P.2d 943 (Alaska 1986).

00000016

3933

Ex. 5, p. 7

> specifically that statements in the affidavit
> are false, together with a statement of
> reasons in support of the assertion of
> falsehood, the burden then shifts to the state
> to show by a preponderance of the evidence
> that the statements were not made inten-
> tionally or with reckless disregard for the
> truth. If the state does not meet this burden
> then the misstatements must be excised and the
> remainder of the affidavit tested for probable
> cause.[6]

(Citations and footnotes omitted). The court also warned that if a police officer affiant intentionally made misstatements, the search warrant should be invalidated regardless of whether probable cause remained when the misstatements were excised.[7]

The Malkin court adopted the requirements set out in Franks that the defendant must meet before being entitled to an evidentiary hearing.

> To mandate an evidentiary hearing, the
> challenger's attack must be more than
> conclusory and must be supported by more than
> a mere desire to cross-examine. There must be
> allegations of deliberate falsehood or of
> reckless disregard for the truth, and those
> allegations must be accompanied by an offer of
> proof. They should point out specifically the
> portion of the warrant affidavit that is
> claimed to be false; and they should be
> accompanied by a statement of supporting
> reasons. Affidavits or sworn or otherwise
> reliable statements of witnesses should be
> furnished, or their absence satisfactorily
> explained.[8]

In his motion to suppress, Woodard contended that the state misled Judge Andrews in several ways: (1) The state allegedly

---

[6] Id. at 946.

[7] See id. at 946 n.6.

[8] State v. Malkin, 722 P.2d at 946 n.5 (quoting Franks v. Delaware, 438 U.S. at 171-72). Franks' and Malkin's rule with respect to affidavits applies equally to sworn-in-court testimony.

falsely represented that VanHousen was a citizen witness; (2) Investigator Reeder allegedly testified falsely that no promises had been made to VanHousen for his cooperation; (3) Investigator Reeder allegedly testified falsely and made material omissions in summarizing witnesses' descriptions of the robbery; (4) Investigator Reeder allegedly made a material omission in failing to tell Judge Andrews that Woodard had dark hair when Reeder described a suspicious individual with light brown hair who had previously been seen at Carrs. In addition, Woodard contended that VanHousen made several false statements and material omissions in his testimony, and that VanHousen was acting as an agent of the state when he did so.

Woodard's challenge to the search warrant centered primarily on his contention that VanHousen lied at both search warrant proceedings by claiming that he was a citizen witness and had no prior knowledge of, participation in, or legal responsibility for the robbery and murder. Woodard supported this claim with a chronology of VanHousen's evolving testimony following the June 10 and 11 search warrant hearings. On June 25, 1992, VanHousen was vigorously interrogated by police officers and began, for the first time, to admit greater complicity in the Carrs robbery. On June 30, 1992, after reaching a new deal with the state, VanHousen was interviewed again. At this time, he admitted to lying in all of his prior statements to the police and in his prior sworn testimony at the search warrant proceedings. VanHousen admitted to helping to plan the robbery at Carrs and to receiving part of the proceeds. Ultimately, VanHousen was indicted on lesser

charges pursuant to his new agreement.    In his grand jury testimony, VanHousen admitted to talking about the robbery with Woodard beforehand, discussing the fact that Monday would be a good day to rob the store, telling Woodard when the Loomis guards were usually there, meeting with Woodard on the morning of the robbery both before and after the robbery, receiving $3000 of the robbery proceeds from Woodard, and discussing the details of the robbery with Woodard afterwards.

In rejecting Woodard's motion to suppress, Judge Hunt found that VanHousen was not a governmental agent and therefore his false testimony was not grounds for invalidating the search warrant and suppressing evidence seized pursuant to it.    She also determined that none of the alleged false statements or material omissions by the state was designed to mislead Judge Andrews, and, alternatively, that none of the statements was material to a finding of probable cause.  Judge Hunt concluded that Woodard had not made the requisite showing to require an evidentiary hearing on the motion, and denied the motion to suppress.

Woodard contends that he made a sufficient showing such that Judge Hunt was required to grant him an evidentiary hearing to enable him to advance his motion to suppress under <u>Franks/Malkin</u>. However, we believe that Judge Hunt's findings are supported by the record, and that those findings support her decision to deny Woodard's motion to suppress.

There is little question that VanHousen lied at the search warrant proceeding.  However, as the state points out, the purpose of the exclusionary rule is two-fold: to deter illegal

Ex. 5, p. 10

governmental actions, and to protect judicial integrity.    In J.M.A.
v. State, the Alaska Supreme Court explained the purpose of the
exclusionary rule with respect to illegal searches and seizures:

> The two-fold purpose of the exclusionary rule
> is to deter law enforcement officers from
> engaging in unconstitutional searches and
> seizures by removing their incentive to do so,
> and to relieve the courts from being compelled
> to participate in such illegal conduct. . . .
> [W]hether the exclusionary rule should be
> invoked depends instead on whether to do so
> would deter the particular governmental
> employee, and others similarly situated, from
> engaging in illegal searches of private
> citizens.[9]

The same analysis is appropriate in the context of false statements
or material omissions used to mislead a judge into granting a
search warrant.    In the absence of objectionable governmental
activity, neither purpose of the exclusionary rule is served.

In her findings, Judge Hunt found that VanHousen was not
a government agent and that the government was not chargeable with
his false statements.    Woodard argues that VanHousen was a
government agent at the second hearing because of his immunity
agreement with the state.    In McAllister v. State,[10] the court
addressed the issue of whether the informant in the case was a de
facto governmental agent whose testimony was subject to scrutiny
under Franks.    The court stated that the appropriate test was
whether, in light of all the circumstances of the case, the

---

[9] 542 P.2d 170, 176 (Alaska 1975) (quoting Dyas v. Superior
Court, 522 P.2d 674, 677 (Cal. 1974)).

[10] 18 F.3d 1412 (7th Cir. 1994).

00000020

3933

informant should be regarded as an agent of the state.[11]  The court considered factors such as whether the government knew of the conduct, whether the informant's purpose was to further law enforcement efforts or his own ends, whether he performed the questioned conduct at the request of the government, and whether he was offered a reward.[12]

Applying these factors, Judge Hunt could properly determine that VanHousen was not a governmental agent when he testified at the search warrant proceedings.  The evidence before Judge Hunt indicated that VanHousen was an accomplice to the robbery who, not surprisingly, consistently understated his involvement.  The record shows that the state made every effort to encourage VanHousen to be truthful and immediately returned to court when VanHousen changed his version of his involvement.  VanHousen's lies at the hearing were obviously designed to minimize his own involvement in the crime and to possibly obtain more lenient treatment.  In McAllister, the court categorized this kind of testimony as self-serving on the part of the witness and not indicative that he was acting on behalf of the government.[13]  Each successive account which VanHousen gave showed more clearly his involvement in the crime and would have strengthened, rather than weakened, the state's showing of probable cause.  The state had nothing to gain from VanHousen's lies understating his involvement in the crime.  His false statements and omissions were not aimed at

---

[11] See id. at 1417.

[12] See id. at 1417-18.

[13] See id. at 1418.

00000021

3933

Ex. 5, p. 12

misleading the judge into granting a search warrant without probable cause. Rather they were the opposite -- they were aimed at protecting him from prosecution by hiding information which would have contributed to a finding of probable cause. Under these circumstances, we conclude that Judge Hunt did not err in concluding that VanHousen was not a government agent for purposes of applying the Franks/Malkin rule.

Judge Hunt could properly find that Woodard's other contentions had little merit. As Judge Hunt pointed out, Judge Andrews listened to the taped police interview of VanHousen and was aware of the statements which the police had made to VanHousen. There was no showing that the police attempted to mislead Judge Andrews by describing VanHousen as a citizen witness. Nor did Investigator Reeder misstate the witness descriptions of the robber. The witnesses generally described a tall, white male; Officer Reeder's testimony can legitimately be characterized as a fair description of the witnesses' statements. Judge Hunt could properly conclude that Investigator Reeder's failure to mention that Woodard had a different hair color when he described another person whom VanHousen testified that he had seen at Carrs does not appear to be material. We conclude that Judge Hunt did not err in denying Woodard's Franks/Malkin challenge without conducting an evidentiary hearing.

We also conclude that Judge Hunt did not err in upholding Judge Andrews' conclusion that there was probable cause to issue the Glass warrant authorizing the police to record VanHousen's conversations with Woodard. In upholding the warrant, Judge Hunt

00000022    Ex. 5, p. 13

emphasized the fact that Woodard fit the physical description of the robber, that he had talked to VanHousen about robbing Carrs within three weeks of the crime, and that he possessed a .10 millimeter Glock, an unusual weapon.

<u>SWs 92-131 through 135</u>

Woodward next contends that Judge Hunt erred in denying his motion to suppress evidence seized via warrants which the state obtained on June 16, 1992. On that date the state made application for search warrants to install a pen register and a calling line identifier on Woodard's phone, and for authorization to search Woodard, his trailer, and his girlfriend's white Honda.[14]  Judge Andrews issued the warrants.

Woodard contends that Judge Hunt erred in failing to allow him a <u>Franks/Malkin</u> hearing to contest these warrants. He first contends that Investigator Spadafora misled Judge Andrews concerning an identification of Woodard as the person who had robbed a Little Caesar's Pizza shop on June 7, 1992, the night before the Carrs robbery/murder. However, Judge Hunt concluded that there was no showing that the differences between the victim's description of the robber and the description which Officer Spadafora gave were material. Judge Hunt's finding is supported by the record. Woodard also contends that the police made a material omission in failing to reveal that the newspaper description of the person who committed the Carrs robbery/murder did not derive from eyewitness identifications but was actually a description of

---

[14] Woodard had allegedly used his girlfriend's vehicle on the date of the robbery and on other occasions connected with the robbery.

-14-

*3933*

Ex. 5, p. 14

Woodard based upon the police investigators' belief that Woodard was the person who committed the crime. References to the newspaper article and the description in the article were made several times during the hearing. However, we agree with Judge Hunt that Woodard failed to make a sufficient showing of either police misconduct or the materiality of the information in question. We accordingly affirm her decision that Woodard did not make a sufficient showing to require a <u>Franks/Malkin</u> hearing.

Woodard next contends that the state presented insufficient probable cause to Judge Andrews to justify the warrants. He argues that these latest warrants were derived from VanHousen's testimony in support of the earlier <u>Glass</u> warrant (SW 92-915) and evidence obtained from the execution of that warrant. He again contends that SW 92-915 was improperly issued, and that therefore search warrants SW 92-131 through 135 were based on the prior illegality and should be suppressed. Since we have already rejected Woodard's foundational argument that the original <u>Glass</u> warrant was improperly issued, we reject this argument which is based upon the assumption that the original <u>Glass</u> warrant was illegally issued. Woodard also argues that, even if the original <u>Glass</u> warrant was properly issued, there was insufficient probable cause to justify search warrants 92-131 through 135. However, the testimony at the search warrant hearing for SW 92-915 was sufficient to support a finding that Woodard had probably committed the crime. The testimony which Judge Andrews heard at the later search warrant hearing for SWs 92-131 through 135 bolstered that conclusion. Woodard's person, home, telephone, and girlfriend's

00000024

vehicle were places where the police were likely to find evidence of the crime.[15]  We conclude that Judge Hunt did not err in concluding that there was sufficient evidence before Judge Andrews for a finding of probable cause to issue the search warrants.

### SW 92-137 and -138

Woodard next contends that Judge Hunt erred in failing to suppress evidence which the police obtained from SW 92-137 (a Glass warrant for conversations between Woodard and Karl Bohlin) and SW 92-138 (a second search warrant for Woodard's trailer).  Woodard contends that Karl Bohlin, who was involved in hiding the money which Woodard obtained from Carrs, made material false statements.  However, Judge Hunt determined that Bohlin, like VanHousen, was not a governmental witness.  Judge Hunt properly found that Woodard had not made a sufficient showing that the state had engaged in any misconduct to justify a Franks/Malkin hearing.  Judge Hunt also did not err in determining that there was probable cause to issue the warrants.  At this point there was substantial probable cause that Woodard had committed the crime and Bohlin's testimony justified the issuance of the warrants.

### Federal Search Warrant

Woodard next contends that Judge Hunt erred in failing to suppress evidence obtained from a search of his trailer which was conducted under the authority of a federal warrant.  He contends that he was entitled to a Franks/Malkin hearing to attack this warrant and that the warrant was not supported by probable cause.

---

[15] See State v. Chapman, 783 P.2d 771, 772 (Alaska App. 1989).

00000025

3933

Ex. 5, p. 16

We again conclude that Judge Hunt did not err in concluding that Woodard made an insufficient showing to justify a <u>Franks/Malkin</u> hearing, and that there was probable cause to issue the warrant.

## EYEWITNESS IDENTIFICATION

Woodard argues that Judge Hunt erred in denying his motion to suppress witness Robin Conaway's pretrial and in-court identification of Woodard as the person who committed the Carrs robbery/murder. Robin Conaway was working in the Deli section of the Carrs Aurora Village store at the time that the robbery and murder occurred. After hearing the gunshot and seeing a man jump the half-wall surrounding the customer's service booth, Conaway fled out a rear exit along with other employees. After she left the store, she saw the robber crossing the parking lot, apparently yelling for people to get out of his way. She watched the man for less than a minute. Following the crime, Conaway was interviewed at the store by an Anchorage Police Officer. According to Judge Hunt's findings, Conaway described the suspect as "very big and tall, 6'4", over 220 pounds, a white, light-complexioned, adult male with straight, short, dark hair, and wearing a royal blue jacket or windbreaker and blue work pants." In response to questions, Conaway indicated there was nothing unusual or distinctive about the suspect's voice and that he did not look muscular. She stated that she did not know whether the suspect had a mustache or beard because she saw only the side of his face. The police estimated that Conaway was approximately 100 feet from the suspect at the time of her observation.

00000026    3933

Ex. 5, p. 17

Judge Hunt found that when the police arrested Woodard, the newspaper published a color photograph of Woodard, bound in hand and ankle cuffs with another prisoner. Conaway saw the newspaper photograph in the break room of the Carrs store. The paper was folded so that she could only see the photograph. When she saw the photograph, Conaway stated that it "looks like the man who robbed Carrs." Other employees told her that it was not.

After finding out that Conaway might be able to identify the robber, Investigator Reeder showed her a photographic lineup. The lineup consisted of six black and white, Department of Motor Vehicle photographs, including one of Woodard. According to Judge Hunt's findings:

> When Reeder showed her the photo lineup, Conaway pointed to defendant's photograph stating that it "resembles" the suspect she saw. Reeder inquired as to Conaway's level of certainty on a 1 to 10 scale, 10 being absolutely certain. Conaway paused and stated that her level of certainty would be "8 or 9 if she could see him from the side." Conaway then asked Reeder whether she had identified the man. Inv. Reeder nodded affirmatively. Conaway explained that she asked Inv. Reeder if she was right because she did not want to pick the wrong person. She was surprised that she could identify the suspect from front view photographs.

Judge Hunt noted that in cases decided under the Alaska State Constitution, the supreme court has found no violation of due process in admitting an identification which was tainted by an accidental pretrial confrontation between a witness and a suspect.[16] However, she found that federal cases had held that the due process

---

[16] See Cox v. State, 575 P.2d 297, 302 (Alaska 1978); Kimble v. State, 549 P.2d 73, 77 (Alaska 1975).

00000027

3933

Ex. 5, p. 18

clause could be violated by any unduly suggestive identification procedure, whether or not the police were responsible for the suggestive procedure.[17]

Judge Hunt concluded that Conway's identification of Woodard was tainted. She found that the newspaper photograph depicting Woodard restrained and in custody suggested that he was guilty of the crimes charged. She found that Conaway saw the photograph of Woodard in custody and restrained in the newspaper and read the accompanying article which mentioned that Woodard was a suspect in the Carrs robbery/homicide and that Woodard matched the physical characteristics of the shooter. However, she concluded that Conaway's identification of Woodard was reliable despite her exposure to the news coverage.

In determining whether identification testimony will be admissible, "the test is whether such identification is reliable, as weighed against the corrupting effect of the suggestive

---

[17] See <u>United States v. Bouthot</u>, 878 F.2d 1506, 1516 (1st Cir. 1989) ("Because the due process focus in the identification context is on the fairness of the trial and not exclusively on police deterrence, it follows that federal courts should scrutinize all suggestive identification procedures, not just those orchestrated by the police, to determine if they would sufficiently taint the trial so as to deprive the defendant of due process."); <u>Thigpen v. Cory</u>, 804 F.2d 893, 895 (6th Cir. 1986) ("[O]nly the effects of, rather than the causes for, preidentification encounters should be determinative of whether the confrontations were unduly suggestive."); <u>Green v. Loggins</u>, 614 F.2d 219, 222 (9th Cir. 1980) ("Although we recognize that there is no intentionally wrongful police conduct involved in an accidental encounter, we also recognize that the deterrence of such conduct is not the primary purpose behind judicial review of tainted identification testimony. Rather, a court reviews a challenged in-court identification essentially to determine whether the witness' testimony retains sufficient indicia of reliability. . . . It is certainly possible that an in-court identification by a prosecution witness may prove to be unreliable, even though the pre-trial encounter in question has not involved any culpable police conduct.").

Ex. 5, p. 19

identification itself."[18]    In assessing the reliability of the identification, the court should consider five factors:  (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation.[19]  Judge Hunt applied this test and determined that Conaway's identification of Woodard was reliable and admissible under due process standards despite Conway's exposure to the news coverage.  After applying the Holden standard in detail, Judge Hunt concluded:

> Considering the totality of the circumstances, Conaway's pretrial and in-court identifications of the defendant as the man she saw fleeing from Carrs on June 8, 1992 have sufficient indicia of reliability to be admissible and to permit her to make an in-court identification of the defendant.  She has consistently described major features of the man she saw and has done so with confidence.  She first recalled these features just shortly after the robbery/homicide.  Inv. Reeder's affirmative nod after she identified defendant from the photo lineup was not a corrupting influence on the identification already made.

We accept the trial court's findings of fact on a motion to suppress unless clearly erroneous.[20]  We independently review the totality of the circumstances surrounding the identification to

---

[18] Holden v. State, 602 P.2d 452, 456 (Alaska 1979).

[19] Manson v. Brathwaite, 432 U.S. 98, 114 (1977); Holden, 602 P.2d at 456.

[20] See Gallmeyer v. State, 640 P.2d 837, 839 (Alaska App. 1982).

-20-    00000029

determine if the identification was sufficiently reliable.[21]  We conclude that Judge Hunt applied the correct legal standards in deciding that Conaway's identification of Woodard was admissible. Having independently reviewed the record, we agree with her finding that Conaway's identification was sufficiently reliable to admit at trial.

In a related argument, Woodard contends that Judge Hunt should not have permitted Robin Conaway to testify under the Alaska Rules of Evidence because there was insufficient evidence "to support a finding that [the witness had] personal knowledge of the matter" and because the probative value of the evidence was outweighed by the danger of unfair prejudice.[22]  However, it is clear that Judge Hunt could determine that Robin Conaway's identification was based upon her personal knowledge and that the probative value of her identification outweighed the danger of unfair prejudice to Woodard.

## CHANGE OF VENUE

Woodard next contends that Judge Hunt erred in denying his motion for a change of venue due to pretrial publicity or, in the alternative, that Judge Hunt erred in not granting him additional peremptory challenges.

On November 2, 1992, Woodard filed a pretrial motion for a change of venue based on pretrial publicity; alternatively, he

---

[21] See, e.g., White v. State, 773 P.2d 211, 215 (Alaska App. 1989).

[22] See A.R.E. 602, 403.

Ex. 5, p. 21

requested ten additional peremptory challenges.  Woodard attached twelve newspaper articles and a list of forty-five television news reports.  The state opposed the motion, noting that it had agreed to a lengthy continuance of the trial until March 22, 1993, over five months after the last news report on October 2, 1992.  Judge Hunt denied Woodard's motion without prejudice to renew it during or after voir dire.

Jury selection began March 25, 1993.  The parties agreed to the "struck" or "Texas" style method of jury selection.  Under this method, jurors would be voir dired individually until thirty-two had been chosen.[23]

Woodard renewed his motion for a change of venue before the questioning of individual prospective jurors began.  He claimed that the juror questionnaires indicated that 95% of the prospective jurors had been exposed to some pretrial publicity.  The state objected to the bringing of the motion at that time, noting that the panel members might not have heard anything prejudicial.  Judge Hunt denied the motion, but stated that it could be renewed after questioning of some of the jurors.

Judge Hunt and counsel individually questioned fifty-six prospective jurors.  Twenty-four were excused for cause before a panel of thirty-two prospective jurors passed for cause was obtained.  Of these twenty-four excused prospective jurors, only

---

[23] This ensured twelve jurors, two alternates, with ten peremptory challenges for the defendant and six peremptory challenges for the state plus one peremptory challenge for each side with respect to the alternates.  Former Alaska R. Crim. P. 24.  Criminal Rule 24(d) was subsequently amended in 1994 to give each side ten peremptory challenges.  See ch. 117, § 1, SLA 1994; SCO 1204 (effective July 15, 1995).

three were excused specifically as a direct result of pretrial publicity. Of the remaining twenty-one, eleven had heard about the case, five knew people connected with the case, and eight were excused for other reasons without being specifically asked about pretrial exposure to the case. Of the thirty-two prospective jurors passed for cause, all but one had heard something about the case and fifteen had heard or seen something about Woodard in the media. All assured the court that they could hear the case without bias. From the record it does not appear that any of the jurors acknowledged knowing about evidence that was inadmissible at trial.

In Mallott v. State, the supreme court stated:

> "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755 (1961). The ultimate objective of the trial court therefore is to find twelve jurors "who would, under the proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court." Nebraska Press Association v. Stuart, 427 U.S. 539, 569, 96 S.Ct. 2791, 2807, 49 L.Ed.2d 683, 703 (1976).[24]

The court in Mallott made it clear that the trial court would rarely be in error in refusing to grant a motion for change of venue before voir dire.

> Whether pretrial publicity is so prejudicial and so pervasive that no such jury could be selected to try a particular case in a particular locale is a determination that is exceedingly difficult to make prior to the questioning of potential jurors. Therefore almost without exception trial courts have been permitted the discretion to rely on voir

---

[24] 608 P.2d 737, 745-46 (Alaska 1980).

3933

00000032

Ex. 5, p. 23

dire rather than their own speculation as to the impact of pretrial publicity.[25]

Later, the court continued:

> [I]n the absence of "inherently prejudicial pre-trial publicity" so inflammatory that a subsequent trial in that locale would be, or would appear to be but "a hollow formality," we will not find reversible error merely because the trial judge chose to proceed with voir dire to determine the impact of the publicity.[26]

Thus, there is no question that Judge Hunt was correct in deferring ruling on Woodard's motion for change of venue until after <u>voir dire</u>.

Ordinarily, the defendant must establish actual prejudice in order to be entitled to a change of venue.

> The ultimate burden imposed on a defendant by the Supreme Court with respect to transfer of venue has been to demonstrate that pre-trial publicity actually resulted in "a partiality that could not be laid aside" in those jurors finally seated to adjudicate guilt or innocence. <u>Murphy v. Florida</u>, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed. 2d 589, 595 (1975).[27]

In order to meet this burden, the defendant must do more than show that jurors have been exposed to pretrial publicity because some exposure to the facts and issues of a case is to be expected in an important case.[28]

---

[25] <u>Id.</u> at 746 (footnote omitted).

[26] <u>Id.</u> at 747 (footnotes omitted).

[27] <u>Id.</u>, at 748.

[28] <u>See</u> <u>Newcomb v. State</u>, 800 P.2d 935, 938 (Alaska App. 1990); <u>see</u> <u>also</u> <u>Irwin v. Dowd</u>, 366 U.S. 717, 722-23 (1961).

Ex. 5, p. 24

However, this burden of showing actual prejudice is eased where a case generates "intensive pretrial publicity" and "a substantial number of venirepersons appear to have been prejudiced," because of the chance that similar prejudices are shared by other prospective jurors which "renders unrealistic the burden requiring the defendant to show actual prejudice."[29]  For such cases, the Alaska Supreme Court adopted the following ABA standard:

> A motion for change of venue or continuance shall be granted whenever it is determined that, because of the dissemination of potentially prejudicial material, there is a substantial likelihood that, in the absence of such relief, a fair trial by an impartial jury cannot be had. . . . A showing of actual prejudice shall not be required.[[30]]

Woodard has failed to demonstrate any actual prejudice on the part of any of the prospective jurors.  He contends, however, that the pretrial publicity in his case was sufficiently intensive to warrant the more liberal standard adopted in Mallott.

We applied this more liberal standard in Newcomb, where twenty-eight of the seventy-eight prospective jurors were excused for cause due to their exposure to pretrial publicity or their familiarity with aspects of the case.[31]  However, in Newcomb we also stated that bare numbers are not enough to indicate whether jury prejudice is present.  We suggested consideration of other factors,

---

[29] Newcomb, 800 P.2d at 938; Mallott, 608 P.2d at 748.

[30] Mallott, 608 P.2d at 748 (alteration in original) (quoting ABA Standards Relating to the Administration of Criminal Justice, Fair Trial and Free Press § 8-3.3(c)(1978)).

[31] See Newcomb, 800 P.2d at 938.

Ex. 5, p.25

such as the nature of the pretrial publicity, the passage of time since the publicity, and the nature of the community in which the trial is being held.[32]

In the instant case, although nearly all of the prospective jurors were aware of the Carrs robbery/homicide, very few of the jurors appeared to be aware of prejudicial information which Woodard would contest at trial. Only three of fifty-six prospective jurors who underwent _voir_ _dire_ were excused specifically due to pretrial publicity and one was excused due to prejudice which she formed based on what her husband had told her. Another four were excused at least in part because of personal knowledge about Woodard and two were excused because they knew witnesses. Thus, as many as ten of the fifty-six jurors might be considered as having been excused "for cause due to their exposure to pretrial publicity or their familiarity with various aspects of the case."[33]

In _Newcomb_, we suggested that the court consider the nature and extent of the pretrial publicity. Although there appears to have been substantial publicity surrounding the robbery/homicide, the publicity does not appear to have been anywhere near as intensive as the pretrial publicity which we discussed in _Newcomb_.[34] In _Newcomb_, we stated:

> One significant factor is the precise nature of the pretrial publicity in a given case. The potential for unrevealed jury

---

[32] _See_ _id._ at 939.

[33] _Id._ at 938.

[34] _See_ _id._ at 938.

-26-

00000035

3933

Ex. 5, p. 26

trial, but any reference to Woodard's criminal history, other possible charges, or paramilitary activity was not allowed.

Another factor which we considered in Newcomb was the passage of time between the bulk of the publicity and the trial. Exposure to pretrial publicity is entitled to less weight if the passage of time has "blunted its impact" on the potential jurors.[40] Here, most of the publicity occurred several months before the trial, lessening its impact on the pool of prospective jurors.

In Newcomb, we also discussed the nature of the community in which the trial is held. "We believe it significant that Newcomb's trial was held in Anchorage, a relatively large community in which extensive pretrial publicity can be expected to have limited impact."[41] Woodard's trial was also held in Anchorage, so it is reasonable to believe that the publicity in the case was of "limited impact."

We indicated in Newcomb that, in reviewing the trial court's decision on a motion for change of venue, this court had a duty to independently evaluate the record of the circumstances surrounding the trial, but stated that we would give considerable deference to the trial court and would reverse only for an abuse of discretion.[42] In the instant case, having independently reviewed the record, we conclude that Judge Hunt did not err in refusing to grant Woodard's motion for a change of venue.

---

[40] See Newcomb, 800 P.2d at 935; Mallott, 608 P.2d at 747; Chase, 678 P.2d at 1351-52.

[41] See Newcomb, 800 P.2d at 940.

[42] See id. at 937.

00000037   3933

Ex. 5, p. 27

prejudice can be expected to increase when publicity is inherently prejudicial or inflammatory. Several types of publicity fall into this category. The paradigm is a report of a confession or of other significant evidence that is suppressed or otherwise inadmissible. Closely related are reports of important factual details that the defendant will actively seek to dispute at trial. Also included are emotionally charged editorials. This category further encompasses prejudicial accounts of the defendant's criminal history, particularly when such accounts are inaccurate.[35]

The news reports in this case did not include such items as a confession or significant evidence that would not be admitted at trial, such as was discussed in Chase v. State.[36] Nor did they involve factual issues the defendant would dispute at trial other than his claim that he was not the actual perpetrator.[37] Nor were the articles particularly emotionally charged.[38] However, one article detailed Woodard's criminal history, several discussed his arrest on federal drug and weapon charges, and three discussed other possible robberies which the police believed Woodard had committed.[39] In addition, some of the articles referred to Woodard having an "arsenal" of weapons and one stated he possessed Soldier of Fortune type literature. Evidence concerning drugs came in at

---

[35] Id. at 939 (citations omitted).

[36] 678 P.2d 1347, 1351-52 (Alaska App. 1984).

[37] See, e.g., Arnold v. State, 751 P.2d 494, 500 (Alaska App. 1988).

[38] See, e.g., Mallott, 608 P.2d at 747.

[39] See, e.g., Nelson v. State, 781 P.2d 994, 997-98 (Alaska App. 1989).

-27-

00000036

Woodard argues that the prospective jurors in this case were tainted by the pretrial publicity. He contends that Judge Hunt erred in failing to grant his challenges for cause of two jurors or, in the alternative, failing to grant him extra peremptory challenges. In <u>Jerrel v. State</u>, we stated:

> [I]n order to preserve a defendant's right to an impartial jury, the trial court may respond to a defendant's challenges of prospective jurors for cause in either one of two ways. First, the trial may grant a defendant's challenges for cause in a liberal manner. Second, the trial court may decline to grant challenges for cause in a liberal manner so long as the court offers the defendant extra peremptory challenges.[43]

Our review of the <u>voir dire</u> process indicates that Judge Hunt liberally allowed Woodard to exercise challenges for cause. We therefore conclude that Judge Hunt did not err in refusing to dismiss either of the two jurors in question for cause. We also note that neither of the two prospective jurors whom Woodard unsuccessfully challenged for cause served on the jury. We note that in <u>Mallott</u>, the court found that "[s]ince none of the persons whom Mallott unsuccessfully challenged for cause actually served on the jury, the impartial jury guarantee was fully protected here."[44] We conclude that Judge Hunt did not err in refusing to grant Woodard's challenges for cause and that there is no basis to conclude that the jury which tried Woodard was not impartial.

---

[43] 756 P.2d 301, 305 (Alaska App. 1988); <u>see also</u> <u>Mallott</u>, 608 P.2d at 748-50.

[44] 608 P.2d at 749.

00000038

3933

Ex. 5, p. 29

## VANHOUSEN TAPES

Woodard next contends that Judge Hunt erred in refusing to allow him to play tape-recorded conversations between Woodard and David VanHousen which the police surreptitiously recorded under authority of the Glass warrant (SW 92-915). Judge Hunt allowed the state to play the tape of Woodard's first recorded conversation with VanHousen. Woodard's contention is that Judge Hunt erred in refusing to allow him to play the tape recordings of the subsequent conversations.

The police recorded six conversations between David VanHousen and Woodard under authority of SW-915. The first recorded conversation was a phone conversation which took place the evening of June 11, 1992. The second recorded conversation took place later that evening when the two met behind Northway Mall. The police recorded two more phone conversations on June 12. On June 14, the police recorded two more face-to-face conversations at Woodard's home.

At trial, the state introduced the tape of the first recorded conversation into evidence. In that tape, Woodard had returned a telephone call to VanHousen. VanHousen told Woodard that he needed to talk to him and asked if they could meet somewhere:

A:  Just a second, hold on -- is this super bad, Dave?

Q:  I'd rather not talk about it over the phone.

A:  Does it have to do with this?

Q:  Oh what?

A:  The thing?

Ex. 5, p. 30

Q:   What thing's that?

A:   Oh, the thing.

Q:   What thing?

A:   You know --

Q:   No I don't know -- tell me.

A:   Hn -- OK.

Woodard was clearly uneasy with VanHousen's manner during the conversation.  He asked, "Is there somebody right there?" and commented, "God you're acting real funny," followed by, "Man, are you -- are you OK, is everything cool?  Honestly on our friendship?"  VanHousen told Woodard that he did not go to work that day and that he was worried because "they're polygraphin' all the employees."  They concluded the phone call by agreeing to meet behind the Northway Mall in fifteen minutes.   The state contended at trial that "the thing" referred to the Carrs robbery/homicide.

The second conversation which the police recorded was the face-to-face conversation between Woodard and VanHousen in the parking lot at the Northway Mall.  VanHousen testified at trial that he signaled Woodard at the beginning of the conversation that he was wired.

In the second through sixth conversations, VanHousen repeatedly expressed his concern about having to take a polygraph examination; Woodard attempted to reassure him and suggested contacting a lawyer.  VanHousen repeatedly brought up a supposed prior conversation the two of them had had about how easy it would be to rob Carrs; Woodard denied having anything more than vague memories of such a conversation.  VanHousen told Woodard that Carrs



Security was pressuring him.  He said that they had a description that fit Woodard and knew he and Woodard were friends.  In the last conversation, VanHousen became more direct, specifically asking if he could borrow $10,000 from the Carrs robbery.  Woodard asked if VanHousen was playing some sort of sick joke and whether VanHousen was high on drugs.  At the end of the conversation, VanHousen directly accused Woodard of robbing Carrs, at which point Woodard got angry at him and told him he couldn't believe what VanHousen was saying.  Throughout the conversations, Woodard asked VanHousen what was wrong with him, why he was so worried about the polygraph, why he was acting so weird, why he was not acting like himself and whether he was on drugs.

At trial, Woodard wanted to introduce the conversations on these tapes.  Woodard contended that the tapes were not hearsay, but "verbal acts" which were relevant to show why Woodard acted as he did in the days after the robbery.  Woodard contended that admission of the recorded conversations would tend to show why Woodard was increasingly suspicious that VanHousen was implicating him in the crime, why he may have believed he was subject to surveillance, and why he may have been nervous or defensive. Alternatively, Woodard argued that the tapes were admissible under Evidence Rule 803(3), the state of mind exception to the hearsay rule.  He argued that his recorded statements were relevant to show his state of mind during the period of time following the robbery when the state asserted that he was acting suspiciously.  Woodard contended that the wires showed a different, innocent reason for

his activities and refuted the state's implication that his behavior indicated a guilty conscience.

In denying Woodard's motion to admit the tape recorded statements, Judge Hunt relied on our decision in Brannen v. State, where we stated: "A defendant's self-serving statements are hearsay and cannot be admitted into evidence unless they qualify under some exception to the hearsay rule or are used for a non-hearsay purpose."[45] She concluded that, as in Brannen, Woodard's statements were not admissible under Evidence Rule 803(3) which exempts hearsay statements that express an existing state of mind, emotion, sensation or physical condition to prove the declarant's state of mind. She found that, as in Brannen, Woodard "had time to reflect and a motive to fabricate before he made the statements."[46] She also concluded that Woodard had not established a credible non-hearsay basis for admitting the statements.

We believe that Judge Hunt's decision refusing to admit evidence of the tape-recorded statements was not an abuse of discretion. As we pointed out in Brannen, generally a defendant's exculpatory statements are inadmissible hearsay.[47] Judge Hunt did not err in determining that Woodard did not establish either that the statements were admissible for a non-hearsay purpose or that they were admissible under a hearsay exception. We accordingly find no error.

---

[45] 798 P.2d 337, 340 (Alaska App. 1990).

[46] Id. at 341.

[47] See id. at 340; see also State v. Agoney, 608 P.2d 762, 764 (Alaska 1980); Stumpf v. State, 749 P.2d 880, 899 (Alaska App. 1988).

## POLICE INTERVIEW OF VANHOUSEN

Woodard next contends that Judge Hunt erred in refusing to allow him to play a portion of the video-taped police interview of VanHousen which took place on June 25, 1992. It was during this June 25 interview that VanHousen first admitted to direct involvement in the Carrs robbery/homicide and implicated Woodard as a co-conspirator, rather than as someone he just thought might be the perpetrator. Before cross-examination of VanHousen, Woodard asked to be permitted to play portions of the videotape. Woodard stated that he wanted to show the pressure the police put on VanHousen, including threatening to charge him with murder, before VanHousen changed his story. Woodard argued that the videotape was admissible under Alaska Evidence Rule 613.(a) as evidence of bias. The state argued that Woodard could elicit testimony from VanHousen about whether or not the police put pressure on him and that the tape was not admissible unless VanHousen denied matters which were contradicted by the tape-recorded interviews. The state contended that because the videotape included irrelevant opinions of the police officers the tape would be more prejudicial than probative. Judge Hunt deferred ruling on this matter, concluding that under Evidence Rule 613, Woodard needed to establish a foundation by affording VanHousen the opportunity to explain any bias or interest.

On cross-examination, VanHousen testified that during the June 25 interview the police put tremendous pressure on him and threatened him. After establishing this, Woodard again asked Judge Hunt to play the videotape, arguing that he had established the

-34-

00000043

necessary foundation. Judge Hunt concluded that since VanHousen had fully admitted that he felt pressured and intimidated, admitting the tape served no purpose: VanHousen had admitted what Woodard wished to establish. In response, defense counsel stated that he would establish a more extensive foundation for admission of the tape. Defense counsel then elicited that VanHousen felt pressured by specific statements the police made, that the police threatened to prosecute both him and Woodard, and that the police threatened that if VanHousen did not cooperate he might be charged with murder. VanHousen testified that it was at this point that he told the police of his involvement. Following this testimony, defense counsel did not renew his request to play the videotape of the interview.

Evidence Rule 613 provides for the impeachment of witnesses:

> (a) _General Rule_. Prior statements of a witness inconsistent with his testimony at a trial, hearing or deposition, and evidence of bias or interest on the part of a witness are admissible for the purpose of impeaching the credibility of a witness.
>
> (b) _Foundation Requirement_. Before extrinsic evidence of a prior contradictory statement or of bias or interest may be admitted, the examiner shall lay a foundation for impeachment by affording the witness the opportunity, while testifying, to explain or deny any prior statement, or to admit, deny, or explain any bias or interest. . . .

In arguing that Judge Hunt erred in refusing to allow him to play the videotape of the police interview with VanHousen,

00000044

3933

Ex. 5, p. 35

Woodard points to cases such as <u>Bentley v. State</u>,[48] and <u>Nunn v. State</u>.[49] In <u>Bentley</u>, the court found that the trial court erred in refusing to allow a defendant to play a tape recording of an inconsistent statement of a critical witness in an assault case, because, under the particular circumstances of that case, the court concluded that it was necessary for the jury to hear the actual tape in order to be able to evaluate the credibility of the witness.[50] In <u>Nunn</u>, we found that the trial court had not abused its discretion in allowing extrinsic evidence of a prior inconsistent statement because the statement was critical to the case and it was important to show the victim's demeanor at the time she made the prior statement.[51]

However, in the instant case, Judge Hunt did not abuse her discretion in concluding that David VanHousen's admission that the police had pressured and intimidated him was sufficient to show his bias and interest. She could find that VanHousen's admissions fully established the point which the defense was trying to make, and that playing the tape to further establish what VanHousen had already admitted was unnecessary. We find no error.

---

[48] 397 P.2d 976, 978 (Alaska 1965).

[49] 845 P.2d 435 (Alaska App. 1993).

[50] <u>See</u> 397 P.2d at 978.

[51] <u>See</u> 845 P.2d at 440.

Ex. 5, p. 36

## IMPEACHMENT WITH POLYGRAPH EVIDENCE

Woodard next contends that Judge Hunt erred in refusing to allow him to introduce evidence that Sean Pierce and David VanHousen had failed to pass polygraph examinations as required by their formal plea and cooperation agreements with the state. However, as Woodard recognizes, ordinarily polygraph results are not admissible at trial.[52]  Woodard argues that, although polygraph results are generally not admissible, under some circumstances evidence of a polygraph examination may be necessary to fully cross-examine a witness.[53]  However, in the instant case, Judge Hunt fully allowed Woodard to establish Pierce's and VanHousen's bias. Woodard was able to establish that Pierce had not fulfilled all the conditions of his agreement and that VanHousen had failed to fulfill a condition of his first agreement.  He was also able to show that Pierce and VanHousen were both worried about staying in the state's good graces to protect their plea agreements.  We conclude that Judge Hunt did not err in determining that Woodard could fully establish Pierce's and VanHousen's bias without specifically informing the jury of the portions of their agreements which required them to pass polygraph examinations.  Under these circumstances, Judge Hunt could properly determine that admission of this information would merely create unnecessary confusion.[54]

---

[52] See Pulakis v. State, 476 P.2d 474 (Alaska 1970); Haakanson v. State, 760 P.2d 1030 (Alaska App. 1988).

[53] See United States v. Lynn, 856 F.2d 430 (1st Cir. 1988).

[54] Alaska Rule of Evidence 403 provides:

> Although relevant, evidence may be excluded if
> (continued...)

3933

Ex. 5, p. 37

## IMPEACHMENT OF CONAWAY'S IDENTIFICATION

Woodard contends that Judge Hunt erred in refusing to allow him to admit, as an exhibit, photographs of Woodard which appeared in the newspaper after his arrest. Woodard contends that the photographs were relevant for the purpose of rebutting Robin Conaway's identification of Woodard.

During Robin Conaway's testimony at trial, defense counsel showed her a number of photographs of Woodard that had appeared in the newspaper. These head-on photographs appeared in the newspaper on June 24, July 8, and July 21, 1992. Conaway testified that the newspaper was usually in the Carrs break room and the defense later showed that she worked on the three days that the photographs appeared in the paper. However, Conaway insisted that she had not seen the pictures. She did acknowledge seeing the full body profile photograph of Woodard in the paper on June 19, 1992. Defense counsel's contention at trial was that the three additional photographs were very like the head-on photograph of Woodard that appeared in the photographic lineup from which Conaway chose Woodard's picture. The defense argued that Conaway's presence at work, where the newspaper was available in the break room on the days that photographs of Woodard were in the paper, was circumstantial evidence that she had been exposed to the photographs. And, in light of Conaway's surprise at being able to

---

[54] (...continued)
    its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

00000047

3933

pick Woodard out of the photo lineup, when none of the photographs were profile shots, evidence tending to show that Conaway had seen these head-on photographs would tend to impeach her identification. Judge Hunt declined to admit the photographs as an exhibit.

Although the photographs may have been of marginal relevance to establish why Conaway might have been able to pick Woodard out of a line-up of head-on photographs when she claimed to have only seen his profile, exclusion of the evidence was not error. Relevant evidence may be excluded under Evidence Rule 403[55] when it is cumulative. Woodard was able to effectively establish the shakiness of Conaway's identification and to show that it was tainted by the fact that she had seen at least one photograph of him in the paper. He was able to establish that the other photographs had appeared in the paper and that Conaway might have seen them. Judge Hunt could properly determine that showing the jury the newspaper photographs of Woodard would have had little additional value.

### VIDEOTAPE OF WOODARD FIRING A SHOTGUN

Woodard next contends that Judge Hunt erred in allowing the state to introduce into evidence a videotape which showed Woodard firing a .10 millimeter Glock semiautomatic handgun and a pump shotgun at trees in a wooded area. The videotape was made by Woodard and a friend, Chris Presley, on May 28, or 29, 1992, in the Eklutna area. Apparently, after making the videotape, Presley showed it to Karl Bohlin, who made a copy of the tape. Bohlin

---

[55] See footnote 54, supra, for test of Evidence Rule 403.

Ex. 5, p. 39

later turned his copy of the tape over to the police. Lieutenant Gifford watched the videotape. Later, when Gifford was with Sean Pierce in Eklutna examining the remains of number of items Pierce said that he and Woodard had burned there, Gifford noticed that a nearby area looked like the place where the videotape was filmed. He recognized a hole in a tree that was shown on the videotape being made by the shotgun. He also recognized chopped-off branches which looked like they could have been knocked to the ground by a shotgun. Gifford found shotgun shells, .10 millimeter Glock cartridges, and an ammunition box. A human hair found on the ammunition box was later identified as similar to Woodard's. The .10 millimeter cartridges were found to have been fired from the same weapon as shells found in the booth at Carrs after the robbery/homicide.

Woodard agreed that the videotape of him shooting the Glock was admissible evidence, but argued that the videotape of him firing the pump shotgun should not be admitted because it involved a weapon unrelated to the crime. He also contended that the videotape was prejudicial because seeing Woodard "firing and cutting trees off, right and left shows, apparently, an aggressive bad personality, destroying those trees, essentially." The state responded that the footage of Woodard shooting the shotgun was relevant for four reasons. First, the video focused on a hole in a tree caused by Woodard shooting the shotgun and showed Woodard shooting branches causing them to fall into an alcove; Gifford recognized the hole in the tree and the fallen branches when he was in the area, which was what led him to investigate and find the

00000049                    3933

Ex. 5, p. 40

shotgun shells, .10 millimeter cartridges, and ammunition case. Therefore, the state argued, the video was relevant to show what Gifford did and why he did it.    Second, the footage showed that Woodard was a good shot, which was relevant because the robber was a good shot.    Third, the footage helped show that the police independently collected evidence connecting Woodard with the crime (the state argued that this was essential to rebut Woodard's claim that the police were led by the false testimony of David VanHousen and others.    Fourth, the footage corroborated Sean Pierce, who took the police to where he and Woodard supposedly burned evidence.    The state argues that the fact that Woodard had been to that very place ten days earlier with Chris Presley supported Pierce's story.

Woodard responded by offering to stipulate that the area where the videotape was filmed was the same area where Gifford found the evidence.    He also argued that showing that he could hit trees with a shotgun was unrelated to his ability to fire a pistol. (Tangentially, he asserted that from the evidence it was not clear the robber even had to be a particularly good shot given the close distance.)    Finally, he argued that the videotape of firing the shotgun was inflammatory and prejudicial, particularly in light of the defense's willingness to stipulate that the area in which Gifford found the evidence was the area on the videotape.    After watching the videotape, Judge Hunt overruled the defense objection, finding that the prejudicial impact of the evidence was outweighed by the probative value of the evidence on the issue of identification.    We conclude that Judge Hunt did not abuse her discretion in admitting the shotgun portion of the videotape.    The videotape

00000050

3933

Ex. 5, p. 41

was relevant to illustrate an important part of the police investigation which connected Woodard to the weapon which was used in the crime. Judge Hunt could properly conclude that the jury would not be unduly prejudiced by a videotape of Woodard firing a shotgun.

## MISTRIAL MOTION BASED ON VIOLATION OF A PROTECTIVE ORDER

Woodard next contends that Judge Hunt erred in not granting his motion for a mistrial for an incident which occurred during the testimony of Sean Pierce. At a hearing outside of the jury's presence, before Pierce testified, the state represented that it had instructed Pierce that he was not to testify about prior bad acts by Woodard. Pierce was not present at this hearing. The state asked the court to readmonish Pierce shortly before he testified. The court agreed to do so. The court then addressed several motions by the parties. One of the defense motions was a request to clarify the court's order that nothing could be said by any of the witnesses implicating Woodard in other crimes. The state apparently planned to elicit testimony from the witnesses about their reasons for admitting their prior crimes; with respect to Pierce, the state stated that they expected him to say that he had two reasons -- protecting his agreement with the state which required him to be truthful, and protecting his credibility because he knew that the defendant knew about his crimes. Judge Hunt issued the following ruling from the bench:

> The court has consistently ruled that the defendant's alleged involvement in other criminal activities, prior bad acts, is not admissible. And it is not admissible for

> purposes of having either Mr. Pierce, or Mr.
> VanHousen, or Mr. Bohlin, or any other
> witness, say, I admitted to the police that I
> did "x" act, because the defendant knew that I
> had done that act, and would therefore tell
> his lawyer, and it would be investigated, and
> the police would find out.    That is not
> admissible.

Before Pierce testified the following day, the court instructed

Pierce:

> You are not permitted, by any testimony that
> you give in this trial, to refer to any
> alleged or purported prior bad acts -- prior
> criminal activity of the defendant.  Do you
> understand what I mean by "prior alleged or
> purported bad acts or criminal activity?"

Pierce responded that he understood this.  The court instructed him

that if he was asked a question that he thought required him to

disclose any prior criminal activity of Woodard he was to not

answer the question and instead should ask counsel to rephrase the

question.

During the state's questioning of Pierce, the following

exchange took place:

> Q:  And during that search warrant testimony,
> did you provide information about your own
> involvement, and Mr. Woodard's involvement in
> the armed robbery?
>
> A:  Yes.
>
> Q:  And prior to giving that testimony, did
> you tell or inform the police of other
> criminal activities you had been involved in?
>
> A:  Yes.
>
> Q:  And why is it that you provided that
> information to the police?
>
> A:  In keeping with telling the truth, because
> Jon knew everything, and . . .

-43-

00000052

*3933*

Ex. 5, p. 43

At this point, defense counsel objected and the court excused the
jury.  Defense counsel then moved for dismissal with prejudice, or
alternatively, for a mistrial, and requested an evidentiary hearing
to find out how the prosecuting attorneys had prepared the witness
and to discover if the prosecutors had engaged in any misconduct.

Judge Hunt denied the motions for dismissal with
prejudice and for a mistrial.  She also denied Woodard's motion to
conduct an evidentiary hearing into possible prosecutorial
misconduct.  Judge Hunt found that the violation of her protective
order had been inadvertent but admonished the state that she
expected it to caution its witness against making similar
statements.  She stated that she would assume that any further
violations of the protective order were not inadvertent.  She found
that Pierce's statement was sufficiently ambiguous so that it was
not necessary to declare a mistrial.  She reasoned that the jury
would understand that Woodard could know about Pierce's crimes
without having participated in them.  Judge Hunt then questioned
Pierce and readmonished him about the protective orders.  Pierce
stated that he thought he was "just not to -- suppose[d] to label
[Woodard] as -- as taking any kind of action."  The court asked if
he now understood that the restriction was broader than that.
Pierce responded that he understood and "did not know that before."
The court then instructed the jury:

> Ladies and gentlemen, the last answer
> given by Mr. Pierce is stricken from the
> record, and you are instructed to disregard it
> entirely.  There is no claim or evidence in
> this case that the Defendant was in any way
> involved in any of the other crimes admitted
> to by Mr. Pierce.  It would be improper and
> unfair for anyone to suggest or speculate as

-44-

00000053

393

to anything else.  And the answer is stricken from the record.

In <u>Roth v. State</u>,[56] we explained that in reviewing the trial court's denial of a motion for mistrial, we are to reverse the trial court's decision only if the trial court abused its discretion.  We recognized that the trial court was in a better position than we are to determine whether the impact of a particular incident which took place in court was sufficiently severe to warrant a mistrial.  In <u>Roth</u>, we stated the general rule that, where the trial court gives a cautionary instruction which withdraws improper testimony from the jury's consideration, there is an assumption that the jury will follow the instruction.[57]  It appears to us that Judge Hunt could properly find that Pierce's statement was sufficiently ambiguous to minimize any prejudice.  We conclude that Judge Hunt did not abuse her discretion in concluding that a curative instruction would sufficiently remedy any prejudice resulting from Pierce's statement so that it was unnecessary to grant a mistrial.


## SHACKLING AT TRIAL

Woodard next contends that Judge Hunt erred in allowing Woodard to appear at pretrial hearings and at trial wearing handcuffs and leg irons which were attached to a belt chain.  She provided that the chains would be hidden from view to the extent possible by placing skirting around the prosecution and defense

---

[56] 626 P.2d 583 (Alaska App. 1981).

[57] <u>See</u> <u>id.</u> at 585.

3933

Ex. 5, p. 45

tables.   Woodard contends that these restraints denied him his constitutional right to be presumed innocent and interfered with his ability to participate in his trial since he "could not freely look through papers, make notes or even move without exposing his condition to the jury."

This court discussed the appropriateness of having the defendant physically restrained in <u>Stern v. State</u>.

> A criminal defendant has a right to appear in front of his or her jury without the badges of custody.  This rule is intended to insure that the jury is not prompted to relax the presumption of innocence on account of the defendant's status as prisoner.

> However, this right is not absolute.  A judge may order the defendant physically restrained if the judge is convinced that this action is reasonably necessary either to forestall the defendant's escape, to protect the safety of participants and spectators, or to insure the orderly process of the court.  A trial judge's decision to order the defendant physically restrained is not to be overturned unless the decision is shown to be an abuse of discretion.[58]

In her order denying Woodard's motion to not be restrained in the courtroom, Judge Hunt found that:

> The defendant has been accused of planning and executing several armed robberies; he is a bodybuilder with extensive background in using paramilitary weaponry; he faces a 99 year sentence in this case and has other charges pending for later trials which makes him a flight risk.

We conclude that Judge Hunt gave sufficient reasons to justify the security restraints in this case.  We accordingly find no error.

---

[58] 827 P.2d 442, 448 (Alaska App. 1992)(citations omitted).

00000055

3933

Ex. 5, p. 46

Judge Hunt sentenced Woodard on September 24, 1993. As part of its restitution request, Carrs submitted a bill for counseling of employees following the robbery/homicide. Following sentencing, Woodard filed a motion for disclosure of the psychotherapy records of Carrs employees who received psychotherapy following the robbery/homicide. In the alternative, Woodard asked the court to subpoena the information and review it in camera. Judge Hunt denied Woodard's motion. In denying the motion, she noted that there was no Alaska case law discussing discovery following sentencing. She stated that under the Federal Rules of Criminal Procedure, further discovery was generally not allowed after sentencing except perhaps where the information sought would tend to support a motion for a new trial based upon newly discovered evidence.[59] Judge Hunt questioned whether the information which Woodard sought could be considered newly discovered: she noted that during the trial it was disclosed that several Carrs employees had received counseling in connection with the robbery/homicide. She further concluded that Woodard had not made any allegation which would suggest that the information would be material, other than for impeachment purposes, and so it would not be the type of newly discovered evidence upon which a motion for a new trial could be based.[60]

---

[59] See Fed. R. Crim. P. 16(c) (duty to disclose continues prior to and during trial).

[60] See Rank v. State, 382 P.2d 760 (Alaska 1963) (setting out the test for obtaining a new trial based upon newly discovered evidence including requirement that evidence relied on must not be merely for impeachment).

00000056    3933

We agree with Judge Hunt that Woodard did not make a sufficient showing to justify granting his motion for post-trial discovery. The trial had been concluded, and the witnesses in question had every right to have the court respect their privacy. Woodard's motion appeared to be an attempt to set out on a fishing expedition which had little chance for success. Given the showing which Woodard made in the trial court, we conclude that Judge Hunt did not abuse her discretion in denying his request.

### DOUBLE JEOPARDY

We now turn to the state's cross-appeal. The jury convicted Woodard of murder in the second degree (felony murder) and robbery in the first degree. Woodard contended that sentencing him on both convictions would violate the double jeopardy clauses of the United States and Alaska Constitutions. Judge Hunt agreed, and therefore only sentenced Woodard on the murder conviction. The state appeals, arguing that Judge Hunt erred in concluding that sentencing Woodard for felony murder and robbery would violate double jeopardy.

In <u>Todd v. State</u>, the supreme court concluded that sentencing a defendant "for felony murder and the predicate felony of first degree robbery [does] not violate the Double Jeopardy Clauses of the United States and Alaska Constitutions."[61] We accordingly conclude that Judge Hunt erred in reaching the opposite conclusion. We therefore remand the case to Judge Hunt for reconsideration in light of <u>Todd</u>.

The conviction is AFFIRMED. The case is REMANDED.

---

61 817 P.2d 674, 683 (Alaska 1996).

Ex. 5, p. 48