MANNHEIMER, Judge, concurring.

Woodard's appeal presents several difficult issues, and the proper resolution of these issues is not altogether free from doubt — as evidenced by the fact that each of the judges of this court has written a separate opinion.

In this concurrence, I do not address every point that Woodard has raised in his appeal. Rather, I confine myself to the major issues that divide our court. I conclude either that Woodard's claims of error are meritless or that the identified errors caused him no significant prejudice.

As I explain below, the issue that troubles me most is Judge Hunt's decision to shackle Woodard during trial. Woodard was not given a fair opportunity to be heard before the judge made her decision, and the record does not support the judge's decision. However, the judge took several precautions to ensure that the jury remained unaware of the shackles. Thus, the remaining question is whether Woodard must show that the judge's action prejudiced the jury's consideration of his case. Must a defendant in these circumstances demonstrate some reason to believe that the jury's deliberations were affected by the shackling? Or does an unjustified shackling automatically lead to reversal of a criminal conviction even in the absence of identifiable prejudice to the defendant? With some hesitation, I conclude that the defendant must demonstrate prejudice. I therefore vote to affirm Woodard's convictions.

3933

00000058

Ex. 5, p. 49

*The Malkin issue: Was Woodard entitled to an evidentiary hearing on his claim that the State's warrant applications contained intentionally false statements?*

In the trial court, Woodard asserted that the State's various applications for warrants were flawed by the inclusion of false statements, and that these statements were either intentionally false or else made with reckless indifference to the truth. Based on these assertions, and pursuant to State v. Malkin[1], Woodard asked for suppression of the evidence obtained under these warrants. Judge Hunt declined to hold a hearing into Woodard's allegations; she ruled that Woodard had not presented sufficient evidence of a Malkin violation to warrant a hearing.

With regard to the false statements of David VanHousen, I agree with my colleagues that Malkin does not require invalidation of the warrants. Woodard does not assert that the authorities knew that VanHousen was lying. Rather, he argues that the State is chargeable with these lies because VanHousen was a "government agent". But VanHousen had no ongoing relationship with the police or the prosecutor. The authorities knew that VanHousen had knowledge of the robbery/homicide, and they were attempting to secure his cooperation in solving the case. For his part, VanHousen hoped that his combination of cooperation and lies might help him escape the punishment he might normally expect for his role in these crimes. However, neither Malkin nor any other legal authority I am aware of says that, whenever the authorities grant

---

[1] 722 P.2d 943 (Alaska 1986).

3933

00000059

Ex. 5, p. 50

concessions to a witness in order to induce the witness to come forward, the government thereby unconditionally guarantees the truth of the witness's testimony.

I now turn to Woodard's allegations that the prosecutor and certain police officers either intentionally or recklessly made false statements during the warrant applications. As Judge Bryner's dissent emphasizes, our review of Judge Hunt's ruling is no easy task. The task is so difficult because the <u>Malkin</u> decision gives uncertain guidance on several key issues.

The narrow question initially presented to the Alaska Supreme Court in <u>Malkin</u> was whether a search warrant should be invalidated if (1) the search warrant application contained false assertions of fact, and (2) the officer making those assertions acted negligently with respect to the possibility that the assertions were false. The State petitioned the supreme court to hear the case because this court had answered the question "yes"; we held that negligent misstatements in a search warrant application required invalidation of the resulting warrant.[2] The supreme court granted hearing and ultimately decided that negligent misstatements would not invalidate a resulting search warrant.

Having answered the narrow question presented, the supreme court then outlined the circumstances in which false assertions in a warrant application *would* invalidate a warrant. In general terms, the court declared that false assertions in a

---

[2] See <u>State v. Malkin</u>, 678 P.2d 1356, 1362 (Alaska App. 1984).

00000060                Ex. 5, p. 51

warrant application might require invalidation of the warrant if the officer making those statements either intentionally falsified the facts or at least recklessly disregarded the possibility that the assertions in the warrant application were false. However, for litigants trying to pursue or defend suppression motions, and for judges who are called upon to decide these motions, Malkin is a frustrating decision because it leaves crucial questions either unaddressed or ambiguously answered.

The first issue arises after the defendant has shown that one or more statements in the warrant application are false. The supreme court ruled in Malkin that, even after the defendant proves that the authorities made false statements when applying for a warrant, the warrant will remain valid if the police only negligently misstated the facts — that is, if the police officer's only fault was a failure to exercise reasonable care in verifying the assertions in the warrant application. Malkin holds that the warrant can be attacked only by asserting that the police either intentionally or recklessly misstated the facts.

Woodard alleged that the authorities either intentionally or recklessly made false statements in support of the warrant applications, but Judge Hunt ruled that Woodard had not presented a sufficient case to warrant an evidentiary hearing on his allegations. Thus, Woodard's case presents the question: What foundational showing must a defendant make before the defendant is entitled to an evidentiary hearing on the issue of whether the officer acted intentionally or recklessly in presenting false

statements to the magistrate? Phrased another way, what founda-
tional showing must a defendant make before the court is obliged to
hold an evidentiary inquiry into the mental state of the police
officer who applied for the warrant?

Generally, a litigant is entitled to a hearing if the
litigant presents the court with a *prima facie* case — evidence
which, if believed, is sufficient to prove that the litigant is
entitled to relief under the applicable law. In <u>Davis v. State</u>[3],
this court indicated that we would apply this same rule to <u>Malkin</u>
cases.[4]

But, if we are to apply this rule to <u>Malkin</u>, we must ask
two more questions. First: What must be proved to invalidate a
warrant under <u>Malkin</u>? And second: Who bears the burden of proof?
That is, who loses if the evidence is lacking or inconclusive?
<u>Malkin</u>'s answers to these questions are ambiguous and confusing.

Turning to the first question — What must be proved? —
the main text of the <u>Malkin</u> opinion twice declares that a warrant
will be invalidated (a) if the police intentionally or recklessly
presented false statements of fact to the magistrate, *and* (b) if,
stripped of these false statements, the warrant application no
longer establishes probable cause for the issuance of a warrant.
That is, the false statements must be material.

Here is what the <u>Malkin</u> court said:

---

[3] 766 P.2d 41 (Alaska App. 1988).

[4] 766 P.2d at 43-44 (majority opinion), and at 46-47 (concur-
ring opinion of Judge Singleton).

*3933*

00000062

> The rule we embrace is that once the defendant
> has [identified] specific[] statements in the
> affidavit [as] false, together with a
> statement of reasons in support of the
> assertion of falsehood, the burden then shifts
> to the state to show ... that the statements
> were not made intentionally or with reckless
> disregard for the truth. If the state does
> not meet this burden[,] *then the statements
> must be excised and the remainder of the
> affidavit tested for probable cause.*

722 P.2d at 946 (emphasis added) (footnotes omitted). The court

reiterated this rule at the end of the <u>Malkin</u> opinion:

> We hold, therefore, that the proper way
> to strike the balance between societal
> interests in the use of reliable evidence and
> in protection from unreasonable invasions of
> privacy *is to excise misstatements from the
> police officer's affidavit if he cannot show
> that they were not made intentionally or
> recklessly.*

722 P.2d at 948 (emphasis added). There is yet a third place where

the main text of <u>Malkin</u> refers to the requirement of materiality:

> [W]e decline to ... place[] on the defendant
> the full burden of proving that intentional or
> reckless misstatements were made. ... [O]nce
> the defendant has shown [that] the affidavit
> contains *material false statements*, the burden
> should shift to the prosecution to justify
> these misstatements by showing that they were
> not made intentionally or recklessly.

<u>Malkin</u>, 722 P.2d at 947-48 (emphasis added).

Thus, the main text of <u>Malkin</u> repeatedly requires the

defendant to show that the challenged statements are material.

However, in footnote 6 of the opinion (722 P.2d at 946), the

supreme court appears to endorse a different rule from the one

repeatedly stated in the main text of the decision.

-54-

Ex. 5, p. 54

In footnote 6, the court declared that if "the police officer ... intentionally made the [false] statements[,] then the search warrant should be invalidated whether or not probable cause would remain ... after the misstatements [are] excised." The rationale for this approach, according to the footnote, is that "[a] deliberate attempt to mislead a judicial officer in [an] affidavit deserves the most severe deterrent sanction that the exclusionary rule can provide."

Footnote 6 appears to say that a warrant should be invalidated (a) if the police recklessly presented false statements of fact to the magistrate and if, stripped of these false statements, the warrant application no longer establishes probable cause for the issuance of a warrant, or (b) the police intentionally presented false statements of fact to the magistrate, regardless of whether those statements made any difference to the determination of probable cause.

Obviously, there is tension between the main text of Malkin and footnote 6. The three descriptions of the rule presented in the main text of the opinion (all of which are quoted above) require proof that the false statements were material to the finding of probable cause. These three portions of the main opinion are difficult to reconcile with the rule suggested in footnote 6.[5]

---

[5] I note that the supreme court's only subsequent characterization of Malkin also restates the requirement of materiality and appears to be inconsistent with footnote 6:

(continued...)

3933

00000064

Ex. 5, p. 55

The answer, I believe, lies in a conservative reading of footnote 6 — one that focuses on whether the officer engaged in a "deliberate attempt to mislead a judicial officer".

If the rule stated in footnote 5 were interpreted broadly — if the footnote were read to require invalidation of a warrant whenever an officer made any intentional false statement whatsoever — this would lead to insupportable results. Suppose, for instance, that a police officer applied for a warrant to search a suspected armed robber's residence, and that the officer stated in his affidavit that his involvement in the criminal investigation began when he was on patrol and heard the report of an armed robbery. Assume also that the truth of the matter — purposely concealed by the officer — was that the officer had not been on patrol, but rather in his house, when he heard his dispatcher report the robbery; the officer lied because he had stopped at home to have a beer, in violation of department regulations.

It would seem to make little sense to invalidate a warrant, even when a police officer has purposefully misstated or omitted facts, if the officer's misstatement or omission was not intended to affect the magistrate's decision to issue the warrant,

---

[5] (...continued)
We have previously held that intentional or reckless misstatements in affidavits supporting search warrants must be excised and the remainder of the affidavit reviewed for probable cause. State v. Malkin, 722 P.2d 943, 946 (Alaska 1986). If the remainder of the affidavit is insufficient to support the search warrant, the evidence gathered with the warrant must be suppressed. See id.

Bostic v. State, 805 P.2d 344, 348 (Alaska 1991).

-56-
000**65**

3933

and if the misstatement or omission had no relevance to the magistrate's decision.  In fact, this court has twice suggested that <u>Malkin</u>'s footnote 6 should not be interpreted that broadly. Instead, we have suggested that footnote 6 was intended to penalize, not every knowing falsehood, but only (in the words of footnote 6) a "deliberate attempt to mislead a judicial officer".

In Judge Singleton's concurring opinion in <u>Davis v. State</u>[6], he stated:

> It seems to me that <u>Malkin</u> requires more than a showing that the affiant may have been aware that one or more of his assertions were false. In order to quash a warrant, the trial court should find that the false statements were included with the intent to mislead the magistrate.  In such a case, the court can readily infer that the affiant, at least, believed that the false statements were material.  <u>See</u> <u>Williams v. State</u>, 629 P.2d 54, 64 n.22 (Alaska 1981).

<u>Davis</u>, 766 P.2d at 47 n.3.  This approach was echoed in <u>Gustafson v. State</u>[7], where we addressed the claim that the police violated <u>Malkin</u> when, having obtained a warrant but having not yet served it, they discovered new information that was arguably relevant to the magistrate's decision to issue the warrant.  We held that exigent circumstances prevented the police from interrupting their investigation to seek clarification from the magistrate, and thus

> the authorities' failure to return immediately to the magistrate was not "intentional" for purposes of <u>Malkin</u>, 722 P.2d at 946 n.6 — that

---

[6] 766 P.2d 41 (Alaska App. 1988).

[7] 854 P.2d 751 (Alaska App. 1993).

-57-

3933

00000066

Ex. 5, p. 57

is, the authorities did not engage in a "deliberate attempt to mislead a judicial officer".

<u>Gustafson</u>, 854 P.2d at 758 n.2.

If footnote 6 is interpreted in this fashion, then it is more reconcilable (even if not completely reconcilable) with the three places in the main text of <u>Malkin</u> where the supreme court required the defendant to demonstrate the materiality of the misstatement. Under this conservative reading of footnote 6, the defendant would have to show either (a) that the officer recklessly misstated the facts and the misstatement is material, or (b) that the officer intentionally misstated the facts, and the misstatement either is material or appeared material to the officer at the time.

Under this suggested analysis, a defendant seeking an evidentiary hearing under <u>Malkin</u> has to make a *prima facie* showing that one or more statements in the warrant application are false and that these statements either are material or, at least, they appeared material to the officer at the time. The defendant also has to make a *prima facie* showing that the officer acted either recklessly or intentionally when he or she made these statements. That is, the defendant has to present facts which, if believed, would support a reasonable conclusion that the officer either knew that the statements were false or, at least, was aware of a substantial and unjustifiable risk that the statements were false.

My conclusion regarding the defendant's required *prima facie* case does not conflict with the supreme court's decision to place the burden of proof — that is, the ultimate burden of

-58-                                                        *3933*

Ex. 5, p. 58

persuasion — on the State.  The law is full of instances in which
a court is authorized to deny a litigant a trial or hearing unless
the litigant offers evidence that is sufficient to create a
substantial dispute as to each material element of the case.  This
is the same "some evidence" rule that we apply when deciding
whether a defendant is entitled to litigate self-defense or to have
the jury consider a lesser included offense.  The fact that the
defendant must demonstrate that the issue is in reasonable dispute
does not alter the State's ultimate burden to prove the defendant
wrong.  The language of footnote 5 of <u>Malkin</u> (722 P.2d at 946)
supports my interpretation.  In that footnote, the supreme court
said:

> To mandate an evidentiary hearing, the
> [defendant's] attack must be more than
> conclusory and must be supported by more than
> a mere desire to cross[-]examine.  *[The defen-*
> *dant's] allegations of deliberate falsehood or*
> *of reckless disregard for the truth ... [must]*
> *be accompanied by a statement of supporting*
> *reasons.  Affidavits or ... otherwise reliable*
> *statements of witnesses should be furnished,*
> *or their absence satisfactorily explained.*

(Emphasis added)

In his dissent, Judge Bryner rejects this reading of
<u>Malkin</u>.  He points out that the defendant in <u>Malkin</u> failed to make
a preliminary showing of the police officer's intent or
recklessness when Malkin's suppression motion was litigated in the
superior court.  Judge Bryner reasons that, if *prima facie* proof of
the officer's culpable mental state were required, then (in the
absence of such proof the supreme court would simply have affirmed

-59-

00000068

Ex. 5, p. 59

the superior court's ____ of Malkin's suppression motion.
Instead, the supreme ____ remanded the case to the superior court
for further proceedings. ____ this, Judge Bryner concludes that
the supreme court ____ a defendant to obtain an evidentiary
hearing even in the ____ of any reason to believe that the
police officer acted ____ally or recklessly.  I believe this
conclusion is unwarra____.

    Prior to Ma____, ____etent attorneys and judges (indeed,
the members of this ____ might reasonably believe that even a
negligent misstateme__ __ a search warrant application could
invalidate the result____ ____.  If so, then the defendant would
not have to prove any____ ____ the officer's subjective awareness
of the falsity of the ____; to assemble a *prima facie* case for
suppression, the de____ would only have to show that a
reasonable person in __ ____'s position would have perceived a
substantial and unjus____ risk that the statement was false.
But the supreme court __ __ Malkin that negligent misstatements
would not invalidate a ____.  After Malkin, suppression hinges
on litigation of __ ____'s subjective awareness of the
statement's falsity __ __ least, the officer's subjective
awareness of a sub____ and unjustifiable risk that the
statement was false).  ____ changed the rules in this manner, the
supreme court remande ____'s case to the trial court so that
Malkin could reformul___ __ suppression motion; it would have been
unfair to throw Malki__ __ __ court for failure to anticipate that

-60-

3933

Ex. 5, p. 60

he would have to present evidence of the police officer's culpable
mental state.

For the reasons explained above, I conclude that when a
defendant alleges that the police have *intentionally* misrepresented
the facts in a search warrant application, the trial court need not
hold an evidentiary hearing unless the defendant presents a *prima
facie* case (some good reason to believe) that (1) the officer's
statements were in fact false, (2) the officer knew that the
challenged statements were false[8], and (3) that the false
assertions are material to the finding of probable cause, or that
the false assertions would have appeared material to the officer at
the time.

In Woodard's case, Judge Hunt concluded that all of the
asserted misstatements in the various warrant applications were not
material to the findings of probable cause. All three members of
this court agree with Judge Hunt's assessment. For me, this ends
the matter. Even though Woodard alleged that the authorities had
intentionally misstated various facts, he failed to present a *prima
facie* case that the challenged statements were material to the
finding of probable cause (or that the officers would have
perceived these statements to be material). Thus, Woodard was not
entitled to an evidentiary hearing.

---

[8] See AS 11.81.900(a)(2) for the definition of "knowingly".

-61-

3933

00000070

*Should Woodard have been permitted to introduce the second through fifth of his recorded conversations with VanHousen?*

Pursuant to a <u>Glass</u> warrant, David VanHousen engaged in five recorded conversations with Woodard. The first of these conversations was introduced by the State because, during this conversation, Woodard made reference to "the thing". The State argued that this "thing" was the robbery/homicide.

In the second through fifth of these conversations, VanHousen repeatedly tried to induce Woodard to admit his involvement in the robbery/homicide, or at least to talk openly about the crime. Woodard, however, responded with repeated denials, and by questioning VanHousen's sanity.

At trial, VanHousen testified that he and Woodard were long-time associates, that Woodard was the robber, and that he (VanHousen) had been Woodard's accomplice. VanHousen attempted to explain Woodard's failure to discuss the robbery by asserting that he (VanHousen) had silently tipped Woodard off that the police were monitoring the conversations. (VanHousen testified that he used hand signals and that he mouthed the word "wired".)

On April 28, 1993, while cross-examining VanHousen, Woodard's attorney sought to introduce evidence that Woodard had failed to say anything incriminating in the second through fifth conversations. The defense attorney told Judge Hunt that he did not wish to introduce any of the details of conversations 2 through 5; rather, he simply wanted to confront VanHousen with the fact

that Woodard had failed to make any incriminating statements during these conversations.

The defense attorney offered two theories of admissibility for this evidence. First, he argued that the evidence was relevant to prove *VanHousen's* state of mind and to impeach VanHousen's testimony about tipping Woodard off. The defense attorney argued that VanHousen was placed in a predicament: he had told the police that he and Woodard were long-time friends and that they had planned the robbery together, but somehow Woodard had failed to talk to him about the robbery. Woodard's attorney argued that VanHousen invented the story of the hand signals and the mouthed words just as he had invented Woodard's participation in the crime — all part of his plot to falsely pin the crime on Woodard so that VanHousen and his friends Karl Bohlin and Sean Pierce could escape punishment.

Having made this argument, Woodard's attorney presented an alternative argument: that the conversations were relevant to prove *Woodard's* state of mind. Under this theory, Woodard's failure to say anything incriminating to VanHousen was evidence that Woodard had no consciousness of guilt. Implicit in this argument is the premise that a person who has no consciousness of guilt is most likely not guilty.

Judge Hunt rejected both of these theories of admissibility. She ruled that the proposed evidence was hearsay and was not admissible.

*3933*

Ex. 5, p. 63

Judge Hunt was mistaken when she denied Woodard's request to summarize the taped conversations for the jury — that is, to introduce evidence that VanHousen had failed to elicit from Woodard any admission that Woodward knew of or participated in the robbery. This fact was not "hearsay"; the proposed testimony did not involve the introduction of any out-of-court assertions of innocence for the truth of the matters asserted.  Rather, the proposed testimony involved the fact that Woodard failed to make the assertions (or other utterances) that one might expect under the circumstances if VanHousen was telling the truth about Woodard's participation in the crime.

(This appears to be the reverse side of the evidentiary coin discussed in Watson v. State [9] and in Doisher v. State [10], where the State offered evidence of the defendant's failure to respond to accusations because the defendant's silence supposedly constituted an implicit admission of the truth of those accusations.)

Ironically, Judge Hunt issued the correct ruling on this point of evidence the very next day (during Woodard's continued cross-examination of VanHousen), when a similar evidentiary issue came up.  Woodard's attorney asked VanHousen to confirm that one of the police stratagems during the taped conversations was to have VanHousen ask Woodard for some of the money stolen during the robbery (supposedly, so that VanHousen could leave town).   The

---

[9] 387 P.2d 289, 291-92 (Alaska 1963).

[10] 658 P.2d 119 (Alaska 1983).

3933

00000073

Ex. 5, p. 64

defense attorney then wanted to elicit the fact that Woodard had never given VanHousen any money in response to these pleas.

Despite the prosecutor's objection that any testimony concerning the content of the taped conversations would constitute "hearsay", Judge Hunt allowed Woodard's attorney to continue questioning VanHousen on this point. Woodard's attorney then elicited the fact that VanHousen had asked Woodard for some of the robbery proceeds, and that "Woodard didn't give [VanHousen] a dime".

The issue of the four taped conversations surfaced again about three weeks later in the trial. This time, the issue arose because Woodard's attorney filed a written motion asking permission to introduce the *details* of the four conversations. The defense attorney argued that VanHousen's accusations against Woodard during these taped conversations were relevant to explain away part of the State's case.

The State had introduced evidence that Woodard began to act strangely (and seemingly a little paranoid) as the police pursued their robbery investigation. The State suggested that this behavior indicated Woodard's consciousness of guilt. The defense attorney argued that Woodard's behavior — including his verbal behavior during the taped conversations — could reasonably be attributed to the fact that VanHousen had repeatedly accused him of being the gunman in a notorious robbery/homicide. The defense attorney argued that, introduced for this purpose, VanHousen's statements and Woodard's statements were not hearsay.

-65-                                              *3933*

00000074

Judge Hunt issued a written decision in which she again ruled that the taped conversations were inadmissible. She correctly distinguished the two different types of evidence on the tapes: (1) Woodard's statements (his denials of wrongdoing and his expressions of surprise at VanHousen's accusations), and (2) VanHousen's statements (his attempts to prompt Woodard to make incriminating statements). As to Woodard's statements, Judge Hunt ruled that they were not admissible to prove Woodard's state of mind because Woodard had failed to show that the statements were spontaneous. As to VanHousen's statements, Judge Hunt concluded that they were not "verbal acts", and therefore that they were not admissible.

Judge Hunt was correct in ruling that Woodard's taped protestations of innocence were inadmissible hearsay when offered to prove his innocence. Even though Woodard invoked the "state of mind" exception to the hearsay rule, that exception does not apply here. (This point is explained in Marino v. State. [11])

Judge Hunt's ruling might be debated because she failed to distinguish the different types of utterances that Woodard made on the tapes. Many of Woodard's utterances are not direct assertions of innocence, but rather are expressions of surprise or incredulity that VanHousen would accuse him of being the robber. These utterances might not be "statements" within the meaning of Evidence Rule 801(c), and thus they might not be hearsay.

---

[11] 934 P.2d 1321, 1331-32 (Alaska App. 1997).

As noted in <u>Marino</u>, 934 P.2d at 1332, some cases from other jurisdictions suggest that such non-assertive verbal conduct is admissible to prove "consciousness of innocence". However, this point is only debatable, and Woodard does not devote substantial attention to this theory in his briefing to this court. Further, there was a real danger that the jury would view Woodard's exclamations of astonishment at being accused as the functional equivalent of direct assertions of innocence. For these reasons, I would uphold Judge Hunt's decision to exclude these utterances (even though, technically, they may not have qualified as "assertions").

Judge Hunt was mistaken when she ruled that VanHousen's statements on the tape were inadmissible hearsay. They were, in fact, not hearsay. Judge Hunt may have been led astray by the parties, who characterized the issue as whether VanHousen's statements on the tape were "verbal acts". Judge Hunt correctly recognized that VanHousen's statements during these taped conversations were not "verbal acts", at least as that term is normally used. This conclusion, however, is beside the point. An out-of-court statement can be admissible even though it does not constitute a "verbal act".

Here, the defense theory of admissibility is a classic non-hearsay theory. Woodard obviously was not trying to introduce VanHousen's accusations for the truth of the matters asserted; rather, he offered them for their effect on the hearer (Woodard). Woodard offered VanHousen's repeated accusations (or, more

Ex. 5, p. 67

precisely, Woodard's hearing them) for the purpose of showing how the accusations might have affected Woodard's mental state and his subsequent behavior; the defense argued that if Woodard exhibited "guilty" behavior during the investigation, this was attributable to VanHousen's accusations rather than Woodard's consciousness of guilt. Introduced for this purpose, VanHousen's statements during the four taped conversations were relevant and were not hearsay.

I thus conclude that Judge Hunt committed error when she refused to allow the defense to introduce the summarizing fact that Woodard failed to make incriminatory admissions during the four taped conversations with VanHousen, and she committed error again when she ruled that VanHousen's accusatory statements during these taped conversations were hearsay. Do these errors require reversal of Woodard's convictions? On balance, I believe not.

First, as just explained, the defense attorney was able to introduce the fact that Woodard was peculiarly unresponsive when VanHousen, his friend and supposed accomplice, asked for money from the robbery.

Second, during Woodard's cross-examination of another supposed accomplice, Sean Pierce, the defense attorney was able to elicit exactly the kind of evidence that Judge Hunt forbade here. During cross-examination, Pierce testified that he received a telephone call from Woodard after the police searched Woodard's house on June 17th. During this conversation (according to Pierce), Woodard declared, "I haven't done anything", and "I'm innocent of the Carrs robbery." A few minutes later, during re-

-68-

00000077

cross-examination, Pierce again described his June 17th telephone conversation with Woodard. This time, Pierce testified that Woodard said (1) that he was innocent, and (2) that he thought VanHousen was wired.

Finally, Woodard ended up with a record sufficient to support a plausible exculpatory explanation of his "paranoid" behavior during the police investigation. In his summation to the jury, Woodard's attorney argued:

> DEFENSE ATTORNEY: Wires two through five on these other dates — what do we know about them? We know that Dave VanHousen attempted to get money from Mr. Woodard, and he wouldn't give him any.
>
> And we know that, on [June] 14th, Mr. VanHousen confronted Mr. Woodard [with] the police-planted profile ... — not [an accurate] description of the robber, but what Investigator Reeder admitted was a [fabricated] police profile. [VanHousen] [s]howed him that, ladies and gentlemen[.] ... [Now] ask yourself: Why was Jon Woodard acting paranoid? Why was Jon Woodard getting suspicious? ... [I]magine that a friend of yours keeps contacting you over and over again, repeatedly, [a friend] who happens to work where a crime happened. Next, imagine that you pick up your Sunday morning paper, and there is your description, to a "T". Sure, he's getting concerned. He's getting concerned that this setup is happening.

This, combined with Pierce's testimony that Woodard declared himself to be innocent, leads me to conclude that Judge Hunt's ruling, though erroneous, was not reversible error.

3933

00000078

Ex. 5, p. 69

*The exclusion of the fact that VanHousen and Pierce had
failed polygraph examinations*

On February 23, 1993 (about a month before trial began),
Woodard filed a motion seeking permission to introduce evidence
that Pierce and VanHousen had failed to pass polygraph
examinations. Woodard relied on <u>United States v. Hart</u> [12] for the
proposition that polygraph evidence, although not admissible to
prove the truth or falsity of the examinee's answers, could
nevertheless be admissible if it was relevant for some other
purpose.

Woodard argued that Pierce's failure to pass the test was
relevant because Pierce's plea agreement with the State required
him to pass the polygraph. Because Pierce had so far failed to
pass, he was assumedly under considerable pressure to come up with
a story that supported the State's case.

Woodard's argument with respect to VanHousen was
different because VanHousen's plea agreement did not require him to
pass a polygraph exam. (VanHousen's first plea agreement had
included such a provision, but this provision was not included in
his second — and current — plea agreement.) Woodard argued that
VanHousen's failure to pass the polygraph was relevant because
(1) after VanHousen failed the polygraph, he presented the police
with a revised story that was substantially more incriminatory
toward Woodard, and (2) the authorities, after hearing VanHousen's

---

[12] 344 F.Supp. 522 (E.D.N.Y. 1971).

00000079

revised story, decided that it was no longer necessary to require VanHousen to pass a polygraph. Woodard concluded that this series of events was pertinent to VanHousen's state of mind — that these events must have convinced VanHousen that he could freely embroider his story because he would no longer be subjected to polygraph examination.

On April 3rd, Judge Hunt denied Woodard's request to introduce the polygraph results. Judge Hunt noted that Woodard's authority (United States v. Hart) had been roundly criticized in United States v. MacEntee [13], and she indicated that she favored the MacEntee analysis. Judge Hunt also noted that Alaska cases squarely hold that a witness's willingness or unwillingness to take a polygraph examination is irrelevant and should be kept from the jury. [14]

Judge Hunt acknowledged that federal circuit courts of appeal had, on occasion, decided that a witness's failure to pass a polygraph could be admissible if the witness's plea agreement required the witness to pass the exam. [15] However, the judge concluded that Woodard had numerous other ways of attacking the credibility of VanHousen and Pierce, so that even if the polygraph evidence had some relevance to this issue, the probative force of

---

[13] 713 F.Supp. 829 (E.D.Pa. 1989).

[14] See Lewis v. State, 469 P.2d 689, 693 (Alaska 1970); Leonard v. State, 655 P.2d 766, 771 (Alaska App. 1982).

[15] See United States v. Barger, 931 F.2d 359 (6th Cir. 1991); United States v. Lynn, 856 F.2d 430, 433-34 (1st Cir. 1988).

-71-                                                    3933

the evidence was outweighed by the prejudicial effect of the evidence.

Because the scientific underpinnings of polygraph testing have not gained general acceptance within the relevant scientific community, polygraph results are not admissible in Alaska to prove that a witness is telling the truth or is lying.[16] Here, Woodard identified two plausible ways in which VanHousen's and Pierce's polygraph results might be relevant, apart from any assertion about the ultimate truth or falsity of VanHousen's and Pierce's accounts.

The first plausible ground of relevance is that, because of VanHousen's and Pierce's failure to pass the polygraph, the authorities would be able to pressure the two men. Both men's plea agreements required them to tell the truth in response to all questioning. (This was in addition to the clauses requiring them to take the polygraph.) Because VanHousen and Pierce faced considerable criminal liability if they breached their plea agreements, the authorities could use the polygraph results to pressure VanHousen and Pierce to change their story until the two men came up with an account of the crime that was more to the authorities' liking (in other words, an account more directly incriminatory of Woodard).

The second plausible ground of relevance is more direct, although it only applies to Pierce. Pierce's plea agreement required him to pass the polygraph. Because Pierce failed the polygraph, he was in violation of his plea agreement. He therefore

---

[16] See Pulakis v. State, 475 P.2d 474 (Alaska 1970).

*3933*

00000081

Ex. 5, p. 72

was potentially motivated to say anything the authorities wanted him to say, so that they would refrain from invoking their power to annul the agreement.

Despite the identification of these two plausible grounds of relevance, Judge Hunt was still authorized (indeed, obligated) by Evidence Rule 403 to weigh the arguable probative force of this evidence against its potential for unfair prejudice. Alaska courts have repeatedly acknowledged the substantial prejudicial effect of polygraph evidence. As pointed out in Haakanson v. State: [17]

> [P]olygraph evidence might be perceived by the jury as a complete answer to questions of credibility. Such evidence could also lull the jury into a false sense of security and result in the jury's failing to carefully scrutinize conflicting ... testimony.

With regard to Woodard's first suggested theory of admissibility (the theory that the authorities could accuse VanHousen and Pierce of lying and thus force them to alter their stories), Woodard clearly was able to make his point without mentioning the polygraph results. It was sufficient for Woodard to show that, after VanHousen and Pierce gave their accounts of the crime to the police, the police informed the two men that they did not believe their stories.

Woodard engaged in just this type of inquiry when he cross-examined Pierce at trial. Woodard's attorney had Pierce confirm that his plea agreement obliged him to tell the truth about anything and everything he was asked. Pierce acknowledged that he

---

[17] 760 P.2d 1030, 1035 (Alaska App. 1988).

00000082

had submitted to many police interviews and that, following his interview with Investigator Harrick (who was the polygraph operator, although the jury was not informed of this fact), the police plainly told Pierce that they believed he was withholding material information concerning the robbery. A little later in the cross-examination, Pierce conceded that he had submitted to a subsequent interview with Investigator Harrick on January 5th, and that, following this interview, the police again told Pierce that they still thought he was withholding material information.

This cross-examination laid the foundation for Woodard's argument that Pierce was under a lot of pressure to come up with a story that was satisfactory to the police, and that the police had in fact repeatedly pressured Pierce to change or augment his story.

Woodard's attorney engaged in similar cross-examination of VanHousen. VanHousen initially gave an account of the robbery in which he completely omitted his knowledge of (much less his participation in) the crime. VanHousen conceded that, on June 25th, the police made it clear to him that they didn't believe his story; they threatened him with dire legal consequences if he didn't start cooperating. It was then that VanHousen first told the police of his personal involvement in the robbery and his personal knowledge of Woodard's guilt.

A little later in the cross-examination, VanHousen conceded that he changed another facet of his initial story (concerning the anticipated split of the robbery proceeds) only after the police made it clear to him that they didn't believe what

-74-

00000083                                   Ex. 5, p. 74

he was telling them.  In his questions, Woodard's attorney clearly suggested that VanHousen kept changing his story until he found one that the police were willing to believe.

Woodard's attorney was able to return to this theme in his summation to the jury.  He reminded the jury that the police had repeatedly told VanHousen that they thought VanHousen was lying — and that, in response, VanHousen had repeatedly changed his story until he came up with a version of events that the police were willing to believe.

> DEFENSE ATTORNEY:  VanHousen ... admitted that ... [he] knew or believed, before [he] ever claimed that [he was] involved [in the crime] and pointed the finger at Jon, that the police thought it was [Woodard].  And that's critical. ...    [VanHousen] knew who to identify if [he was] going to be believed: Jon Woodard.

Based on this record, Judge Hunt was right when she concluded that Woodard had the means to establish his point without mentioning the polygraph.  Woodard's attorney wished to demonstrate that (1) VanHousen's and Pierce's plea agreements obligated them to tell the truth, and (2) both men were informed, several times, that the police did not believe their stories — thus creating pressure on the two men to alter their accounts until the police pronounced themselves satisfied.  This point could be made — and was made — without explaining to the jury that it was the failed polygraph tests that led the police to conclude that VanHousen and Pierce were lying.

-75-

00000084

As mentioned above, Woodard presented a second plausible reason why the polygraph results were independently relevant with regard to Pierce: Pierce's plea agreement required him to pass the polygraph, and he was therefore in violation of his plea agreement — and subject to the mercy of the authorities. However, this issue was ultimately addressed by stipulation.

During Woodard's cross-examination of Pierce (after Judge Hunt had already denied the defense request to introduce the polygraph results), Woodard's attorney asked permission to bring up the fact (without directly mentioning the polygraph clause) that Pierce was already in violation of a clause of his plea agreement, and thus the State was authorized to unilaterally revoke the agreement at any time. Judge Hunt ruled that Woodard should be able to bring this matter to the jury's attention. The parties then drafted a stipulation to this effect.

Relying on this stipulation, Woodard's attorney cross-examined Pierce extensively regarding (1) the dire consequences that Pierce faced (essentially, life in prison) if the State revoked the agreement, and (2) the fact that the State was at liberty to revoke the agreement at any time, because Pierce had already breached the agreement. Pierce admitted that, because the State could revoke the agreement at any time, he did not want to do anything that might cause the State to exercise that authority.

Later in the trial, during Woodard's cross-examination of David VanHousen, the jury was read a similar stipulation with regard to VanHousen's plea agreement with the State. The jury was

3933

0C000085

Ex. 5, p. 76

told that VanHousen had failed to fulfill an unspecified condition of his first agreement with the State; the jury was also told that, when the agreement was renegotiated, the State omitted this condition from the second version of the agreement.

Because this stipulation did not prove that VanHousen was in breach of his current agreement with the State, the stipulation never became a significant part of the cross-examination. However, Woodard was able to establish his point that VanHousen was potentially in the State's pocket. Even though VanHousen's second plea agreement omitted the requirement of a successful polygraph examination, the second agreement continued to require VanHousen to truthfully answer all inquiries related to the robbery/homicide. During his direct examination, VanHousen conceded that he had already violated this provision of the agreement: in a police interview conducted after he signed the second agreement, VanHousen lied about what he had done with some of the proceeds of the robbery. (He asserted that he had told this lie to protect his girlfriend). Thus, Woodard could make the same argument with respect to VanHousen that he would make with respect to Pierce: that the State had the power to unilaterally revoke the plea agreement, and thus VanHousen was under considerable pressure to please the State. For these reasons, I again conclude that Woodard had the means to establish his point without mentioning the polygraph.

0C000086

Ex. 5, p. 77

Of the two cases Woodard cites in favor of admitting the polygraph results, <u>United States v. Barger</u> [18] is all but irrelevant because the case was a procedural nightmare. <u>United States v. Lynn</u> [19] is more to the point, but the facts are quite different from Woodard's case, and the court's reasoning is fundamentally flawed.

In <u>Lynn</u>, the government relied on the testimony of the defendant's supposed accomplice, Byron. The jury heard evidence that Byron's plea agreement obligated him to take and pass a polygraph test. [20] However, the government did not offer this information; it was elicited by the defense attorney on cross-examination. [21] Having elicited the fact that Byron was required to pass a polygraph, the defense attorney then tried (unsuccessfully) to introduce evidence that some of Byron's answers during the test had yielded "inconclusive" results. On appeal, the First Circuit agreed that this evidence should have been admitted.

The First Circuit gave three reasons for its conclusion. First, the court held that the proposed area of inquiry was relevant to show "Byron's [willingness] to lie to continue to curry favor with the government". [22] The problem with the court's conclusion is that it rests on an illegal assumption: the court assumes that Byron's failure to pass the polygraph was admissible

---

[18] 931 F.2d 359 (6th Cir. 1991).

[19] 856 F.2d 430, 433-34 (1st Cir. 1988).

[20] 856 F.2d at 432.

[21] <u>Id.</u>

[22] 856 F.2d at 433.

-78-

3933

0C000087

Ex. 5, p. 78

to prove that Byron was lying. Polygraph evidence inadmissible for this purpose.

The Lynn court then stated that Byron's pol[y] should have been admitted because it was fundament[al] the government to inform the jury of the poly Byron's plea agreement, then falsely lead the jury to conc[lude] Byron had complied with this clause by cutting off cross-examination that would have revealed that Byron's test results were inconclusive. This sounds good, but (as pointed out above) it was *Lynn's* attorney who informed the jury of the polygraph clause. Moreover, regardless of who informed the jury of the polygraph clause, this rationale does not apply to Woodard's case. Judge Hunt explicitly forbade both parties from mentioning the polygraph clauses in Pierce's plea agreement and VanHousen's first plea agreement; before these plea agreements were admitted into evidence, the polygraph clauses were redacted.

Finally, the Lynn court decided that the polygraph evidence was crucially important to Lynn's defense because, apart from this evidence, the defense engaged in relatively little cross-examination designed to reveal Byron's potential reasons for lying to please the government. Again, the facts of Woodard's case are quite a bit different. As outlined above, Woodard's attorney delved deeply into all of the possible reasons why VanHousen and Pierce might wish to lie about Woodard's involvement in the crime, including all the potential pressures that the government could bring to bear on these two witnesses.

*3933*

00000088

Ex. 5, p. 79

In sum, I do not believe that Judge Hunt abused her discretion when she concluded that the unfair prejudice of the polygraph evidence outweighed any legitimate probative value it might have — and that Woodard could make his points without introducing polygraph results.

*Judge Hunt's refusal to allow Woodard to introduce the two newspaper photographs that showed Woodard's face from the front*

Robin Conway (a Carrs employee) testified that she was working at the deli counter on June 8th (the day of the robbery). She heard a shot, looked toward the sound, and saw someone holding his arm over the side of the courtesy booth. She could see the shooter from the chest up. She then ducked down behind the counter. She and some other co-workers left the store through a storage area, then ran across the street (Benson Boulevard). When she turned around to look, she saw the robber coming across the parking lot. At first, the robber was coming toward her, but then he stepped behind some semi trucks and was lost to her view.

Conway testified that, when she saw the robber come across the parking lot, he was not wearing a mask — just a hat "on the back of his head". However, she conceded that she never saw the robber full in the face; she only got a side view.

Eleven days later, on June 19th, while Conway was in the Carrs employees' break room, she saw a copy of the Anchorage Daily News spread out on a table. The paper contained a photo of Woodard

-80-

*3933*

0C000089

Ex. 5, p. 80

in custody.  (Woodard had been arrested, not for the Carrs robbery, but for illegal cultivation of marijuana.)  This June 19th photograph was the first time that Woodard's picture had appeared in the newspaper.

Conway looked at the photo and exclaimed to a co-worker that this man looked like the robber.  The co-worker immediately told Conway that this man was *not* the robber.[23]  Conway conceded that, after recognizing the man in the photo as the robber, she failed to contact the police.  She explained that she believed this would be unnecessary, since the police already had this man in custody.

Conway denied seeing any other photos of Woodard.  She also denied having read the description of the robber that had previously been published in the paper.  (This last fact was of substantial importance to the weight of Conway's testimony, because the police conceded that they purposely "fed" the media a description of Woodard, hoping that Woodard — or his possible accomplices — might be prompted to incriminatory action.)

Conway did not speak with a police officer about her identification until several months later — December 9th.  She testified that, in the intervening months, she saw no more photos of Woodard, nor did she follow the media accounts of the investigation.  Then, on December 29th, Investigator Reeder

---

[23] The record does not explain whether Conway's co-worker had an independent, contradictory memory of the robber, or whether the co-worker was merely telling Conway that, according to the newspaper article, Woodard had been arrested for growing marijuana.

-81-

interviewed Conway again and showed her a series of photographs; she picked one out (photo number 5) as being the Carrs robber. Conway testified that, on a scale of 1 to 10, her level of certainty was "8" or "9". Photo number 5 was Jon Woodard.

In cross-examination, Woodard's attorney pointed out that, shortly after the robbery, Conway was interviewed by a police officer (Officer Hollingsworth) and, in this interview, she was extremely fuzzy on many details of the robber's appearance and actions. She indicated several times that she could not be sure of details that the officer was interested in. In particular, Conway conceded that she told Hollingsworth that she "could not see the front of [the robber's] face; [she] didn't see his face."

In the next portion of the cross-examination, Woodard's attorney attempted to get Conway to admit that she was exposed to media coverage of the investigation (and that therefore her identification of Woodard as the robber might have been influenced by media accounts). Conway conceded that the break room at Carrs usually contained a copy of the Anchorage Daily News. Woodard then showed Conway Exhibit AD, a montage of four photos of Woodard that appeared in the Daily News on four different dates. Conway stated that she did not remember any of them.

In response to Conway's answer, Woodard's attorney demonstrated that, at a pre-trial hearing held three weeks before, Conway identified one of these photos as being the one she had seen in the Daily News on June 19th. Conway admitted her mistake, but denied that she had ever seen the other three. The defense

-82-

attorney pressed her: "Might you have seen these others and simply not remember them?" Conway answered, "I didn't see those pictures." Conway conceded that, if these pictures had been lying out in the Carrs break room, she would have been in a position to see them. But she again denied seeing them or noticing them.

At this juncture, Woodard's attorney moved for admission of Exhibit AD. The prosecutor objected that Conway had testified that she had seen only one of the photographs depicted in the exhibit. The defense attorney answered that he was not bound by Conway's answers — that the photographs were relevant because they had been published, and thus Conway might have seen them and might have been unconsciously influenced by them.

Judge Hunt ruled that, if the argued relevance of the photographs was the fact that Conway might have seen them, then in the absence of any reason to believe that Conway had in fact seen the photographs, there was not a sufficient evidentiary foundation for admitting them. The transcript of the latter part of Judge Hunt's ruling contains many "indiscernibles", but it is clear that she invited Woodard's attorney to renew his motion if he could present a better foundation.

Following this ruling, Woodard's attorney separated the one photograph that Conway admitted seeing, labeled it Exhibit AD-1, and moved its admission. There was no objection.

Woodard's cross-examination of Conway concluded with a series of questions designed to demonstrate that her initial description of the robber was substantially different from her

later description — and that Conway's later description of the robber appeared to have changed to fit the characteristics of the person depicted in the newspaper photo she saw on June 19th (Exhibit AD-1).

Several days later, Woodard called Terry Hegge, the manager of the Aurora Village Carrs. Hegge testified that Robin Conway had been at work on June 24th, July 8th, and July 21st — the days on which the other three photos in Exhibit AD appeared in the Anchorage Daily News. Based on this testimony, and on Conway's testimony that copies of the Daily News were usually present in the employees' break room, Woodard's attorney again sought admission of Exhibit AD (that is, the three remaining photos in that exhibit). Woodard argued that Conway's presence at work on those three days was important circumstantial evidence that Conway might have seen these photos, and that these photos might have influenced her identification of Woodard as the robber.

Judge Hunt again refused to admit the three photographs. She ruled that Woodard had still failed to present the necessary foundation to show that they were relevant. The judge concluded that, even if Conway was at work on the days in question, this was not sufficient proof that she was exposed to the three photos, given Conway's testimony that she did not read or even see these newspapers.

This ruling was error. I agree with Judge Hunt that the photographs did not become admissible merely because they were published. For example, if the photographs had appeared, not in

-84-

00000093

the Anchorage newspaper, but rather in a newspaper in some other state, then I would have no trouble upholding Judge Hunt's ruling that the photos were irrelevant (at least in the absence of some proof that Conway could have seen them). However, given the fact that the Daily News is Anchorage's only daily newspaper, and given the evidence that copies of the Daily News were frequently (if not invariably) found in the break room at Conway's place of employment, Woodard established a sufficient evidentiary foundation to secure admission of the photographs. The record supports at least a reasonable inference that Conway *might* have seen these photographs.

That being said, I conclude that the error was harmless. True, two of the later photographs show Woodard's features better. But it must be remembered that Judge Hunt's ruling restricted only the introduction of photographs, not testimony about them. From the testimony at trial, the jury knew that other photographs of Woodard had appeared in the newspaper and were potentially seen by Conway, despite her denials.

Moreover, of the four photographs of Woodard that appeared in the Daily News, Conway identified the *first one* — the one that appeared on June 19th. The defense never questioned the date of Conway's conversation with her co-worker about the fact that the photograph in the paper (on June 19th) looked like the robber. Thus, Conway at least tentatively identified Woodard before any of the other photographs appeared in the paper. Further, as explained above, the June 19th photograph appeared in

-85-

3933

00009094

Ex. 5, p. 85

connection with a story about Woodard's arrest for growing marijuana, not his arrest for the Carrs robbery. That is, Conway's identification of Woodard could not have been influenced by the text accompanying Woodard's picture. Thus, even if the defense could prove that Conway saw the three later photographs, and could show that these photographs solidified Conway's identification of Woodard in the photo-lineup conducted on December 29th, the defense would still have to explain why Conway tentatively identified Woodard before she ever saw the other three photos.

Another factor leads me to conclude that the error was harmless. The defense still had plenty of ammunition to attack Conway's identification. Conway admitted that she got only a brief view of Woodard from across Benson Boulevard (a multi-lane street). Her initial description of the robber varied in many particulars from her later description. Moreover, as explained above, the Anchorage Daily News published verbal descriptions of the robber — descriptions that were purposely drafted by the police to match Woodard's features. The defense could argue — and did argue — that Conway's identification of Woodard was influenced by these verbal descriptions.

In his summation, the defense attorney spent several pages of transcript attacking Conway's identification of Woodard. He pointed out that, with the exception of the three accomplices (VanHousen, Pierce, and Bohlin), no one identified Woodard as the robber until his photograph appeared in the newspaper, a photograph that showed him shackled. And then only one person identified him

-86-

— Robin Conway.   The defense attorney argued that Conway's identification demonstrated

> how police and media focus and influence impacted witnesses and literally started [a] self-fulfilling prophecy that the man [fingered] by the self-admitted perjurer VanHousen was the robber.  The perjurer gives [Woodard's] name, the police plant his description in the newspaper, and it takes on a life of its own.

Woodard's attorney argued that Conway's identification was "clearly the result of media influence".  He pointed out that Conway's initial description of the robber on June 8th (shortly after the event) was quite vague and, to the extent it was precise, it described a man considerably different from Woodard.  The defense attorney emphasized that Conway (in her trial testimony) claimed to have seen the robber's face from approximately 140 feet away.  The defense attorney also emphasized that, in her initial police interview, Conway had declared that she had not seen the robber's face.

Then, on June 19th, when Woodard was arrested in connection with the illegal cultivation of marijuana and his photograph appeared in the newspaper, Conway all of a sudden "recognized" him.  Her description of the robber suddenly altered to fit the details of this photograph, a photograph depicting a man in chains.  Speaking of the June 19th photograph, Woodard's attorney concluded:  "That's what she remembers, ladies and gentle-men:  the [photograph] in the [news]paper. ... This is a clear case of suggestion replacing memory."  Of all the witnesses to the

-87-

00000096

robbery, no one else came forward to identify Woodard.  Based on these facts, the defense attorney argued that Conway's identification must be the result of suggestion.

This is not a bad argument, and I do not think it failed for lack of the three photographs.  Instead, the argument probably failed because (1) three of Woodard's accomplices testified that he was the robber, (2) Woodard's Glock pistol was the weapon used in the robbery, (3) Woodard's fingerprint was found on some of the money taken during the robbery, and (4) a hair consistent with Woodard's hair was found among the robbery proceeds.  For these reasons, I conclude that Judge Hunt's refusal to admit the three later photographs was harmless error.

*Judge Hunt's decision to shackle Woodard during trial*

Woodard was shackled during his trial.  How Judge Hunt made the decision to shackle Woodard is a little mystifying.

In November 1992 (before the start of the omnibus hearing), Woodard filed a pre-trial motion (labeled "P-2") asking Judge Hunt to make various rulings regarding courtroom security and how Woodard would appear to the jury.  One of Woodard's requests was that he not be handcuffed or shackled during trial.

In its response to this motion, the State told the court that Judicial Services was "*considering* requesting additional restraints in this case, given the circumstances of this offense and the background of the defendant."  (Emphasis added)  The State

pointed out that Woodard was alleged to have committed a series of armed robberies, all well-planned, and one culminating in the intentional killing of a Loomis security guard.  In addition, Woodard was a large, strong man (a bodybuilder), and he had exhibited "unusual interest in paramilitary procedures ... and illegal weapons (including automatic weapons and silencers)".  The State also pointed out that, given the lengthy sentences that Woodard faced, he could be considered a flight risk.

Nevertheless, after listing all of these reasons why Judicial Services might want Woodard shackled during trial, the State declared that they were *not* seeking extraordinary security measures at this time.  Instead, the State told Judge Hunt that they were "simply requesting [that] normal security measures be observed.  These procedures ... include two uniformed Judicial Services officers in the courtroom[,] in view of the jury, *with the defendant unshackled*".  (Emphasis added)

Woodard's reply noted that he and the State were in basic agreement regarding most aspects of trial security.

At the omnibus hearing on February 18, 1993, Judicial Services brought Woodard to court wearing leg shackles and with both of his hands handcuffed and chained to a waist belt. (Apparently, Judicial Services did this without seeking prior judicial approval, for Judge Hunt had yet to issue any ruling on Woodard's pre-trial motion.)  Woodard's attorney objected to the shackling, and the prosecutor offered a justification.  Judge Hunt ruled that the leg shackles would stay on, but she also ruled that

-89-

3933

Woodard was entitled to have his hands unfastened from the waist belt so that he could take notes.

One month later, on March 22, 1993, Judge Hunt issued a written order deciding the various issues raised by Woodard in his pre-trial motion. Judge Hunt declared that "several facts [were] pertinent to [the] defendant's requests":

> The defendant has been accused of planning and executing several armed robberies; he is a bodybuilder with extensive background in using paramilitary weaponry; he faces a 99[-]year sentence in this case and has other charges pending for later trials[,] which makes him a flight risk.

Based on these considerations, Judge Hunt issued the following ruling on Woodard's request not to be shackled during trial:

> Request: [that] Defendant not be restrained during trial in the courtroom — denied. Defendant will be restrained in the usual way during trial[,] with ankle chains hidden from view by table skirting[,] and by a belt chain to which his wrists are attached by chains.

When the parties appeared in court the next day (March 23rd), the defense attorney objected that Judge Hunt had just ordered Woodard shackled throughout the trial, even though the State had never made such a request:

> DEFENSE ATTORNEY: The State made no application to have my client shackled during the trial. And when the court ruled on Motion P-2, it imposed shackling — without a request by the [State], and without an opportunity to be heard by the defense.

occoooo99

Judge Hunt responded:

> I ruled in response to requests that you
> specifically made about how security would be
> handled. The court deemed that you had been
> heard from. ... You raised the issue.

Having received this odd response, Woodard's attorney immediately
inquired "if there were any communications outside the presence of
my client, between the court and judicial services, concerning
security precautions for this trial?" Judge Hunt answered yes —
but only with regard to whether the security officers would be in
uniform or plain clothes.

Woodard's attorney continued to object, declaring that he
had never had a client chained during trial, and that he had never
heard of such security measures being taken for a defendant with no
prior felony record, who had never tried to escape or to resist law
enforcement officers. Judge Hunt never responded to these remarks,
with one exception: she agreed to allow the parties to remain
seated whenever court convened or recessed, so that Woodard would
not have to stand up in front of the jurors and thereby reveal his
shackles.

Pursuant to Judge Hunt's ruling, Woodard wore shackles
throughout his trial.[24] Woodard's legs were chained (although the
chain was wrapped so that it would not make noise when Woodard
shifted his legs or feet), and Woodard's left hand was handcuffed
and chained to a waist belt. His right hand was free. Skirting

---

[24] On March 26th, at the beginning of the second day of jury
selection, the defense attorney described Woodard's situation for
the record.

-91-

00000100

*3933*

Ex. 5, p. 91

was placed around the defense table to hide these shackles from the jury, and skirting was placed around the prosecution table so that the jury's attention would not be drawn to the defense table.

In Anthony v. State [25], the supreme court declared that a defendant should not be forced to wear "manacles, shackles [or] other physical restraints ... [except when required] to protect the safety and decorum of the court, to prevent a threatened escape, or to respond to some other manifest necessity." [26] The court added that "[t]he restraints imposed should be the least intrusive [needed to] accomplish the desired result." [27] Moreover, the court stated that "[s]uch measures should be taken only after the defendant has been given an opportunity for a hearing". [28]

As explained above, the State never asked Judge Hunt to order Woodard shackled. Judge Hunt made that decision *sua sponte*, and without advance notice to Woodard. Whether or not the shackling was justified, this procedure violated Anthony.

Moreover, Judge Hunt's stated justification for her action is not convincing. As the defense attorney pointed out, Woodard had no prior felony record, and he had never attempted to escape or tried to resist law enforcement officers. True, Woodard was accused of a serious and violent crime, he was physically strong, and he perhaps had martial arts training. But the State

---

[25] 521 P.2d 486 (Alaska 1974).

[26] Id. at 496.

[27] Id.

[28] Id.

Ex. 5, p. 92

3933

was aware of all this and yet refrained from asking for shackling. In her order, Judge Hunt declared that Woodard would be "restrained in the usual way during trial", but (as Judge Bryner's dissent forcefully points out) the treatment that Woodard was subjected to could hardly be termed "usual". As a factual matter, such shackling is hardly "usual" in the courts of Alaska. But more importantly, the Anthony decision declares that shackling can not be deemed "usual" as a legal matter. Rather, shackling must be specially justified by the circumstances of the particular case. I see no adequate justification here.

Thus, the decision to shackle Woodard encompasses two errors, one procedural and one substantive. The hard question is what this court should do about these errors.

Both Anthony itself and our subsequent glosses on Anthony (see, for example, Newcomb v. State [29] and Stern v. State [30]) indicate that unjustified shackling creates reversible error because of its prejudicial effect on the jury: shackling may lead the jury to believe that the court already considers the defendant guilty (or, at least, that the court considers the defendant to be a dangerous and violent person).

This rationale was clarified in Newcomb. The defendant in Newcomb was heavily (and apparently obviously) shackled during trial, but this court declared that the visible shackling of the defendant was not error because the trial evidence itself would

_____

[29] 800 P.2d 935, 942 (Alaska App. 1990).

[30] 827 P.2d 442, 448 (Alaska App. 1992).

3933

00000102

have convinced the jurors that there was good reason to restrain the defendant:

> [T]he jury knew that [Newcomb had been] in prison for a felony when he broke out of the Wildwood Correctional Center.  The jury also knew that he was charged with shooting two police officers who were trying to arrest him for the escape.  Given these circumstances, the information that Newcomb was in custody during [the] trial could hardly have come as a surprise to any thinking member of his jury, no matter how Newcomb was presented in the courtroom. ...
>
> To assure basic fairness under [these] circumstances, the trial court was not required to undertake the wholly unrealistic task of convincing the jurors that Newcomb had been released and was no longer in custody.  Rather, the court was required to assure ... that Newcomb was presented to the jury with an appearance of dignity and decorum in keeping with the presumption of innocence.

Newcomb, 800 P.2d at 942.  In other words, the fact that the trial judge ordered Newcomb shackled during trial did not materially add to the inference of dangerousness that would be drawn by "any thinking member of [the] jury", so the shackling did not prejudice the fairness of Newcomb's trial.

The situation was quite different in Woodard's case; the shackling certainly had the potential for creating (or materially augmenting) an inference of guilt or dangerousness, over and above the evidence presented at trial.  Woodard was accused of a violent crime, but he claimed that someone else committed that crime.  Had the jury been aware that the court had ordered Woodard shackled hand and foot, the jury could easily have inferred that the court

-94-

knew things about Woodard that they didn't — things that proved Woodard's guilt.   However, there is nothing in the record to indicate that the jury was aware of the shackling.

Because the jury was apparently unaware of the shackling, I hesitate to reverse Woodard's convictions on this ground.  One of the axioms of appellate review is that a trial court judgement should not be reversed simply because an error occurred in the trial court proceedings.   Generally, the appellant must also establish that the error prejudiced the fairness of those proceedings. [31]

Even egregious interference with a criminal defendant's constitutional rights will not always lead to reversal of a conviction.   For example, in United States v. Morrison [32], two agents of the federal Drug Enforcement Agency (DEA), aware that Morrison had been indicted and had retained private counsel, approached her and sought to obtain her cooperation in a related investigation.   The agents did not notify Morrison's attorney that they intended to speak with her.   In fact, during the conversation, the agents disparaged Morrison's attorney, suggesting that a low-priced attorney would probably provide low-quality services, and that Morrison would be better off represented by the public

---

[31] See Love v. State, 457 P.2d 622, 629-631 (Alaska 1969).   In criminal proceedings, when the error involves a deprivation of constitutional rights, the appellant need only establish a reasonable possibility that the error prejudiced the fairness of the lower court proceedings. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

[32] 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981).

3933

00000104

defender. Despite the drug agents' suggestions, Morrison "declined to cooperate [with the DEA] and immediately notified her attorney".[33]

Despite the blatant misconduct of the federal agents, the Supreme Court upheld Morrison's indictment against her claim that her Sixth Amendment right to counsel had been violated:

> [W]ithout detracting from the fundamental importance of the right to counsel in criminal cases, ... [c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests.
>
> . . . .
>
> Our approach has ... been to identify and then neutralize the taint by tailoring relief appropriate in the circumstances ... . The premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense. Absent such impact on the criminal proceeding, however, there is no basis for imposing a remedy [if the proceeding] can go forward with full recognition of the defendant's right to counsel and to a fair trial.

Morrison, 449 U.S. at 364-65, 101 S.Ct. at 667-68.[34]

---

[33] Id., 449 U.S. at 362, 101 S.Ct. at 666-67.

[34] But see United States v. Cronic, 466 U.S. 648, 659-661; 104 S.Ct. 2039, 2047-48; 80 L.Ed.2d 657 (1984), where the Supreme Court recognized that when a defendant is effectively deprived of all assistance of counsel, the fact-finding process is so seriously undermined that reversal is automatic; the defendant need not demonstrate specific prejudice.

0C000105

Woodard's case does not involve a government attempt to interfere with the attorney-client relationship, but rather an erroneous order to shackle the defendant. However, the principle appears to be the same: in assessing Woodard's claim of error, we must examine the record to see if the threatened harm actually came to pass.

As explained above, the rule against shackling defendants at trial rests on the perception that juries will be prejudiced against defendants who are shackled. Prior Alaska decisions on this subject have focused on the danger that a judge's decision to shackle a defendant will implicitly communicate to the jury the notion that the defendant is violent and, thus, more likely guilty. But when the jury remains ignorant of the shackling, this prejudice does not arise.

In Woodard's case, Judge Hunt took several precautions to ensure that the jury would remain unaware of the fact that Woodard was shackled. There is nothing in the record to suggest that these precautions were ineffective. Because the jury did not know that Woodard was shackled, I conclude that Judge Hunt's erroneous decision to shackle Woodard should not result in reversal of Woodard's convictions.

I reach this conclusion with some hesitation. I fear that a decision to affirm Woodard's convictions will undermine Anthony by conveying a dangerous message to trial judges: the message that an unjustified shackling — even an unjustified shackling that is compounded by a failure to allow the defendant to

-97-

3933

0C000106

Ex. 5, p. 97

be heard — will be overlooked so long as the trial judge successfully hides the shackling from the jury. Such a message can have only pernicious effects on future trials.

These considerations might seem to favor a rule of automatic reversal in cases of unjustified shackling. Automatic reversal has been applied when defendants are deprived of the assistance of counsel [35] or are deprived of their right to a public trial. [36] But the act of shackling a defendant is not, of itself, so destructive of the basic trial process as to require automatic reversal of a conviction. Indeed, this court's decision in Newcomb explicitly rests on the conclusion that even when the jury is fully aware of the defendant's shackling, the shackling is not necessarily prejudicial to the fairness of the defendant's trial.

I therefore reject a rule of automatic reversal, and I conclude that the error in shackling Woodard was harmless.


*Conclusion*

With regard to all the claims of error discussed in this concurring opinion, I conclude either that Woodard's claims are meritless or that the errors Woodard has identified did not prejudice the fairness of his trial. With regard to the rest of

---

[35] See United States v. Cronic, 466 U.S. at 659-661; 104 S.Ct. at 2047-48; State v. Celikoski, 866 P.2d 139, 141-42 (Alaska App. 1994).

[36] Bright v. State, 875 P.2d 100, 110 (Alaska App. 1994); Renkel v. State, 807 P.2d 1087, 1094 (Alaska App. 1991).

3933

0C000107

Ex. 5, p. 98

Woodard's claims of error, I agree with Judge Coats's discussion of these claims.  I therefore join Judge Coats in voting to affirm Woodard's convictions.

*3933*

00000108