BRYNER, Chief Judge, dissenting.

I disagree with the court's decision and would find error on six points raised by Woodard. I would conclude that the first error requires additional consideration by the trial court. I would further conclude that the cumulative impact of the remaining five errors requires a new trial. I therefore dissent.

<u>Suppression Motion</u>

My first point of disagreement involves Woodard's S-1 suppression motion. Woodard based his "S-1" suppression motion largely on claims of misstatements and omissions in the testimony underlying the various search warrants issued in connection with his case. On appeal, he contends that the trial court erred in denying his motion; he claims that, at a minimum, the court should have allowed an evidentiary hearing on his claims. Woodard relies on <u>State v. Malkin</u>, 722 P.2d 943 (Alaska 1986).

In affirming the superior court's denial of Woodard's motion, Judge Coats reads <u>Malkin</u> to incorporate the "substantial preliminary showing" rule set forth in <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978); Judge Mannheimer reads <u>Malkin</u> to require a prima facie showing of materiality, even when there is a prima facie showing of falsehoods that were intended to mislead the issuing magistrate. Both views misread <u>Malkin</u>.

In <u>Franks</u>, the United States Supreme Court allowed a warrant to be challenged upon a showing that the underlying affidavit contained a material misstatement that was recklessly or intentionally made. <u>Franks</u> assigned to the defendant the dual

oceoo109

burden of establishing, first, the existence of a material misstatement, and, second, the recklessness or intentionality of its inclusion in the warrant. Franks, at 155-56.

As an adjunct to this dual burden, Franks adopted the "substantial preliminary showing" rule, which holds that no evidentiary hearing need be held on a claim of material misstatement absent prima facie evidence addressing both elements of the defendant's dual burden, that is, absent a preliminary showing of the defendant's ability to prove both that a material misstatement was made and that its making was reckless or intentional:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

Id. at 171.

In Malkin, the Alaska Supreme Court adopted Franks in part, but only in part. Applying Alaska constitutional law, the court imposed on the defendant only the first of the dual burdens of proof adopted by Franks -- only the burden of proving the existence of a material misstatement. Under Malkin, once the defendant meets this threshold burden, the burden shifts:

00000110

> The burden we embrace is that once the defendant has pointed out specifically that statements in the affidavit are false, together with a statement of reasons in support of the assertion of falsehood, the burden then shifts to the state to show by a preponderance of the evidence that the statements were not made intentionally or with reckless disregard for the truth.

Malkin, 722 P.2d at 946 (footnotes omitted).

As can be seen, Malkin specified that, to make a threshold showing that a false statement exists, and so shift the burden to the state to prove lack of recklessness or intent, the defendant must provide only "a statement of reasons in support of the assertion of falsehood[.]" Id.

To illustrate what the defendant's supporting "statement of reasons" should include, however, Malkin cryptically referred to the Franks substantial preliminary showing rule. In a footnote, Malkin observed that "[i]n regard to the showing the defendant is required to make, the Supreme Court [in Franks] stated the following"; the footnote then proceeded to quote, without any further elucidation, the substantial preliminary showing language from Franks, which has already been quoted above. Malkin, 722 P.2d at 946 n.5.

Based upon Malkin's footnoted quotation of Franks' substantial preliminary showing language, the superior court in this case understandably reasoned that Malkin had adopted Franks' substantial preliminary showing rule lock, stock, and barrel. The superior court thus concluded that, before being entitled to an evidentiary hearing, Woodard was required to make a preliminary

offer of proof as to both elements of the dual burden existing under Franks; this even though, under Malkin, Woodard had the ultimate burden actually to prove only the first element. The court concluded that Woodard was not entitled to an evidentiary hearing, because he had failed to make a specific offer of any evidence proving that the misstatements or omissions alleged in his suppression motion had been made intentionally or recklessly.

Judge Coats's opinion accepts this interpretation of the Malkin/Franks interplay. But I do not read Malkin to adopt the Franks substantial preliminary showing rule in toto.

Although Malkin quotes the rule with apparent approval, the opinion does so in passing and in a footnote, without explanation. Significantly, the footnoted mention of Franks is tied to the portion of the Malkin text in which the Alaska Supreme Court discusses a defendant's singular burden, under Alaska law, to "point out specifically that statements in the affidavit are false," and to submit "a statement of reasons in support of the assertion of falsehood." Malkin at 946 (emphasis added). Malkin makes no mention in the text of any statement of reasons in support of the defendant's assertion of recklessness or intent. And in virtually the same breath as it describes the defendant's burden to allege and offer proof of a false statement, Malkin distinguishes this burden from the burden of disproving recklessness or intentionality -- a burden that it places squarely on the state's shoulders. Malkin later emphatically declares that "once the defendant has shown the affidavit contains material false

-103-

3933

statements, the burden should shift to the prosecution to justify these misstatements." __Malkin__, at 948.

Given its express allocation of evidentiary burdens, __Malkin__'s passing, footnoted reference to __Franks__ could not reasonably have been meant as a literal adoption of the __Franks__ preliminary showing requirement in its entirety; for it would seem nonsensical to allow an evidentiary hearing to be held only when the defendant establishes an ability to prove something that the state will actually be required to disprove.

A far more plausible reading of __Malkin__ is that its footnoted quotation of __Franks__ was intended, not to specify in hard and fast terms what an offer of proof must substantively allege, but instead merely to exemplify how the defendant must go about making the offer: that the defendant's "statement of reasons in support of the assertion of falsehood," __Malkin__, 722 P.2d at 947, must, in compliance with __Franks__' procedural requirements, "be more than conclusory," "be supported by more than a mere desire to cross examine," "be accompanied by an offer of proof," "point out specifically the portion of the warrant affidavit that is claimed to be false," "be accompanied by a statement of supporting reasons," and be accompanied by "affidavits or sworn or other reliable statements of witnesses." __Franks__ at 171.

This reading is borne out by __Malkin__'s own explanation for rejecting __Franks__' dual-burden requirement: "[T]o make the defendant prove intent or recklessness would probably impose an insurmountable burden on him." __Malkin__, at 948. It would be

-104-

0C000113

nothing short of stunning anomaly for the supreme court to say, in one breath, that the burden of proving intentional or reckless falsity is likely to be insurmountable, while holding, in the next, that the defendant must nonetheless adduce prima facie proof of intent or recklessness in order to win an evidentiary hearing.

Additional proof of Malkin's meaning lies in what the opinion actually did. The factual discussion in the opinion indicates that Malkin asserted that a police officer made false statements in a warrant affidavit. The trial court obviously did not require Malkin to make a preliminary offer to prove that the false statements were intentional or reckless. In fact, it did not even inquire into the issues of intent or recklessness. Instead, the court simply granted Malkin's suppression motion after an evidentiary hearing confirmed the existence of the alleged misstatements.

In deciding Malkin, the supreme court reversed the trial court, holding that suppression should have been granted only if the false statements were intentionally or recklessly made, and were material. The supreme court then remanded the case, directing the trial court "to excise misstatements from the police officer's affidavit if he [the officer] cannot show that they were not made intentionally or recklessly." Malkin, 722 P.2d at 948.

As already mentioned, no preliminary offer of proof on intent or recklessness was made before the superior court in Malkin's case. If the supreme court had thought such an offer to be an indispensable prerequisite to an evidentiary hearing, it

-105-

3933

00000114

Ex. 5, p.105

would have concluded, upon reversing the superior court's suppression order, that no evidentiary hearing was justified. Instead, the court remanded for an evidentiary hearing, in effect directing the state to assume its burden of disproving recklessness or intent by having the police officer explain his misstatements. The supreme court's failure to require a preliminary showing as a prerequisite to an evidentiary hearing on remand is strong evidence that the court intended to adopt no such requirement.[1]

In short, it seems clear to me that Malkin should not be read to adopt the Franks substantial preliminary showing rule. To obtain an evidentiary hearing, Woodard was not required to make an offer of proof on recklessness or intent as to any alleged misstatement.

This conclusion, however, does not end the inquiry. The bulk of Woodard's suppression motion involved alleged misstatements and omissions by VanHousen and Bohlin, two participants in the robbery or its aftermath who eventually became police informants and testified personally before the issuing magistrate in return for various concessions. In my view, the superior court properly concluded that the Malkin/Franks rule does not apply to the

---

[1]    Judge Mannheimer sees the result in Malkin as being a logical consequence of the supreme court's having adopted a new rule of law, which altered pre-existing procedures and therefore required a remand for relitigation. See concurring opinion at 60-61. But the Malkin opinion gives not the slightest hint that such considerations played a role in the court's decision to remand.

0C000115

testimony of these witnesses, who were not law enforcement officers.[2]

Woodard's remaining allegations involved misstatements and omissions attributed to Anchorage Police Investigators Reeder and Spadafora, FBI Special Agent Niedringhous, and Assistant District Attorney Branchflower.    The superior court properly concluded that these alleged misstatements and omissions were not material and so would not result in suppression, even if recklessly made.    Thus, no evidentiary hearing was necessary to explore the possibility of reckless misstatements.

But Woodard contended below and argues on appeal that these statements and omissions were intentional.    In *Malkin*, the supreme court noted that "[a] deliberate attempt to mislead a judicial officer in a sworn affidavit deserves the most severe deterrent sanction that the exclusionary rule can provide."    *Id.* at 946 n.6.    Accordingly, the court held that intentional misstatements would result in suppression regardless of their materiality.    *Id.* Because Woodard expressly alleged intentional misstatements, the superior court's finding of non-materiality did

---

   [2]    Suppression could be justified only if VanHousen or Bohlin could be characterized as government agents.    Wayne R. LaFave, *Search and Seizure* § 4.4(b) at 493-94 (3rd ed. 1996).    Any government witness is a "government agent" in the sense that the witness's testimony occurs at the behest of the government.    For purposes of the *Malkin/Franks* rule, however, agency in this sense is immaterial.    An informant who is promised immunity or other concessions in exchange for agreeing to testify about conduct or events predating the agreement does not, *ipso facto*, become a government agent.

00000116

not in itself justify the court's decision to deny Woodard an evidentiary hearing.

In this regard, however, the substantial preliminary showing rule articulated in Franks takes on renewed significance. In concluding that deliberate attempts to mislead a judicial officer should result in suppression regardless of materiality, the supreme court in Malkin expressly relied on the California Supreme Court's reasoning in People v. Cook, 583 P.2d 130, 133 (Cal. 1978), citing that decision for the dual propositions that "[a] deliberate attempt to mislead a judicial officer in a sworn affidavit deserves the most severe deterrent sanction that the exclusionary rule can provide. Further, the fact that the officer has lied puts the credibility of the officer and of the entire affidavit into doubt." See Malkin, 722 P.2d at 946 n.6.

In adopting Cook's ruling, however, Malkin took pains to observe that "[t]he California Supreme Court ruled [in Cook] that where the misstatements were alleged to have been made deliberately the full burden should be on the defendant to prove intent." Malkin, at 946 n.6 (emphasis added) (citing Cook, 583 P.2d at 142-44). A reading of Cook confirms Malkin's characterization of the case: Cook unambiguously requires the defendant to bear the full burden of proving an intentional misstatement. The defendant's proof must address both the existence of the misstatement and its intentionality.

Although at first blush the anomaly of imposing the dual Franks burden of proof on a defendant claiming an intentional

-108-

misstatement might seem even more egregious than imposing the same burden on a defendant merely claiming a reckless misstatement, the California Supreme Court's opinion in <u>Cook</u> carefully and persuasively explains why the more rigorous burden of proof is appropriate in the instance of an intentional misstatement. <u>Id.</u> at 142-44. <u>Cook</u> advances five reasons for applying the more rigorous burden in the case of an intentional misstatement: 1) Proof of whether a misstatement was reckless or not typically depends on circumstances known only to the officer, whereas proof of a knowing misstatement poses no peculiar obstacle to defendants.    2) The officer's knowledge can often be inferred from circumstantial evidence that is readily available to the defendant.    3) The defendant need only prove a knowing falsehood; proof of specific intent to deceive the issuing magistrate is not required.    4) Knowledge can be established by a showing of wilful blindness, or conscious indifference to truth.    5) And a defendant capable of offering proof that any single statement in an affidavit is knowingly false will be entitled to an evidentiary hearing at which the truthfulness of all statements can be explored. <u>Id.</u>

As I read <u>Malkin</u>, the case adheres fully to <u>Cook</u> with regard to claims of deliberate misstatements.  I would thus conclude that, under <u>Malkin</u>, a defendant claiming the right to automatic suppression based on an intentional misstatement must shoulder the dual burden of proving the existence of the misstatement and its intentional nature.

-109-                                                     3933

00000118

Since this is essentially the dual burden that <u>Franks</u> imposes, it follows that a defendant who seeks an evidentiary hearing on a claim of deliberate misconduct must fully comply with <u>Franks</u>' substantial preliminary showing rule. The defendant must offer proof as to both elements of the claim: the existence of the misstatement and its intentional nature. Absent an appropriate offer of proof, no hearing need be held.

In the present case, Woodard pointed to a number of misstatements in the affidavits and testimony that various officers submitted to the court in furtherance of probable cause. The pertinent inquiry must therefore focus on whether any of Woodard's claims of deliberate falsehood were supported by a prima facie showing of knowing falsehood, so as to require an evidentiary hearing.

In connection with this inquiry, I think it crucially relevant to emphasize two points made by the California Supreme Court in <u>People v. Cook</u> when it explained why a defendant should bear the burden of proving that a misstatement was intentional: First, an intent to misstate, like any mental state, is often not susceptible of direct proof but, "'may be evidenced in other ways,' e.g., by circumstantial evidence and the inferences which the trier of fact may draw therefrom." <u>Id.</u> at 143 (citation omitted). The second point is that a prima facie showing of even a single knowing misstatement will entitle the defendant to an evidentiary hearing at which the truthfulness of all other alleged misstatements can be freely explored:

-110-

The defendant is not limited to proving the falsity of only the particular allegations he challenged in his prima facie showing. . . . In most instances it would be difficult if not impossible for the defendant to discover in advance of the hearing each and every allegation that he can ultimately prove false. Yet once he has shown that certain allegations were knowingly untrue, the integrity of the entire affidavit is cast into doubt. . . . [I]f . . . the defendant's preliminary investigation discloses specific facts which would lead a reasonable man to suspect that one or more of the allegations in the affidavit were perjurious, he is entitled to inquire at the hearing into the truth of the remaining allegations.

Id. at 144.  Thus, under Cook, once the trial court is presented with prima facie evidence of even a single misstatement that supports an inference of knowing falsehood, the defendant is entitled to a hearing at which the truthfulness of the entire affidavit can be fully explored.

I do not quarrel with Judge Mannheimer's assertion that, for purposes of the Malkin rule, an intentional misstatement must be something more than a knowing misstatement, that is, a statement of facts the attesting officer knows to be false.  Rather, the falsehood must be intentional in the sense of having been intended to mislead the issuing magistrate as to probable cause.  Cf. Gustafson v. State, 854 P.2d 751, 758 n.2 (Alaska App. 1993).  This would imply that, to qualify as intentional and result in suppression, a false statement must at least have appeared to be potentially material to the officer who made it.

But Judge Mannheimer would conclude that, because all of the asserted falsehoods in this case are in fact immaterial, "this

3933

00000120

ends the matter." The conclusion is premature, however, because it implies that a prima facie showing of an officer's subjective intent to deceive the issuing magistrate necessarily turns on proof of the objective materiality of the officer's false statement, viewed after the fact. Judge Mannheimer's implication is incorrect as a logical matter because it overlooks the very real possibility that an officer's <u>subjective</u> assessment of materiality might be inaccurate -- that the attempt to deceive the magistrate might involve a false statement that the attesting officer actually but incorrectly believes might make a difference. Judge Mannheimer's implication is also implausible as a legal matter, for it would mean that only material misstatements could potentially qualify as intentional misstatements under <u>Malkin</u>; yet the <u>Malkin</u> rule expressly requires suppression for all intentional falsehoods, regardless of their materiality.

Applying the foregoing standards to the record currently before this court, I would be inclined to say that Woodard made out a prima facie case of an intentional misstatement: at least some of the demonstrable false statements he alleges would, if proved, give rise to a rational inference that, regardless of their lack of objective materiality, they were intentionally made with intent to deceive the issuing magistrate. For this reason, it appears to me that Woodard should probably have been granted an evidentiary hearing on his allegations -- however unlikely it might have seemed that a hearing would ultimately bear out Woodard's claims of intentional misconduct.

3933

0C000121

Nevertheless the issue is properly one to be resolved by the superior court in the first instance. Here, the court's decision to deny Woodard a hearing was issued sua sponte. The parties had no occasion to argue the Cook standards to the superior court, and the court did not purport to consider or apply them. Although the superior court relied on the conclusion that the various purported misstatements that Woodard attributed to law enforcement officers were not material, the court did not distinguish between recklessness, as to which materiality would be relevant, and intentional misrepresentation, as to which materiality would have no bearing.

Accordingly, I would hold that a remand is necessary and would direct the court, on remand, to reconsider the issue of Woodard's entitlement to an evidentiary hearing in light of the standards discussed above. I would further direct the court to proceed with an evidentiary hearing if it concluded that one was called for.

### Exclusion of VanHousen Tape Recordings

The court upholds, as either not error (Judge Coats) or harmless error (Judge Mannheimer), the trial court's exclusion of five conversations between Woodard and VanHousen that were surreptitiously tape-recorded by VanHousen. The trial court reasoned that the excluded tapes were relevant only as hearsay -- to prove the substantive truth of Woodard's statements asserting his innocence.

-113-

To be sure, "[a] defendant's self-serving statements are hearsay and cannot be admitted into evidence unless they qualify under some exception to the hearsay rule or are used for a non-hearsay purpose." State v. Agoney, 608 P.2d 762, 764 (Alaska 1980); Stumpf v. State, 749 P.2d 880, 899 (Alaska App. 1988). The trial court found that the recorded conversations were inadmissable as evidence of Woodard's state of mind and that Woodard established no other "credible non-hearsay basis" for their admission. In my view, these findings are incorrect.

First, but for several conclusory assertions of innocence that could readily have been redacted, Woodard's end of the recorded conversations could not have been offered for a hearsay purpose -- that is, to prove the truth of the substance asserted therein -- for Woodard's statements asserted little of substance, and almost no substance whose truth Woodard could conceivably have been interested in proving.

Most of the recorded conversations consisted of VanHousen's efforts to draw admissions out of Woodard and Woodard's responses deflecting VanHousen's efforts. Many of these responses were themselves questions, asserting nothing of substance but seeking a response from VanHousen. Woodard's various affirmative suggestions to VanHousen -- that VanHousen should tell the truth to the police, that he should take a lie detector test, and that he should contact a lawyer -- were certainly not offered to prove the truth of the substantive matters they asserted -- that is, that VanHousen really would have been well-advised to speak truthfully

-114-

to the police, that he actually should have taken a lie detector test, or that in fact he did need a lawyer.

This was not a situation in which Woodard gave VanHousen a detailed, self-serving explanation of innocence that he later sought to place before the jury as backhanded proof that Woodard had actually done as he said. These statements and others -- such as Woodard's claim that he had no recollection of conversations mentioned by VanHousen or his ultimate angry assertion that he could not believe VanHousen was accusing him of the robbery -- bore directly on Woodard's state of mind at the time of his conversation with VanHousen.

And Woodard's state of mind was crucially relevant. The prosecution had sought to record Woodard surreptitiously and to ensnare him through a conversation with a false friend into making various admissions. What the state got for its efforts was one arguably inculpatory reference to "the thing"; a good deal of arguably evasive conduct by Woodard that it characterized as reflecting a state of mind that was conscious of guilt; and many statements that seemingly reflected a state of mind compatible with innocence. By convincing the trial court to sustain its objections, the state enabled itself to present its own side of the state-of-mind evidence but denied Woodard the opportunity to respond in kind.

It is especially troubling that Woodard had no alternative means of establishing what actually transpired between himself and VanHousen. The jury remained unaware that, in all of

-115-

VanHousen's recorded but unplayed efforts to entrap Woodard, Woodard had made no admissions at all.  Having heard Woodard's arguably incriminatory reference to "the thing," and having been informed of the existence of additional recorded conversations, the jury was left to speculate as to what Woodard might have said, or not said.

The state contended that Woodard's words, "the thing," referred to the Carrs robbery and thus constituted an admission; but evidence placing these words in a more complete context and establishing that Woodard made no other ostensible admissions during the balance of his extensive conversations with VanHousen would have tended to refute the state's contention and might have led the jury to conclude that Woodard's reference to "the thing" was innocent.  Cf. A.R.E. 106.

More significant still, evidence showing that Woodard had said nothing arguably incriminatory during his later conversations with VanHousen would have apprised the jury of Woodard's ability to withstand pressure specifically calculated to elicit an incriminatory response from a guilty defendant, and it would have provided the jury with an innocent explanation for the supposedly suspicious behavior engaged in by Woodard while talking to VanHousen.  Because the jury was not given any insight into the nature of the recorded conversations, the prosecution was able to portray Woodard's actions while conversing with VanHousen as indicating Woodard's consciousness of guilt.

00000125

Had the disputed evidence been heard, Woodard might have persuasively argued that his actions reflected a different state of mind: one of an innocent person who is suddenly beset by an erstwhile friend advancing a series of progressively bizarre statements and accusations. That Woodard made no further incriminatory remarks under these circumstances is certainly relevant evidence of his state of mind; it is not hearsay; and it is qualitatively different than the mere repetition of a self-serving denial of guilt that is offered to establish its substantive truth.

It is an oversimplification to think that Woodard's statements could readily be separated from his acts in these circumstances. To the extent that Woodard's statements were being offered to prove his innocence, they were offered not for their substantive truth, but rather to counteract the state's persistent claim that Woodard's conduct -- conduct in which these statements played an integral role -- revealed his consciousness of guilt. By isolating Woodard's conduct from the verbal context in which it occurred -- a context that lent meaning to the conduct -- the state was able to focus exclusively on its own highly selective, self-serving, and potentially unreliable version of what Woodard's conduct meant.[3]

---

[3]    An illustration might be helpful: Imagine that a defendant charged with murder, upon being confronted by a friend with an accusation of committing the crime, paused and looked down momentarily, and then adamantly denied the accusation. It would be one thing to exclude the self-serving denial if it were offered only as evidence of its own substantive truth. But it would be
(continued...)

-117-                                              3933

00000126

Ex. 5, p. 117

Nor is it proper to justify excluding the disputed recordings as fabricated or unreliable -- the rationale relied on by the state to argue that these recordings could not be admitted under the "state-of-mind" exception to the hearsay rule. A.R.E. 803(3). The express terms of the state-of-mind exception do not contemplate judicial screening to ensure reliability and do not limit admissibility to statements made under particularly reliable circumstances. Compare, e.g., A.R.E. 803(3) with 803(2) (excited utterance admissible only if "made while the declarant was under the stress of excitement cause by the event or condition").[4]

Moreover, the state of mind exception to the hearsay rule deals with the narrow situation occurring when an out-of-court

---

[3] (...continued)
quite another matter to exclude it if the state were allowed, in the first instance, to produce testimony that the defendant, after being accused of the crime, paused and looked down, as if guilty.

[4]     A.R.E. 803 (3) provides:

> **Then Existing Mental, Emotional, or Physical Condition.** A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) offered to prove his present condition or future action, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

A.R.E. 803(2) provides:

> **Excited Utterance.** A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

-118-

00000127

statement expressly declares the speaker's existing state of mind
and is offered to prove that the declared state of mind actually
existed at the time of the declaration. Although many of Woodard's
recorded statements indirectly reflected his then-existing state of
mind, they did not explicitly declare his state of mind, and so did
not call into play the state-of-mind exception; they were not
offered for proof of their substantive content and were thus
admissible as non-hearsay.

Furthermore, although VanHousen claimed that, at the
outset of the excluded conversations, he had signaled with his
hands and thereby alerted Woodard to the presence of a hidden
recorder, this testimony was disputed by Woodard. If the jury
believed VanHousen, it obviously would have disregarded Woodard's
recorded responses to VanHousen's accusations. Yet if the jury
disbelieved VanHousen, it might have found the recorded
conversations to be significant evidence of Woodard's state of
mind. VanHousen's credibility was a question for the jury. By
pronouncing the disputed statements categorically inadmissible as
unreliable expressions of Woodard's state of mind, Judge Coats's
opinion quietly usurps the jury's fact-finding function.

Nothing in Brannen v. State, 798 P.2d 337 (Alaska App.
1990), calls for a contrary conclusion. Judge Coats's opinion
relies on Brannen, id. at 340, for the proposition that self-
serving denials of guilt are inadmissible to prove state of mind
under A.R.E. 803(3). But that case is readily distinguishable. It
dealt with detailed, self-serving exculpatory statements that

-119-

00000128   Ex. 5, p. 119

Brannen offered for the ostensible purpose of proving what Brannen's state of mind was on a later occasion -- seven months after the statements were originally made -- when Brannen engaged in another conversation. Brannen argued that his initial declarations of innocence were relevant to show his subsequent state of mind because the original remarks established his later awareness that he had been accused of sexual abuse. We rejected this argument as unpersuasive, noting that Brannen's awareness of the pending accusations was established by independent evidence.

We went on to note that, in any event, Brannen's initial statements did not fall within the state-of-mind exception, because they did not "qualify as present sense impressions," A.R.E. 803(3), that is, they "were not statements expressing a present condition, nor were they made spontaneously. Brannen had time to reflect and a motive to fabricate before he made the statements." Brannen, 798 P.2d at 340-41. Our conclusion thus obviously centered on the fact that Brannen's statements, even when he first made them, did not purport to describe his then-existing state of mind, as required by A.R.E. 803(3); instead, they described an event that had occurred in the past. Statements of this kind fall outside the express terms of A.R.E. 803(3). Finding no plausible non-hearsay purpose for admission of the initial statements, we upheld their exclusion.

To be sure, virtually any ostensibly spontaneous statement of a present sense impression may be the product of reflection and may describe a fictive state of mind. But the state-of-mind exception, as written in A.R.E. 803(3), categorically

-120-                                                    3933

0C000129

allows the admission of such statements because they are <u>generally</u> <u>reliable</u> and because case-specific circumstances potentially rendering them unreliable are relatively easy for parties to prove and for juries to understand and evaluate. Woodard's statements were neither categorically less spontaneous nor categorically more vulnerable to fabrication than any other type of statement qualifying under A.R.E. 803(3).

As we have seen, Woodard's recorded statements did not consist of a detailed denial of guilt masquerading as state-of-mind evidence. The statements related little of substance: if used at all, they would have been used as evidence of Woodard's state of mind, not as proof of the matters asserted therein. And to the extent that they directly declared his state of mind (for example, his disbelief that VanHousen was accusing him or his inability to recall past conversations) and so constituted hearsay requiring reliance on the state-of-mind exception, the statements qualified as "present sense impressions" and as "statements expressing a present condition." <u>Id.</u>

I by no means suggest that the trial court was bound to admit all of the disputed recordings. The court undeniably has broad latitude in regulating the amount of evidence produced on any particular issue, in excluding cumulative or unnecessarily time-consuming evidence, and in parsing out potentially prejudicial portions of otherwise admissible recordings. Had the jury been informed that Woodard made no additional incriminatory statements after his disputed mention of "the thing," the subsequent

3933

00000130

Ex. 5, p. 121

recordings could properly have been redacted to eliminate any particularly self-serving factual assertions, and Woodard could properly have been limited to playing only a representative sample of these recordings -- one sufficient to communicate a meaningful and accurate impression of Woodard's response to VanHousen's tactics. The jury would then have been given a fair taste of Woodard's reactions without being forced to sit through the entire meal.

But excluding the recorded statements entirely was improper because it entirely deprived the jury of the ability to judge Woodard's supposedly incriminating reactions in context. The likelihood of prejudice stemming from the tapes' wrongful exclusion was particularly exacerbated by the fact that Woodard's counsel, reasonably expecting that the tapes would be played, had told the jury in his opening statement that it would later hear for itself that Woodard had not incriminated himself when dealing with VanHousen. Since the jury never did hear the tapes, it could only have viewed counsel's opening statement, in retrospect, as a promise unfulfilled.

### Exclusion of Polygraph Evidence

The court holds that the trial court properly excluded evidence of VanHousen's and Pierce's failed efforts to pass a polygraph exam. I disagree.

-122-

*3933*

0C000131

While the polygraph is not an "infallible Geiger counter"[5] of truth, neither is its mention invariably taboo. The general rule excluding evidence of polygraph results does not require courts to shield litigants from the logical consequences of their own tactical machinations: a party who wilfully drags a polygraph into a legal fray should not be heard to complain of its mention at trial when its use becomes relevant for some purpose other than to prove the substantive truth of the examined witness's testimony. See, e.g., Leonard v. State, 655 P.2d 766 (Alaska App. 1982).

Here, the state negotiated formal witness agreements securing VanHousen's and Pierce's testimony against Woodard; in return for this testimony, the agreements promised VanHousen and Pierce various concessions. The witness agreements also included provisions requiring VanHousen and Pierce to promise that when they testified, they would tell the truth. To enforce this obligation, the state made VanHousen and Pierce promise to take polygraph tests and made their ability to pass these tests a condition of the state's duty to follow through on the concessions it promised in the witness agreements. Both men tried the polygraph and failed repeatedly. Yet the state took no action to rescind their agreements.

VanHousen reached his agreement with the state on June 11, 1992; the agreement was "conditioned upon VanHousen successfully passing a polygraph examination." VanHousen was

---

[5]   Mallott v. State, 608 P.2d 737, 748 (Alaska 1980).

-123-

00000132

interviewed on the polygraph twice on June 19 and twice more on June 25. During these interviews VanHousen consistently claimed that he "knew" Woodard was the robber and murderer but adamantly refused to admit that he had been involved in the robbery himself; thus, he could provide no convincing explanation for his certainty about Woodard's role. The polygraph results all showed that VanHousen was being deceptive.

Ultimately, after investigators let VanHousen know that he had failed the polygraph, that the police already knew that both VanHousen and Woodard had been jointly involved in the robbery, and that VanHousen stood to be prosecuted if he did not come up with more convincing evidence against Woodard,[6] VanHousen began to change his version of events by implicating both himself and Woodard in the planning and preparation of the robbery. Woodard remained the gunman in these accounts. Notably, after changing his version of events, VanHousen was never again subjected to a polygraph. Instead, on July 7, VanHousen entered into a second cooperation agreement with the state. This renegotiated agreement conspicuously omitted the successful polygraph test requirement. Ten days later, on July 17, VanHousen testified before the grand jury and gave what was for all intents and purposes the version of events that he later testified to at trial.

---

[6]    Investigators told VanHousen: that the police had already gathered "strong evidence" of "the part everybody played," that they knew "exactly what Jon [Woodard] did... we know that you[r] planning with Jon took place some time before this," that "the least of your problems is you perjured yourself again," and that they could "guarantee you, you're probably going to be charged."

Ex. 5, p. 124

00000133

Sean Pierce's situation was somewhat different. On June 22, 1992 (ten days after VanHousen entered into his initial cooperation agreement with the police), before giving the police his first taped interview, Pierce entered into a cooperation agreement with the state. Like VanHousen's agreement, Pierce's agreement was conditioned upon his successfully passing a polygraph examination. Unlike VanHousen, however, Pierce was not polygraphed until much later during the investigation -- December 1992 and January 1993. By that time, Pierce had already given the police essentially the same version of events that he later testified to at trial -- a version fully implicating Pierce, VanHousen and Woodard in the Carrs robbery, describing Pierce's own role as that of an accomplice who remained on lookout outside the store, and describing Woodard's role as that of the lone gunman.

Pierce first underwent polygraph testing on December 30. During the test he said that everything he had told the police was truthful and that he had withheld nothing. The test showed both statements to be lies. When confronted with these test results, Pierce denied any deception, insisting that "I have not withheld anything." After the test, one of the investigators reassured Pierce that "we do not, unless you pull[ed] the trigger on... on this guy, we're not interested in you Sean[.]" The investigators suggested various possible explanations for Pierce's failure to pass the polygraph test that would not undermine his accusation of

3933

00000134     Ex. 5, p. 125

Woodard.[7] At the same time, the investigators clearly communicated that Woodard remained, and would remain, the ultimate target of their investigation.[8]

By January 6, Pierce had come up with two possible explanations for his failure to pass the December 30 test: that he might have failed because he withheld information about his involvement with Woodard in a prior unrelated armed robbery, or that he might have failed because he neglected to mention that he and Woodard had returned to the area near Carrs the day after the Carrs robbery to recover surveillance equipment, which Pierce had used during the robbery and had afterward hidden in a nearby residential area. The police gave Pierce a second polygraph test, asking if he had "now told the police everything you know about the Carrs murder," and whether he had "now told the police of your full involvement with the Carrs murder." Pierce answered yes to both questions and failed to pass the test: the polygraph indicated that his answers were "now in the inconclusive range." After the test, the investigators again asked Pierce "if he couldn't figure out if there was something he was leaving out."

---

[7]    For example, the officers suggested that perhaps Pierce might not have been straightforward about the money he received from the robbery, perhaps he had not acknowledged having a weapon on him at the time, perhaps the sudden recollection of a disturbing dream had distracted him, or perhaps, in mid-question, "something else popped in your mind and you think, oh shit, I didn't tell 'em about that."

[8]    Indeed, one of the investigators went so far as to reassure Pierce that "I think its prob'ly gonna be insignificant . . . but y'know we gotta explain why it's doing this." Pierce was also told that full disclosure was essential because "we gotta know . . . you gotta remember Woodard knows everything, OK?"

3933

00000135

Ex. 5, p. 126

Pierce was tested again the next day, January 7. While being polygraphed, he denied shooting the guard during the Carrs robbery, denied lying when he said that it was Woodard who shot the guard, and admitted that he helped dispose of the evidence from the Carrs robbery. The examiner concluded -- while noting the "confusion" inherent in these results -- that Pierce had been deceptive in denying that he had shot the guard, but had been truthful in claiming that it was Woodard who shot the guard. The examiner also concluded that Pierce was truthful in admitting that he had disposed of evidence from the robbery.

A new, reformulated test was administered in which the examiner asked Pierce if he had "pulled the trigger" on the Carrs guard and whether he felt responsible in any way for the guard's death. Pierce denied pulling the trigger and answered yes to the question whether he felt responsible. Pierce did not pass the test: his denials of pulling the trigger were in the "inconclusive or indefinite range;" his claim that he felt responsible for the guard's death revealed a "strong physiological response."

Pierce was then advised to return the following day for further testing. However, he was never retested. The state simply concluded that "there was no further use in running any more polygraph examinations on Mr. Pierce without further admissions to find out why we're getting indefinite or inconclusive charts." This apparently ended Pierce's polygraphing.

When it came time for VanHousen and Pierce to testify at trial, Woodard understandably wanted to inform his jury of these

Ex. 5, p. 127

00000136

circumstances.   The trial court, however, declared the subject taboo and barred all mention of the polygraph information.  The court concluded that the information's relevance hinged on the assumption, long legally discredited, that the polygraph is a reliable truth-testing device.  See Pulakis v. State, 475 P.2d 474 (Alaska 1970).

But Woodard sought to admit the polygraph information not because the failing results would signal the jury that VanHousen and Pierce had actually lied, but rather because the manner in which the state reacted to the negative results -- its essential failure to react to the apparent lies -- may well have sent clear and unmistakable signals to both witnesses that the state would condone dishonesty.  The legitimate relevance of the polygraph information thus lay in its potential effect on VanHousen and Pierce -- on their subjective perception of their duty to tell the truth: the duty upon which their witness agreements supposedly hinged.

Given their negative polygraph results, both witnesses knew that the state had strong grounds for concluding that they had lied.  Their apparent lies had been documented by the very device that the state itself had selected as a measure of truth and that the state was therefore likely to credit.  Both witnesses knew that, despite the state's awareness of these apparent lies, which directly violated their witness agreements, they had suffered no adverse consequences: the witness agreements remained intact.  The police had abandoned all further efforts to obtain successful test

-128-

    0C000137

results and to explain the multiple unsuccessful results.  Under these circumstances, both VanHousen and Pierce could logically conclude that, as far as the state was concerned, they were free to lie -- provided, of course, that they continued to incriminate Woodard and made their stories convincing.

Sustaining the trial court's ruling on this issue, the court reasons that Woodard managed to "fully establish Pierce's and VanHousen's bias without specifically informing the jury of the portions of their agreements which required them to pass polygraph examinations." Nothing could be further from the truth.

The ruling that shielded the jury from any polygraph information left VanHousen, Pierce, and the state in a singularly advantageous position.  The jury was told of the witness agreements, including the condition requiring VanHousen and Pierce to tell the truth.  But the jury was not told of the condition requiring these witnesses to take and pass a polygraph test, or of their failure to abide by this condition.  Instead, it was told only that the witness agreements contained an additional, undisclosed condition, which had been violated in some unspecified way.  The court correctly observes that this state of affairs left Woodard in a position to establish that VanHousen and Pierce were heavily biased in favor of the state by virtue of their witness agreements.  Yet what both Judge Coats's and Judge Mannheimer's opinions ignore is that the exclusion of the polygraph information prevented Woodard from presenting an accurate and complete picture

-129-                                        *3933*

Ex. 5, p. 129

of how this bias might have shaped VanHousen's and Pierce's stories.

Both witnesses freely acknowledged entering into witness agreements that were advantageous to themselves; both professed to recognize that they stood to suffer considerable losses by violating the agreements, and thereby risking rescission; and both acknowledged committing an unspecified violation of the agreements that the state had thus far tolerated. Nevertheless, without the disputed polygraph information, these unspecified violations could plausibly be viewed as precisely what made VanHousen's and Pierce's testimony credible. VanHousen and Pierce could insist, and the state could argue, that because of these violations, VanHousen and Pierce knew that their fates were essentially in the state's hands -- that the state might rescind the agreements at any time for failing to tell the truth.

The state could plausibly maintain that VanHousen's and Pierce's primary motivation was to do nothing to risk recission of their agreements; the witnesses, in turn, could plausibly maintain that the only way they could assure themselves of the state's continued willingness to overlook the past breaches was to continue living up to their end of the bargain; and the jury could be left with the illusion that the central element of the bargain was the duty of both witnesses to tell the truth -- in other words, that the paramount risk that both witnesses would presumably never dare to take was the risk of being caught in a lie.

3933

00000139    Ex. 5, p. 130

All this despite the fact that both of these witnesses knew full well that they had given the state solid reason to believe -- by its own chosen measure -- that their version of the crime had been untruthful. Both witnesses thus managed to parade before the jury the illusion that the biases generated by their witness agreements left them strongly and singularly motivated to tell the truth. Without the missing polygraph information, this illusion was seemingly impenetrable. The prosecution was able to hammer home the point that it had bargained for the truth and had gotten it.

Woodard, by contrast, had no convincing response: he could and did claim that VanHousen and Pierce had consistently lied and that, by the time of trial, they felt secure in the knowledge they needed only to avoid changing their stories, regardless of the truth. But without the excluded polygraph information, this claim was decidedly anemic, for it left unaddressed the provision in the cooperation agreement allowing the state to prosecute these witnesses if they lied. Hence, the response failed to resolve the core riddle of why these witnesses might not be motivated to tell the truth by their fear of being caught in a lie.

Had Woodard been allowed to inquire into the existence of the polygraph requirement and to establish the circumstances surrounding its breach by both witnesses, he might have burst the illusory bubble and meaningfully shaken the credibility of VanHousen and Pierce, the state's two primary witnesses. As matters actually stood, however, Woodard was most certainly not

-131-

00000140

Ex. 5, p. 131

able to "fully establish Pierce's and VanHousen's bias." The trial court allowed Woodard to hoist the sails but deprived him of the wind necessary to fill them. Exclusion of the polygraph evidence violated his right to confront and cross-examine these witnesses. This is an error of constitutional dimension. <u>Delaware v. VanArsdall</u>, 475 U.S. 673, 679 (1986); <u>United States v. Lynn</u>, 856 F.2d 430 (1st Cir. 1988); <u>Wood v. State</u>, 837 P.2d 743, 745 (Alaska App. 1992).

<u>Exclusion of Woodard's Newspaper Photographs</u>

The court concludes that the trial court properly excluded photographs of Woodard that appeared in the Anchorage Daily News after Woodard's arrest (Judge Coats), or that any error was at most harmless (Judge Mannheimer). I disagree.

Robin Conaway witnessed the Carrs robbery and shooting but only managed to see the robber in profile. Conaway later identified Woodard from a photographic lineup shown to her by the police. The lineup depicted Woodard in a close-up, head-on view. When Conaway recognized Woodard's photograph in the lineup, she expressed surprise at her ability to make an identification from the head-on view, since she had only seen the robber's profile.

On cross-examination, Conaway acknowledged seeing a photograph of Woodard in the newspaper before she identified him from the photographic lineup. But Conaway claimed that the only newspaper photograph she had seen was a full-body, profile shot; she denied seeing any other photographs. Conaway's testimony thus minimized the possibility that her exposure to the newspaper

-132-

3933

0C0000141                      Ex. 5, p. 132

photograph had influenced her subsequent identification from the photographic lineup.

Woodard nevertheless sought the admission of two additional photographs that had appeared in the newspaper prior to the photo lineup in which Conaway identified Woodard. The two additional news photographs differed from the shot Conaway acknowledged seeing, and were similar to the photograph in the lineup in significant respects: one was a close-up shot of Woodard's head, and both were more or less straight-on views, rather than profiles. Woodard sought to show that Conaway might have seen the two additional photographs and that her exposure to them could have influenced her later selection of the similar photograph included in the photo lineup.

In support of his offer to admit the two additional photographs, Woodard established that Conaway subscribed to the Anchorage Daily News at home and that copies of the paper were commonly kept in plain view in the employees' lounge at Carrs, where Conaway worked. Woodard also established that Conaway had been present at work on the days when the photographs appeared in the newspaper.

The trial court, however, refused to admit any photographs other than the profile view that Conaway acknowledged seeing; the court ruled that the excluded photographs were irrelevant in light of Conaway's testimony indicating that she had never seen them. The court likewise precluded any testimony describing the excluded photographs, or establishing that the head-

-133-

00000142

on shots of Woodard had appeared in the newspaper and might have been viewed by Conaway.

But this ruling essentially presumed the credibility of Conaway's testimony. The jury was not bound to accept Conaway's denial. Evidence of the disputed photographs' ready availability to her was sufficient to support a reasonable inference that Conaway might have seen them.

Judge Coats justifies the photographs' exclusion as cumulative evidence. Yet they were not cumulative: no comparable evidence was admitted. The full-body shot that Conaway acknowledged seeing had comparatively little tendency to impeach Conaway's identification: since that shot depicted Woodard in profile, it did not explain Conaway's ability to identify him from a head-on view. Considering that Conaway had only briefly observed the robber, at a distance and in profile, and that she had subsequently provided a description that did not closely fit Woodard, her eventual ability to select Woodard from a head-on photograph in a lineup may well have helped persuade jurors of the accuracy of her identification.

The jury saw and heard of only the full-body, profile photograph of Woodard; and the prosecution made much of Conaway's self-declared prowess in being able to identify the head-on lineup photograph despite never having seen the robber except in profile. Had the jury been able to see the more similar head-on shots that appeared in the newspaper shortly before the lineup, it might have entertained a reasonable doubt as to whether Conaway had actually

identified anything other than a recently-seen newspaper photograph.

These photographs were not cumulative; there was ample foundation for their admission; admission would have taken a negligible amount of time; and they would hardly have been confusing to the jury or unfairly prejudicial to the state. In my view, the trial court abused its discretion in excluding them. See, e.g., Kucki v. State, 483 N.E.2d 788 (Ind. App. 1985); Hill v. State, 783 S.W.2d 257 (Tex. App. 1989); State v. Dunn, 246 S.E.2d 245 (W.Va. 1978).

### Shotgun Video

The court decides that the trial court properly admitted portions of video tape that showed Woodard firing a shotgun at some trees. The court's decision finds the video tape "relevant to illustrate an important part of the police investigation[.]" Yet the tape does not illustrate any part of the investigation at all; what it actually illustrates is Woodard firing shots from a shotgun into tree branches, at close range, in a recklessly indiscriminate manner, and with seeming delight in his ability to wield so much destructive power.

The videotaped shotgun scenes themselves reveal no apparent connection between Woodard and the alleged homicide apart from Woodard's propensity for destructive recklessness. Although the tape was undeniably instrumental in enabling the police to place Woodard at the scene of the shotgun's firing, where other evidence connecting him to the robbery was found, Woodard's

-135-

3933

Ex. 5, p. 135        00000144

presence at scene of the target practice had already been solidly established by independent evidence (discarded shells and portions of the video showing Woodard firing the handgun used in the robbery). And the manner in which the police followed the clues to the connecting evidence was not disputed and had been fully described without reference to the shotgun portion of the video.

Nothing illustrated in the disputed portion of the video is relevant to any issue that was actually in dispute at trial. The state argued below that the shotgun scene established Woodard's marksmanship. The trial court did not rely on this theory, and it is flatly unconvincing. The tape shows Woodard firing seven or eight close-range shots at tree branches with a weapon that the police euphemistically called a street sweeper; even at that, Woodard appears to have missed one of his shots.

Woodard's prowess with a gun was already amply demonstrated by the portion of video that portrayed him firing the actual murder weapon -- evidence whose admissibility Woodard did not challenge. The scene of Woodard firing the handgun admittedly reduced the possibility that the jury's exposure to the shotgun scene, in itself, might result in significant prejudice. But the shotgun scene was nevertheless propensity evidence pure and simple, and it ought to have been excluded as such. See Brown v. State, 601 P.2d 221, 226-27 (Alaska 1979). Even though slight, the prejudice stemming from this error weighs in the balance with other prejudice caused by the other errors occurring during Woodard's trial.

-136-                                                3933

### Shackling

Woodard spent more than two months before a jury, wearing a handcuff on his right arm and leg irons on his ankles, all attached by chains to another chain around his waist. The court condones what happened. Judge Coats uncritically concludes that the trial court "gave sufficient reasons to justify the security restraints in this case." I cannot agree with this conclusion, for I am unable to endorse a rule that would routinely subject defendants to the prospect of jury trials in chains.

My aversion to having prisoners shackled during jury trials has nothing to do with my personal aesthetic preferences but instead is rooted in a well-settled notion of fundamental fairness, which demand that, absent a compelling showing of actual necessity, the accused "should be permitted to face the jury with the appearance and dignity of a free and innocent man." Anthony v. State, 521 P.2d 486, 495 (Alaska 1974). "This rule is intended to insure that the jury is not prompted to relax the presumption of innocence on account of the defendant's status as prisoner." Stern v. State, 827 P.2d 442, 448 (Alaska App. 1992). It is also meant to guard against discouraging the accused from freely exercising the vital right to testify. See, e.g., Kennedy v. Cardwell, 487 F.2d 101, 106 (6th Cir. 1973).

This rule originated in the earliest traditions of our legal system:

> The historical development of the rule that a defendant should be unfettered while standing trial, except in extraordinary instances, has been traced from Virgil and the

-137-                                             3933

Ex. 5, p. 137

> Bible through the Magna Carta and the great
> English scholars Bracton, Coke and Blackstone
> -- into our own jurisprudence.

Kennedy v. Cardwell, 487 P.2d at 105 (citations omitted).  The

historical aversion to shackling flourished early in the case law

of our own nation:

> [A]ny order or action of the Court which,
> without evident necessity, imposes physical
> burdens, pains, and restraints upon a prisoner
> during the progress of his trial, inevitably
> tends to confuse and embarrass his mental
> faculties, and thereby materially to abridge
> and prejudicially affect his constitutional
> rights of defense; and especially would such
> physical restraints in like manner materially
> impair and prejudicially affect his statutory
> privilege of becoming a competent witness and
> testifying in his own behalf.
>
> Again, to require a prisoner during the
> progress of his trial before the Court and
> jury to appear and remain with chains and
> shackles upon his limbs, without evident
> necessity for such restraint, for the purpose
> of securing his presence for judgment, is a
> direct violation of the common law rule[.]

People v. Harrington, 42 Cal. 165, 168-69 (Cal. 1871).  Early

Oregon case law likewise applied "this ancient rule of the common

law." State v. Smith, 8 P. 343 (Or.  1883).

Cases like Harrington and Smith have stood the test of

time and remain vital today.  For example, in People v. Duran, 545

P.2d 1322, 1327 (Cal.  1976), the California Supreme Court relied

on Harrington in holding "that a defendant cannot be subjected to

physical restraints of any kind in the courtroom while in the

jury's presence, unless there is a showing of manifest need for

such restraints."  In State v. Moore, 609 P.2d 866, 867 (Or.  App.

1980), Oregon built upon Smith to hold "a trial judge has the

-138-

3933

0C000147    Ex. 5, p. 138

discretion to order the shackling of a defendant if there is evidence of an immediate and serious risk of dangerous and disruptive behavior." See also State v. Kessler, 645 P.2d 1070, 1073 (Or. App. 1982).

The current standard in the Ninth Circuit specifies that shackling "'must be limited to cases urgently demanding that action.'" Jones v. Meyer, 899 F.2d 883 (9th Cir. 1990) (quoting Spain v. Rushen, 883 F.2d 712 (9th Cir. 1989)). To find "urgent demand," the trial court must "be persuaded that by compelling circumstances 'that some measure was needed to maintain the security of the courtroom,'" and must "'pursue less restrictive alternatives before imposing physical restraints.'" Id.

These standards were violated in Woodard's case. The state originally saw no need to shackle Woodard. Responding to Woodard's pretrial request for precautionary measures to ensure that he would not be seen in handcuffs, the state said:

> In this case the State is not requesting additional security at this time. The State is simply requesting normal security proce-dures be observed. These procedures, which include two uniformed Judicial Service officers in the courtroom in view of the jury, and the defendant unshackled, do not violate the defendant's right to be presented to the jury with an appearance of dignity and decorum in keeping with the presumption of innocence.

The state noted, however, that Lieutenant Yakopatz, head of the Alaska State Troopers Judicial Services Division, had indicated that the Judicial Services Office was "considering requesting

-139-

00000148

additional restraints." An affidavit from Lieutenant Yakopatz confirmed that a request was under consideration.[9]

Yet the trial court operated under the mistaken impression that shackling was routine procedure in a serious murder case. At the omnibus hearing, Woodard appeared in handcuffs, belly chain, and leg irons; his attorney asked the court to remove these restraints for purposes of the hearing. The judge asked Lieutenant Yakopatz to respond. The lieutenant replied, "Our standard procedure is that leg irons and belly chains be utilized in this particular case, as we have in the past in similar trials." Lieutenant Yakopatz explained that, since Woodard's crime involved the use of deadly force, and since a "newspaper article profiled by the U.S. Marshall's Office indicate[s] that [Woodard] is [a] body building participant and practices the martial arts," his case qualified for "a high profile security requirement." Lieutenant Yakopatz also mentioned that a formal, written security profile for Woodard was being prepared. But there is no indication in the record that the profile was ever completed or that it was ever

---

[9]   Lieutenant Yakopatz' affidavit stated, in relevant part:

> Given the nature of this particular case, and the defendant's background, we are considering requesting additional restraints, including leg irons, with a skirting around counsel tables to conceal the leg irons. The defendant committed a cold and calculating murder. He made extensive plans prior to the crime, including the use of an "inside person", "a look out", and alternate escape plans. Additionally, his extensive interest in paramilitary gear, illegal weapons, surveillance, and fake identification, make him a dangerous person and an escape risk.

3933

0C000149      Ex. 5, p. 140

submitted to the trial court or the parties for review and consideration.

After hearing from Lieutenant Yakopatz, the trial court did allow Woodard's hands to be uncuffed for purposes of the omnibus hearing, but, in apparent reference to Woodard's future hearings and trial, the court indicated, "I am basically going to honor the request of Judicial Services that he be remained restrained as he is." The court subsequently entered a written order finding:

> The defendant has been accused of planning and executing several armed robberies; he is a bodybuilder with extensive background in using paramilitary weaponry; he faces a 99 year sentence in this case and has other charges pending for later trials which makes him a flight risk.

For these reasons, the order required that Woodard be "restrained in the usual way" during trial; it went on to specify that "the usual way" meant "with ankle chains hidden from view by table skirting and by belt chain to which his wrists are attached by chains."

But contrary to Lieutenant Yakopatz's statements, which the trial court appears to have accepted, it is not "standard procedure" to require the accused to remain shackled while facing the jury -- even in cases involving the most serious classes of felonies. In fact, the practice, though not without precedent, is rare. Only three Alaska appellate decisions since statehood have dealt with prisoners who were shackled at trial for security reasons: <u>Stern v. State</u>, 827 P.2d 442, 448 (Alaska App. 1992);

-141-

00000150    Ex. 5, p. 141

_Newcomb v. State_, 800 P.2d 935, 942 (Alaska App. 1990); and
_Contreras v. State_, 767 P.2d 1169, 1172 (Alaska App. 1989).[10]   And
each of these cases involved solid and specific proof of conduct or
threats that posed a clear and present danger of flight or
courtroom violence.

In _Contreras v. State_, Contreras' legs were shackled
behind a skirted table during trial because he had escaped from
custody seven times, including an escape from the very trial in
which he was ultimately shackled.   767 P.2d at 1172.   The trial
court  determined that the state had met its burden of showing
"extreme need."  _Id._  We upheld that decision.

In _Newcomb v. State_, Newcomb escaped from prison in Kenai
while serving a 43-year term; he had an extensive criminal record
that included convictions for serious crimes of violence.   The
police eventually found Newcomb in Anchorage.   When they closed in
to arrest him, he shot two officers, seriously injuring one.
Taking Newcomb into custody required the combined efforts of six
police officers and a police dog.   Newcomb was brought to trial for
escape, attempted murder, and first-degree assault.   Given these
circumstances, the trial court ordered Newcomb seated behind a
skirted table with his feet shackled and his left hand cuffed to a
chain around his waist.   800 P.2d at 941.   This court upheld the
decision, finding "abundant reason" for caution.   _Id._

---

[10]   _See also Anthony v. State_, 521 P.2d 486, 496 (Alaska
1974) (involving a prisoner appearing in shackles as a trial
witness); and _Rae v. State_, 884 P.2d 163 (Alaska App. 1994)
(involving a defendant who was bound and gagged at trial due to
disruptive behavior, rather than for security reasons).

3933

Ex. 5, p. 142

00000151

In _Stern v. State_, Stern stood trial for first-degree murder. At the time, he had four prior assault convictions. A pretrial evidentiary hearing revealed that he had openly advocated the killing of police officers and had said that he anticipated such killings would occur; Stern had also told Judicial Services officers that it would take more than two of them to restrain him. _Id._ at 449. Even under these extreme circumstances, the trial court allowed Stern to appear before the jury without shackles during much of his trial. As a precautionary measure, the court opted to increase the number of Judicial Services officers in the courtroom from two, the usual number, to four. Only when the number of available officers was reduced due to demands of other trials did the court order Stern placed behind a skirted defense table with his feet shackled. 827 P.2d at 448. This court affirmed the order. _Id._

In Woodard's case, as in the foregoing cases, the offenses charged were serious crimes of violence. In all other respects, however, Woodard's case pales by comparison. For here there was no evidence of any specific acts or threats of courtroom violence. There was mention of Woodard's size and apparent strength, and of his evident interest and training in martial arts and "paramilitary weaponry."[11] There was unsubstantiated talk of

---

[11]    In context, "paramilitary weaponry" seems to be a buzz-phrase. "Paramilitary weapons" are military or military-style weapons in the hands of civilians; a person with an "extensive background in using paramilitary weapons" is thus simply a civilian who knows how to use military weapons. A large number of Alaskans fall into this category.

3933

00000152

"high profile security requirements" supposedly met by these criteria. And there were vague references to "standard procedures" for such cases. But there was little or nothing else.

Woodard had no prior record of criminal convictions and no proven history of criminal violence. After his alleged commission of this offense but before his arrest, Woodard remained at liberty and was under active investigation and surveillance. During this period he apparently threatened harm to no one and never sought to flee. He evidently kept in touch with the police at their request. And when it became obvious that the investigation was closing in upon him, Woodard headed for his attorney, not his arsenal. He was arrested without incident. The record contains no evidence of post-arrest violence, infractions or threats.

In short, there was no case-specific evidence before the court of any unusual security risk or pressing need for close physical restraint. As we have already mentioned, the state initially voiced the position that Woodard's case called for no unusual security measures. If specific evidence or information suggesting courtroom violence or flight existed, it could have, and should have, been brought forward promptly for evaluation by the court on the record. Or if the evidence existed but was deemed too sensitive to divulge in open court, or in Woodard's presence, it should have been offered to the court in camera, with a sealed record maintained for appellate review.

-144-

3933

00000153

But no offer of case-specific evidence was made, and the trial court evidently conducted no inquiry to determine its possible existence. The court made no finding of actual necessity for physical restraint; nor did it inquire into or consider the availability and feasibility of less restrictive measures. <u>See Anthony v. State</u>, 521 P.2d at 496 (even when physical restraints are justified, only the least intrusive restraints may be used). There is no case specific showing in the record establishing a compelling need to shackle Woodard.

Judge Mannheimer suggests that Woodard should be required to demonstrate prejudice. But what prejudice could he show beyond that already apparent? Although Woodard sat behind a table that was skirted to obstruct the jury's view, it is difficult to imagine how the jury could have failed to notice the situation after Woodard appeared before it in this condition, day after day, during two months of trial: Woodard could never stand; or pour himself a drink without assistance; or flip the pages of his legal pad without putting down his pen or pencil; or even rest his hands and elbows on the table. Myriad clues would surely have alerted jurors that Woodard was restrained and would have served as a constant reminder that the prosecution, the court, and perhaps even his own counsel considered him dangerous.

Indeed, Judge Mannheimer seizes on the obviousness of the prejudice as a reason to avoid reversal, observing that, in <u>Newcomb</u>, when we upheld Newcomb's trial in shackles, we voiced optimism concerning the jury's ability to set aside prejudices.

-145-

Ex. 5, p. 145

0C000154

But Newcomb, Stern, Contreras, and cases like them must be read in context: they stand at most for the proposition that, when external circumstances -- circumstances that in large measure are attributable to the accused's own voluntary conduct -- render a trial in shackles manifestly necessary, the inevitable and inherent prejudice of holding such a trial is constitutionally tolerable. None of these case suggest that the unnecessary shackling of an accused during a jury trial may simply be dismissed as harmless error unless accompanied by a showing of case-specific harm. Such a rule would be a long stride toward a "usual way" allowing all defendants to be brought before juries in chains.

Admittedly, we live in times marked by a disturbing increase in public violence. The threat of violence in the courtroom is all too real. I do not suggest that we should ignore it. Yet we must also remain vigilant against succumbing to the hollow temptations of a bunker mentality. In a free society founded upon the rule of law, the courtroom must ultimately be governed by the law, not by the iron fist. The vitality of our traditional criminal justice system depends on the public's continued perception that justice will prevail by rule and reason, not by force of arms. While courts must always be prepared to respond to active threats of violence or flight with strong, swift, and effective measures, we can ill-afford a "usual way" of handling prisoners that forces them to trial in shackles on the mere assumption that something might happen.

-146-

Alaska case law and the American legal tradition have long struck an appropriate balance by following the rule that obvious physical restraint of a defendant in a jury trial is appropriate only upon a case-specific showing of compelling circumstances, and only after an express consideration and rejection of less restrictive alternatives.[12] Each case, of course, brings its own facts; in each case, determining the existence of compelling circumstances warranting physical restraint requires a careful weighing of the totality of the circumstances. Here, based on the record currently before us, the balance tips decidedly against the measures ordered below. Absent a case specific showing of compelling need, Woodard should not have been shackled at trial.

### Cumulative Error

The evidence presented against Woodard at trial was unusually strong and undeniably compelling. As to any single error, the chance of actual prejudice would seem slight. I am convinced, however, that the cumulative impact of the errors was significant and worked to deprive Woodard of his fundamental right to a fair trial, and so cannot be ignored. Drumbarger v. State, 716 P.2d 6 (Alaska App. 1986). Accordingly, I would reverse Woodard's conviction and remand for a retrial.

---

[12]    The appropriateness and harmful consequences of shackling defendants during non-jury trials or during courtroom proceedings outside the presence of the jury presents a different question. Potential prejudice is obviously greatly reduced in the absence of the jury. This case calls upon us to consider a situation in which Woodard underwent a jury trial in shackles. I mean to express no opinion as to the appropriateness of shackling in any other context.

-147-

*3933*