IN THE COURT OF APPEALS OF THE STATE OF ALASKA

JON A. WOODARD                          )
                                        )
                    Appellant,          )
                                        )
        vs.                             )
                                        )
STATE OF ALASKA                         )
                                        )
                    Appellee            )
_____)    Court of Appeals No. A-08243

Trial Court No. 3AN-00-06982 CI

---

CERTIFICATE OF COMPLIANCE WITH VICTIMS' RIGHTS ACT OF 1991

I certify that this document and its attachments do not contain (1) the name of a victim
of a sexual offense listed in AS 12.61.140, or (2) a residence or business address or
telephone number of a victim of or witness to any offense unless it is an address used to
identify the place of the crime or it is an address or telephone number in a transcript
of a court proceeding and disclosure of the information was ordered by the Court.

---

APPEAL FROM THE SUPERIOR COURT,
THIRD JUDICIAL DISTRICT AT ANCHORAGE,
THE HONORABLE JOEL H. BOLGER, SUPERIOR COURT JUDGE PRO TEM

APPELLANT'S OPENING BRIEF

                    Christine Schleuss (7811132)
                    1227 West 7th Avenue, 2nd Floor
                    Anchorage, Alaska  99501
                    (907)258-0704
                    Attorney of Appellant
                    Jon A. Woodard

Filed in the Court of Appeals of
the State of Alaska, this 21st
day of October, 2003.

Clerk of the Appellate Court

By: _____

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW . . . . . . . . . . 2

STANDARD FOR REVIEW . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    I.   Mr. WOODARD PROVED THAT HE WAS ENTITLED TO A NEW
        TRIAL . . . . . . . . . . . . . . . . . . . . . . . . 19

        A.   Case law supports Woodard's claim that he
            was entitled to disclosure of Defendant
            X's identity, the admissions attributed to
            VanHousen made to him, as well of the
            favorable treatment the State gave him . . . . 19

        B.   Facts pertaining to this argument establish
            that if Woodard's attorney had known early
            on about the identity of Defendant X and had
            known about his deals with the prosecutor,
            Woodard would have succeeded in suppressing
            evidence seized pursuant to the search
            warrants, or would have been acquitted . . . . 21

   II.  AT A MINIMUM, MR. WOODARD IS ENTITLED TO A REMAND SO
        THAT HE HAS A FULL AND FAIR OPPORTUNITY TO PRESENT HIS
        CASE BASED ON THE EVIDENCE IN THE STATE=S FILES WHICH
        WAS NOT PRODUCED AT THE EVIDENTIARY HEARING.
        . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 30

i

TABLE OF AUTHORITIES

CASES:

Atkinson v. State,
869 P.2d 486, 492 (Alaska App. 1994) . . . . . . . . . . . 20

Braham v. State,
571 P.2d 631, 644 (Alaska 1977) . . . . . . . . . . . 19, 27

Carriger v. Stewart,
132 F.3d 463 (9th Cir. 1997) . . . . . . . . . . . . . 21

Giglio v. U.S.,
405 U.S. 150, 92 S.Ct 763, 31 L.Ed.2d 104 (1972) . . . . . . 20

Grinols v. State,
10 P.3d 600, 618 (Alaska App. 2000) . . . . . . . . . . 28

Keith v. State,
612 P.2d 977, 982 (Alaska 1980) . . . . . . . . . . . . 28

Kyles v. Whitley,
514 U.S. 419, 434, 115 S.Ct. 1555,
1566, 131 L.E.2d 490 (1995) . . . . . . . . . . . . . . 3, 20

Massey v. Delaware,
514 A.2d 402 (Delaware 1986) . . . . . . . . . . . . . 28

Putman v. State,
629 P.2d 35 (Alaska 1980) . . . . . . . . . . . . . . 19

Russell v. Mississippi,
819 So.2d 1177 (Mississippi 2001) . . . . . . . . . . 28

Salazar v. State,
559 P.2d 66, 71-72 (Alaska 1976) . . . . . . . . . 3, 25, 27

Singh v. Prunty, 142 F.3d 1157 (9th Cir. 1998) . . . . . . . 20

Sledge v. State,
763 P.2d 1364 (Alaska App. 1988) . . . . . . . . . . 19, 20

State v. Malkin,
722 P.2d 943 (Alaska 1986) . . . . . . . . . . . . . 22

U.S. v. Bagley,
473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) . . . . . 19

U.S. v. Steinberg,

ii

99 F.3d 1486 (9th Cir. 1996)   . . . . . . . . . . . . . .  21

<u>Washington v. Texas</u>,
388 U.S. 14, 17, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)  . . .  27


CONSTITUTIONAL PROVISIONS:

U. S. Constitution, Fifth Amendment . . . . . . . . . . . .19, 28

U. S. Constitution, Fourthteenth Amendment . . . . . . . 19, 28

Alaska Constitution, Article 1, Section 7. . . . . . . . 19, 28

Alaska Constitution, Article 1, Section 11 . . . . . . . 19, 28

Ex. 10, p. 4

FEDERAL AND STATE CONSTITUTIONS RELIEF UPON

United States Constitution, Amendment V:

No person shall be held to answer for a capital, or otherwise
infamous crime, unless on a presentment or indictment of a grand
jury, except in cases arising in the land or naval forces, or in
the militia, when in actual service in time of war or public
danger; nor shall any person be subject for the same offense to
be twice put in jeopardy of life or limb; nor shall be compelled
in any criminal case to be a witness against himself, nor be
deprived of life, liberty, or property, without due process of
law; nor shall private property be taken for public use, without
just compensation.

United States Constitution, Amendment 14:

Section 1. All persons born or naturalized in the United States,
and subject to the jurisdiction thereof, are citizens of the
United States and of the state wherein they reside. No state
shall make or enforce any law which shall abridge the privileges
or immunities of citizens of the United States; nor shall any
state deprive any person of life, liberty, or property, without
due process of law; nor deny to any person within its
jurisdiction the equal protection of the laws.

Section 2. Representatives shall be apportioned among the several
states according to their respective numbers, counting the whole
number of persons in each state, excluding Indians not taxed. But
when the right to vote at any election for the choice of electors
for President and Vice President of the United States,
Representatives in Congress, the executive and judicial officers
of a state, or the members of the legislature thereof, is denied
to any of the male inhabitants of such state, being twenty-one
years of age, and citizens of the United States, or in any way
abridged, except for participation in rebellion, or other crime,
the basis of representation therein shall be reduced in the
proportion which the number of such male citizens shall bear to
the whole number of male citizens twenty-one years of age in such
state.

Section 3. No person shall be a Senator or Representative in
Congress, or elector of President and Vice President, or hold any
office, civil or military, under the United States, or under any
state, who, having previously taken an oath, as a member of
Congress, or as an officer of the United States, or as a member
of any state legislature, or as an executive or judicial officer
of any state, to support the Constitution of the United
States, shall have engaged in insurrection or rebellion against

iv

the same, or given aid or comfort to the enemies thereof. But Congress may by a vote of two-thirds of each House, remove such disability.

Section 4. The validity of the public debt of the United States, authorized by law, including debts incurred for payment of pensions and bounties for services in suppressing insurrection or rebellion, shall not be questioned. But neither the United States nor any state shall assume or pay any debt or obligation incurred in aid of insurrection or rebellion against the United States, or any claim for the loss or emancipation of any slave; but all such debts, obligations and claims shall be held illegal and void.

Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

Alaska Constitution, Article 1, Section 7:

No person shall be deprived of life, liberty, or property, without due process of law. The right of all persons to fair and just treatment in the course of legislative and executive investigations shall not be infringed.

Alaska Constitution, Article 1, Section 11:

In all criminal prosecutions, the accused shall have the right to a speedy and public trial, by an impartial jury of twelve, except that the legislature may provide for a jury of not more than twelve nor less than six in courts not of record. The accused is entitled to be informed of the nature and cause of the accusation; to be released on bail, except for capital offenses when the proof is evident or the presumption great; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.

v

STATEMENT OF JURISDICTION

On June 7, 1993, Appellant Jon Woodard was convicted following a jury trial of Murder in the Second Degree and Robbery in the First Degree.  On appeal, his convictions were affirmed. Woodard v. State, 1198 WL 849246 (Alaska App. 1998).  After his appeal, on March 16, 2000, the superior court entered an amended judgement.  Exc. 20.

Subsequently, on May 3, 2000, Mr. Woodard timely filed an Application for Post-Conviction Relief - Criminal Rule 35.1. Exc. 3-58. The State opposed.  Exc. 50-54.  On January 23, 2002, Superior Court Judge Joel H. Bolger conducted an evidentiary hearing on Woodard's Application.  Tr. 2.  Judge Bolger issued Findings of Fact, Conclusions of Law & Order dismissing Mr. Woodard's claims (exc. 88-97); and, on February 7, 2002, a Final Judgment.  Exc. 98.

Notice of appeal was timely filed on March 6, 2002.  This Court has jurisdiction pursuant to AS 22.07.020.  This appeal is brought as a matter of right pursuant to Appellate Rules 202, 204, and 214.

1

STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.   The Superior Court erred when it denied Mr. Woodard's application for a new trial.

2.   At a minimum, Mr. Woodard is entitled to a remand so that he has a full and fair opportunity to present his case based on the evidence in the State's files which was not produced at the evidentiary hearing.

2

STANDARD FOR REVIEW

1.  At post-conviction relief proceedings, where the government withheld material evidence, reversal is required if there is a "reasonable probability" that, had the evidence been disclosed, the result of the proceeding would have been different.  <u>Kyles v. Whitley</u>, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.E.2d 490 (1995).

2.  A trial court's denial of a continuance will be reversed where there is an abuse of discretion.  <u>Salazar v. State</u>, 559 P.2d 66, 71-72 (Alaska 1976).

3

STATEMENT OF THE CASE

On June 8, 1992, a lone gunman robbed the Aurora Village
Carrs store. The gunman disguised his identity by wearing a ski
mask, sunglasses, and a cap. Trial Tr. 3037, 3082, 3101.[1] He hid
his eyes behind sunglasses. Trial Tr. 3028, 3107, 3124. He wore
a cap. Trial Tr. 3058, 3543. M.O.&J. 2. In the course of the
robbery, the gunman shot and killed a Loomis security guard.
Trial Tr. 3078-79, 3607-09. M.O.&J. 2. The gunman grabbed money
from the manager's booth and fled the store, using a back
entrance. Trial Tr. 3080-81, 3104, 3194-95, 3540-41. M.O.&J. 3.
Eyewitnesses to the robbery/homicide could not provide any useful
descriptions of the perpetrator. But within two days police
focused their investigation on Jon Woodard, to the exclusion of
other suspects. Trial Tr. 145. M.O.&J. 3. First police built
their case through a number of surreptitious tape recordings of
conversations between Woodard and a police informant named David
VanHousen. These led to searches of Woodard's home and telephone
calls.[2] These searches led to more surreptitiously taped
conversations and still more searches. M.O.&J. 3. Ultimately,

---

[1] References to pretrial and trial proceedings are made as
"Trial Tr. and Trial R." References to the post-conviction
proceedings are made as "Tr. and R." Citation is also made to
where these facts were set out by this Court in its opinion in
Woodard v. State, 1198 WL 849246 (Alaska App. 1998), cited as
"M.O.&J."

[2] The conversations were taped pursuant to Glass warrants.
Trial R. 548-795. The other searches were also conducted
pursuant to search warrants. Trial R. 797-882, 890-958, 962-
1079, 304-13, 1108-1197.

the State charged Woodard with both first and second-degree murder and with robbery. Trial R. 23-27. Judge Hunt presided over pretrial hearings and trial. James McComas represented Mr. Woodard. The trial took place in June 1993. The jury acquitted Woodard of first-degree murder, but convicted him of second-degree murder and robbery. Trial R. 2729-31, .M.O.&J. 2.

In a one hundred forty-seven page decision (Judge Mannheimer concurring, Chief Judge Bryner dissenting) this Court affirmed Jon Woodard's convictions. Woodard v. State, 1198 WL 849246 (Alaska App. 1998). The Supreme Court denied Woodard's Petition for Hearing by a two-two vote (Justice Bryner not participating).

Woodard then filed an Application for Post-Conviction Relief. Judge Bolger was assigned to the case (Judge Hunt having retired). Tr. 2. Leslie Hiebert of the Office of Public Advocacy represented Woodard. Tr.2.

In his Application, Jon Woodard alleged violations of due process and Criminal Rule 16 (Claim I), fraud on the court (Claim II), and violation of the Confrontation Clause (Claim III).[3] Exc. 3-49. Woodard based his claims on the fact that, illegally, the State withheld the identity of the informant whose information first focused the investigation on him. Far more damaging than withholding the identity of the informant, Woodard alleged that the State withheld information concerning the

---

[3] In Claims IV and V he challenged his transfer to a private prison in Arizona. Those claims are not part of his appeal.

5

extremely favorable treatment given the informant in his own
criminal misdeeds because of the information he provided against
Woodard. Id. The factual basis for Jon Woodard's claims is set
out here.

Two days after the robbery/homicide, on June 10, 1992,
police sought their first search warrant to record conversations
between Woodard and David VanHousen who worked at Carrs. At the
hearing on the first search warrant sought by the State,
Assistant District Attorney Branchflower elicited from APD
Detective Bill Reeder the following:

> Q:  Now is it true that what initially focused
>     your attention on Mr. VanHousen was some
>     information that you received through an
>     attorney here in town who represents an
>     individual who is charged with a drug
>     offense, and let's call that person defendant
>     X.  That the information you received through
>     the district attorney's office was that the
>     attorney who represents defendant X had
>     talked to Mr. VanHousen's father, and that
>     according to defendant X Mr. VanHousen's
>     father was lamenting the fact that his son,
>     David VanHousen, had told him of possibly
>     being involved. . . .
>
> A:  Yes, that is - that is correct.
>
> Q:  All right.  So, that's what initially atten -
>     directed the attention of the police to Mr.
>     VanHousen, correct?
>
> A:  That's correct.  And the fact that Mr.
>     VanHousen was an employee at Carrs.  We
>     verified that through work records.

Exc. 27. Detective Reeder went on to testify that VanHousen's
father refused to speak with them. Exc. 28. The police then
contacted VanHousen who also immediately sought to incriminate

6

Woodard and to exonerate himself.   From there the State
continued forward with several more search warrant hearings, all
of which incorporated testimony from the earlier hearings.
M.O.&J. 3-4.

"Defendant X" was a man named William Turlington.   The only
information concerning Turlington that was written down prior to
Woodard's trial was found in a one paragraph police report.   To
summarize, the report said that John Murtagh, Turlington's
attorney, contacted the D.A.'s office and told that office that
his client had information on the Carr's murder.   Exc.1.
According to the report, Turlington was told by his friend John
VanHousen that John's son worked at Carrs, knew who the shooter
was, and had commented that no one was supposed to get hurt.   Id.
As McComas explained it in a memo he wrote on July 27, 1992, the
testimony at the search warrant hearings indicated that
Turlington had a drug case but that <u>no deals would be made</u> and <u>no
benefit was provided</u> in return for the information.   Exc.2.

On July 27, after he read discovery naming Murtagh as the
attorney discussed at the search warrant hearing, McComas
contacted him.   Murtaugh told McComas that no deals had been
made and that Murtagh had a subjective belief that if the
information turned out to be important there might be some
benefit to his client.   Exc. 2.   McComas' written notes of this
contact do not mention the name of Murtagh's client.   Id.

7

In October of that year, Judge Hunt ordered the State to produce discovery concerning the case, including discovery about informants. She also ordered the State to continue to produce discovery as it was generated. Exc. 29-30, Tr. 29, 136.

In direct violation of Judge Hunt's Order as well as in violation of court rule, constitutional provisions, and case law requiring disclosure, the State never told Woodard's trial attorney the extraordinary favors it gave to Turlington. Nearly three months after McComas spoke with Murtagh and only about six weeks after Judge Hunt ordered continued discovery, by way of Information replacing Indictment, the State charged Turlington with two Class B felony drug sales. (State v. Turlington, Case No. 3AN-S 91-6378 Cr.) Exc.64-65.[4] That same date the State entered into a cooperation/plea agreement with Turlington whereby he received a completely suspended sentence and was placed on probation. Exc.33-35. The information replaced an indictment which alleged five counts of sale of cocaine and one count of possession of cocaine. The indictment was dated September 6, 1991. Exc. 57-63. Turlington's criminal conduct was considerably more serious than indicated by the Information replacing the Indictment. Assistant District Attorney Novak described it as "The two counts incorporate defendant making

---

[4] Woodard attached most of the court records from Turlington's case to his Original Application. Exc.31-49. A complete set of the court judgments related to three of Turlington's cases was Exhibit 1 at the evidentiary hearing on Woodard's Application. Exc.57-87, Tr. 23.

deliveries of cocaine on four separate occasions (involving quantities of ½ ounce to two ounces) and possessing more than ½ pound of cocaine with intent to deliver." Exc.44.    The agreement was expressly conditioned on Turlington never previously having been convicted of a felony.  Exc. 34.  Nothing in the agreement indicated that it was made in return for Turlington's assistance in prosecuting Woodard.  Thus, someone looking through the public files would not know that Turlington's information about Woodard was one of the bases for the favorable agreement.  That fact did not become part of a public document until 1995. Tr.23-24. Assistant District Attorney John Novak signed the charging document.  The District Attorney himself, Edward McNally, signed the charging document and the cooperation/plea agreement. Exc.32,35.

Turlington continued to commit crimes.  On August 23, 1995, Mr. Novak filed a Supplemental Sentencing Memorandum in the above case as well as in Turlington's subsequent criminal case. (State v. Turlington, Case No. 3AN-S 94-8516.)  Turlington's subsequent charge was also for trafficking in cocaine.  Exc. 43-46.  The Memorandum described Turlington's contacts with the State.  For the first time in public, the State told the reasons for the lenient charge and sentence.  Included among the reasons was the fact that Turlington provided information "that eventually lead to the prosecution and conviction of Jon A Woodard. . . ."  Exc.

9

44. [5]  The Memorandum described that Turlington's only verified job was narcotics trafficking.  It noted that he repeatedly violated probation for such violations as failing to submit to urinalysis, including during the time prior to Woodard's trial; yet no petition to revoke probations was filed.  It noted that on three occasions, including one prior to Woodard's trial, he tested positive for cocaine; yet no petition was filed.  It noted that Turlington was charged with shoplifting in [June] 1993, yet no petition was filed.  Exc.45.

When Turlington appeared before Judge Andrews for sentencing on a petition to revoke in the 1991 case and for sentencing on the 1994 case, she stated:

> I have not seen in my experience, so much
> non-compliance on probation without a
> petition to revoke.  Now the only thing I can
> think of is that because your information was
> so valuable in the Woodard murder case, that
> they wanted to cut you further slack than
> they already cut you or maybe the case was
> going on for a period of time during that or
> there was some issue that they wanted to cut
> you slack, I don't know."

Exc.48.  Despite all this misconduct, the only penalty suffered by Turlington on the 1991 charge was that a year was added to his

_____

[5] Explaining the reasons for the original plea agreement, Mr. Novak stated in a pleading from August 1995 that at the time the State entered into the agreement, a trial judge had suppressed the evidence against Turlington.  The state filed a petition for review with this Court which was accepted.  While the matter was being briefed, Murtagh came to the D.A.'s Office with the information which led to Woodard's prosecution and conviction.  In addition, at Turlington's original sentencing, according to Novak, Turlington's attorney stated he was an elderly man who was no longer in the business of dealing cocaine. Exc.44-45.

period of probation.  He still was not ordered to serve jail time on that conviction.  Exc. 73.

And most extraordinarily, despite the fact that Turlington was not even granted a Suspended Imposition of Sentence in the first place, and despite all his probation violations and crimes, on January 20, 1998, Turlington's Judgment of Conviction in the 1991 case was ordered set aside.  Exc.74.

The extent of Turlington's misdeeds as well as the favors and benefits provided to him by the State were withheld from Woodard and his attorney.  It was only in 1995, after Woodard's conviction, that the State publicly disclosed in a written document the favors it provided him and disclosed that one of the reasons for its favors was his assistance in the Woodard case.

When Mr. Woodard found out that which had been hidden from him, he filed his Application for Post-Conviction Relief. Needless to say, John Novak was a key witness for Woodard.  Ms. Hiebert listed him on her witness list dated November 2, 2001. Exc. 55.  The day before the evidentiary hearing she had Novak served with a Subpoena to Appear & Produce which ordered him to bring with him "all records in the possession of the District Attorney's office pertaining to William Turlington."  Exc. 56, Tr. 4.  But when Novak appeared at the evidentiary hearing on January 23, he did not bring the files with him.

Instead, at the start of the hearing, before any witnesses were called, Assistant District Attorney Mary Anne Henry told the court that the files were in archives.  If archived in Anchorage,

11

it would take a week to obtain them.  If archived in Juneau, it would take two weeks to retrieve them.  Tr. 4.  Accordingly, she sought to quash the subpoena to the extent that it called for the production of files.  Tr. 4.

Ms. Hiebert responded that it had long been known [indeed since Mr. Woodard filed his Application] that the basis for the application was the State's failure to disclose all of the information in its possession concerning Turlington in violation of the trial court's order.  Tr. 5.  She explained that in light of that fact and in light of the fact that she listed Mr. Novak on her witness list, "I didn't anticipate that the state wouldn't have retrieved those documents already in the course of proceedings because you would have had to consult those docu - those files in order the answer the request for admission."  Tr. 5.  At that point the court took the State's motion under consideration, but chastised the defense because it had a full range of unused discovery options.  Tr. 5.  The hearing then proceeded.

The parties contested whether Turlington's identity as "Defendant X" had been revealed to the defense prior to trial. The State produced a copy of the Reeder police report (found at exc. 1), and claimed that it had produced it to the defense. Tr.10.

Mr. McComas testified that at the time he spoke with Mr. Murtagh his recollection was that he was unaware of the identity

12

of the person Murtagh represented.  Tr. 134-35.  He also said
that if he had known Defendant X's name he would have told his
investigator to take further action.  Tr. 135.  Mr. Woodard
testified that he had never seen the police report before, that
he was unaware that Detective Reeder had identified in the report
that "Defendant X" was William Turlington, and that he had no
knowledge whether the report was provided in discovery to
McComas.  Tr. 20.  John Murtagh testified that he had no memory,
and had not made an entry in his file, that he disclosed
Turlington's name to McComas.  Sealed Tr. 47.[6]   He stated, "That
would have probably been significant enough that I would have
made note of it."  Id.  He had no memory of any conversation with
McComas.  Id.

In his findings of fact, Judge Bolger did not clearly
resolve this issue.  Exc. 89-90.  He did note that "Turlington's
identity and the details of the tip" were probably provided to
McComas in Reeder's report.  Exc. 95.

It was uncontested that the State never disclosed to the
defense the extremely favorable treatment given to Turlington
over the years, including during the time prior to Woodard's
trial. Judge Bolger found that the prosecution did suppress
evidence about Turlington's plea bargain.  Exc. 95.

According to Ms. Henry, disclosure was not required because

---

[6] John Murtagh's testimony was sealed and is found in a
separate volume of transcript.  It is referenced in this brief as
"Sealed Tr. ___."

13

Turlington was only marginally involved. Tr. 10. Further she claimed that because McComas knew Turlington's name, "All of the documents subsequent to that were public record and Mr. McComas had just as much access to the plea agreement, to the charging documents that had been attached to the post conviction relief as the state did. And the state is not required to turn over things that the defense already has an opportunity to obtain." Tr. 11.

But as detailed above, the record reflects that the fact that Turlington's information against Woodard provided a basis for his favorable treatment was not part of the public documents until years later, after Woodard had been convicted.

The evidentiary hearing did little to clear up the circumstances surrounding this favoritism. John Murtaugh testified that nothing in his files indicated that he negotiated for a set-aside of the conviction. Sealed Tr. 7. Relying on his years of experience he stated that he had never successfully negotiated a set-aside for a client who had not originally received an SIS. Sealed Tr. 8-9. He agreed that under case law from this Court a set-aside was not permissible for a defendant who had not originally received an SIS. Sealed Tr. 9.

Murtagh relied on his time sheets to provide some detail concerning his communications with the District Attorney's Office about Turlington's information about the Carrs' robbery. He stated that he first spoke with Steve Branchflower on June 10, 1992. Sealed Tr. 10. Murtagh conveyed to Branchflower on that date the information told to him by Turlington. His notes read

14

that John VanHousen ". . . told Mr. Turlington that his - John
VanHousen's house is close by the Carrs, and that his son - that
is, <u>John VanHousen's son David</u>, the manager in the Produce
Department, had set it up." Sealed Tr. 13-14 (emphasis added).
Murtagh elaborated, "John VanHousen told Bill [Turlington] that
John's son, David, the manager at the Produce Department, had set
this up. And that was told." Sealed Tr. 14. He explained that
the "it" could only have meant he was referring to the robbery at
Carrs in June 1992. <u>Id</u>. In Murtagh's words, "If those statements
were true, then he [VanHousen] should be a suspect. He certainly
should be somebody to be contacted." Sealed Tr. 15. Murtagh
explained that he was attempting to negotiate a deal for
Turlington because he was concerned that this Court might reverse
the suppression order. Sealed Tr. 16.

In addition to speaking with Mr. Branchflower on June 10,
Mr. Murtagh said, "I also have notes having talked with Mr.
Novak, and having talked with Mr. McNalley." Sealed Tr. 10-11.
He spoke with McNally, Novak's boss, on July 8 and on August 19,
1992. Sealed Tr. 29, 33. He spoke with them both when they
called him on October 6. Sealed Tr. 19. He had repeated
telephone calls with Novak, including on September 29, October 6,
November 16, and December 15. Sealed Tr. 43. His last time slip
was on December 16, 1992, and said, "Pick up deal." Sealed Tr.
43. In seeking a favorable disposition for his client, Murtagh
repeatedly made the point that Turlington had provided specific

15

information in the Woodard case.  Sealed Tr. 30.  After the plea agreement was entered, it appears that Murtagh did not represent Turlington any further.  And there was no indication that police officers communicated with Murtagh.

Assistant District Attorney Novak's testimony was striking in that he said that he was involved in negotiations of Turlington's case, but he did not know whether he was involved in conversations with Mr. Murtagh with regard to Woodard.  Tr. 111. He said that he did not have access to his file and he did not recall conversations about the negotiations or whether Mr. McNally or Ms. Henry handled those.  Tr. 112, 124-25.  He purported to be amazed by the set aside order in the 1991 case. Tr. 114.  As to whether he knew the information about Turlington's criminal felony background when he was originally involved in Turlington's case [which was prior to Woodard's trial], Novak said that he did not know.  He agreed that he should have known about the prior criminal history.  Tr. 117-18. When pressed about when he found out about Turlington's prior convictions, he said "I don't know - I mean, I haven't looked at my old file."  Tr.  120.  As to his repeated conversations with Murtagh, he said "I Haven't reviewed. . . ."  Tr. 121.  He explained that if he had his file, "I would suspect I would have some notes - my notes reflecting the - the chain of events and things like that.  But, as I sit here now, I - I can't tell you." Tr. 125.  And when further queried that if he had access to the

16

Turlington file he would have found notes to refresh his
recollection about the course of negotiations, he agreed that he
was a careful lawyer and would have written notes to the file to
refresh his recollection.  Tr. 127.  He knew that he was on the
witness list for this case, but had no idea what he was
testifying about and had never seen a copy of the application for
post-conviction relief.  Tr. 121.

After Murtagh, Novak, and McComas had testified, Ms. Hiebert
pointed out that she believed that from the State's Answer (1)
denying Turlington was an informant witness in the Woodard case
requiring disclosure to the defense; and, (2) admitting that the
State entered into a plea agreement with Turlington, denying it
was a "cooperation agreement," and denying that the agreement was
conditioned on Turlington providing information resulting in
Woodard's prosecution, (That portion of the State's Answer is
Exc.50-54),  the State had consulted its files before filing its
Answer.  Tr. 139-41.  She apologized to the court for her error.
Tr. 140.  She asked the court to Order disclosure of a copy of
the District Attorney's file on Turlington, including information
about how the District Attorney and the Assistant District
Attorneys negotiated Turlington's case and how much of Woodard's
case was a known factor.  Tr. 142.

Judge Bolger denied her request.  He concluded that she had
an adequate opportunity to conduct discovery on the matter and
refused to leave the proceedings open for further discovery.  Tr.
143.  He then took the matter under advisement.  Tr. 152.

17

Subsequently, he issued written Findings of Fact, Conclusions of law & Order dismissing Woodard's Application.  Exc. 88-97.  This appeal follows.

ARGUMENT

I.   Mr. WOODARD PROVED THAT HE WAS ENTITLED TO A NEW TRIAL.

A.   Case law supports Woodard's claim that he was entitled
     to disclosure of Defendant X's identity, the admissions
     attributed to VanHousen made to him, as well of the
     favorable treatment the State gave him.

The due process clauses of the United States Constitution[7]

and the Alaska Constitution[8] as well as the provisions of

Criminal Rule 16, require the government to disclose to the

defense in a criminal case evidentiary material in its

possession.  Putman v. State, 629 P.2d 35 (Alaska 1980).  This

requirement of disclosure includes information pertaining to

informants.  The Alaska Supreme Court explained the importance of

this requirement as follows:

> But the defendant is entitled to have access
> to all relevant evidence in the possession of
> the state in order that he be afforded his
> right to a fair trial. The question of
> whether he has a fair trial relates to
> constitutional guarantees such as due process
> and the right to have compulsory process for
> obtaining witnesses in his favor.

Braham v. State, 571 P.2d 631, 644 (Alaska 1977).  Evidence which

impeaches an informant is required to be disclosed.  U.S. v.

Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985);

Sledge v. State, 763 P.2d 1364 (Alaska App. 1988).  Citing the

Sledge opinion, this Court stated:

> The standard governing disclosure of
> confidential information to the
> defendant in a criminal case is as

---

[7] U.S. Const. Fifth and Fourteenth Amendments

[8] Art. 1, Sec. 7.

19

> follows: [A]ny material evidence should
> be disclosed to the defendant. Material
> evidence means any evidence where "there
> is a reasonable probability that, had
> the evidence been disclosed to the
> defense, the result of the proceedings
> would have been different. A 'reasonable
> probability' is a probability sufficient
> to undermine confidence in the outcome.

Atkinson v. State, 869 P.2d 486, 492 (Alaska App. 1994), citing

Sledge v. State, 763 P.2d at 1369. An informant's leniency

agreement must also be disclosed. Giglio v. U.S., 405 U.S. 150,

92 S.Ct 763, 31 L.Ed.2d 104 (1972). And information affecting the

credibility of an informant must be disclosed even though the

informant does not testify at trial. Kyles v. Whitley, 514 U.S.

419, 115 S.Ct. 1555, 131 L.E.2d 490 (1995).

The Kyles opinion was before the Supreme Court on a federal

habeas after the state court had denied the defendant's appeal

and his application for collateral relief. In that case, as here,

it was revealed on collateral review that the state had not

disclosed evidence favorable to the defendant. The court held

that where the undisclosed evidence was material, constitutional

error results from its suppression by the government, if there is

a "reasonable probability" that, had the evidence been disclosed,

the result of the proceeding would have been different. 514 U.S.

at 434, 115 S.Ct. at 1566.

A number of federal cases have followed Kyles and determined

that due process requires disclosure of information about

informants. Singh v. Prunty, 142 F.3d 1157 (9th Cir. 1998)

(government violated due process by withholding informant's

20

cooperation agreement); <u>Carriger v. Stewart</u>, 132 F.3d 463 (9th

Cir. 1997) (government violated due process by withholding

information about informant); <u>U.S. v. Steinberg</u>, 99 F.3d 1486

(9th Cir. 1996) (government violated due process by withholding

impeachment evidence).

There was much discussion as to whether Turlington was an

informant. That word is defined as "a person who gives

information." Merriam-Webster OnLine Dictionary (10[th] ed.)  The

Cambridge International Dictionary of English defines an

informant as "someone who gives information to another person or

organization: a police/secret informant."  Finally, The

American Heritage Dictionary of the English Language (Fourth Ed.

2000) defines an informer as "One that gives information.  One

who informs against others."  Clearly, William Turlington met the

definition of an informant. As such, disclosure of the

information about his full statements concerning what he knew

about VanHousen as well as the favorable treatment he received

were required to be disclosed.

   B.   Facts pertaining to this argument establish that if
        Woodard's attorney had known early on about the
        identity of Defendant X and had known about his deals
        with the prosecutor, Woodard would have succeeded in
        suppressing evidence seized pursuant to the search
        warrants, or would have been acquitted.

Prior to his trial, Mr. Woodard made a compelling case in

his motion to suppress evidence obtained from the search warrants

that the police had withheld from, or misrepresented to, the

21

search warrant judge information which entitled him to suppression under <u>State v. Malkin</u>, 722 P.2d 943 (Alaska 1986). The State offered Van Housen as a witness. He specifically stated that he did not plan the robbery with Woodard. M.O.&J. 5. But Murtagh testified that before this date he had told an attorney with the District Attorney that "John VanHousen told Bill [Turlington] that John's son, David, the manager at the Produce Department, had set this up. And that was told." Sealed Tr. 14. Judge Bolger found that this information had been conveyed from Murtagh to the State. Exc. 89. But it was not in Reeder's police report, was not told to McComas, and was not told at the search warrant hearing. Indeed, it was not told in any of the search warrant hearings. VanHousen went from denying any involvement to reluctantly admitting to being the "inside man." But he never admitted that he had set up the robbery. M.O.&J. 5-6.

Had this material misstatement/falsehood been told to McComas and to the court as part of Woodard's suppression motion, the result would have been different. Once this deception came to light, it would have been clear that the State mislead Judge Andrews throughout the search warrant hearings. This falsehood, combined with the favorable treatment being accorded to VanHousen, mandated suppression under the <u>Malkin</u> decision.

Woodard was tried during May-June 1993. A key focus of Woodard's defense at trial was that David VanHousen, Sean Pearce,

22

and Carl Bolhin, the three men who testified that Woodard planned and carried out the robbery, were lying to save their own skins. His attorney argued that the three  received extremely lenient sentences in return for implicating Woodard.  His attorney argued that they were covering up the identity of the true robber/ shooter and were falsely blaming Woodard instead.

As detailed, his was a close case.  A jury acquitted Woodard of the most serious charge, first degree murder.  What all this means is that disclosure of the favorable treatment consistently provided to Turlington would have been sufficient to tip the balance of this case in favor of acquittal.  Armed with this evidence, Woodard's attorney would have had the means to plant a reasonable doubt in the mind of the jury that (1) Turlington was the person who, along with VanHousen, set up the robbery, not Woodard; (1) Turlington was the robber, not Woodard;[9] (3) Turlington, whom Woodard did not know, was the instigator of a plot amongst VanHousen, Pierce, and Bohlin to frame Woodard in order to protect the robber.

The defense impeached witnesses who said Woodard was involved by showing their biases and their motive to lie to protect themselves as well as the robber.  And the defense was that the people who were providing information against Woodard were more significantly involved than they admitted and were using Woodard as a patsy.  Tr. 136.  The favoritism accorded

---

[9] Turlington was out of custody on June 8, 1992, the date of the Carrs robbery/homicide.  Sealed Tr. 33.

23

Turlington would have been a crucial part of this defense.

With the Turlington information, McComas could have gone after Turlington, and evaluated whether he was part of the conspiracy to shift blame.  Tr. 144-45.  With the Turlington information McComas would have had strong grounds to impeach the investigation itself; that is, to impeach the officers as to why they failed to investigate Turlington and VanHousen as the instigators of this crime and failed to investigate Turlington as a prime suspect.  Tr. 151.

II.  AT A MINIMUM, MR. WOODARD IS ENTITLED TO A REMAND SO THAT HE HAS A FULL AND FAIR OPPORTUNITY TO PRESENT HIS CASE BASED ON THE EVIDENCE IN THE STATE'S FILES WHICH WAS NOT PRODUCED AT THE EVIDENTIARY HEARING.

At a minimum, Jon Woodard established that he was entitled to production of the State's files on Turlington and was entitled to have the case left open for the presentation of additional evidence once his attorney had an opportunity to review the files.  The documents and testimony elicited in this case left a huge gap concerning Turlington's connection to Woodard's prosecution.  There can be no doubt that he received extraordinarily, even unheard of, favorable treatment.  The question, which in all likelihood would have been answered by the materials in the state's files, is why did he receive this treatment.  Perhaps the State will argue that part of the reason for the favorable plea bargain was the risk that the trial court's suppression of evidence in Case No. 3AN-S91-6383 would be upheld on review.  And perhaps the State will argue that part of

24

the reason for the plea agreement was its belief that Turlington was no longer a drug dealer. But the fact remains that after the plea agreement was finalized, the only continuing basis for the favoritism Turlington enjoyed from 1992 through 1998 was his cooperation and information concerning Jon Woodard. The details as to the exact information the State received from Turlington (and perhaps continued to receive) as well as when it received information, as to how the State used his information, as to when the State knew that Turlington had prior convictions and lied in his plea bargain, and as to why Turlington received such favorable treatment, can only be discovered through the State's Turlington files.

Woodard recognizes that it is within the trial court's discretion whether to deny a continuance. And it is also true that not every denial of a request for additional time violates due process. Salazar v. State, 559 P.2d 66, 71-72 (Alaska 1976). But it is also true that it has long been the law in Alaska in both criminal and civil cases that a defendant should rarely be denied an opportunity to present evidence. In Salazar, the defendant in a criminal case sought a continuance to enable a key witness to be available to testify. The trial judge denied the request for a continuance, which came in the midst of a jury trial. On appeal the supreme court reversed. It described the considerations which were pertinent as: (1) whether the testimony is material to the case; (2) whether the testimony can be elicited from another source; (3) whether the testimony is

25

cumulative; (4) probability of securing the absent witness in a reasonable time; (5) whether the requesting party was diligent and acting in good faith; (6) the inconvenience to the court and/or others; and (7) the likelihood that the testimony would have affected the jury's verdict. Id. Adapting these considerations to the denial of a continuance to enable Woodard's attorney to obtain, review and present evidence from the District Attorney's files on Turlington, and to possibly re-call Novak once he had refreshed his memory with documents and notes from the file, should result in a conclusion that Judge Bolger abused his discretion when he denied Woodard's request.

As detailed above, the information in the State's Turlington files was material to the defense.  It was the only source left for explaining the questions left open after the witnesses testified including these stated above.  Evidence is considered material when its disclosure would, by a reasonable probability, have resulted in the defendant's acquittal.  Kyles v. Whitley, supra.

The material could have been obtained in a week or two at the most.  There was no jury involved so there was minimal inconvenience to the court and parties.  Indeed, it is not unusual in judge-tried cases for the case to be left open to allow the parties to present additional evidence.  Certainly, attorney Hiebert did not act in bad faith.  While perhaps she could have, and even should have, relied on civil discovery methods to obtain the files, it was not unreasonable for her to

26

believe that, given the specificity of the State's Answer, the State must have consulted the files before answering Woodard's application.  Accordingly, it was not unreasonable for her to believe that the files would be available on a one-day subpoena to John Novak, who had long been listed as a witness.  Exc.55.

Jon Woodard had a constitutional right under the due process clause of the Alaska Constitution and under his right to compulsory process to bring this evidence to the attention of Judge Bolger.   In the case of <u>Washington v. Texas</u>, 388 U.S. 14, 17, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), cited in the <u>Salazar</u> opinion, Chief Justice Warren observed:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.  Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law.

It is true that the constitutional provisions speak of compulsory process for "obtaining witnesses" in a defendant's favor.  But this clause has been construed as applying as well to documentary evidence.  <u>Braham v. State</u>, 571 P.2d 631, 644 (Alaska 1977)

<u>Salazar</u> dealt with the issue of the denial of a continuance in the context of a pre-trial criminal case.  But it should apply

27

with equal force to this first post-conviction relief application.  The appellate courts of Alaska recognize that the due process clause of the Alaska Constitution[10] applies to post-conviction relief proceedings and affords criminal defendants in Alaska greater rights than are enjoyed under the federal constitution.  Grinols v. State, 10 P.3d 600, 618 (Alaska App. 2000) (Alaska due process grants a defendant the right to counsel in post-conviction relief proceedings, including the right to representation).

A defendant's constitutional right to compulsory process [11] relates to obtaining both witnesses and documentary evidence in the accused's favor and is intended to ensure a fair trial. It is normally a right associated with pre-trial discovery.  Keith v. State, 612 P.2d 977, 982 (Alaska 1980).  But as with the right to due process, it should apply to a post-conviction proceeding where a defendant is denied access to evidence in his favor. Russell v. Mississippi, 819 So.2d 1177 (Mississippi 2001) (protections of compulsory process entitle defendant to discovery of materials in prosecution files so that he can effectively prepare his application for post-conviction relief); Massey v. Delaware, 514 A.2d 402 (Delaware 1986) (protections of due process and compulsory process entitle defendant to an post-conviction evidentiary hearing where he can present evidence to prove the incompetence of a trial juror).

---

[10]Article 1. Sec. 7.

[11]Article 1, Sec. 11.

28

Under the above case law, Mr. Woodard was entitled to discovery of the materials in the District Attorney's files on Turlington. Denial of a brief extension to enable him to review and present the materials as a continuation of his evidentiary hearing denied him due process and compulsory process.

29

CONCLUSION

The State of Alaska was required to disclose to Jon Woodard prior to his trial the identity of Defendant X and the extraordinary benefits conferred on X (William Turlington) in return for the key information he supplied which led to Woodard's prosecution and conviction. At a minimum Woodard was entitled to a full and fair hearing on his Application for Post-Conviction Relief which included production by the State of its complete files on Turlington. The State's failure to disclose entitles Woodard to a new trial. At a minimum he is entitled to a remand, to an order that the State produce Turlington's files, and to a continued hearing on his Application.

DATED this 21st day of October, 2003.

By: _____
CHRISTINE S. SCHLEUSS
ABA No. 7811132

30