# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

JOHN ARNOLD WOODARD,

                Petitioner,

vs.

JOHN CRAIG TURNBULL,

                Respondent.

3:05-cv-00089-TMB-JDR

**RECOMMENDATION REGARDING RESPONDENT'S MOTION TO DISMISS CERTAIN CLAIMS**

(Docket No.50)

The court has now before it motion by the respondent to dismiss claims two, four, five, six, eight, ten, eleven, and twelve of Mr. Jon Arnold Woodard's petition for writ of *habeas corpus*. (Docket No. 50). Said motion is made on the grounds that these claims should be dismissed because Arnold either failed to exhaust them in state court or did not identify them as federal claims in state court thereby making them procedurally barred. In his reply brief the respondent also asserts a statute of limitations ground. Woodard filed an opposition at docket No. 69 and the state replies at docket No. 74. Woodard's amended petition pursuant to 28 U.S.C. § 2254 was filed at docket No. 33. The respondent answered it at docket No. 49-1, to which Woodard filed a so called "opposition" to said answer at docket No. 70. Oral argument has not been requested and

1

is not deemed necessary.  For the reasons that follow the respondent's motion should be granted in part and denied in part.

## PROCEDURAL BACKGROUND

Woodard was indicted for first-degree murder, second-degree felony murder, and one count of first-degree robbery for the June 8, 1992 offenses at Carrs.  On June 7, 1993, Jon Woodward was convicted acquitted of a charge of first-degree murder, but convicted of second degree felony murder and first-degree robbery.  He was sentenced to 66 years in prison for the second degree murder, but was not sentenced for the robbery.

On direct appeal, The Alaska Court of Appeals affirmed and directed the trial judge to impose a separate sentence on Woodard for first-degree robbery.  She imposed a concurrent sentence.

Woodard filed a petition for hearing to the Supreme Court of Alaska.  The petition was considered by four justices and denied.

Woodard next filed a post-conviction application in state court claiming *inter alia* that the state improperly failed to provide exculpatory evidence concerning an informant whose lawyer told the police to investigate another informant/witness, namely, David Van Housen.  The instant petition followed.

## THE EVIDENCE AT TRIAL

Woodard does not dispute that the following evidence was adduced at trial.

*A. The murder and the robbery:*

On June 8, 1992 at approximately 8:33 a.m., Terrence Becker, a Loomis security officer, riding in an armored car, arrived at the Aurora Village shopping center. [Tr. 3015,3264-74]  Becker, who was delivering small bills for use as change and planning to pick up the previous day's receipts for deposit, exited the Loomis truck and walked to the customer service booth, where he met Kimberly Giddings. [Tr. 3014-15,

3274] The customer service booth was an open cubicle topped with glass panels. [Tr. 3065-67, 3489] The booth contained a drop safe where money, checks, and other receipts were deposited after being counted. [Tr. 2298-3005] Loomis employees carried the key to the drop safe into the store daily. [Tr. 3000, 3005-06] Cash trays prepared with bills and change for use by cashiers were stored in a second safe. [Tr. 3001-05]

Giddings took the key from Becker and unlocked the drop safe. [Tr. 3011, 3016] She then put the money and other receipts from the drop safe into two blue, zippered bank deposit bags which were in turn placed in a canvas bag provided by Becker. [Tr. 3012-17] Becker then gave Giddings a number of $1 and $5 bills. [Tr. 3017-20]

In the meantime, Woodard, on his knees and pretending to look at frozen food in an aisle near the customer service booth, and already wearing sunglasses and gloves, put on his mask. [Tr. 3028,3048,3058-59,3082-83,3086, 3107, 3116, 3245-46, 3250, 3524, 3532, 3544-45, 4457, 5278]

Woodard got up and ran down the aisle to the customer service booth. [Id.] Woodard demanded that someone in the booth open the door. [Id.] None of the several persons in the booth heeded his request, so Woodard hoisted himself up on the wooden door of the booth, held himself there with one arm, pointed a .10- millimeter Glock semi-automatic at the back of the booth, and said: "I want the money." [Tr. 3022,3052,3076,3101, 3126-27,3246,4297] Becker, who was still in the booth, told Giddings to get down, unsnapped his holster, and began to draw his gun. [Tr. 3023, 3077, 3101, 4455]

Woodard shouted: "Don't do it; don't do it,"chambered a round into his gun, and shot Becker. [Tr. 3023, 3054-55, 3078, 3102, 3152-53, 3289, 4298, 4455,5278] Becker collapsed and fell on Giddings. [Tr. 3023] A Carrs employee opened the door to the booth for Woodard after he made additional threats. [Tr. 3079, 3103, 4455]

Woodard took the Loomis bag, full of money and other receipts, from Giddings. [Tr. 3018-22,3024,4455-56] Woodard also took money from the second safe and some of the $1 and $5 bills that Becker had delivered. [Tr. 3024-25, 3056, 3079-80, 3104, 3179, 4456, 5278] Woodard warned the persons in the booth not to do anything because he had people "watching." [Tr. 3056, 3080-81, 3104] As he left the booth, Woodard said, "Fuck you sons-of-a- bitches." [Tr. 5279] Woodard stole $127,669.41; $51,228.29 was in cash. [Tr. 6767-68]

Woodard went down an aisle, into a rear area of Carrs, and out a back door, and then took off his mask. [Tr. 3180-82, 3195,3290, 3520-21, 3541- 42, 3713,5281] Robin Conaway, a Carrs employee who had run out of another rear door during the robbery, saw Woodard walking away from the store, and later identified him in a photographic lineup and at trial. [Tr. 3704, 3710-13, 3742-44, 3749-50, 3803-04]

Becker's gun was found by his foot. [Tr. 3157] Becker's wound bled profusely. [Tr. 3291-93] Paramedics took Becker to the hospital where he died. [Tr. 3295, 3607] During the autopsy that followed, it was determined that the fatal bullet had entered Becker's head in the outside corner of his left eye, traveled towards the middle of his head and slightly downward, and fragmented. [Tr. 3608]

### 2. The Murder Weapon - the .10-Millimeter Glock:

Woodard, who lived in Penland Park with Sara Wiggers, his girlfriend, had purchased a .10-millimeter Glock semi-automatic handgun (serial no. UH 929) on March 23, 1991. [Tr. 4063-70, 4253-55, 4310-11] Woodard pawned this .10-millimeter Glock on January 3,1992, and redeemed it on March 5, 1992. [Tr. 7035-46]

The police found and seized the expended .lo-millimeter round that had been ejected from the Glock when Woodard shot Becker in the customer service booth. [Tr. 3402, 3447, 3458-59] The police then located 25 rounds of expended .10-millimeter

ammunition that Woodard had fired in the presence of friends from the Glock in two separate locations shortly before the robbery. [Tr. 3687-90,4075-98,4114-18,5080-82] The police also obtained a videotape which showed Woodard shooting the .10-millimeter Glock in one of the two locations. [Id.] At one of the locations, a human hair like Woodard's was found attached to a burned ammunition box. [Tr. 5088-89, 7331]

Robert Shem, a firearms expert, concluded that the 25 expended .10-millimeter shells and the expended .10-millimeter round found in the Carrs booth had all been fired from the same gun. [Tr. 4206-12] Shem also concluded the slug that had killed Becker was fired from a .10-millimeter Glock. [Tr. 4132, 4136-61]

On the afternoon after the murder, Woodard dismantled the .10-millimeter Glock and threw the pieces into the Knik River; the pieces were never found. [Tr. 5283, 7485-86] Thus, the characteristics of the murder weapon themselves were not compared with the expended shell found at Carrs or the bullet fragments obtained from the victim. Testing of a .10-millimeter Glock that Woodard purchased after the murder (serial no. WX 876) with money stolen from Carrs revealed that the shell found at Carrs had not been fired from it. [Tr. 4161-64, 7068]

### 3. Events Leading up to the Murder and Robbery:

Woodard first discussed the possibility of robbing the Carrs Aurora Village store and how easy it would be with his friend David VanHousen, the Carrs freezer food manager, in approximately 1987; a similar discussion occurred in early May of 1992. [Tr. 4234,5231,5242,5244,5346] In late May of 1992, Woodard again said he was thinking about robbing the Aurora Village Carrs store and that he had been watching the store from across the street. [Tr. 5247] Woodard asked VanHousen to confirm the Loomis armored-car schedule and to tell him how much money Carrs took in each day, and VanHousen did so. [Tr. 5247-51] Woodard showed VanHousen a ski mask he planned to wear, said he was going to wear mismatching tennis shoes, and said

another unnamed friend would be posted as a lookout on the skywalk that crosses Northern Lights Boulevard near the store. [Tr. 5257-59]

A few days later, Woodard appeared at Carrs while VanHousen was working. [Tr. 5260] At Woodard's request, VanHousen accompanied Woodard to the back of the store where Woodard opened a door to determine whether it could be used as an escape route. [Tr. 5261-62] The alarm on the door did not sound. [Id.]

Also, in May of 1992, Woodard also approached a second friend, Sean Pierce, and asked him to help him with the robbery. [Tr. 4319] Woodard told Pierce he had another, unnamed friend who worked at Carrs, and that this person had provided information concerning the receipts and Loomis armored- car arrival times and procedures. [Tr. 4319-24,4338] Woodard and Pierce made specific plans for the robbery. [Tr. 4325, 4333-35] Woodard told Pierce he was going to wear a flak vest during the robbery and discussed the Loomis deliveries. [Tr. 4319-20, 4333, 4352, 4354] Pierce then went to Carrs and watched the inside the customer service booth while Loomis personnel made a pick up and delivery. [Tr. 4324, 5263-66]

Woodard and Pierce agreed that Pierce would station himself on the skywalk, that Pierce would signal Woodard when the Loomis van approached Carrs, and that Pierce would also signal Woodard if police were in the area. [Tr. 4331-33] Woodard and Pierce obtained the transmitter Pierce was to use during the robbery and a scanner-type receiver which Pierce programmed for his transmitter. [Tr. 4327, 4330, 5030] Woodard and Pierce tested the transmitter and receiver on two occasions -once while Pierce was on the skywalk and Woodard was in Carrs. [Tr. 4330-32]

On the night of June 7, 1992, which was the night before the robbery, Woodard telephoned VanHousen, discussed his plan to rob Carrs, and told VanHousen to meet him at the tennis courts on Minnesota Boulevard near Aurora Village when his shift ended at eight the next morning. [Tr. 5266-57]  Woodard also telephoned Pierce,

told him to be ready, and said he would pick him up first thing in the morning. [Tr. 4339-40] In addition, Woodard called another friend, Karl Bohlin, and told him that he would be able to repay him $1,800 he had borrowed for a trailer payment soon because he and Pierce planned to rip off some drug dealers. [Tr. 5943-44, 5951-52, 6495]

On the morning of June 8th, Woodard, driving Sara Wigger's white Honda, picked up Pierce and his bicycle and drove to a park near the Carrs store where he gave Pierce the transmitter and a pair of binoculars. [Tr. 4340,4343- 46] Pierce left the park on his bike and stationed himself, as planned, on the Northern Lights skywalk. [Tr. 4341-46]

Woodard, still driving the white Honda, then met VanHousen at the tennis courts. [Tr. 5267-69] By this time Woodard had changed into the dark clothing he was planning to wear during the robbery. [Tr. 4332, 5271-72] He was also wearing sunglasses and gloves. [Tr. 5272] VanHousen tried to talk Woodard out of the robbery, but Woodard told VanHousen he had been waiting to commit the robbery and that he (VanHousen) should relax. [Tr. 5269-70] Woodard told VanHousen that he had a friend on the skywalk serving as a lookout, and VanHousen heard the lookout's (Pierce's) voice testing the transmitter and receiver system ("check, 1, 2, 3") at 8:15 that morning. [Tr. 5270] Woodard then asked VanHousen to remain in the area to provide an alternate escape route. [Tr. 5271] VanHousen told Woodard he would do so, but then stayed close to his father's nearby home rather than at the park. [Tr. 5273]

After Woodard left VanHousen, he parked the white Honda behind Carrs near the Piedmont Apartments. [Tr. 4456-57] Woodard then entered the Carrs store, heard a transmission from Pierce stating that the Loomis armored car was in the area, and waited for Becker in the freezer aisle. [Tr. 4355]

*4. Events Occurring After the Murder and Robbery:*

After Woodard was seen by Robin Conaway as he left the area of Carrs, he walked towards the Piedmont Apartments, climbed some stairs over a fence, walked to the white Honda, got in, and drove home. [Tr. 3503, 4456-57]

When Pierce, standing on the skywalk, saw the police cars arriving, he transmitted a warning to Woodard. [Tr. 4356-57] Pierce then descended from the skywalk and hid the binoculars and transmitter in some bushes. [Tr. 4359-62] He then bicycled to Woodard's trailer. [Tr. 4365]

When Pierce arrived at the trailer, he and Woodard went to a separate room in order to avoid Wiggers. [Tr. 4366] Woodard told Pierce he had fired at the guard. [Id.] They then counted the money Woodard said he had obtained during the robbery. [Tr. 4371-72] The counting was interrupted when Wiggers received a telephone call from the Palmer hospital stating that her mother had been in an accident. [Id.] Wiggers took her car and drove to Palmer. [Id.] Woodard told Pierce that VanHousen had said the robbery would net at least $50,000 in cash, but the money Pierce saw totaled only $16,000. [Tr. 4430]

Woodard and Pierce decided at this juncture to dispose of incriminating items that could tie Woodard to the robbery. [Tr. 4434-37] They took a cab to Pierce's home where Pierce changed clothes. [Tr. 4267-71,4275-76, 4435] The cab then took the two men to a rental car agency. [Tr. 4271,4435-36] Woodard paid the cab driver with a $20 bill and two $5 bills and then gave approximately $600 in cash to Pierce so that he could rent a car. [Tr. 4272, 4434]

Woodard and Pierce then returned to Woodard's trailer in the rental vehicle (a white Subaru), and picked up three bags containing the clothes and tennis shoes Woodard had worn during the robbery, the non-cash items that were stolen (food stamps, checks, etc.), and Woodard's Glock, extra clips, and ammunition. [Tr. 4436-39] They

then drove to a gravel pit near Eklutna where they burned the clothing and non-cash items in an old car frame. [Tr. 4440-42, 5283] Woodard and Pierce next drove to the Knik River where Woodard dismantled the .10-millimeter Glock and threw the pieces, extra ammunition, and clips into the river. [Tr. 4443-45,5283] Woodard told Pierce he was going to purchase another .10-millimeter Glock as soon as possible so no one would think it was strange that his was missing. [Tr. 4445-46] Woodard then drove Pierce back to the trailer and gave him $500 from the proceeds. [Tr. 4447] Woodard said VanHousen would be very upset that the guard had been murdered, and said he planned to contact VanHousen and pay him $3,000. [Id.] During the day, Woodard fully described the events of the murder and robbery to Pierce. [Tr. 4454-57]

Woodard met VanHousen outside his home later on June 8th, told him he obtained only $14,000 to $16,000 in the robbery, gave him $3,000 from the proceeds, and said the $3,000 ought to be enough for VanHousen to keep his mouth shut. [Tr. 5283-85] Woodard described the murder and robbery in detail to VanHousen, said that he and Pierce had burned the physical evidence, that he had thrown the murder weapon in a river, and that he was buying a new .10- millimeter Glock and other weapons. [Tr. 5284]

On June 9, 1992 between 5:50 a.m. and 7:45 a.m., Woodard telephoned eight weapons dealers. [Tr. 7671-771 He then went to the post office, obtained five money orders, and mailed them to four gun dealers. [Id.] One of the weapons he ordered was the replacement .10-millimeter Glock. [Id.] He and Pierce then picked up the binoculars, transmitter, and scanner from the location where Pierce had stashed them. [Tr. 4460]

Later on June 9th, Woodard purchased a big screen TV and speakers from Magnum Electronics with $3,097 in cash. [Tr. 7004-09] He then went to the Sun Factory, Karl Bohlin's business, where he repaid the $1,800 loan with currency in large

denominations. [Tr. 5922, 5924, 5930, 5957,6495] Woodard then paid $241 in cash to redeem a shotgun he had pawned on May 30, 1992. [Tr. 7046-47]

On June llth, Woodard ordered several additional guns. [Tr. 7004-09] At approximately 9:00 p.m. that night, VanHousen, who had been contacted by the police and was ostensibly cooperating with them (but had not revealed the extent of his own involvement in the crimes), telephoned Woodard in an attempt to set up a meeting with him. [Tr. 5355-56] VanHousen told Woodard that he needed to talk with him and, while the officers were recording their conversation, asked if they could meet somewhere:

> Woodard: Just a second, hold on -is this super bad, Dave?
>
> VanHousen: I'd rather not talk about it over the phone.
>
> Woodard: Does it have to do with this?
>
> VanHousen: Oh what?
>
> Woodard: The thing.
>
> VanHousen: What thing's that?
>
> Woodard: Oh, the thing.
>
> VanHousen: What thing?
>
> Woodard: You know -
>
> VanHousen: No I don't know -tell me.
>
> Woodard: Hn -OK.

[Exh. 6 at 30-31]

When VanHousen, wearing a recording device ("wire"), met Woodard on the evening of June 11th behind the Northway Mall in Woodard's car. [Tr. 5355,5727-30] VanHousen signaled Woodard that he was "wired by gesturing and by mouthing the word "wired." [Tr. 5355, 5727-30] While VanHousen was in Woodard's car, Woodard engaged in "counter surveillance driving." [Tr. 7242- 46] He drove across an open field, across curbs, retraced his path, and alternately drove fast and slow. [Id.] After Woodard

dropped VanHousen off at the Northway Mall, he drove to Karl Bohlin's house in Stuckagain Heights. [Tr. 5969-73, 7246-48] Woodard told Bohlin he thought the drug dealers he had ripped off were watching him, that he needed to hide the proceeds for awhile, and that he needed guns. [Tr. 5969-73] Bohlin agreed to go to Woodard's trailer to get Woodard's money and guns for him, and Woodard drew a map of the room in his trailer showing the location of the money. [Tr. 5971]

Bohlin then drove from his Stuckagain Heights home to Woodard's Penland Park trailer in his (Bohlin's) car. [Tr. 5973, 7248-49] Woodard, who by this time was aware that a Maroon van parked near his home was likely conducting surveillance, hid in the back of Bohlin's car. [Tr. 5974] Bohlin entered Woodard's trailer, told Sara Wiggers that he needed to borrow a gun because he and Woodard were going shooting the next day, and picked up the money and guns. [Tr. 5975] Bohlin took the money, which was in two white plastic Safeway bags, and the guns, which he placed in a gun case, and left the trailer. [Tr. 5975] As Bohlin drove away from the trailer, Woodard asked him whether the maroon van was still parked near the trailer. [Tr. 5976] Bohlin saw the van and told Woodard it was there. [Id.]

When Bohlin and Woodard returned to Bohlin's home, Woodard borrowed a gun case from Bohlin, placed $1,500 under the foam lining in the case, and placed the guns he had asked Bohlin to retrieve in the case. [Tr. 5978- 79, 7248-49] He told Bohlin to hide the rest of the money and not to look at it. [Tr. 5980] Bohlin hid the money. [Tr. 5981-82] Woodard then drove home and entered his trailer carrying two gun cases. [Tr. 6688, 7250]

On June 12, 1992, Woodard purchased four new tires for Wigger's white Honda from Johnson's Tire Service and had them installed for a total of $322 in cash. [Tr. 7012-18, 7088-90]

On Monday, June 15th, Woodard visited Bohlin at the Sun Factory. Woodard patted Bohlin on the chest as if he was looking for a wire, told Bohlin that a Ramcharger, which he believed was an undercover police vehicle, had followed him to Wasilla the previous weekend, and asked Bohlin to identify people who walked past the tanning business. [Tr. 5997-6002, 6076]

On Tuesday, June 16th, Woodard gave Pierce $500 in cash. [Tr. 4466] Woodard said the $500 would have to hold Pierce for awhile because he no longer had access to the cash - that he had hidden it. [Id.] Later that day Woodard received some of the guns he ordered including the new .10-millimeter Glock. [Tr. 6048]

At six o'clock p.m., the police went to Woodard's home. [Tr. 7486-88] Woodard made arrangements to meet them at the station later. [Id.] When Woodard went to the station, the police searched the white Honda and Woodard and seized two pairs of sunglasses. [Tr. 7488-90] Woodard had $253 in currency in his wallet. [Tr. 7488] The police searched Woodard's home and found the binoculars, the scanner-receiver, and the transmitter that had been used in the crimes. [Tr. 4420-21, 6811]

After the police searched Woodard's home, they searched Bohlin's home. The money Woodard gave Bohlin to hide - $30,297.89 in currency and coins - was found in a crawl space. [Tr. 6026, 7050-62, 7175-7189] Woodard's fingerprint was found on a $100 bill, and a hair similar to Woodard's was with the money. [Tr. 7190-92, 7195, 7327, 7329] Bohlin, who was cooperating, gave the police the videotape that showed Woodard shooting the Glock. [Tr. 6027-31]

On June 17,1992, the police, who had learned that they overlooked an area underneath the trailer, searched Woodard's home a second time. [Tr. 6813] The police found plastic Safeway grocery bags and located a trap door which led to a crawl space which contained a marijuana grow operation, a flak vest, and the gun case Bohlin had

lent Woodard. [Tr. 6813-14, 6816, 7262-66] Woodard was arrested by the FBI for drug and weapons offenses. [Tr. 4498]

On June 20, 1992 Pierce went to Eklutna with police officers and showed where he and Woodard had set fire to and burned Woodard's clothing and the non-cash items. [Tr. 4041-42, 4501-02] Remnants of the tread pattern of a shoe or sneaker, zipper parts, possible canvas remnants, and paper that was not completely burned was recovered. [Tr. 5068-80] Portions of a Loomis book, food stamps, and portions of two Carrs customers' checks dated June 7, 1992, were also identified in the ashes. [Tr. 5124-47]

## DISCUSSION

Section 2254(b)(1)(A) provides that the exhaustion of state remedies is ordinarily a prerequisite to obtaining federal *habeas corpus* relief. The exhaustion requirement is met if: (1) petitioner has "fairly presented" his federal claim to the highest court with jurisdiction to consider it; or, (2) pursuant to § 2254 (b)(1)(B)(I) and (ii) he demonstrates that no state corrective process is available, or that such process is ineffective to protect his rights. State remedies are not exhausted if the petitioner has the right under the law of the State to raise, by any available procedure, the question presented. *Johnson v. Zenon,* 88 F.3d 828 (9th Cir. 1996) citing § 2254(c). In the instant case, the respondent's motion is based on § 2254(b)(1)(A). Additionally, the respondent's reply brief raises a statute of limitations ground solely as to Woodard's eighth ground, and then only as to the amendment to his *pro se* petition made post appointment of counsel. The court will address each of the respondent's arguments in order.

## 1. Ground Two

Woodard's second ground challenges the exclusion of five surreptitiously recorded conversations between himself and David VanHousen violated his rights to due

process, confrontation, and compulsory process. These tapes were recorded after VanHousen communicated to Woodard that he was "wired". In a recorded telephone call between Woodard and VanHousen which occurred before VanHousen told Woodard he was wired, Woodard made reference to "the thing". At trial "the thing" was portrayed by the state as the robbery and slaying. The trial court allowed the state to play a tape of Woodard's first recorded conversation with VanHousen, but not tape recordings of the five subsequent conversations. Woodard claims other recorded conversations: (1) would have been used at trial to put his reference to "the thing" in a non-incriminating context; and, (2) would have been used to impeach VanHousen's testimony that he "tipped off" Woodard that he was wired during the second recorded conversation between them.

In his petition for hearing before the Supreme Court of Alaska Woodard argued: "Out-of-court statements must be admitted where necessary to permit the defense reasonable opportunity to present its case. *See Keith v. State,* 612 P.2d 977, 981-84 (Alaska 1980), reversed because of exclusion of the decedent's journal, which should have been admitted to the decedents state of mind. *See also Chambers v. Mississippi,* 410 U.S. 284 (1973)." Exhibit 6 p.6. His petition also argued that the ruling violated his "constitutional right to present a defense". There, he cited *Keith* again. Woodard now argues that *Chambers* and *Keith,* the only two cases he cited in support of his claim, raised issues that went directly to the Confrontation Clause of the United States Constitution in a wholly "unveiled" manner in accordance with *Casella v. Clemons,* 207 F.3d 18, 21 (1ˢᵗ Cir. 2000).[1] This First Circuit case – which set forth an amorphous standard that seems to be summed up with the notion that a claim's federal

_____

[1] Woodard's brief also submits that *Casella* is cited in *Zenon.* It was not. Additionally, Woodard states that in *Zenon v. Johnson* "cited with approval" the case of *Duncan v. Henry,* 513 U.S. 364 (1995). Court's of appeal do not approve of Supreme Court decisions; rather, they follow them.

"quality must be readily apparent" – is not particularly helpful.  A corpus of law on this issue has been established in the Ninth Circuit.  Two cases in particular serve as guide posts.  First, in *Castillo v. McFadden,* 399 F.3d 993, 999 (9th Cir. 2005) the court instructs: "In short, the petitioner must have either referenced specific provisions of the federal constitution or cited to federal or state cases involving the legal standard for a federal constitutional violation."  The Ninth Circuit also teaches: "For a federal issue to be presented to be presented by the citation of a state decision dealing with both state and federal issues relevant to the claim, the citation must be accompanied by some clear indication that the case involves federal issues".  *Fields v. Waddington,* 401 F.3d 1018-1022 (9th Cir. 2005); quoting *Casey v. Moore,* 386 F.3d 896, 912 n. 13 (9th Cir. 2004).  *Fields* refines its holding by providing  that if a state supreme court affirmatively states that rasing a particular state constitutional claim is identical rather than analogous to a federal claim, or if said state court makes some other affirmative statement a particular claim serves to raise a federal claim, then the exhaustion requirement is satisfied.  Here, the Alaska Supreme Court has made no such affirmative statement as to Woodard's claims.  This leaves this court with a tension as between *Castillo* and *Fields*.

In *Jerry Lee Douglas v. Superintendent Zee Hyden,* 3:03-221-cv-JWS docket No. 95 at p.4, Judge Sedwick cited *Castillo* in holding that citation to a federal case "involving  the legal standard for a federal constitutional violation is sufficient to establish exhaustion.  Therefore, the Magistrate Judge follows *Castillo.*  Since *Keith* specifically references the Sixth Amendment in reference to its discussion of the rights to confrontation, due process and compulsory process, Woodard's claims were properly presented to the Alaska Court of Appeals in this regard.  *See Keith* 612 P.2d at 982.  Moreover, under this view of satisfaction of the exhaustion requirement, his passing reference to *Chambers* is fairly inferred to buttress a federal claim fairly presented.  Thus, the respondent's motion to dismiss should be denied as to ground two.

**2.  Ground Four**

        Woodard's fourth claim is that the trial judge's refusal to admit three photographs of him that appeared in the Anchorage newspaper violated his right to due process of law, confrontation, and compulsory process.  Again, the respondent posits that Woodard failed to exhaust this claim because he did not fairly present it in his petition to the Alaska Supreme Court.  That petition cited *Kuki v. State,* 483 N.E.2d 788 (Ind.App. 1985).  *Kuki* relied upon *United States v. Wade,* 388 U.S. 218 (1967) as authority on this subject.  Therefore, Woodard argues, he fairly presented the case to the Alaska Supreme Court.

        The only distinction between grounds two and four is that the exhaustion argument for ground two is based on an Alaska case and ground for four it is based on an Indiana case.  Under *Castillo*, this is a distinction without a difference.  The fact is that  a state case was relied upon which in turn looked to a federal case for the same claim.  There are instances when a case from a different jurisdiction is cited because it is more on point than another case.  Given the relative dearth of case law in the young state of Alaska, this practice is particularly understandable.  Thus, Woodard did exhaust ground four, and the respondent's motion to dismiss it should be denied.

**3.  Ground Five**

        Woodard's fifth ground for relief claims that the exclusion of the tape recording of the police interview of David VanHousen violated his rights to due process, confrontation, and compulsory process.  The respondent contends that while Woodard did raise an issue of federal constitutional law to the Alaska Court of Appeals, he did not raise it before the Alaska Supreme Court.  Therefore, the respondent maintains, Woodard did not exhaust this ground because he did present this claim to all of the state courts, including the Alaska Supreme Court.  *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999).

The respondent makes two arguments.  First, he concedes that Woodard raised his claim before the Court of Appeals but that it involved an evidentiary issue and not a constitutional claim, and that the claim was not presented as a federal claim because Woodard only cited *Bentley v. State,* 397 P.2d 976-978.  *Bentley* cites *Gordon v. United States,* 344 U.S. 414, 421 (1953) and *Asgill v. United States,* 60 F.2d 776, 779 (4th Cir. 1932).  As discussed *supra*, citation to a state case that in turn relies on a federal case for a constitutional claim satisfies the exhaustion requirement.  Furthermore, while *Gordon* is rather vague as to whether it is just considering a federal rule of evidence – as opposed to the constitutional underpinnings of such a rule – *Asgill* is clearly a case of constitutional dimension.  *Asgill* expressly discusses *Alford v. United States,* 282 U.S. 687 (1931): "Mr. Justice Stone has outlined with great clearness the law applicable to this issue.  In that case it is shown that the cross-examination of a witness is a matter of right . . . and the essence of a fair trial . . ."  *Asgill*, 60 F.2d at 779.   This included, the Fourth Circuit continues, a showing that a witness' "testimony was biased because given under promise or expectation of immunity, or under the coercive effect of his detention by officers . . . "  *Id.*  Based on the court's earlier analysis to the reference of *Asgill* in *Bentley,* this satisfied the exhaustion requirement at the Alaska Court of Appeals.

However, the respondent also contends that this would not satisfy the exhaustion requirement because it was not presented in Woodard's petition to the Alaska Supreme Court.  The court's reading of that petition reveals that the opposite is true.  At page 10 of the petition Woodard claims that a portion of a videotape of a police interview with VanHousen showing that he was pressured and threatened to incriminate Woodard should have been admitted, and *Bentley* is cited in support of this claim.  Therefore, Woodard did exhaust this claim and the respondent's motion to dismiss should be denied as to ground five.

4. **Ground Six**

   In ground six, Woodard argues that his conviction was obtained by the use of evidence gained by illegal searches and seizures by way of the police making intentional and reckless misrepresentations during the course of obtaining search warrants. *See Franks v. Deleware,* 438 U.S. 154 (1978). Further, Woodard contends he was denied a full and fair opportunity to present this theory in state court because his request for an evidentiary hearing was denied. That contention is confined to his petition and is not discussed in his opposition brief. (Docket No. 70). Nonetheless, the court will consider it as well.

   The respondent's passing reference to this issue offers no authority on the question of whether Woodard had a full and fair opportunity to litigate this claim in state court. This is a threshold matter. Fourth Amendment claims are not cognizable in federal habeas proceedings if a petitioner has had a full and fair opportunity to litigate them in state court. *Stone v. Powell,* 428 U.S. 465, 481-482 (1976). *Franks* claims are not excepted from this rule. *Smith v. Maggio,* 664 F.2d 109, 111 (5th Cir. 1981). Here, the issue is whether Woodard had a full and fair opportunity to litigate his *Franks* claim despite having been denied an evidentiary hearing on that claim. Alaska's standard for granting an evidentiary hearing on a *Franks* motion is taken directly from *Franks.* That standard is:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*State v. Malkin,* 722 P.2d 943, 946 n.5 (Alaska 1986) *citing Franks,* 438 U.S. at 171; *See also Davis v. State,* 755 P.2d 41, 43 (Alaska App. 1988). While Alaska decisional law follows *Franks* in all other respects, it is notable that it rejects that portion of *Franks* which places the "full burden" on the defendant to prove intentional or reckless misstatements were made. Rather, once the defendant has shown the affidavit contains material false statements, the burden shifts to the prosecution to justify these statements by showing that they were not made intentionally or recklessly. *Malkin,* 722 P.2d at 947-948. Although this standard is more favorable to a criminal defendant, it is not the focus here. Rather, since the motion for evidentiary hearing was denied, the focus is strictly upon the question of whether that in turn denied Woodard a full and fair opportunity to litigate the *Franks* issue.

The query calls for an examination of the allegations of falsehood or reckless disregard for the truth which were presented to the trial judge. To do this, the court looks to the Alaska Court of Appeal decision. (Exhibit 5 p.12). There, the court reviews for correctness the trial court's ruling that Woodard contention that Van Housen was acting as a government agent – when he no doubt lied at a hearing on the search warrant application – was correct.[2] This was critical because *Franks* only applies to misleading statements by government agents, and a civilian is considered a government agent in the context of a *Franks* motion only if he is motivated to assist government agents while harboring no legitimate independent motivation for engaging in the challenged conduct. *U. S. v. McAllister,* 18 F.3d 1412, 1417-1418 (7th Cir. 1994) citing *United States v. Attson,* 900 F.2d 1427, 1432 (9th Cir. 1990). Van Housen's testimony

---

[2] The court's review of the record confirms that the Court of Appeals decision presents an accurate synopsis of the proceedings before the trial judge. If it is Mr. Woodard's contention that they do not, he may identify – with specific particularity – in his objections to this recommendation what else in the record should be considered. Indeed, Woodard's brief is scant on specific particularity, and any of his objections and his future briefing should be more thoroughly referenced.

at the search warrant hearing minimized his own involvement in the robbery, thereby exemplifying conduct which is motivated by self interest.  There was no evidence of a reward nor any showing of conduct other than a personal motive to assist the government.  He was not, therefore, acting as a government agent and, under *Stone,* his claim must be dismissed.

Another reason for finding against Woodard on ground six is apparently lost on the parties.  The search warrant in this case is a creature of state, not federal, law.  Specifically, it was a so called *Glass* warrant.   Under the holding in *State v. Glass,* 583 P.2d 872 (Alaska 1982), a matter of state constitutional law, electronic monitoring of oral conversations by police officers is illegal unless the police first obtain a search warrant even though one participant to the conversation consents to the monitoring.  Federal law has no such requirement for placing a "wire" on an informant.  *A fortiori,* since the Fourth Amendment is not implicated, *Franks* is inapposite.  Thus, Woodard's sixth ground is not cognizable under § 2254.

**5.  Ground Seven**

Woodard claims the firearms seized from his home with search warrants should have been suppressed because the firearms were not being actively used in connection with a drug offense when they were seized.  In his opposition brief Woodard concedes that he did not present this claim to the Alaska Supreme Court.  He then makes a one sentence and patently specious argument that because this court had determined he had not committed a parallel federal firearms offense: "Mr. Woodard asserts that such facts constitute significant cause and prejudice under the authority of *Wainwright v. Sykes,* 433 U.S. 72, 86-87 (1977)."  The respondent's motion should be granted as to ground seven because  Woodard concedes he failed to exhaust his state court remedies regarding it.

**6. Ground Eight**

Ground eight is challenged by the respondent on both exhaustion and statute of limitations grounds.  In ground eight Woodard's *pro se* § 2254 petition (adopted *in toto* in the amendment filed by his counsel) claims he is entitled to relief because he was shackled at trial.  In his amended petition Woodard emphasizes that he "was denied due process by his having been shackled on his legs, body and one hand, during the trial, which was observed and realized by the jury."  In his petition to the Alaska Supreme Court he argued: "No jury could have failed to notice his immobility. Being shackled affected his mental faculty, impaired communications with counsel, impacted his decision not to testify and was painful.  *See Kennedy v. Cardwell,* 487 F.2d 101, 105-106 (6th Cir. 1973, cert. Den, 416 U.S. 959 (1974)."

The respondent urges that Woodard did not present a claim that jurors observed him in shackles to the Alaska Supreme Court.  Rather, although conceding that a claim related to the shackles was presented to that court, the respondent urges that in that petition and in his original *pro se* petition to this court Woodard "*did not* allege that the restraints had in fact been seen by jurors during his trial."  The respondent's argument is specious.  When Woodard argued: "No jury could have failed to notice his immobility.  Being shackled affected his mental faculty, impaired communications with counsel, impacted his decision not to testify and was painful.  *See Kennedy v. Cardwell,* 487 F.2d 101, 105-106 (6th Cir. 1973, cert. Den, 416 U.S. 959 (1974)" he plainly presented the claim that the jurors saw him shackled.  The respondent would have the court engage in semantics and require that Woodard have stated that the shackles were seen, viewed or directly observed by the jurors, as if such words were magic incantations.  The gist of the claim was sufficiently presented to satisfy the exhaustion requirement.  Ergo, the respondent's motion should not be granted as to ground eight on the ground that Woodard failed to exhaust it.

Additionally, the respondent posits that his amended petition is untimely because the allegation that the shackles were seen by the jurors was filed long after the statute of limitations ran.  As the respondent correctly argues, where the statute of limitations in a § 2254 petition has run, an amendment to a claim must relate back under Fed. R. Civ. P. 15(c)(2).  *Mayle v. Felix,* 545 U.S. 644, 664 (2005).  Moreover, the respondent is also correct in contending that in order to relate back an amendment must rest on the same core of operative facts.  *Id.*  The respondent errs, however, when arguing: "The initial *pro se* complaint did not involve *any* 'operative facts' – merely an allegation that he could have been able to have shown that shackles could have been seen at a pretrial hearing."  *Felix* merely held that the same "trial, conviction, or sentence" does not meet the same "conduct, transaction, or occurrence" test for determining what constitutes a common core of operative facts.  *Id.*  Important to the case *sub judice*, *Felix* expressly instructs: "So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order."  *Id.*  Here, the amendment is a mere expansion of the original claim, and is patently based on the common core of operative facts relating to Woodard having been shackled in the presence of the jurors.  Therefore, the respondent's motion to dismiss count eight should not be granted on statute of limitations grounds.

## 7.  Ground Ten

In ground ten Woodard claims the prosecution unconstitutionally failed to disclose favorable evidence, and denied him a full and fair opportunity to present this issue in state court.  This claim involves his collateral attack on his conviction in state court and the subsequent appeal to the Alaska Court of Appeals and the Alaska Supreme Court which were taken years after his first round of appeals.  Specifically, he claims the prosecution failed to disclose evidence regarding an informant (identified in the respondent's briefing as William Turlington) who could have been presented as a

witness or alternate suspect in the Carrs Robbery.  The information withheld included his past criminal record for robbery, drug convictions, current criminal record of theft, probation violations, a plea bargain/cooperation agreement, favorable treatment for providing information that led to Woodard's prosecution, and the nature of his relationship with VanHousen's father,  which, he maintains, if disclosed: (1) could have been used at trial or in other proceedings as exculpatory evidence in Woodard's favor, to support his defense that the informant and VanHousen committed or planned the Carrs robbery; (2) could have led to other admissible material and favorable evidence; and (3) could have been used at trial to impeach state authorities and their investigative methods.  He submits that he was denied a full and fair opportunity to litigate this issue due to the Superior Court denying him a continuance to receive further discovery and undisclosed information from the state's files regarding VanHousen.

Urging a failure to exhaust, the respondent contends Woodard failed to present this issue to the Alaska Court of Appeals.  In response Woodard maintains that he did preserve the federal claim(s) now asserted, because in his briefing for post-conviction relief at the trial court level he cited *Brady v. Maryland,* 373 U.S. 83 (1963) "on the questions posed by the Tarlington-VanHousen situation".  The respondent submits several propositions which this court rejects.  The first of these relates to Woodard's contention that he was denied a full and fair opportunity to litigate the issues at hand.  During the hearing before the state court judge (Judge Bolger), Woodard requested a continuance on the ground that he needed to obtain the state's files on Turlington so that he could explore the key information Turlington supplied that led to Woodard's conviction, and which was given in exchange for beneficial treatment by the state.  Judge Bolger denied that request finding that the case had been pending for two years and Woodard had ample opportunity to conduct discovery.  According to the respondent, the question of whether the matters surrounding Turlington were fully and

fairly litigated is procedurally barred because Woodard did not cite the federal constitution or any federal right when he asked Judge Bolger for a continuance. This is a specious argument. It is the underlying claims that require citation to federal authority, not a motion to continue so that such claims may be properly litigated.

Next, the respondent argues the claims presented in the case at bar were not exhausted. Regarding the Alaska Court of Appeals, the respondent notes that although Woodard cited *Brady v. Maryland,* 373 U.S. 83 (1963) in his petition to the Supreme Court of Alaska, he did not cite *Brady* in his appeal to the Court of Appeals. This argument misses the mark. Woodard's briefing to the Court of Appeals cited many federal cases in making his case. Exhaustion does not require that he cite a particular case or the best case(s). Regarding the Supreme Court, the respondent argues Woodard only preserved his claim that his federal constitutional rights were violated by the failure to disclose favorable treatment provided to the informant Turlington. Again, the court's reading of Woodard's briefs to the state appellate courts reveals that Woodard cited several federal authorities and cast a much wider net of claims than those the respondent argues were made. These range from the impact of impeachment denied, to the full and fair opportunity to litigate the materiality of Turlington's statements to law enforcement. In other words, the implications of his claim that his rights were violated is much broader in scope than merely saying that the claim is that the prosecutor should have disclosed the information. Rather, the consequences of that failure coupled with the denial of his belated efforts to obtain the state's records were also preserved for litigation under § 2254. Otherwise, Woodard would, in part, have to show what he was denied knowing which goes to the heart of his claims. Thus, in maintaining consonance with the discussion concerning *Castillo* at "**1**" *supra*, Woodard did exhaust his state remedies as to ground ten, and the respondent's motion should be denied as to it.

**8. Ground Eleven**

Like ground ten, ground eleven finds its genesis in Woodard's post-conviction proceeding and the appeal to the Alaska Court of Appeals and petition to the Supreme Court of Alaska which followed it. In ground eleven Woodard claims that the prosecution failed to disclose favorable evidence and denied him a full and fair opportunity to litigate the matter by failing to disclose favorable evidence that witness VanHousen was the person who "set up" the Carrs robbery, which if disclosed: (1)could have been used in search warrant proceedings, the grand jury, or trial to exculpate Woodard and impeach VanHousen's credibility as a witness and support the theory that VanHousen committed or planned the Carrs robbery; (2)could have led to other material evidence; and (3) could have been used at trial to impeach state authorities and their investigative methods. Finally, he claims the Superior Court's denial of a continuance to receive further discovery and undisclosed information from state files, which may have shown that state investigators and prosecutors knew of VanHousen's involvement or additional culpability and did not disclose it to the defense or in obtaining a search warrant.

To the extent it attacks obtaining a search warrant, Fourth Amendment claims are not cognizable in federal habeas proceedings if a petitioner has had a full and fair opportunity to litigate them in state court. *Stone,* 428 U.S. at 481-482. Here, Woodard contends that he was denied a full and fair opportunity to litigate because of Judg Bolger's denial of his motion for a continuance to conduct further discovery. Woodard summarily argues that this and all of ground eleven tracks the discussion of ground ten *supra*. Woodard is mistaken. As the respondent deftly points out, Woodard did not raise the search warrant issue in his post-conviction proceeding before Judge Bolger, and the Alaska Court of Appeals expressly refused to consider the claim for that

reason.  Furthermore, Woodard did not raise the grand jury claim in the post-conviction action.

On the other hand, for the reasons discussed at ground ten *supra*, in all other respects Woodard's claims in ground eleven were properly exhausted and warrant litigation on their merits.  Accordingly, the respondent's motion to dismiss should be denied as to them.

**9.  Ground Twelve**

Woodard concedes that ground twelve was not exhausted and withdraws it.  The motion should be granted as to ground twelve.

## CONCLUSION

For the foregoing reasons the respondent's motion to dismiss for failure to exhaust at docket No. 50 should be **GRANTED in part and DENIED in part**.  The motion should be granted as to grounds six, seven, and twelve.  The motion should denied as to grounds two, four, five, eight, and ten.  Concerning ground eleven the claims contained therein concerning the Fourth Amendment and grand jury proceedings should be dismissed, and the other claims should be litigated on their merits.

DATED this <u>29th</u> day of May, 2007, at Anchorage, Alaska.

/s/ John D. Roberts
JOHN D. ROBERTS
United States Magistrate Judge

Pursuant to Federal Rule of Civil Procedure 72(b), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **the close of business on June 25, 2007**. The failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal. McCall v. Andrus, 628 F.2d 1185, 1187-1189 (9th Cir.), cert. denied, 450 U.S. 996 (1981). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation United States v. Howell, 231 F.3d 615 (9th Cir. 2000). Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed **no later than the close of business on July 9, 2007**.

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment. See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).