IN THE SUPREME COURT OF THE STATE OF ALASKA

JON ARNOLD WOODARD,                )
                                   )
            Petitioner,            )
                                   )   Supreme Court No. S-11693
        vs.                        )
                                   )   RECEIVED
STATE OF ALASKA,                   )
                                   )   NOV 2 2 2004
            Respondent.            )
_____)   Clerk of Appellate Courts
Court of Appeals No. A-8243            Anchorage, Alaska
Superior Court No. 3AN-00-6982 Ci.

> VRA CERTIFICATION. I certify that this document and its attachments do not contain (1) the name of a victim of a sexual offense listed in AS 12.61.140 or (2) a residence or business address or telephone number of a victim or witness to any crime unless it is an address used to identify the place of the crime or it is an address or telephone number in a transcript of a court proceeding and disclosure of the information was ordered by the court.

## RESPONSE TO PETITION FOR HEARING

A.   Introduction

Jon Arnold Woodard was convicted of second-degree felony murder and first-degree robbery for murdering a Loomis Security guard and robbing the Aurora Village Carrs of $127,661.41. The court of appeals affirmed. *Woodard v. State (Woodard I)*, Mem. Op. & J. No. 3933 (Alaska App., December 9, 1998). The case was the subject of three different opinions by the court, but notably even the dissenting opinion described the evidence

**Proposed Exhibit**                                    EXHIBIT D - 1

against Woodard as "unusually strong and undeniably compelling." *Id.* at 147 (Bryner, C.J., dissenting).[1]

Woodard then brought this post-conviction action claiming that a statement made by a tipster, William Turlington, and information about Turlington (allegedly unknown to Woodard's trial attorney), would have led to Woodard's acquittal at trial. Judge Joel Bolger rejected Woodard's claim in a written opinion and denied Woodard a continuance so that he (Woodard) could search for additional evidence. [*See Order*, dated February 1, 2002, attached as Exhibit A] The court of appeals affirmed. *Woodard v. State (Woodard II)*, Mem. Op. & J. No. 4931 (Alaska App., September 29, 2004).

Woodard's petition for hearing from the court of appeals' decision should be denied. The decision below was a mainstream application of settled law. The contention that the state misled the judge who issued the search warrants, is wrong and at a minimum borders on the absurd.

B.  Trial evidence

On June 8, 1992, Woodard, armed with a 10-millimeter Glock semiautomatic handgun, robbed the Aurora Village Carrs and killed Terrence

---

[1]  In the subsequent petition for hearing, Woodard reasserted a claim that he had made in the trial court and in the court of appeals: that the state, in the hearing held on the application for the search warrant, had purposely misled Judge Andrews. Woodard devoted all of three sentences in his petition to the claim. None of the justices of this court recommended granting the petition on the claim, although two justices would have granted

2                                                                                    EXHIBIT D – 2

Becker, a Loomis Security guard. Woodard, wearing a ski mask, sunglasses, and gloves, approached the booth where the money was located and demanded that the door be opened. When no one did so, Woodard pointed the Glock at the rear of the booth and said, "I want the money." Becker drew his weapon and Woodard shot him in the head. Woodard then grabbed the proceeds, ran out a back door, pulled off his mask, and walked away.

David VanHousen was the "inside man." He had told Woodard when the armored truck would arrive, how much money would be in Carrs at the time, and how to escape through the back door. VanHousen was a back-up getaway driver for Woodard, met with him after the robbery, and was paid $3,000 by Woodard for his assistance in the robbery.

Sean Pierce, Woodard's second accomplice, acted as a lookout. Pierce later helped Woodard destroy checks, food stamps, and other evidence from the grocery store, and watched Woodard throw the disassembled 10-millimeter Glock into a river. VanHousen and Pierce had never met. Woodard contacted his friend Karl Bohlin when he became aware the police were on to him and had Bohlin hide $35,000 of the proceeds in his attic, where the police later recovered it.

A Carrs employee watched Woodard leave after the robbery and identified him at trial. The money found at Bohlin's residence was contained

---

the petition on different discrete claims. *See Order*, dated September 17,

in Carrs' money wrappers. Woodard's fingerprint was on a $100 bill found at Bohlin's, and a hair similar to Woodard's was found in the money. Marks on the shell casing left at the scene had been fired from the same gun as shell casings found where Woodard practiced shooting his 10-millimeter Glock.

C. <u>The post-conviction allegations and the evidence</u>

In his post-conviction application, Woodard alleged that the state violated the federal and state due process provisions, Criminal Rule 16, and a court order requiring the state to continue to provide discovery by failing to disclose (1) a December 1992 plea agreement with tipster Turlington, (2) Turlington's record of prior criminal convictions, (3) Turlington's violation of probation on February 4, 1993, and the state's failure to move to revoke Turlington's probation prior to Woodard's trial, (4) Turlington's arrest for shoplifting (after Woodard's trial), and (5) unspecified information concerning Turlington's background and relationship with the VanHousens. Woodard asserted:

> The [foregoing] evidence was relevant and material to [Woodard's] defense, in that had it not been withheld by the state and instead disclosed at the early stages of the state's investigation, the prosecution . . . may not have occurred, and if disclosed to the defense and effectively used at trial, would have at least counterbalanced the weight of the state's evidence, resulting in a different trial outcome.

---

1999 (*Woodard v. State*, File No. S-8917).

4

EXHIBIT D – 4

Woodard later supplemented his application with the allegation that his trial attorney, James McComas, was unable to develop a trial defense based on the possibility that Turlington framed Woodard because of the state's failure to disclose information about Turlington.

At an evidentiary hearing held on the application, it was shown that in September of 1991 – nine months before the murder/robbery – Turlington was charged with multiple counts of third-degree and fourth-degree misconduct involving a controlled substance. Turlington's attorney, John Murtagh, had won an order suppressing most of the cocaine. The state had filed a petition for review and Murtagh was worried about reversal, but knew the state could not prevail at trial without the suppressed evidence.

Two days after the robbery, Turlington told Murtagh that John VanHousen had said that his son, David VanHousen, had "set up" the robbery, and therefore that the police should check out the VanHousens. Murtagh called prosecutors and said that a client named "X" had provided the information. The prosecutors realized that "X" was Turlington, and passed on the information to the police.

The police viewed Turlington's information as the equivalent of a "Crime Stoppers" tip. Turlington was unwilling to wear a wire and was not interviewed. Further, Turlington and David VanHousen had not spoken to each other, and the father refused to speak with the police. The police did not

check to see if Turlington had a criminal record and were unaware of Turlington's robbery convictions from the early 1960s.

At the hearing to obtain a search warrant to record conversations between David VanHousen and Woodard that was held before Superior Court Judge Elaine Andrews, the prosecutor asked Detective Reeder:

> [I]s it true that what initially focused your attention on [David] VanHousen was some information you received through an attorney here in town who represents an individual who is charged with a drug offense, and let's call that person defendant X. That the information you received through the District Attorney's Office was that the attorney who represents defendant X had talked to Mr. VanHousen's father, and that according to defendant X Mr. VanHousen's father was lamenting the fact that his son, David VanHousen, had told him of possibly being involved. And I can't recall exactly what was said. Words to the effect, however, that no one was supposed to get killed, and generally telling defendant X that he was worried about his son.

Reeder answered yes. Reeder's contemporaneous police report identifies both Murtagh and defendant X:

> APD received information from the DA's office that Attorney John Murtagh had a client, William Turlington, who had information on [the] Carrs murder. Apparently Turlington's friend, John VanHousen, had told him his son worked at Carrs and knew who the shooter was. We also received information that the son had made the comment that "no one was supposed to get hurt," and was upset.

This police report was provided to McComas, and McComas telephoned Murtagh. McComas memorialized the call:

> Today [July 27, 1992] I spoke with John Murtagh (274-8664) after reading in discovery that it was he who passed along the name of [David VanHousen's] father. It has been represented in search warrant hearings that a defense attorney representing a client in a drug case provided information to the Anchorage D.A.'s office concerning this lead, in hope of obtaining benefit for his client. . . . The way Murtagh explains it, it sounds like no specific deal or agreement was reached, but that representations were made by prosecutors and/or police to the effect that if the information turned out to be good, the state would take that into account and confer appropriate benefits in the future. In fact, Murtagh's case has not been resolved. He got some evidence suppressed and the state filed a petition for review. John has a subjective belief that he was reasonably led to conclude that if the information provided was important [it] would return to the ultimate benefit of his client in terms of how the state dealt with the case. However, so far, no agreements have been reached.

On December 17, 1992, the state charged Turlington by information with third-degree misconduct involving a controlled substance in two consolidated counts. At the same time, Turlington, Murtagh, and the state entered into a written plea agreement providing that Turlington would plead to the information and receive concurrent sentences of four years with four suspended. The agreement was conditioned upon Turlington having no previous criminal history of felony convictions. On December 17, 1992, Turlington was sentenced in accordance with the agreement.

In December of 1994, a year-and-a-half after Woodard's trial (which began March 25, 1993, and ended June 7, 1993), Turlington was charged with third-degree misconduct involving a controlled substance for

new cocaine offenses. At the same time, a petition to revoke probation was filed in the 1991 case. The petition alleged that Turlington had failed to appear for urinalysis on May 13, 1993, and on five other occasions occurring after Woodard's trial. It also alleged that Turlington had tested positive for cocaine on February 4, 1993, and on three other occasions after Woodard's trial. The state also alleged that that Turlington had a 1962 New York conviction for conspiracy to commit robbery and a 1964 New Jersey conviction for armed robbery.

The state later filed an information reducing the new cocaine charges to two counts of fourth-degree misconduct involving a controlled substance, to which Turlington pled. At the later disposition/sentencing hearing, the prosecutor said that the state had entered into the original plea agreement with Turlington because (1) Judge Gonzalez had suppressed all the cocaine obtained during the search on account of a purported "knock and announce" violation, (2) Turlington provided the information that led to Woodard's conviction, and (3) Turlington was elderly and well-intentioned.

At a later disposition hearing, Judge Andrews commented that she had not previously seen so much non-compliance on probation without a petition to revoke; the judge speculated that no petition to revoke had been filed because Turlington's information was extremely valuable or because Turlington is educated and charming. Judge Andrews found that Turlington

had violated the terms and conditions of probation in the 1991 case and extended his probation for an additional year. On the 1994 offenses, the judge sentenced Turlington to a term of three years with two suspended on condition that he complete a six-year term of probation. On January 20, 1998, Turlington's 1991 conviction was set aside.

Notably, Woodard's attorney admitted at the conclusion of the post-conviction evidentiary hearing that her claims concerning what attorney McComas would have done with the information about Turlington at trial were theoretical and speculative. [Tr. 143]

### C. Decision of the court of appeals

Woodard claimed for the first time on appeal from the denial of his application that the state intentionally deceived Judge Andrews when she issued the search warrant by failing to tell her that Turlington's information from John VanHousen was that his son, David VanHousen, had "set up" the robbery. The court of appeals rejected this claim because of the elementary rule that new arguments made for the first time on appeal are impermissible. *Woodard II*, Mem. op. at 4. The court of appeals then rejected Woodard's contention that the further information about Turlington would have enabled him (Woodard) to show at his trial that Turlington was the perpetrator of the murder. The court said Woodard could not show that Judge Bolger's findings – that the additional information about Turlington and his plea agreement

did not constitute exculpatory evidence – were erroneous or that Turlington had any material knowledge or evidence. *Woodard II*, mem. op. at 5, 7-8.

The court of appeals concluded that Turlington was a mere tipster so that the state could have properly refused to disclose his identity and the details of his case under *Schmid v. State*, 615 P.2d 565, 573 (Alaska 1980). *Woodard II*, mem. op. at 5-8. The court also rejected the claim that Judge Bolger's had abused his discretion by declining to continue the post-conviction evidentiary hearing so that the Turlington case files (if they existed) could be retrieved from archives. *Id.* at 8-9.

D. <u>Argument</u>

1. *Woodard made no argument in the superior court concerning the search warrant application proceedings*

Woodard first claims he argued in the superior court that the information from Turlington which had not been disclosed would have enabled him to show the prosecutor and police knew that David VanHousen, who testified at the search warrant hearing and minimized his involvement, had lied, so that the resulting evidence would have been suppressed. [Pet. 10] Woodard is mistaken. The record, as set forth above, and as shown by Judge Bolger's decision, is to the contrary. Woodard did not mention the search-warrant proceedings until this appeal, and the transcripts of the search warrant application hearings are not in the record. Indeed, no one

testified about the warrant applications at the post-conviction evidentiary hearing.

Woodard next states that the court of appeals was wrong to rely on *Schmid* in holding that the state had no duty to disclose information concerning Turlington. Woodard asserts that *Schmid* is distinguishable because the state in Woodard's case had gratuitously supplied Turlington's name to him. [Pet. 11] But Woodard cites no cases to support this bald claim and the fact that Turlington was a mere tipster is effectively conceded by Woodard's failure to argue otherwise. Further, the disclosure of Turlington's name does not make *Schmid* inapplicable. Woodard produced no evidence at the post-conviction hearing that Turlington had any knowledge of the offense beyond what the senior VanHousen had said to him; there is no evidence that Turlington knew Woodard's name and no one had interviewed Turlington.

  2.   Woodard misreads case authority dealing with disclosure of information concerning informants

Woodard cites *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555 (1995), *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375 (1985), *Giglio v. United States*, 405 US. 150, 92 S.Ct. 763 (1972), *Singh v. Prunty*, 142 F.3d 1157 (9th Cir. 1998), *Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997), and *United States v. Steinberg*, 99 F.3d 1486 (9th Cir. 1996), for the proposition that the state must disclose lenient treatment provided to informants. [Pet. 11-12] Woodard misreads these cases. In all these cases except *Kyles*, the

courts said the prosecution must disclose information concerning leniency given to persons who were "key witnesses" who testified at trial, not mere tipsters. In *Kyles*, the subject person did not testify, but was not, like Turlington, a mere tipster. The *Kyles* "informant" was actually a key witness who had substantial personal knowledge of the offense at issue. *See Kyles*, 514 U.S. at 441-54, 115 S.Ct. at 1569-76.

> 3. More information concerning what Turlington said and/or the lenient treatment he provided would have made no difference at the warrant application hearing

As aforesaid, this claim was not preserved. Moreover, it is not meritorious. Judge Bolger found that nothing Turlington said was exculpatory. Rather than deal with the judge's finding, Woodard points out that Judge Bolger found Murtagh had told the authorities that the senior VanHousen had said to Turlington that he was concerned because his son David had set up the robbery, and then argues that this would have led to the suppression of the evidence obtained with the search warrants. [Pet. 12-13]

However, Judge Bolger did not make findings concerning what the authorities understood Murtagh to have said, and Murtagh also testified: "[T]he essence of [what Turlington said] was 'You ought to check out the VanHousens.' I thought that was about 99% of it." Moreover, the prosecutor through Detective Reeder told Judge Andrews at the search warrant hearing

that the senior VanHousen had said that his son was possibly involved, that he was worried about his son, and that *"no one was supposed to get killed."*

The fair inference of the latter statement, attributed to David VanHousen, is that David VanHousen was involved in the planning of the robbery – that he had set up the robbery. How else would David VanHousen know that no one was supposed to be killed? Indeed, the senior VanHousen had no reason to be worried about his son unless he was "involved." In short, there is no material difference between the testimony at the application hearing and the "set up" statement. Additionally, the prosecutor played the full tape recording of the police interview of David VanHousen at the warrant hearing and cross-examined VanHousen vigorously. *See Woodard I*, mem. op. at 12-13 (outlining state's efforts to induce VanHousen to admit guilt during search warrant application hearing and explaining that more admissions by VanHousen would strengthen showing of probable cause at warrant hearing); at 61 (Mannheimer, J., concurring) (concluding that Woodard had failed to present *prima facie* case that statements challenged as intentionally false were material to finding of probable cause).

Woodard also switches arguments in midstream and claims that the information about Turlington would have resulted in an acquittal at trial as the defense would have identified him as the perpetrator. [Pet. 13-14] But Woodard ignores, for example, the evidence that his fingerprint and hair

13                                     EXHIBIT D -- 13

were found on the stolen money and the evidence showing that the fatal shell was fired from his gun. Further, the testimony of the three accomplices was extremely strong. Woodard's claim the accomplices had falsely blamed the robbery on him was belied by the fact that they had never met one another.

4. *Woodard is not entitled to a remand*

Woodard states the court of appeals erred in finding that Judge Bolger did not abuse his discretion in refusing a continuance so he could obtain discovery of the state's archived Turlington files and present any evidence he found in those files.[2] But Judge Bolger pointed out the case had been pending for two years and Woodard did not subpoena the archived files until 4:25 p.m. the day before the scheduled evidentiary hearing. Woodard cites *Salazar v. State*, 559 P.2d 66, 71-72 (Alaska 1976), where this court set forth criteria that should be considered when a mid-trial continuance is requested. In contrast to the situation in *Salazar*, Woodard has not shown (1) what testimony he expected to produce, (2) that the testimony could not been elicited from another source, (3) that any new testimony would not be cumulative, (4) that the material would be available in a reasonable time (As aforesaid, the files were in archives and may have been destroyed as a matter of routine), (5) that he had been diligent and was in good faith, (6) absence of

---

[2] Judge Bolger denied the state's motion for additional time to provide discovery receipts showing that McComas had received Reeder's police report, as well.

inconvenience to the court and parties, or (7) the likely affect of the information on the result of the case. *See Salazar*, 559 P.2d at 72-74. Woodard has merely speculated concerning the possible content of the files. Further, since Turlington was a mere tipster, Woodard was not entitled to the information. *Schmid*, 615 P.2d at 573.

E.   Conclusion

Woodard states hearing should be granted because the decision of the court of appeals is in conflict with decisions of the United States Supreme Court, *Schmid*, and *Salazar*. As has been shown, it is not.

DATED this 22nd day of November, 2004.

GREGG D. RENKES<br>
ATTORNEY GENERAL<br><br>
By: _/s/ W.H.H._<br>
W. H. Hawley (6702008)<br>
Assistant Attorney General