IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

JON ARNOLD WOODARD,          )
                             )    CASE NO: A05-0089 CIV (RRB)
            Plaintiff,       )
                             )
                             )         **OPENING**
                             )    **BRIEF ON THE MERITS**
JOHN (CRAIG) TURNBULL        )
                             )
            Defendant.       )
_____)

        Plaintiff, Jon A. Woodard, through his undersigned counsel, Hugh W. Fleischer, hereby files his opening brief on the merits.

This brief is based upon the factual and legal arguments contained herein, the affidavits and the documents attached to the amended petition and later pleadings of Mr. Woodard. This brief also incorporates the initial petition and the exhibits thereto, filed herein on April 27, 2005.

        Jon Woodard went to trial before the Alaska Superior Court, Superior Court Judge Karen L. Hunt, and twelve person jury starting on March 25, 1993. On June 7, 1993 Mr. Woodard was found guilty of Murder in the Second Degree (AS 11.41.110) and Robbery in the First Degree (AS 11.41.500(a) (1). He was found not guilty of Murder in the First Degree (AS 11.41.100 (a) (1). On September 24, 1993, Mr. Woodard was sentenced to imprisonment for sixty-six years.

        Thereafter, there was an appeal filed with the Alaska

Court of Appeals, which, in a split decision, affirmed the Superior Court Judgment on December 9, 1998. An appeal was taken to the Alaska Supreme Court, which affirmed on September 17, 1999.

After the Supreme Court decision there was post-conviction relief sought through the same three State courts, with the Alaska Supreme Court denying post-conviction relief on December 29, 2004. Mr. Woodard filed his petition for habeas corpus on April 27, 2005, well within the year allowed for such a petition under 28 U.S.C. § 2244(d)(1)

During the trial the defense asserted and re-asserts that Mr. Woodard is innocent of the charges of which he was convicted and that the actual person responsible for the said murder and robbery was Robert F. Kane. There are witnesses who can and will testify that prior to the Carr's robbery and murder that Mr. Kane was in severe financial difficulties, including that less than a month prior to the robbery, Northrim Bank mailed a letter to Mr. Kane stating that a $65,000 check drawn on First Hawaiian Bank by Rob F. Kane was returned for non-sufficient funds. In addition, Kane owed $10,400.00 to John Santora and $20,000 to Mr. Thomas Rayfield, a business person, who owned South Central Radio and another person $15,000.00. On June 8, 1992, the Carr's Grocery Store was robbed and the Loomis guard, Terrence Becker, was killed. More than $49,000.00 in cash was stolen. Mr. Kane was known to be

in Anchorage on that day.  Thereafter, on June 9 and June 15, 1992, Kane paid one person $3,000.00 and $5,000.00, in cash, respectively.  On June 18, 1992. Kane pays John Santora $10,400.  After the Carr's robbery Kane was in a vehicle with Mr. Rayfield in front of the First National Bank of Anchorage at Dimond Boulevard in Anchorage, Mr. Rayfield saw Kane hold a large box, into which Rayfield could see that the box was full of money, rapped in rubber bands.  When Rayfield later attempted to collect the money owed to him by Kane, Kane threatened him with a handgun.  There are numerous other facts, all of which point to Rob F. Kane as the person responsible for those heinous acts of June 8, 1992.  It is particularly notable that the State has not addressed the serious contention by Mr. Woodard that Mr. Kane is responsible for the robbery and murder in this case.  The fact that the State, at no point, addressed this issue should constitute a waiver by the State on this matter.  Rule 5 of the Federal Rules Governing Section 2254 Cases, states in (b) that. "The answer [to a Habeas petition] **must** address the allegations in the petition. [Emphasis added]

A. Ground 1 (Eyewitness misidentification, prejudicial impact)

This ground overlaps with Ground 4 (exclusion of photograph to impeach).  The Alaska Court of Appeals decision (Ex. 5, pp.17-21)was an unreasonable application of U.S. Supreme Court precedent under § 2254 (d)(1), in that it did not correctly

apply the five factors regarding evidence of identification of an accused, in **Manson v. Brathwaite**, 432 U.S. 98 (1977), **Stovall v. Denno**, 355 U.S. 293 (1976) those factors being 1) the opportunity of the witness to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation and 5) the time between the crime and the confrontation. 432 U.S. @ 114.  The following will prove that the Alaska Court of Appeals finding of fact is not entitled to a presumption of correctness under § 2254(e)(1), and by clear and convincing evidence also show that the decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding", in violation of § 2254 (d)(2).  Such points of fact that support the above conclusion are:

a) Robin Conaway did not have a sufficient opportunity to view. Judge Mannheimer found: "Conaway admitted that she got only a brief view of Woodard from across Benson Boulevard (a multi-lane street)." Ex. 4 @ 86.  Judge Bryner also found that Conaway had only briefly observed the robber at a distance and in profile. Ex 5 @ 134.

b) Robin Conaway had a low degree of attention. [8767 (1.3-11)]  See, **Thigpen v. Cory**, 804 F.2d 893, 897 (6th Cir. 1986)

4

c) Robin Conaway had given an inaccurate description of Woodard prior to the suggestive event. Judge Mannheimer found, "Her [Conaway] initial description of the robber varied in many particulars from her later description." Ex. @ 86. Judge Bryner found, "she [Conaway] had subsequently provided a description that did not closely fit Woodard…" Ex. 5 @ 134. Ms. Conaway provided, in her initial description a person named "Billy Evans". [#8767 (1.3-11)]

There is legal authority for the proposition that there is prejudicial error where there is a contrast between the initial description and a latter description. ***Tomlin v.Meyers***, 30 F. 3d 1234, 1241-1243 (9th Cir. 1994), ***Solomon v. Smith***, 645 F. 2d 1179, 1186 (2nd Cir. 1981), ***Cossel v. Miller***, 229 F.3d 649, 656 (7th Cir. 2000).

d) Conaway's level of certainty about the identification was quite low. Conaway claimed to recognize Woodard from a photograph in an article the Anchorage Daily News, showing Woodard in custody on unrelated charges. [Vol. 7, pp. 1090-1091] Authorities again have found error in similar cases. ***Thigpen v. Cory***, *infra* @ 896 (witness seeing defendant in custody on unrelated court proceedings was unduly suggestive), ***Green v. Loggins***, 614 F.2d 219, 222 (9th Cir. 1980), ***Cossel v. Miller***, *infra*, @

5

655.  See also, *U.S. v. Monsour*, 893 F.2d 126, 127 (6th Cir. 1990).

e) A significant amount of time passed from the event to the identification.  Officer Reeder interviewed Conaway approximately six or seven months after the robbery. [ # 8766 1.15-25] Such delay has been found to be erroneous. *Cossel v. Miller*, infra @ 656, citing *Neil v. Biggers*, 409 U.S. 201 (1972).

B. Ground 2, (Exclusion of Recorded Conversations Between Woodard and David VanHousen).  Mr. Woodard contends that the Superior Court granted the State's request to admit the first of six surreptitiously tape recorded conversations between Woodard and VanHousen, who testified for the State.  However, the State Court erred in excluding the other five tape recorded conversations between the same.  The latter tapes would have been used at trial to, *inter alia*, 1) put the first tape admitted into a non-incriminating context; 2) to impeach or otherwise refute those State witnesses whose testimony indicated that Woodard displayed a consciousness of guilt; 3) impeach and confront the testimony of VanHousen to the effect that he had "tipped off" Woodard in the second conversation that the conversation was being monitored by the police.; 4) impeach State and Federal investigators' trial testimony that Woodard's conduct displayed consciousness of guilt and to

6

impeach their characterizations that Woodard performed "counter-surveillance driving."

Judge Bryner found prejudicial error regarding Ground 2. [Ex. 5, pp. 113-122]. While Judge Mannheimer found harmless error [Ex. 5, pp. 62-69] Judge Mannheimer's finding violated § 2254 (d) (1) & (2), which resulted in actual prejudice.

The challenged exclusion of tapes, under § 2254 (d)(1) violate the following authorities: *Chambers v. Mississippi*, 410 U.S. 284, 290 (1973); *Lilly v. Virginia*, 527 U.S. 116 (1999); *O'Neal v. McAninch*, 513 U.S. 432 (1995); *Brecht v. Abrahamson*, 507 U.S. 619 (1993); *Medina v. California*, 505 U.S. 437 (1992); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988); *Su Chia v. Camabra*, 360 F.3d 997 (9th Cir. 2004); *Parle v. Runnels*, 448 F.Supp.2d 1158, 1162-1164 (ND CA, 2006).

Judge Bryner also found that Woodard's statement as to "the thing" that was used out of context in the first tape and should have been put into correct context under Alaska Rule of Evidence 106. *U.S. v. Nobles*, 422 U.S. 225 (1975); *DePetris v. Kuykendall*, 239 F.3d 1057, 1063 (9th Cir. 2001); *U.S. v. Baker*, 432 F.3d 1189 (11th Cir. 2005); *U.S. v. Yevakpor*, 419 F. Supp. 2d 242 (ND NY, 2006); *U.S. v. Sutton*, 801 F. 2d 1346 (DC Cir. 1986) "Rule 106 can adequately fulfill its function only by permitting the admission of some otherwise inadmissible

7

evidence when the court finds in fairness that proferred evidence should be considered contemporaneously, accord, **U.S. v. LeFevour**, 798 F.2d 977 (7th Cir. 1986); *See*, McCormick § 56 (2nd Ed.)

C. Ground 3 (Exclusion of Polygraph evidence)

This ground is based upon the fact that the trial court issued an erroneous yet comprehensive ruling that denied the defense the use of or reference to polygraph examinations given by State investigators to David VanHousen and Sean Pierce. This ruling denied Woodard the opportunity to question their demeanor, conduct, reactions and statements made in response to questions before, during and after the polygraph examinations. Such questioning would have been used to impeach the credibility of such witnesses in the specific ways set out in the original Petition. Although Judge Coats found the polygraph results were inadmissible, Judge Mannheimer found two plausible grounds for admissibility. [Ex. 5, p. 70] but then claims such grounds to be implausible. Judge Bryner found the evidence was admissible to show: 1) the manner in which the State reacted to the negative results; 2) the State's failure to react to apparent lies that condoned dishonesty; 3) the effect of Pierce and VanHousen alteration of their stories. [Ex. 5, pp. 127-130] Judge Bryner's proposed use of polygraph evidence, other than showing only the examination results, is

in accord with the U.S. Supreme Court.  In *Wyrick v. Fields*, 459 U.S. 42, 48 (1982), the Court said, " Although the results of the polygraph examination might not have been admissible evidence, the statements Fields made in response to questioning during the course of the polygraph examinations surely would have been." *U.S. v. Velarde-Gomez*, 269 F.3d 1023, 1030 (9th Cir. 2001); See also, *Rothgeb v. U.S.*, 789 F.2d 647, 651 (8th Cir. 1986) (evidence concerning a defendant's demeanor during the polygraph questioning is also admissible)

Exclusion of the polygraph evidence violated Woodard's right to confront and cross examine the referenced witnesses. *Delaware v. Vanarsdall*, 475 U.S. 673, 679 (1986) Therefore, Judges Coats and Mannheimer violated § 2245 (d) (1) in their conclusions re the polygraph examinations. [Ex 5, p.132] VanHousen and Pierce were crucial to the State's case and there was no other evidence that had the impeachment value of the polygraph evidence.   The State also relied heavily on the VanHousen and Pierce in its closing argument. [Disc III, Vol. 46, pp. 8737-end.]

D. Ground 4 (Exclusion of News Photograph)

When viewed in conjunction with Ground 1, the admission of the News Photograph could have impeached Conaway's prejudicial testimony.  The decision of Judge Coats on this ground illustrates that Conaway's testimony was prejudicial at

9

the outset: 'Woodard was able to effectively establish the shakiness of Conaway's identification and to show that it was tainted…" [Ex. 5, p. 39]    Judge Bryner found that it was prejudicial error to exclude [Ex. 5, pp. 132-135], while Judge Mannheimer found that it was harmless error, which Woodard asserts is erroneous under § 2245 (d)(2). [Ex. 5, pp.85-88] Judge Bryner's findings show that Conaway's identification was a product of seeing the excluded News photograph, which would have corroborated Woodard's contention that her description was tailored to the photo and wholly inconstant with her initial identification.    Thus, her identification should have been excluded, as not meeting the standards set down in **Manson v. Bratwaite**, *infra*. [Ex, 5, p. 134].    Judge Bryner also found that the News Photo could have helped the jurors form "A reasonable doubt as to whether Conaway had actually identified anything other than a recently-seen newspaper photograph." [Ex. 5, p.134].    This ground, in addition to ground one, had a prejudicial impact on the verdict under **Brecht**, **O'Neal** and **Chambers**, *infra*.    Because this evidence was excluded, the jury could not consider it when they requested playback. [Disc III, Vol. 47-C @ 8888].

    F. Ground 5 (Exclusion of the VanHousen Interrogation Video)

        The trial Court denied Woodard's request to admit

into evidence a video tape of VanHousen being interrogated by Anchorage police officers, which would have impeached his credibility and exposed his bias and the fact that he received favorable treatment from the State. The video was the best evidence depicting the manner of the police agents using threats to pressure VanHousen to alter his story to accommodate the State's theory to prosecute Woodard. This evidence should have been admitted by the Court under the authority of *Gordon v. U.S.*, 344 U.S. 414, 420-421 (1953); *Dickerson v. U.S.*, 530 U.S. 428 (2000); *Goldberg v. U.S.*, 425 U.S. 94 (1976).

F. Ground 8 (Prejudicial shackling)

Petitioner Woodward's eighth ground, that being, that he was denied due process by his having been shackled on his legs, body and one hand, during the trial, which was observed and realized by the jury. As Justice Breyer stated, in writing the majority opinion of the Supreme Court in *Deck v. Missouri*, 544 U.S. 622 (2005), "We hold that the Constitution forbids the use of shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is 'justified by an essential state interest'—such as the interest in courtroom security—specific to the defendant on trial. *Holbrook v. Flynn*, 475 U.S. 560, 568-569, 89 L.ED2d 525, 106 S. Ct. 1340 (1086); see also *Illinois v. Allen*, 397 U.S. 337, 343-344, 25 L.Ed.2d 353, 90 S. Ct. 1057 (1970)." As the Court also noted,

11

"[T]his rule [against shackles in the presence of the jury] has deep roots in common law. In the 18th Century, Blackstone wrote that 'it is laid down in our ancient books, that, though under an indictment of the highest nature,' a defendant 'must be brought to the bar without irons, or any manner of shackles or bonds; unless there be evident danger of an escape.' 4 W. Blackstone, Commentaries on the Laws of England 317 (1769); see also 3 E. Coke, Institutes of the Laws of England 34 ('If felons come in judgement to answer,…they shall be out of irons, and all manner of bonds, so that their pain shall not take away any manner of reason, nor them constrain to answer, but at their free will.')…It [the rule against shackles]was meant to protect defendants appearing before a jury. See *King v. Waite*, 1 Leach 28, 36, 168 Eng. Rep. 117, 120 (K.B. 1743) ('Being put upon his trial, the Court immediately ordered [the defendant's]fetters to be knocked off.') It should be noted that the Court reversed and remanded the case of Mr. Deck, who had had numerous burglary and theft convictions and had assisted in a jailbreak by two prisoners.

The Ninth Circuit Court of Appeals has looked at the constitutional issue of a visible shackled defendant during trial. In the case of *Rhoden v. Rowland*, 2006 172 F.3d 633(9th Cir. 1999), the Court found that the defendant was physically restrained in the presence of the jury, which caused Rhoden

physical and emotional pain, the shackling was seen by the jury and the physical restraint caused harmful prejudice, so that the petition was granted. In *Dyas v. Poole*, 317 F. 3d 934 (9th Cir. 2003) ruled that since at least one juror could see the shackles from the jury box, there was prejudice to the defendant. *Parrish v. Small*, 315 F.3d 1131 (9th Cir. 2003), where the defendant was charged with attempted murder and assault with a deadly weapon, held that the State court erred, in not holding an evidentiary hearing on whether the jury could have seen the shackles and whether such visibility was prejudicial. *See*, *Clem v. Lomeli*, 2007 U.S. Dist. LEXIS 69758, 74 Fed. R. Evid. Serv. (ND CA 2007). In *Hamilton v. Vasquez*, 882 F.2d 1469 (9th Cir. 1989), where the defendant was convicted of first-degree murder, burglary, robbery and kidnapping and was sentenced to death, raised the issue of visible shackling in a habeas petition, the Court held that the trial court's to shackle him during his state criminal trial violated due process and raised mixed questions of law and fact, on which the district court had a duty to review the state court record.

In the matter at bar, as this Court knows, Mr. Woodard had no convictions when he began his underlying State trial. There was always sufficient security, including at least three armed offices in and about the courtroom to protect the court, court personnel, and public attendees of the trial. (Woodward

13

1, 02/18/93, 14:19)*   Indeed, the Commander of the State Troopers Judicial Services, Jay Yakopatz, testified that Mr. Woodward had not resisted arrest (Woodard 1, 02/18/93, 18:01) had not attempted to escape jail (Woodward 1, 02/18/93, 18:04) nor caused any threat to any witnesses (Woodward 1. 02/18/93, 17:20) nor made any attempt to flee at any point. (Woodard 1, 02/18/93, 17:24). Mr. Woodard's trial counsel made a timely request for a hearing to challenge the then proposed shackling to present evidence why shackling should not occur.   Such hearing was denied by the trial judge.  (Woodard 1, 02/18/93, 14:19)  Most importantly, on this front, is that the trial judge acknowledged that "we do not want the jury to see the defendant in custody during the trial, because of the presumption of innocence…."  Yet, the trial Court conducted no inquiry regarding the actual need or appropriateness of shackling. (49c-et, 08/20/93, 9308:18)  Yet, as the Affidavits of Marjorie Shorthill and Jon Woodard, which were filed with the Amended Petition, show, the jury was fully aware of the shackles and chains with which Mr. Woodard was subjected each day of the trial.  Most, if not all of the then-prospective

* Citations are to the three CD-ROM E-Transcript

jurors entered the courtroom from the rear, from which vantage point in the rear of the courtroom, one could fully observe the shackles and chains.  Obviously, twelve of such potential

14

jurors became the jury for the trial. (Affidavits of Shorthill, ¶ 7 Woodard ¶ 6)  Thus, each juror knew that Mr. Woodard was in chains and shackles and is reasonably presumed to believe he was guilty of the offense, long before the first evidence was adduced.  Incident during jury selection where jurors had the opportunity to view the shackles when they entered through the main door of the court room to the rear of the table at which Woodard was seated [Vol. 9, 1572-75, 1612, 1617-1618, 1712-1714; Vol. 10, 1838-1943; Vol. 12, 2428-2430; Vol. 13, 2673-2675; Vol. 14, 2755-2756.  There were specific jurors who admitted observing and recognizing Mr. Woodard, as shackled, when they entered the courtroom: [Vol. 9, 1703:2-3, Juror # 8, Francis Ord; Vol. 10, Juror # 5, William Daley, 1771:16-19; Vol. 12, Potential Juror Florentino LaPiad, 2378: 24-25, 2379:1-3.  *See also*, 2378:4.  There was also the power failure incident, where jurors observed Woodard's chains and shackles. [Disk III, Vol. 45-B, 8457-8459; Vol. 45-C, 8506 & 8541. Although the record is silent regarding the power outage, the uncontroverted affidavits of Shorthill and Woodard establish the fact of juror observation during the power outage.

The above and § 2245 (d) (2) refute the finding by Judge Coats that table skirting hid all shackles from jurors' view. Judge Coats stated, "She [the Trial Judge] provided that the chains would be hidden from view **to the extent possible** by placing skirting around the prosecution and defense

15

tables."[Emphasis added] [Ex. 5, pp 45-46]

As this Court knows, the criminal process of this Nation contains the hallowed presumption that the defendant in innocent until proven guilty. *Coffin v. United States*, 156 U.S. 432, 453, 39 L.Ed. 481, 15 S.Ct. 394 (1895.) The Supreme Court has held that, "Visible shackling undermines the presumption of innocence and the related fairness of the fact finding process. *Estelle v. Williams*, 425 U.S. 501, 503 (1976). "[Shackling] suggests that to the jury that the justice system itself sees a 'need to separate a defendant from the community at large.' *Holbrook*, supra @ 569, 89 L.Ed.2d 525, 105 S. Ct. 1340. *Deck v. Missouri*, supra @ 631. There were blatant incidents in which the jury saw the shackles and chains such as when there was a power outage and as the jury was being led out past Mr. Woodard, the security officials had bright hand-held lamps on Mr. Woodard and his chains. (Affidavits of Shorthill, ¶ 12, Woodard ¶ 9)In addition, although Mr. Woodard made a concerted effort to be quiet, whenever his body shifted or he reached for something with his one free hand, the chains would activate and were audible throughout the courtroom. (Affidavits of Shorthill ¶ 10), Woodard ¶ 7).

There also is a right to counsel violation of the Sixth Amendment caused by visible shackling. "The use of physical restraints diminishes that right. Shackles can interfere with

16

the accused's 'ability to communicate' with his lawyer. *Illinois v. Allen*, 397 U.S. 337,344 [citations omitted] Indeed, they can interfere with a defendant's ability to participate in his own defense, say by freely choosing whether to take the witness stand on his own behalf….('Look you, keeper, you should take off the prisoner's irons when they are at the bar, for they should stand at their ease when they are tried') *People v. Harrington*, 42 Cal. [165,] 168 [(1871)] (shackles ' impose physical burdens, pains and restraints…tend to confuse and embarrass' defendants mental faculties and thereby tend 'materially to abridge and prejudicially affect his constitutional rights.') *Deck*, supra @ 631.

The Court also looked at the maintenance of a "judicial process that is a dignified process. The courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment. And it reflects a seriousness of purpose that helps to explain the judicial system's power to inspire the confidence and to affect the behavior of a general public whose demands for justice our courts seek to serve. The routine use of shackles in the presence of juries would undermine these symbolic yet concrete objectives. As this Court has said, the

use of shackles at trial 'affronts' the 'dignity and decorum of judicial proceedings that the judge is seeking to uphold. **Allen**, supra @ 344. **Deck**, supra @ 631.

G. Ground 10 (Unconstitutional Suppression of Evidence)

The State prosecutors failed to disclose to Woodard material and favorable evidence regarding an informant, William Turlington, who could have been presented as a witness or an alternate suspect in the subject prosecution. The information withheld included the informant's past criminal record for robbery, drug convictions, theft convictions, probation violations, a plea-bargain/cooperation agreement and had a relationship with VanHousen and VanHousen's Father. All such information could have been used to greatly assist the defendant's case. The State's response that Turlington was not a potential perpetrator of the subject crime or that he could provide any exculpatory information but was a mere "tipster." The State also argued that the information re Turlington was precluded under **Roviaro v. U.S**., 353 U.S. 53 (1957). It is asserted that such preclusion is an unreasonable application of Federal law under § 2254 (d)(1), in that the State's decision on this matter failed to consider **Banks v. Dretke**, 540 U.S. 668, 697-698 (2004), which reaffirmed that **Roviaro** stands for the proposition that "no privilege obtains '[w]here the disclosure of an informer's identity, or of the contents of his

18

communication, is relevant and helpful to the defense of the accused.'", citing *Roviaro* @ 60-61. *See also*, *DeVose v. Norris*, 53 F.3d 201, 206-207 (8th Cir. 1995) (even if the State does not intend to use the witness at trial, it must make such witness available to the defense, which rule applies to informants.)

In this matter, Turlington's record of prior robberies, rewards for providing information in the Woodard case and his associations with the VanHousen family, prior to the subject crime, is clearly relevant and material under *Brady v. Ohio*, 381 U.S. 904 (1971).

It should be noted that the State has not filed and should be compelled to do so, the transcripts of the January 23, 2002 State PCR hearing, which is in two parts: the main hearing, and an excerpt of the testimony of attorney John Murtaugh, who represented Mr. Turlington. The State is required to provide such transcripts under Habeas Rules 4 and 5.

H.  Ground 11 (Unconstitutional Suppression of Evidence, VanHousen)

State prosecutors failed to disclose to Woodard material and defense-favorable evidence that witness VanHousen was the person who "set up" the Carrs robbery. Such information could have obviously been invaluable to the defense. The arguments

19

made in the Ground 10 section have equal relevance to Ground 11. The above stated information as to VanHousen's role cast VanHousen in light that was contrived by the State, and was directly material to impeaching VanHousen at trial, and certainly would have been exculpatory to Woodard. Turlington could have been called as a witness to impeach VanHousen had Woodard had access to such information at trial. Moreover, the above discussion does not, by definition, include other information still undisclosed by the State, as referenced above in the discussion of Ground 10.

<u>**CONCLUSION**</u>

Therefore, based on the above, Mr. Woodard deserves and requests a remand for a new trial without the outrageous shackles and chains. Mr. Woodard reserves the right, upon remand, to file objections to a re-trial.

Dated this 7th day of January, 2008.

LAW OFFICES OF HUGH W. FLEISCHER

By: _S/Hugh W. Fleischer
    Hugh W. Fleischer
    Attorney for Mr. Woodard
    310 K. St., Suite 200
    Anchorage, AK 99501
    907-264-6635
    907-264-6602-Fax
    hfleisch@aol.com

20

CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of
January, 2008, a true copy of
JON WOODARD'S foregoing Amended
Petition was electronically delivered to:

William H. Hawley, Jr.
Assistant Attorney General
Office of Special Prosecutions and Appeals
310 K. St., Suite 308
Anchorage, AK 99501

S/Hugh W. Fleischer

9114.1/560

21