W. H. Hawley
Assistant Attorney General
Office of Special Prosecutions
and Appeals
310 K Street, Suite 308
Anchorage, Alaska 99501
Telephone: (907) 269-6250
Facsimile: (907) 269-6270
Email: william.hawley@alaska.gov

Attorney for Respondent John Craig Turnbull

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | | |
|---|---|---|
| JON ARNOLD WOODARD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 3:05-cv-0089-TMB-JDR- |
| | ) | |
| JOHN CRAIG TURNBULL, Warden | ) | **PROPOSED** |
| | ) | RESPONDENT'S RESPONSE TO |
| | ) | WOODARD'S BRIEF ON THE |
| Respondent. | ) | MERITS |
| | ) | |

A. Introduction

Woodard has failed to establish that he is entitled to relief on the merits. This memorandum will demonstrate that this court should grant judgment to the respondent. The respondent will deal with the claims in Woodard's merits brief seriatim.

In the opening section of his memorandum, Woodard purports to rely upon (1) his affidavit and the affidavit of a family friend alleging that his restraints were visible to the jurors and (2) unspecified documents attached to the amended petition and later pleadings. [Docket No. 100 at 1] The state objects to any consideration of the documents and affidavits as Woodard could have presented this information to the state courts, but failed to do so. The impropriety of Woodard relying on the affidavits was recognized by this court when it refused funds for Woodard to interview jurors to determine whether they had seen Woodard in restraints during the trial. The state's objections to the affidavits will be set forth fully in response to Woodard's arguments in ground eight of his memorandum – the claim that jurors saw him in restraints during trial.

B. Robert Kane did not commit the robbery and murder

Woodard argues that he is innocent and that Robert Kane committed the Carrs robbery and murder. [Doc. No. 100 at 2-3] He asserts that Kane needed money at the time of the robbery and murder, and that Kane had money afterwards. [*Id*.] Woodard also claims that the state has waived the right to respond because the state's answer to his petition did not address this argument. [*Id*. at 3] These arguments are red herrings.

Woodard does not assert that the alleged facts he recites concerning Kane were offered at trial, and does not provide transcript citations to show where the evidence he replies upon was admitted or excluded at trial. [Docket No. 100 at 2-

3]  The state, to the contrary, set forth the overwhelming evidence introduced against Woodard at trial, with transcript citations, in its answer to Woodard's petition.  [Docket No. 49 at 2-17]  The evidence the state set forth in its answer fully negates the claim that Kane is guilty of the murder and robbery and the argument that the state has waived this point.  Moreover, Woodard's claim that Kane needed money at the time of the crime is contradicted by the fact that Kane received approximately $40,000 about the time of the crime, partly as the result of his selling real estate.  [Tr. 8091-94, 8099-8102, 8128-29]  Further, Kane had been in a car accident and had a broken collarbone, so he could not have simultaneously pulled himself up on the manager's booth and shot the victim.  [Tr. 8793]  Finally, Woodard did not assert Kane's supposed guilt or the lack of evidence as a ground for relief in his habeas petition or in the amended petition.  If he had made such a claim, the state would have responded.

The evidence of Woodard's guilt was comprehensive.  It consisted of the testimony of three confederates, David VanHousen, Sean Pierce, and Karl Bohlin, who all gave convincing testimony, despite extensive and vigorous cross-examination, that Woodard planned the crime, committed it, possessed the proceeds, and disposed of incriminating evidence.  [Docket No. 49 at 7-17]

The evidence concerning the murder weapon, a 10-millimeter Glock, strongly incriminated Woodard.  Woodard had purchased the Glock in 1991.  [Docket No. 49 at 11]  The expended shell found next to the body of the Loomis

guard had been fired *from the same Glock* as 25 expended shells found at two locations where Woodard had fired it. [*Id*. at 5-6, 16] Woodard disassembled the Glock after the murder and threw it in the Knik river. [*Id*. at 11] He then purchased a second Glock. [*Id*.]

Other physical evidence was similarly compelling. Woodard asked Karl Bohlin to hide money that was contained in two Safeway bags in his (Bohlin's) home. [Docket No. 49 at 14-15] The police then found $30,297.89 in currency in a crawl space in Bohlin's home. [Docket No. 49 at 16] Woodard's fingerprint (his left thumb) was found on one of the $100 dollar bills in the currency found at Bohlin's home. [Exhibit 49 at 16; Tr. 7195] A hair similar to Woodard's was also found with the money. [Tr. 7190-92, 7328-30] There was no contrary evidence and Woodard offered no reasonable explanation for this evidence at trial.

On June 20, 1992, Pierce took the police to Eklutna where he and Woodard had burned Woodard's clothing, sneakers, and non-cash items taken in the robbery. [Docket No. 49 at 17; Tr. 4041-42, 4501-02, 5066-80] Evidence found in the ashes included sneaker tread, zipper parts, possible canvas remnants, portions of a Loomis book, food stamps, and portions of two Carrs customers' checks dated June 7, 1992. [Docket No. 49 at 17; Tr. 5068-80, 5124-47]

At a nearby location where 15 shells Woodard had fired from his Glock, the murder weapon, were recovered, a burned plastic container for an ammunition box and a burned ammunition box were found. [Tr. 5088] A hair attached to the

plastic container was identified as having the same microscopic features as hair known to be Woodard's. [Tr. 5088-89, 7331]

After the murder, Woodard, who was unemployed and had no visible means of support, began spending large amounts of cash. He paid $322 in cash for new tires for the getaway car (which belonged to his significant other, Sara Wiggers), spent over $1,400 for five new weapons including a replacement for the Glock he had thrown in the river, paid $3,097 in cash for a large-screen television set with speakers, repaid (in cash) a $1,800 loan from Karl Bohlin, paid $241 in cash to redeem a shotgun from a pawn shop, paid Pierce a total of $1,000 in cash, and paid VanHousen $3,000 in cash. [Docket 49 at 11-13, 15-16; Tr. 7066-77]

The incorrect claim that Kane was somehow responsible for the murder was refuted in many particulars by the testimony of Kane's step father, Lyle Davis. [Tr. 3937-4056] In the end, the state's evidence was so strong that even Judge Bryner, who dissented from the decision of the Alaska Court of Appeals, was forced to acknowledge that "[t]he evidence presented against Woodard at trial was unusually strong and undeniably compelling." [Exh. 5 at 147] In sum, the claim that Kane was responsible for the murder is at best a distraction.

C.    Ground one

*Introduction*: Woodard takes issue with the decision of the Alaska Court of Appeals affirming the decision of Superior Court Judge Karen Hunt to admit

the testimony of Robin Conaway, a Carrs employee, who identified Woodard as the person who committed the crimes. Woodard argues that the Alaska Court of Appeals unreasonably applied the Court's decisions in *Manson v. Braithwaite*, 432 U.S. 98, 97 S.Ct. 2243 (1977), and *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1697 (1967), "in that [the Alaska Court of Appeals] did not correctly apply the five factors regarding evidence of identification of an accused." [Docket No. 100 at 3-4] In fact, the Alaska courts scrupulously applied the *Manson* test.

Woodard's actual argument seems to be that bits of evidence mentioned in the opinion of the Alaska Court of Appeals show that Conaway did not have an adequate opportunity to view Woodard, etc. [Docket No. 100 at 4-5] This argument misunderstands the true facts. The Alaska Court of Appeals unanimously sustained Judge Hunt's detailed and extensive factual findings which were made after a pretrial evidentiary hearing. Judge Hunt carefully evaluated the five factors that United States Supreme Court decisions required her to consider. [Exh. 21]

The state will outline the proceedings below and then argue Woodard cannot show, as he must, that the adjudication of the claim was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(2).

*The five-factor test*: In *Manson*, the Court said reliability "is the linchpin in determining the admissibility of identification testimony" and listed five

factors set forth in *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382 (1972), that are to be considered in assessing the reliability and admissibility of identification testimony.  432 U.S. at 114, 97 S.Ct. at 2243.  The factors to be considered are (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. *Manson*, 432 U.S. at 2253, 97 S.Ct. at 2243.  "Short of 'a very substantial likelihood of irreparable misidentification,' [the identification testimony] is for the jury to weigh."  *Id.* at 116, 97 S.Ct. at 2254 (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971 (1968)).

*The suppression hearing*:  Conaway testified at length at the pretrial suppression hearing.  [Tr. 1082-1170]  The facts as stated below are those found by a preponderance of the evidence by Judge Hunt in her decision.  [Exh. 21 at 2]

At the time of the crime, Conaway was working in the deli section of Carrs.  [Exh. 21 at 2-3; Tr. 1083][1]  She heard a gun go off near the manager's station, saw smoke in the air, saw a man with his arm extended above the half wall surrounding the manager's station, and then saw the same man jump over the wall.  [Exh. 21 at 3; Tr. 1083, 1108]  In response to the shot, Conaway ducked down.  [Exh. 3 at 15; Tr. 1083]  Conaway and other Carrs employees

---

[1]    The state is citing both Judge Hunt's factual findings and the related testimony.

went outside through a rear exit, across Benson Boulevard, and were headed toward the parking lot of the nearby Princess Restaurant. [*Id.*]

Conaway stopped at the curb and turned around to see if she could help other employees cross Benson. [Exh. 21 at 3; Tr. 1152] As Conaway turned around, she saw a man, who had exited from a rear door of Carrs, walking across the employees' rear parking lot with his arm extended. [Exh. 21 at 3; Tr. 1087] He had a gun in his hand and was yelling for people to get out of his way. [Exh. 21 at 3; Tr. 1089] He proceeded southwest at an angle to Conaway. [Exh. 21 at 3; Tr. 1089-90] She watched him for less than a minute. [*Id.*] After the man walked off, she motioned for others to return to Carrs. [Tr. 1090]

The day of the offenses, Officer Hollingsworth interviewed Conaway. [Exh. 21 at 3; Tr. 1155-56] Conaway was disoriented by the murder and the commotion that followed it, and felt nervous and a little overwhelmed. [Exh. 21 at 3; Tr. 1091, 1109-10] (Judge Hunt found Conaway was easily flustered but was "both . . . sincere and credible." [Exh. 21 at 3 n.2]) Conaway described the suspect as "very big and tall, 6'4", over 220 pounds," a white, light-complexioned, adult male with straight, short, dark hair; he was wearing a royal blue jacket or windbreaker and blue work pants. [Exh. 21 at 3-4; Tr. 1165-66] At the time, Conaway noticed nothing unusual about the suspect's voice and he did not look muscular. [Exh. 21 at 4; Tr. 1111-12] Conaway only saw the suspect from the side. [Exh. 21 at 4; Tr. 1136, 1167] Investigator Reeder, using an aerial

photograph, estimated that Conaway was about 100 feet away from the suspect. [Exh. 21 at 4; Tr. 1204-05]

On June 19, 1992, a color photograph of Woodard appeared in the local newspaper. [Exh. 15; Exh. 21 at 4; Tr. 1113-14] It showed a "full-length, side-view" of Woodard, a large muscular individual, with long, dark hair pulled back in a ponytail. [Exh. 15; Exh. 21 at 4] He was in hand and ankle cuffs along with another prisoner. [*Id.*] Conaway saw the photograph in the paper in the break room of Carrs; the paper was folded so that only the photograph was visible, and she could not see the headline accompanying it. [Exh. 21 at 4; Tr. 1136-37, 1222] When Conaway first saw the photograph, she said to another employee, Linda Verfaille, that it "looks like the man who robbed Carrs." [Exh. 21 at 4; Tr. 1135]

Conaway felt certain the person in the June 19th photograph was the robber. [Exh. 21 at 5; Tr. 1164-65, 1234] Conaway seldom watched the news on television and had neither read not heard any news about the robbery and murder after it had occurred except for the story and photograph that appeared in the newspaper on June 19. [Exh. 21 at 6; Tr. 1103-07] She had seen no other photographs or television views of the suspect and did not know anyone had been arrested. [Exh. 21 at 5; Tr. 1103-07]

On December 8, 1992, Investigator William Reeder met with Conaway. Conaway described the suspect as muscular and "medium complexioned." [Exh. 21 at 6; Tr. 1111-21] She also said the suspect's hair was pulled back, that he

had a gun with a square barrel in his right hand, and that he appeared to be carrying a bag. [Exh. 21 at 6; Tr. 1123-24, 1128-29] Judge Hunt found the June 19th photograph had jogged Conaway's memory and had helped her to recall details. [Exh. 21 at 3]

Investigator Reeder showed Conaway a photographic lineup with six Department of Motor Vehicle photographs that included Woodard and persons with similar appearances. [Exh. 21 at 6; Tr. 1172-73] Conaway picked out Woodard's photograph and said it resembled the person she saw. [Exh. 21 at 7; Tr. 1099, 1159, 1183] Investigator Reeder asked Conaway to describe her level of certainty on a scale of 1-10. [Exh. 21 at 6; Tr. 1160-61] Conaway said it would be "8 or 9 if she could see him from the side." [*Id.*] When Conaway asked if she had identified the man, Investigator Reeder nodded affirmatively. [Exh. 21 at 6; Tr. 1100, 1162] She explained she did not want to pick the wrong person and said she was surprised she could identify the suspect from front-view photographs. [Exh. 21 at 3; Tr. 1168] Conaway cried after identifying Woodard in the lineup and said she "knew immediately when she looked [at the photograph of Woodard] that it was the subject." [Tr. 1183-84]

In March of 1993, Conaway was provided with a transcript of her initial and December 1992 descriptions of the suspect. [Exh. 21 at 8; Tr. 1100] She corrected portions of her statement concerning the shoes and "earmuffs" she believed the suspect had been wearing. [Exh. 21 at 8; Tr. 1100-02] A fellow

employee had told her that the suspect had been wearing a headset so that she believed what she had thought were earmuffs was actually a headset. [Exh. 21 at 8; Tr. 1100-02]

*Judge Hunt's decision:*  Judge Hunt found the June 19th photograph of Woodard, restrained and in custody, suggested he was guilty. [Exc. 21 at 20] She also found that Conaway read the accompanying article which mentioned not only that he was a suspect in the Carrs robbery and homicide but also that he had been arrested for federal offenses. [*Id.*] However, Judge Hunt then carefully applied the five-factor test set forth in *Biggers* and *Manson*. She concluded that Conaway's identifications were sufficiently reliable to permit her to testify. [Exh. 21 at 23-27]  The judge's careful and detailed analysis is discussed in the argument section below.

*Decision of the Alaska Court of Appeals:*  Judge Coats, joined on this issue by Judge Mannheimer and Chief Judge Bryner, concluded that Judge Hunt had applied the correct legal standard – the five-factor *Manson/Biggers* test –  in determining that Conaway's identification was reliable and admissible. [Exh. 5 at 21] After quoting a portion of the judge's findings, the court said it accepted a trial court's findings of fact on a motion to suppress unless clearly erroneous. [*Id.*] The court then said it had independently reviewed the record and agreed with Judge Hunt's conclusion that Conaway's identification of Woodard was sufficiently reliable to be admitted at trial. [Exh. 5 at 20-21]

*Procedural bar:*  Woodard first states that Ground 1 and Ground 4, the claim that Judge Hunt erred in excluding the head-on June 24, July 8, or July 21, 1992 photographs of Woodard that appeared in the Anchorage newspaper, overlap.  [Docket No. 100 at 3]  Although Woodard argued in his petition for hearing to the Supreme Court of Alaska that he should receive a new trial because of cumulative evidentiary error, he did not argue in that court or in the Alaska Court of Appeals that the alleged error in admitting Conaway's testimony should be cumulated with the alleged error in refusing the admission of the three photographs.  [Exhs. 3, 4, and 6]  Thus, the claim, as it is presently constituted, is unexhausted and this court should rule that it is procedurally barred.  (Indeed, if the pretrial identification claim had been combined in this manner in the original or amended habeas petition, then the state would have argued that the claim is not properly exhausted and was procedurally barred.)

Moreover, Woodard did not attempt to introduce the three photographs he offered at trial at the suppression hearing and did not renew his pretrial motion to suppress Conaway's identification at trial based on these pictures.  [Tr. 1082-1326]  Accordingly, evidence at trial such as the three later photographs should not be used to question the reasonableness of facts found in connection with the motion to suppress.  *See, e.g., Waters v. State*, 64 P.3d 169, 170-71 (Alaska App. 2003) (defendant cannot rely on trial evidence to support argument that denial of pretrial motion was erroneous unless motion was renewed at trial).

*Standard of Review*:  28 U.S.C. §2254(d)(2) provides:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim

> . . .

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In order to prevail in his claim that the resolution of the factual issues with respect to the reliability of the identification, Woodard must show that an appellate court, "applying the normal standards of appellate review, could not reasonably conclude that [a factual] finding of the [trial] court is supported by the record." *Lambert v. Blodgett*, 393 F.3d 943, 971 (2004) (citing *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004)).  A federal judge applying the unreasonable determination clause of §2254(d)(2) "must be particularly deferential to [his] state court colleagues." *Lambert*, 393 F.3d at 971 (citing *Taylor*, 366 F.3d at 1000)  "Mere doubt" concerning the adequacy of the state court's findings is not sufficient: a federal court "'must be satisfied that *any* appellate court to whom [a] defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.'"  *Id*. (quoting *Taylor*, 366 F.3d at 1000 (emphasis added in *Lambert*).

*Argument:*  Woodard's argument does not include even one citation to the pretrial evidentiary hearing or to Judge Hunt's carefully crafted factual findings and analysis.  Accordingly, Woodard has not even addressed the adequacy of the state's fact-finding process, much less shown that it was somehow inadequate.  Moreover, Judge Hunt's findings are in fact supported by the record of the pretrial suppression hearing and the Alaska Court of Appeals was justified in relying on those findings.  The state will first discuss the *Manson/Biggers* factors.

*Conaway's opportunity to view Woodard:*  Woodard argues the first *Manson* factor should be counted against the state as "Conaway did not have a sufficient opportunity to view."  [Docket No. 100 at 4]  He states that Judge Mannheimer stated Conaway "got only a brief view of Woodard" and that Judge Bryner said that Conaway had only "briefly observed the robber at a distance and in profile."  [*Id.* at 4 citing Exh. 5 at 86 and 134]

These statements in the opinion of the Alaska Court of Appeals are directed to another claim of error – the claim that the three head-on photographs that appeared in the Anchorage Daily News should have been admitted at trial (Ground four) – and not to the *Manson* factor at issue here: whether Conaway had a sufficient *opportunity* to view Woodard.  A brief observation of a suspect is not an insufficient time to observe the characteristics of a suspect.

Conaway first saw Woodard from behind when he standing in front of the manager's booth at Carrs and watched him jump into the booth.  [Tr. 1083, 1108]

Conaway and other employees then went out a back door of Carrs. [Tr. 1087-88] Although Conaway conceded that she observed Woodard "for less than a minute" when he was walking across the parking lot behind Carrs, Judge Hunt properly found Conaway's view of Woodard was unobstructed and in a lighted areas. [Exh. 15 at 23; Tr. 1089] (The judge made the same finding with respect to Conaway's observation of Woodard at the time of the robbery itself. *Id*.)

Importantly, the judge also found Conaway deliberately watched Woodard for a "period of time sufficient to observe his physical characteristics, clothing, and walking mannerisms." [Exh. 21 at 23-24] Judges Mannheimer's and Chief Judge Bryner's characterization of Conaway's view of Woodard as "brief" does not show that Judge Hunt's findings were mistaken or unreasonable, or show that the Alaska Court of Appeals was unreasonable in concluding Judge Hunt's findings were supported by the record. Indeed, Conaway testified that she saw Woodard with his arm extended with a gun in his hand yelling for Conaway and other employees to get out of the way. [Tr. 1089] After Woodard yelled, Conaway "[f]roze [and] watched him. I just watched him." [Tr. 1089] She said she did not know how long she watched him, but that "the vision of Woodard just imprinted in [her] mind." [Tr. 1090] In sum, Woodard has failed to show Conaway's opportunity to view him was insufficient.

*Conaway's degree of attention:* Woodard asserts that Conaway had a "low degree of attention." [Docket No. 100 at 4] To support this claim, Woodard cites

a portion of the prosecution's final argument. [Docket No. 100 at 4 citing Tr. 8767] Woodard's attorney had argued that Conaway had testified that "Billy Evans" had been the shooter. The prosecutor responded that Conaway had testified that the shooter could not be a person she knew named Billy Evans because Evans was "too short." Tr. 8767]

The name Billy Evans did come up at the suppression hearing. Judge Hunt found, pursuant to testimony to this effect, that Conaway had told her friend Linda Verfaille that the suspect reminded her of a person named "Billy" from home but that the robber could not have been him because he did not live in Alaska. [Exh. 21 at 5 & n.2; *see* Tr. 1131-35; 1212-13] Judge Hunt also found that Conaway testified that the suspect reminded her of "Billy Evans," an ex-Carrs employee, and that Conaway had wondered for awhile if Evans could have been the robber, but that she concluded he probably was not. [*Id.*]

More to the point, Judge Hunt found the nature of Conaway's observations indicated that her attention was focused on Woodard: the judge found Conaway saw the side of Woodard's face and noted his size, clothing, hair, and actions. [Exh. 21 at 24] Conaway's testimony that she froze, "just watched [Woodard]," and that "the vision of Woodard just imprinted in [her] mind" shows a high degree of attention. [Tr. 1089-90]

Woodard cites *Thigpen v. Cory*, 804 F.2d 893, 897 (6th Cir. 1986), without explanation, to support for his claim that Conaway had a low degree of attention.

16

[Docket No. 100 at 4] In *Thigpen,* the majority of the court said the victim of a robbery who testified that he was too scared by the robbery to pay much attention to the robbers did not satisfy the "degree of attention" *Manson* factor. *Thigpen* is of no assistance to Woodard here because Conaway's testimony was substantially different than the testimony at issue in that case. Further, as a later Sixth Circuit case points out, *Thigpen* was decided before the Antiterrorism and Effective Death Penalty Act became effective, so the majority in that case did not consider the heightened deference due to state-court decisions (such as the decision at issue here) under §2254(d)(2). *See Howard v. Bouchard*, 405 F.3d 459, 471 (6th Cir. 2005).

*Accuracy of description:* Woodard argues that Conaway gave an inaccurate initial description before she saw the photograph of Woodard in the newspaper. [Docket No. 100 at 5] But Woodard does not discuss Conaway's initial description or Judge Hunt's findings. Instead, he cites Judge Mannheimer's statement that Conaway's initial description varied in many particulars from her later description and Chief Judge Bryner's statement in dissent that Conaway provided a description that "did not closely fit Woodard." [*Id.* (citing Exh. 5 at 86 and 134)] Woodard also states that Conaway initially identified "Billy Evans." [*Id.* (citing Tr. 8767)]

Judge Hunt found Conaway initially described Woodard as a tall, approximately 220-pound, light-complexioned white man with straight, dark hair

and that her description of his clothing was similar to other eyewitness accounts. [Exh 15 at 25]  Though the judge found Conaway's description of Woodard's clothing was "similar to other eyewitness accounts," she also found that Conaway had inaccurately described the suspect's hair as short.  [*Id.*]  Judge Hunt then found that *"[t]he rest of [Conaway's initial] description fits the defendant."*  [*Id.* (emphasis supplied)]

Judge Hunt also found that on December 9, 1992, during an interview with Investigator Reeder before picking Woodard out of the lineup, Conaway had described Woodard's hair as dark and said he was wearing a blue jacket.  [Exh. 21 at 25]  Conaway added that Woodard's hair was "sort of in a smooth back position [with] kinda' short sideburns," said he had on sunglasses, said he was carrying a square gun and a bag, and modified her description of his complexion from "light" to "medium."  [*Id.*]  Judge Hunt accepted Conaway's explanation that the changes were attributable to the excitement and confusion that existed immediately after the robbery and said the newspaper photograph jogged her memory as to additional details.  [Exh. 21 at 25; Tr. 1091]

Conaway admitted at the suppression hearing that she at one time indicated to her supervisor that the shooter was "Billy Evans," but that at the evidentiary hearing Conaway was "sure" that he was not the shooter.  [Tr. 1096]

Conaway's initial description was not as detailed as her later description but it did fit Woodard except for the description of his hair as short.  Judge Hunt

reasonably accepted Conaway's explanation for the changes.

*The level of certainty:*  Woodard mistakenly asserts Conaway's level of certainty was "quite low." [Docket No. 100 at 5] As Judge Hunt found, Conaway was immediately certain she had identified the correct person when she saw the photograph of Woodard in the local newspaper. [Exh. 21 at 26; Tr. 1092] This finding is supported by the testimony of Linda Verfaillie. [Tr. 1234] The judge also found that Conaway's ability to identify Woodard from a front-view photograph enhanced the certainty of her identification because she had never before seen a front view of Woodard. [Exh. 21 at 26]

*Time:*  Woodard states that a significant amount of time passed from the crime until the identification. He states that the identification occurred when the photographic lineup was shown to Conaway in December of 1992, six or seven months after the crime. [Docket No. 100 at 6 (citing Tr. 8766)] (The citation is to the prosecutor's rebuttal closing argument.) Actually, the photographic lineup was shown to Conaway on December 8, 1992, six months after the crimes. [Exh. 21 at 6] The judge found that Conaway was interviewed immediately after the event, that the saw the photograph in the newspaper 11 days later, and that she identified Woodard in the lineup six months later. [Exh. 21 at 27] The identification of Woodard 11 days after the crime from the newspaper photograph in the break room substantially negates any claim the lineup identification is unreliable because Conaway did not view the lineup until six months after the

crimes. [Tr. 1234] The primary case Woodard cites on this point, *Cossel v. Miller*, 229 F.3d 649, 656 (7th Cir. 2000), is readily distinguishable as it involved an identification that occurred three years after the crime.

*Totality of circumstances:* Judge Hunt found that the pretrial and in-court identifications Conway made had "sufficient indicia of reliability to be admissible and to permit her to make an in-court identification of Woodard" as Conaway had "consistently described major features of the man she saw and has done so with confidence." [Exh. 21 at 27] She also found that Investigator Reeder's affirmative nod after the identification during the lineup was not a corrupting influence. [*Id.*]

*Conclusion:* The court of appeals, through Judge Coats, found that Judge Hunt's findings were supported by the record and agreed that Conaway's identification was sufficiently reliable. And Judge Hunt found that Conaway's initial description fit Woodard with the exception of her description of the length of his hair.

Woodard does cite one Ninth Circuit case in this section of his brief without explanation, *Tomlin v. Myers*, 30 F.3d 1235 (9th Cir. 1994). In *Tomlin*, the witness, who sat next to the defendant in a car seat for several minutes, said the suspect was five feet six to eight inches tall, had a heavy build, and had a short afro. *Id.* at 1242-43. Tomlin's hair was actually in a "shoulder-length, straightened permanent hair style," and he was 6 feet tall and thin. *Id.* at 1243.

The court found these discrepancies "cast . . . doubt on the reliability of [the] description" given by the witness.

 *Tomlin* is different from the case at bar.  The *Tomlin* witness sat right next to the defendant while Conaway was much further from Woodard.  The witness in *Tomlin* had a much better opportunity to observe the defendant's hair than Conaway had to observe Woodard's hair at a distance, especially when Woodard may have disguised its length.  Further, Conaway never made major mistakes concerning Woodard's height and weight and her initial observations were accurate.  A further reason why *Tomlin* is distinguishable is that it was decided before the AEDPA was enacted and the court, which was reviewing findings made by the United States District Court after an evidentiary hearing, owed no deference to the decision of a state court.

 In sum, Woodard's reliance on snippets from Judge Mannheimer's and Judge Bryner's opinions is unconvincing.  "Short of 'a very substantial likelihood of irreparable misidentification,' [the identification testimony] is for the jury to weigh." *Manson*, 432 U.S. at 116, 97 S.Ct. at 2254 (quoting *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971 (1968)).  Woodard has failed to show that the decision of the Alaska Court of Appeals, based in turn on Judge Hunt's decision, was an unreasonable determination of the facts in the light of the evidence that is not entitled to deference under *Lambert*.  He has further failed to show that an appellate court could not reasonably conclude that the facts found

by the Alaska courts are not supported by the record. *See Lambert*, 393 F.3d at 971.

Alternatively, Woodard is not entitled to relief because he cannot show that the admission of Conaway's testimony "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 622, 113 S.Ct. 1710, 1714 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 1253 (1946). A habeas petitioner who has shown error is not entitled to relief unless he can show "actual prejudice." *Brecht*, 507 U.S. at 637, 113 S.Ct. 1722. It is well to remember that even Chief Judge Bryner, who dissented from the decision of the Alaska Court of Appeals, was forced to acknowledge that "[t]he evidence presented against Woodard at trial was unusually strong and undeniably compelling." [Exh. 5 at 147] Moreover, at trial, Woodard was able to nullify Conaway's testimony with effective cross examination. [Tr. 3800-3911 (described *infra* at 48-53)] Admission of her testimony did not have had substantial and injurious effect or influence on the verdict.

D.    Ground two

Woodard's second claim is that exclusion of four surreptitiously recorded conversations between himself and VanHousen after VanHousen told Woodard that he was "wired" was error. [Docket No. 100 at 6-8] Woodard claims exclusion of the five tape recordings violated his right to a fair trial under

*Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038 (1973). (Woodard also cites *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887 (1999) and other decisions issued after his trial. But he should not be permitted to rely upon the *Lilly* as it was decided after his trial and his direct appeal. *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060 (1989)). Woodard has also cited *Medina v. California*, 505 U.S. 437, 112 S.Ct. 2572 (1992), but *Medina* is not relevant to his claim.

*Proceedings in the trial court:* On June 11, 1992, shortly after the recorded telephone call between Woodard and VanHousen in which Woodard referred to the murder and robbery as "the thing," VanHousen met Woodard at the Northway Mall and got in his car. [Tr. 5443, 5569] At the beginning of their (recorded) conversation, VanHousen mouthed the word "wired" to Woodard. [Tr. 5355-56]

A third recorded conversation occurred on June 12th, at 6:20 p.m., when VanHousen telephoned Woodard. [Tr. 5443-44, 5570] On June 14, 1992, two additional conversations were recorded. [Tr. 5444-45, 5455, 5570] The jury was informed of these wires and was of course aware that they had not been played for them. [Tr. 5443-45, 5634]

Woodard first asked Judge Hunt for permission to prove that Woodard did not admit any involvement in the Carrs crimes during the last four wires. He claimed he was entitled to do so in order to show VanHousen's state of mind and to negate VanHousen's claim that he had tipped Woodard off. [Tr. 5572-73,

5577-78, 5584]  Judge Hunt ruled the tapes were not admissible to prove VanHousen's state of mind.  [Tr. 5573]  Woodard then argued the fact he had admitted no involvement should be admitted under Alaska Evidence Rule 803(3) to show his own state of mind.  [Tr. 5577]  Judge Hunt ruled the evidence was hearsay and sustained the state's objection to it.  [Tr. 5588]

Woodard was later allowed to ask VanHousen whether, during the wired conversations, he asked Woodard for money so that he could "leave town."  [Tr. 5636]  VanHousen admitted that he had asked Woodard for money for this purpose and that Woodard "did not give him a dime."  [Tr. 5636-37]  Woodard also showed that VanHousen had given him a copy of a local newspaper article June 14, 1992 that provided a full description of Woodard and named him as a suspect in the Carrs robbery and murder.  [Tr. 5444-45, 5455-56]

Woodard later filed a written motion asking that the four wires be played for the jury.  Judge Hunt issued a written order denying the motion.  [Exh. 23]

*Decision of the Alaska Court of Appeals:*  Judge Coats ruled that that Judge Hunt's decision to exclude the evidence was not an abuse of discretion.  [Exh. 5 at 30-33]  He ruled the issue was controlled by *Brannen v. State,* 798 P.2d 337, 340 (Alaska App. 1990), where the court of appeals held that a defendant's self-serving statements made on a wire to an associate of a victim were not admissible.  [Exh. 5 at 33]  He further concluded that Woodard had failed to establish that the statements were admissible for a non-hearsay

purpose or that they were admissible under a hearsay exception. [*Id.*]

Judge Mannheimer concurred with the result reached by Judge Coats. He first said Judge Hunt should have permitted Woodard to show VanHousen failed to elicit an admission from Woodard during the four wires that were not played for the jury. [Exh. 5 at 62-64, 68] (However, Judge Mannheimer pointed out that Woodard was permitted to elicit VanHousen's testimony that he had asked Woodard for some of the stolen money so that he could leave town and that "Woodard didn't give VanHousen a dime." [*Id*. at 64-65])

Judge Mannheimer agreed with Judge Hunt that Woodard's statements on the wires, offered to prove his innocence, were not admissible for that purpose. [Exh. 5 at 66] He also agreed that the state of mind exception to the hearsay rule was inapplicable and that the verbal acts doctrine did not authorize the admission of the tapes. [Exh. 5 at 66-67 (citing *Marino v. State,* 934 P.2d 1321, 1331-32 (Alaska App. 1997))] However, he ruled that VanHousen's repeated accusations were admissible for a non-hearsay purpose – to show how the accusations might have affected Woodard's mental state and behavior. [Exh. 5 at 67-68]

In sum, Judge Mannheimer ruled Judge Hunt had erred (1) in refusing to admit the summarizing fact that Woodward did not make admissions during the final four tapes, and (2) she erred when she concluded VanHousen's statements were hearsay. [Exh. 5 at 68] But Judge Mannheimer concluded the errors were

harmless.  First, Woodard was able to introduce the testimony that Woodard was "peculiarly unresponsive when VanHousen, his friend and supposed accomplice, asked for money from the robbery."  [Exh. 5 at 68]  Second, during the cross-examination of Sean Pierce, Woodard elicited protestations of innocence Woodard had made to Pierce.  [Exh. 5 at 68-69]

Pierce said he had received a telephone call from Woodard after the police searched Woodard's home on June 17, 1992.  [Exh. 5 at 68; Tr. 4902]  Pierce testified Woodard told him he did not know why the police had searched his home, that he was not involved in the Carrs crime in any way, that he had not "done anything," and that he had said  "I'm innocent of the Carrs robbery." [Exh. 5 at 68-69; Tr. 4902, 4907-08]  On redirect, Woodard elicited the latter two statements a second time and Woodard's statement to Pierce that VanHousen was wired.  [Exh. 5 at 68-69; Tr. 5049]  Finally, Woodard's attorney made good use of this evidence, arguing:

> Wires two through five on these other dates, what do we know about them?  We know that Dave VanHousen attempted to get money from Mr. Woodard and he wouldn't give him any.
>
> And we know that on [June] 14th, Mr. VanHousen confronted Mr. Woodard [with] the police-planted profile . . . not [an accurate] description of the robber, but what Investigator Reeder admitted was a [fabricated] police profile.
>
> [VanHousen] [s]howed [Woodard] that . . . [Now] ask yourself why was Jon Woodard acting paranoid.  Why was Jon Woodard getting suspicious? . . .  Imagine that a friend of yours keeps contacting you over and over again, repeatedly, [a friend] who happens to work where a crime happened.  Next, imagine that you pick up your Sunday morning paper, and

there is your description, to a "T".  Sure he's getting concerned.  He's getting concerned that this setup is happening.

[Exh. 5 at 69; Tr. 8574]

*Standard of Review:*  Woodard made the general claim in the Alaska Court of Appeals that the exclusion of the wires, the exclusion of the videotaped police interview of VanHousen, the exclusion of evidence VanHousen and Pierce had failed polygraph tests, the exclusion of photographs of Woodard in the local newspaper, and the videotape of Woodard firing a shotgun and the admission of bad character evidence combined to deny him a fair trial.  [Exh. 3 at 68]  No member of the Alaska Court of Appeals addressed the constitutional claim.

Since the Alaska Court of Appeals did not address the claim before this court, Woodard must show that federal constitutional error was committed – that the failure to admit the wires is "contrary to . . . clearly established Federal Law as determined by the Supreme Court of the United States."  28 U.S.C. §2254(d)(1).  A "contrary to" error is established "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." *Williams  v. Taylor*, 539 U.S. 362, 412-13, 120 S.Ct. 412-13 (2000).  *See Early v. Parker*, 537 U.S. 3, 8, 123 S.Ct. 362, 365 (2002) (a state court does not commit "contrary to" error by failing to cite or even show awareness of Supreme Court

cases; issue is whether reasoning or result of state-court decision contradicts Supreme Court decision); *Mitchell v. Esparza*, 540 U.S. 12, 15-17, 124 S.Ct. 7, 10-12 (2003) (decision was not contrary to Court's precedent when it "does not conflict with the reasoning or holdings" of Court's decisions); *Frantz v. Haney*, ___ F.3d ___, 2008 WL 170323 *5 (9th Cir. 2008) (en banc) (same).

*Argument*: Woodard argues that he is entitled to relief under *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038 (1973). [Docket No. 100 at 7-8] His claim is that the four tapes that were not played for the jury would have (1) put Woodard's reference to "the thing" (during the surreptitiously recorded telephone call that occurred before VanHousen told Woodard he was wired) "into a non-incriminating context," (2) refute state witnesses whose testimony indicated that Woodard displayed a consciousness of guilt; (3) impeach VanHousen's testimony that he had "tipped off" Woodard that he (VanHousen) was wired, (4) and refuted police testimony that his conduct displayed consciousness of guilt and to impeach police testimony that Woodard engaged in counter-surveillance driving. [Docket No. 100 at 6-7] Woodard's argument is not meritorious.

Chambers, charged with murder, called as a witness at Chambers' trial a man named McDonald who had previously confessed to the murder. But McDonald repudiated the confession on the stand. *Chambers*, 410 U.S. at 294, 93 S.Ct at 1045. Chambers was then denied permission to examine McDonald as an adverse witness based on a rule that barred parties from impeaching their

own witness. *Id*. at 297, 93 S.Ct. at 1046. Further, because the state hearsay rule did not include an exception for statements against penal interest, Chambers was not permitted to introduce the three confessions McDonald had made to three other persons. *Id*. at 298-99, 93 S.Ct. at 1047-48. The Court held that the exclusion of McDonald's out of court confessions plus the refusal to permit Chambers to cross-examine McDonald denied him a trial "in accord with traditional and fundamental standards of due process." *Id*. at 302-03, 93 S.Ct. at 1049.

The decision of the Alaska Court of Appeals, which affirmed Woodard's conviction despite the exclusion of the four tapes, did not violate *Chambers*. As Judge Mannheimer pointed out (in the process of showing that the exclusion of the tapes evidence was harmless error), ample evidence was available for the purposes Woodard has listed – to put the first tape in context, to meet the state's claim that Woodard had exhibited a consciousness of guilt, and to impeach the claim that VanHousen had tipped off Woodard.

Woodard's attorney made much VanHousen's exhibition of the newspaper to Woodard – the article describing him as a suspect in the Carrs crimes – and argued such conduct would make anyone conduct themselves in a guilty manner. [Tr. 8574] He pointed out that Woodard had refused to give VanHousen even one dime and that Woodard had told Paul Pierce in another conversation that he had not done anything and was "innocent." [*Id*.]

In short, Woodard was not categorically deprived of vital evidence as was the case in *Chambers*. The case at bar is also unlike *Rock v. Arkansas*, 483 U.S. 44, 55, 107 S.Ct. 2704, 2711 (1987), where the defendant, who was the only eyewitness to the murder but whose memory was hypnotically refreshed, was prohibited from testifying. A "weighty interest" of Woodard's has not been infringed. *See Rock*, 483 U.S. at 58, 107 S.Ct. at 2712-13.

Woodard cites *Chai v. Camabra*, 360 F.3d 997 (9th Cir. 2004), without discussion, as a case showing that he is entitled to relief. [Docket No 100 at 7] Woodard's reliance on *Chia* is mistaken as application of the Ninth Circuit test for constitutional error in *Chia* shows that Woodard should not prevail.

Chia was accused of murdering two undercover DEA agents and wounding another in an attempt to steal "buy money." The DEA agents, who had $80,000, drove off with one Kow intending to implement the sting. They were followed by two of Kow's confederates, Wang and Chen. After the agents gave the money to Kow and Wang, Kow and Wang opened fire, killing two of the agents. Kow and Wang fled in a vehicle driven by Chen. During an ensuing chase, Kow and Chen were killed by DEA agents.

Wang then made four separate statements to the authorities. In the first statement, Wang said he, Kow, and Chen planned to rob the DEA agents. The second statement was the same but was more detailed. In the third statement, Wang said Chia had told him not to go through with the plan, warned him that

he should not do so because Kow and Chen were not trustworthy, and said that Chia was not part of the plot. Wang also said that no one had planned to split the proceeds with him. In the fourth statement, Wang confessed his involvement but said again Chia had told him not to go through with the plot.

At Chia's trial, Wang took the Fifth Amendment and refused to testify. The trial court excluded Wang's statements as inadmissible hearsay. The jury convicted based on evidence that Chia interacted frequently with Wang and the others just before the crime and the testimony of an expert that Wang's behavior was consistent with someone engaging in "counter surveillance." *Chia*, 360 F.3d at 1003. The Ninth Circuit held 2-1 that Wang's statements were crucial, reliable, and material and would have substantially bolstered Chia's defense. *Id.* at 1003, 1004.

In determining whether evidence should be admitted on account of the due process right to present a defense, the Ninth Circuit applies a four-factor test, evaluating (1) the probative value of the evidence on the central issue, (2) its reliability, (3) whether it is capable of evaluation by the trier of fact, and (4) whether it is the sole evidence on the issue or merely cumulative. *Chia*, 360 F.3d at 1004. The tapes at issue here clearly fail the four-factor test. The probative value of the tapes was not high. In *Chia*, the statement at issue inculpated Wang "by removing all doubt as to his *mens rea*, while exculpating Chia." 360 F.3d at 1004. Wang's statement was the only evidence available to

Chia to negate the expert's testimony that Chia was a lookout. Woodard, in contrast, had other evidence to explain his guilty conduct: proof that VanHousen had intimidated him by showing him the newspaper article that named him as a suspect. Moreover, Woodard had told Pierce that he was not involved in the crime and that he was innocent. And Woodard had not given VanHousen his supposed co-conspirator any money – not even "a dime" – despite VanHousen's accusations. Finally, the evidence of Woodard's guilt was "unusually strong and undeniably compelling." [Exh. 5 at 147]

The second factor – the reliability of the evidence – weighs heavily against its admission. There is no doubt concerning the content of the wires. But Woodard did not make admissions during the later tapes because VanHousen told him silently that he was "wired." Indeed, even if VanHousen's claim that he mouthed the word "wired" to Woodard is discounted, Woodard's statement to Pierce during the same period of time – that he believed VanHousen was wired – establishes the same proposition: Woodard was aware VanHousen was wired.

Indeed, the very reason a defendant's statements are normally inadmissible is that they are unreliable. *See State v. Agoney*, 608 P.2d 762, 764 (Alaska 1980) (defendant's statement to police did not qualify as excited utterance when he was not excited and had motive to fabricate); *Brannen v. State*, 798 P.2d 337, 341 (Alaska App. 1990) (defendants self-serving statements on wire to victim of crime were inadmissible as defendant had time to reflect and

motive to fabricate). Woodard's statements stand on no different ground as he at least strongly suspected VanHousen was wired when he made the statements at issue.

The third factor is whether the statements on the wires are capable of evaluation by the trier of fact. They are.

The fourth factor is whether the evidence is the *sole* evidence on the issue or merely cumulative. As aforesaid, the jury knew that there were other recorded conversations between VanHousen. The contents were duplicated to a significant extent by the evidence described above and in Judge Mannheimer's concurring opinion.

In sum, the evidence clearly fails three of the four *Chia* factors so that exclusion did not violate Woodard's right to present a defense. Moreover, to the extent that *Chia* conflicts with *Chambers*, it is not binding because it is the decisions of the court that control, not Ninth Circuit decisions. *Early*, 537 U.S. at 8, 123 S.Ct. at 365.

Alternatively, Woodard is not entitled to relief because he cannot show that the exclusion of four tapes "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 622, 113 S.Ct. 1710, 1714 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946)). *See also Fry v. Plyler*, ___ U.S. ___, ___, 127 S.Ct. 2321, 2328 (2007) (*Brecht* harmless error standard applies whether or not the

state court recognized the error and reviewed it for harmlessness). A habeas petitioner who has shown error is not entitled to relief unless he can show "actual prejudice." *Brecht*, 507 U.S. at 637, 113 S.Ct. 1722. The evidence at Woodard's trial was comprehensive and compelling. The four wires would have added little, if anything at all, to Woodard's case; they would not have dented the evidence of Woodard's guilt in any meaningful way.

 E. <u>Ground Three</u>

 In ground three, Woodard claims that the exclusion of evidence that Pierce and VanHousen took and failed polygraph tests violated Woodard's right to confront and cross-examine those witnesses. [Docket No. 100 at 8-9]

 Woodard filed an motion asking that he be permitted to introduce evidence that Pierce and Woodard had failed polygraph examinations. [Exh. 22 at 1] He argued that Pierce's failure to pass a polygraph was relevant because Pierce's plea agreement required him to pass one and that he was under great pressure from the police to support the state's case since he had not done so. [Exh. 5 at 70; Exh. 22 at 3] VanHousen's (second) plea agreement did not require him to pass a polygraph; accordingly, Woodard argued VanHousen's failure to pass one was relevant because (1) after failing the polygraph, VanHousen presented the police with a revised story that was substantially more incriminating towards Woodard, and (2) the police, after hearing Woodard's revised story, decided that it was not necessary to require him to pass one. [Exh. 5 at 70-71; Exh. 22 at 9]

Judge Hunt issued a written decision denying the request to admit evidence that Pierce and VanHousen had flunked the polygraph. [Exh. 22] However, she allowed Woodard to impeach Pierce and VanHousen with the inconsistent statements they made to the polygraph operator. [Exh. 22 at 12-13]

The judge found Woodard had ample evidence available with which to impeach Pierce and VanHousen: their favorable plea bargains, their interest in currying favor in order to avoid prosecution for both charged and uncharged crimes, the special treatment they had received from the state, the specific grants of immunity they had received, the promises of leniency in pending cases, the threats and acts of intimidation by the police, the provisions of their plea bargains they had breached, their perception that the breaches might jeopardize their plea bargains, their lack of candor with the police as evidenced by later revelation of further facts, and their prior inconsistent statements including those made during the polygraph examinations. [Exh. 22 at 13]

Woodard then introduced an enormous amount of evidence at trial in an effort to show that Pierce was biased. Pierce admitted that his plea and immunity agreement, which required him to testify truthfully and to serve only three years for second-degree robbery and one year on a probation revocation, was very favorable. [Tr. 4531-47, 4697-4721] He also admitted he had committed many other offenses and could be sentenced to a total term of 224 years for the Carrs homicide and the other state and federal offenses if the state was able to show he

had not complied with the immunity agreement. [*Id.*] Because the part of the agreement which required Pierce to pass a polygraph was excluded, the parties stipulated before the jury that: "There is one condition of Mr. Pierce's agreement with the state which he has not fulfilled." [Tr. 4614-15, 4734] After the stipulation was read in Pierce's presence, he acknowledged the state could revoke its agreement with him at any time. [Tr. 4735]

Woodard was also allowed to impeach VanHousen with substantial similar evidence. VanHousen entered his first plea agreement on June 11, 1992 before the second warrant application hearing. [Tr. 5349] VanHousen was cross-examined concerning the requirement that he testify truthfully and the fact that he had received immunity for perjury the previous day at the warrant application hearing and then lied again. [Tr. 5352-53] (VanHousen admitted he lied at the second warrant application hearing.) [Tr. 5354-62] VanHousen explained he entered an additional plea agreement on June 30, 1992 because he had violated the first agreement. [Tr. 5363, 5408] In the June 30 agreement, the state agreed not to charge VanHousen with second-degree murder; VanHousen was required to plead to first-degree robbery and first-degree hindering prosecution and to be sentenced for those offenses, to testify truthfully, and be truthful with the police. [Tr. 5364-66, 5713, 5741] The jury was not told that the first agreement required VanHousen to pass a polygraph or that he had flunked it; however, the parties stipulated: "There was a condition in Mr. VanHousen's first agreement that he did

not fulfill. That condition was not included in the second agreement." [*Id.*] Both men were impeached with statements they made to the polygraph examiner, Officer Harrick. [Exh. 5 at 74; Tr. 4941-43, 4950-65; 5637-48] (Accordingly, Woodard's citation of *Wyrick v. Fields*, 459 U.S. 42, 48, 103 S.Ct. 394, 396 (1982), for the proposition that statements to a polygraph examiner are admissible is of no assistance to him. [Docket No. 100 at 9])

Woodard's attorney adduced much additional evidence that VanHousen had reason to be biased in favor of the state. VanHousen understood he could receive a sentence of 99 years if he was prosecuted for second-degree murder, that the maximum for first-degree robbery is 20 years, and that the maximum for hindering prosecution is five years, but that the minimum possible sentence for the charges he agreed to admit was three and one-half years. [Tr. 5707, 5714] He also understood he could be convicted for multiple counts of perjury at the search warrant application hearings and receive a sentence of ten years for each count. [Tr. 5708-10] Woodard also pointed out VanHousen still had his "deal" with the state despite the fact he had lied to the police on many occasions. [Tr. 5741]

*Decision of the Alaska Court of Appeals:* Judge Coats concluded that Judge Hunt did not err in concluding that Woodard could fully establish Pierce's and VanHousen's bias without informing the jury of the provisions in the agreements that required them to pass polygraph examinations and that Judge Hunt could properly conclude that admission of the information concerning the polygraph tests

would merely create unnecessary confusion.  [Exh. 5 at 37]

Judge Mannheimer concurred with Judge Coats.  He rejected Woodard's argument that evidence Pierce and VanHousen had failed the polygraph should have been admitted in order to show that the police would be able to pressure the two men because they faced substantial criminal liability if they breached their plea agreements.  [Exh. 5 at 73]  He concluded Woodard was "clearly able to make his point [that the authorities could accuse VanHousen and Pierce of lying and force them to alter their stories] without mentioning the polygraph results."  [*Id.*]  The judge pointed out that Alaska courts have repeatedly acknowledged the substantial prejudicial effect of polygraph evidence and its potential for unfair prejudice.  [*Id.*]  In upholding Judge Hunt, he found it was sufficient for Woodard to show that, after VanHousen and Pierce made their statements to the police, the police "informed the two men that they did not believe their stories."  [Exh. 5 at 73-74]  He then outlined evidence which showed that Woodard was able to effectively impeach Pierce and Woodard and pointed out that Woodard had used the evidence in argument.  [Exh. 5 at 73-75]

Judge Mannheimer also rejected the argument that Pierce should have been impeached with evidence that he had failed a polygraph examination that his plea agreement required him to pass (so that he was at the mercy of the authorities).  [Exh. 5 at 76]  The judge pointed out the parties stipulated that Pierce had violated his plea agreement.  [*Id.*]  During cross-examination of

Pierce, Woodard had shown that Pierce faced the equivalent of life in prison if the state revoked the agreement and that the state could revoke the agreement at any time because Pierce had already violated the agreement. [*Id.*]

The judge then observed the parties had also stipulated VanHousen had failed to fulfill an unspecified condition of his first plea agreement and that the state omitted this term when the agreement was renegotiated. [Exh. 5 at 76-77] VanHousen admitted that he had violated his second plea agreement by lying about what he had done with the proceeds of the robbery so it was clear that the state could unilaterally revoke his plea agreement. [Exh. 5 at 77] Judge Mannheimer also pointed out the Woodard was able to argue VanHousen had repeatedly changed his story until he came up with a version of events that the police were willing to believe. [Exh. 5 at 75]

Accordingly, Judge Mannheimer concluded that Woodard could make his point that Pierce and VanHousen were entirely beholden to the state without the polygraph evidence. [Exh. 5 at 75-77] Judge Mannheimer then went on to point out that the primary case Woodard had relied upon, *United States v. Lynn*, 856 F.2d 430 (1st Cir. 1988), was distinguishable and did not support Woodard's arguments. [Exh. 5 at 78-79]

*Standard of review:* The Alaska Court of Appeals did not consider the argument that the exclusion of polygraph evidence violated Woodard's federal constitutional rights to confront and cross-examine the witnesses against him.

Thus the issue for this court is whether "contrary to . . . clearly established Federal Law as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d)(1).

*Argument:* Woodard, citing *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431 (1986), argues that the exclusion of polygraph evidence violated his right to confront and cross-examine Pierce and VanHousen. [Docket No. 100 at 8-10] This issue is controlled by *United States v. Scheffer*, 523 U.S. 303, 118 S.Ct. 1261 (1998). In *Scheffer*, polygraph evidence had been excluded on account of a Military Rule of Evidence, 707(a), which provided:

> Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to talk, or taking of a polygraph examination, shall not be admitted in evidence.

The Court rejected the argument that this blanket exclusion of polygraph evidence violate a defendant's right to present a defense. 523 U.S. at 317, 118 S.Ct. at 1269. If a blanket exclusion of polygraph evidence does not violate the federal constitution, then the exclusion of polygraph evidence here could not violate Woodard's right to cross-examine and confront witnesses. *King v. Triplett*, 192 F.3d 517, 524-25 (6th Cir. 1999); *see also United States v. Gardner*, 463 F.3d 445, 468-69 (6th Cir. 2006) (prosecutor did not violate defendant's constitutional rights by failing to disclose that state's witness had flunked polygraph).

Alternatively, as Judge Mannheimer explained in his decision, Woodard

was able to effectively show and argue that Pierce and VanHousen had many reasons to testify favorably to the state – that they were both at the mercy of the state because they had violated their plea agreements. It is well established that polygraph evidence has a high potential for misuse and prejudice as jurors may give excessive weight to the opinions of a polygraph examiner and abandon their duty to assess credibility and guilt. *See Scheffer*, 523 U.S. at 313-14, 118 S.Ct. at 1267. Given this fact and the cross-examination that Woodard actually conducted, it is clear that he was not legally prejudiced and it is very clear that Woodard's right to present a defense was not violated. *See Holmes v. South Carolina*, 547 U.S. 319, 325, 126 S.Ct. 1727, 1731 (2006) (right to present defense is not abridged by exclusion of evidence by rules that are not arbitrary or disproportionate to purposes they are designed to serve).

Indeed, in *United States v. Cordoba*, 194 F.3d 1053, 1063 (9th Cir. 1999), the Ninth Circuit held that a trial judge did not abuse his discretion in ruling polygraph evidence inadmissible under Evidence Rule 702 as it has not been shown to be reliable. The court also held that the risks associated with admitting the results of a (flawed) polygraph examination greatly outweighed its probative value. *Cordoba*, 194 F.3d at 1062-63. *Cordoba*, excluding polygraph evidence under the mere rules of evidence, implicitly holds that exclusion of such evidence does not violate the right to present a defense. *See also Smith v. Baldwin*, 510 F.3d 1127, 1148 (9th Cir. 2007) (prosecutor's refusal to disclose

polygraph result did not violate duty to disclose exculpatory evidence because polygraph results are neither admissible nor material evidence).  In sum, the exclusion of evidence concerning the polygraph tests administered to Pierce and VanHousen was not contrary to any decision of the Court and Woodard is not entitled to relief.

Alternatively, Woodard is not entitled to relief because he cannot show that the exclusion of the fact that VanHousen and Pierce flunked polygraph examinations "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 622, 113 S.Ct. 1710, 1714 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 1253 (1946)).  A habeas petitioner who has shown error is not entitled to relief unless he can show "actual prejudice."  *Brecht*, 507 U.S. at 637, 113 S.Ct. 1722. The evidence at Woodard's trial was "unusally strong and undeniably compelling."  The additional evidence that Pierce and VanHousen had flunked polygraph examinations would not have had substantial and injurious effect or influence on the verdict.

F.    Ground four:

Woodard states that three head-on photographs of himself that appeared in the Anchorage newspaper June 24, July 8, and July 21, 1992, "when viewed in conjunction with Ground one could have impeached Robin Conaway's prejudicial testimony."  [Docket No. 100 at 9]  Woodard argues Conaway's identification of

Woodard was a product of her viewing the June 19th photograph, that the three later photographs would have corroborated his contention that Conaway's description was tailored to the newspaper photographs, and that Conaway's identification of him should have been excluded under *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243 (1977).

Woodard also appears to also be making a bare claim that the exclusion of the three photographs, standing alone, "had a prejudicial impact on the verdict" and that he is somehow entitled to relief under *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038 (1973). [Docket No. 100 at 10] Woodard is mistaken.

*Woodard's attempt to persuade Judge Hunt to admit the three photographs:* At trial, Woodard assembled the four pictures of himself that appeared in the Anchorage Daily News after the offense – the June 19th photograph Conaway had identified and separate photographs that were published on June 24, July 8, and July 21, 1992 – and made an exhibit that included all of them. [Exhibit AD; Tr. 3848, 3851] Woodard's attorney told Conaway the four photographs had appeared in the Anchorage Daily News and asked her whether she saw the photograph she had seen on June 19th in the exhibit. [Tr. 3848, 3851] Conaway first answered that she "[did not] remember those." [Tr. 3848]

Woodard's attorney then presented the photograph that had been shown to Conaway at the suppression hearing and asked her if she had not identified it at the suppression hearing as the photograph she had seen on June 19, 1992. [Exh.

15[2]; Tr. 3849]  Conaway agreed she had seen the June 19th photograph of Woodard, then agreed that the four-picture exhibit Woodard had shown to her included the June 19th photograph, but said she had never seen any of the other photographs in Exhibit AD.  [Tr. 3849-52]

Woodard's attorney argued the jury was not bound by Conaway's statement that she had not seen the three photographs and that she had been in a position to see them.  [Tr. 3853]  Judge Hunt sustained the state's objection to Exhibit AD because Conaway denied having seen it, but admitted Exhibit AD-1, the June 19th picture.  [Tr. 3854-55, 3859]  Part of the ruling is indiscernible and has not been transcribed.  [*Id*.]

Woodard later presented evidence that Conaway had been working at Carrs on the days the photographs of Woodard had been published in the newspaper – June 24, July 8, and July 21 – and asked again for the admission of AD.  [Tr. 7703-05]  Judge Hunt ruled that the fact that Conaway was at work on those days was "not a sufficient connection to turn it into circumstantial evidence" that she had seen the photographs.  [Tr. 7705]

*Decision of the Alaska Court of Appeals:*  The three judges issued separate opinions dealing with Judge Hunt's exclusion of the three photographs.  Judge Coats noted Conaway had testified the daily paper was usually in the break

---

[2]        Exhibit 15 in this court is marked as trial Exhibit No. AE.  It is also marked on a separate sticker as Exhibit B.  This is believed to be the exhibit sticker that was placed on it at the suppression hearing.  [Tr. 3849]  Exhibit 15 is a copy of the June 19, 1992 photograph of Woodard.

room at Carrs and that Conaway had worked on the days the photographs were published. [Exh. 5 at 38] Woodard had argued that the presence of the three photographs in the break room, which were said to be like the photograph of Woodard in the photographic lineup (face-on), was circumstantial evidence Conaway had been exposed to the photographs. [*Id.*]

Judge Coats ruled that Alaska Evidence Rule 403 warranted the exclusion of the three photographs although they may have been of marginal relevance to show why Conaway could pick Woodard out of a lineup of head-on photographs since she claimed she had only seen his profile. [Exh. 5 at 39] He said that showing the jury additional photographs of Woodard would have added little. [*Id.*] Judge Coats pointed out that Woodard was able to effectively establish the shakiness of Conaway's identification and how it was tainted with the evidence that she had seen at least one photograph of him in the newspaper and noted Woodard was able to establish that additional photographs had appeared in the newspaper and that Conaway might have seen them. [*Id.*]

After engaging in an extensive factual and extensive legal analysis, Judge Mannheimer concluded that the three photographs were relevant and should have been admitted but that the error was harmless. [Exh. 5 at 80-88] Judge Bryner (mistakenly stating that Woodard offered two rather than three additional newspaper photographs of Woodard) reasoned in dissent that the head-on photographs "might have [caused the jury] to entertain[] a reasonable

doubt as to whether Conaway had actually identified anything other than a recently-seen newspaper photograph." [Exh. 5 at 132-35]

*Procedural bar:* Woodard argues first his argument that the exclusion of the three photographs was error should be viewed in conjunction with Ground One, his claim that Conaway should not have been permitted to identify Woodard. He states: "When viewed in conjunction with Ground One, the admission of the news photograph[s] could have impeached Conaway's testimony." [Docket No. 100 at 9] He goes on to claim the three unadmitted photographs should have led to the exclusion of any identification testimony under *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243 (1977).

Although Woodard argued cumulative evidentiary error in his petition for hearing to the Supreme Court of Alaska, Woodard did not argue in that court or in the Alaska Court of Appeals that the alleged error in admitting Conaway's identification of Woodard should be cumulated with the alleged error in refusing the admission of the three photographs. [Exhs. 3, 4, and 6] Thus, the present claim, that the three photographs show that Conaway's identification testimony should not have been admitted, is a new, unexhausted and procedurally barred claim. (Indeed, if the claims had been combined in this manner in the original or amended habeas petition, the state would have argued that the claim was not exhausted.) As it is, the present claim is not included in the habeas petition and should be denied for the additional reason that the time in which to file an

amended petition has long since passed.

*Standard of review:* The Alaska Court of Appeals did not consider the argument that the exclusion of the three photographs violated Woodard's federal constitutional rights to confront and cross-examine the witnesses against him. Thus, the issue for this court is whether the decision of he Alaska Court of Appeals is "contrary to . . . clearly established Federal Law as determined by the Supreme Court of the United States" 28 U.S.C. §2254(d)(1).

*Argument:* To establish he is entitled to relief, Woodard must show that the exclusion of the three photographs violated his right to present a defense. Woodard's arguments are hardly briefed at all, but the state will respond. It is clear that the exclusion of the three photographs did not infringe Woodard's right to present a defense. In order to understand why this is the case, it is necessary to review the entirety of Conaway's testimony at trial.

Conaway testified at trial that she saw the robber from the chest up when the shot was filed that killed the victim. [Tr. 3706-07] She then left the building through a rear exit and ran across Benson to the area of the Princess Restaurant. [Tr. 3707-09] When Conaway turned around, she saw "the robber" walking across the parking lot at a steady pace. [Tr. 3710, 3712] He had a gun in his left hand and had something tan in his right arm. [Tr. 3712, 3715] Conaway watched the robber until he went behind some semi-trailers. [Tr. 3711] Conaway did not see the robber straight on; she saw him "from the side."

[Tr. 3713]  He was a "tall big man, with a royal blue jacket on, and dark pants, dark shoes, dark hair, with a square, like forehead."  [Tr. 2714]  His hair was pulled back and did not cover his ears; he was a white man.  [*Id.*]

On direct examination, Conaway agreed she had told Officer Hollingsworth on the day of the offense that the robber did not look like he had a tan, did not say she thought he was carrying something, and was not sure whether he had a moustache.  [Tr. 3722-25]  Conaway said the robber was a big man, but she did not think he was muscular.  [Tr. 2724]

On June 19th, Conaway saw Woodard's photograph in the newspaper in the break room.  It was a side view.  [Tr. 3730]  Conaway said the person in the photograph looked like the robber, but a co-worker, Linda Verfaillie, said it wasn't.  [Tr. 3728-29]  Conaway skimmed the article.  [Tr. 3729]  She did not contact the police because the person in the photograph was already in custody.  [Tr. 3734]

On December 29, 1992, Investigator Reeder interviewed Conaway.  [Tr. 3736, 3742]  Conaway told him she had not at any time seen any photographs of Woodard in the newspaper, other than the June 19th photograph, and that she had not seen him on television.  [Tr. 3737-38, 3795-96, 3837-38]  She did, however, discuss Billy Evans with the deli manager.  [Tr. 3738-39]  Conaway told the deli manager she thought it could have been Evans because he had quit Carrs abruptly.  [Tr. 3738-39]  However, Evans was short and stocky and did not

48

fit the description of the robber.  [Tr. 3739-40]

Later on December 29th, Conaway picked "the shooter" – Woodard – out of a photographic lineup shown to her by Investigator Reeder.  [Tr. 3742-43] Woodard was the fifth individual in the 6-person lineup.  [Tr. 3742-43]  On a scale of 8-10, Conaway's level of certainty was "8" or "9" if she could have seen him from the side.  [Tr. 3742-44]  Conaway also identified Woodard in court.  [Tr. 3750, 3799]

In an interview just before the suppression hearing, Conaway claimed she had thought Woodard was wearing earmuffs.  [Tr. 3751-52]  When another employee said Woodard was wearing a headset, she claimed that a headset was the earmuffs she thought she had seen.  [Tr. 3752]

On cross-examination, Conaway admitted her initial view of the shooter at the manager's booth was from the back, that she "didn't see [the shooter] walk very far" ("not that long") in the parking lot before he disappeared behind a trailer, that she was about 140 feet away from the shooter at the time of her observation, and that other Carrs employees were nearer to the shooter than she was.  [Tr. 3802, 3808, 3811-13]  Woodard's attorney played a portion of the June 8, 1992, tape recorded interview of Conaway by Officer Hollingsworth when Conaway said Woodard not look muscular, was wearing a long sleeved coat, and had no tan.  [Tr. 3818-20,  3833-34]  Conaway also said she did not know if he had facial hair, that he had straight very dark black hair that was not very long,

and that she did not know if he was wearing glasses. [*Id.*]

Conaway admitted she also told officer Hollingsworth that she could not say whether the shooter was carrying an automatic handgun or a revolver despite Officer Hollingsworth displaying his semiautomatic handgun to her. [Tr. 3821-22] Conaway also told Officer Hollingsworth she did not know whether the shooter was carrying anything besides the gun. [Tr. 3822-23] When the officer told Conaway that others had reported seeing a shopping bag, Conaway said she did "not see [any]thing directly." [Tr. 3824]

Conaway admitted that she had not said previous to her testimony at trial that the shooter had a "square forehead" and that she had stated to officer Hollingsworth, "The side of his face was white. I could not see the front of his face. I didn't see the face." [Tr. 3825-27] Later during the interview, Conaway was asked if she would recognize the shooter if she saw him again, and responded she "didn't see [the shooter's] face. I know if I saw him from the side, dressed like he was, I . . ." [Tr. 3829-30]

Conaway admitted on cross-examination she believed that Billy Evans could be the shooter before she saw the June 19, 1992 photograph of Woodard in the break room. [Tr. 3839-41] She denied that she had seen any other photographs of Woodard, any television coverage of the crime (except for the night of the offense), but was forced to admit that she had been in a position to see the daily Anchorage newspaper because it was always available in the break

room at Carrs.  [Tr. 3847-48]

When shown Exhibit AD (the collage of the newspaper photographs of Woodard) on cross-examination, Conaway first said she did not recall any of the pictures.  [Tr. 3848]  She then admitted she had seen the June 19th photograph at the suppression hearing.  [Tr. 3849-50]  Conaway then testified she could have seen the photographs that appeared in the Anchorage newspaper on June 24, July 8, and July 21, 1992 if they were in the break room but denied that she had seen or noticed them.  [Tr. 3851-52]  A copy of the June 19th photograph, Exhibit AD-1, was admitted.  [Tr. 3859]

Conaway admitted that in Exhibit AD-1, Woodard's arms appeared to be "big," that he had a tanned complexion, that he was clean shaven, that he had a noticeable sideburn, and that his hair was pulled back into a pony tail.  [Tr. 3860-61]  Woodard's attorney then suggested that Conaway's later descriptions of the robber appeared to fit the June 19th newspaper photograph.  He pointed out that the description Conaway gave in her direct examination was the same as Woodard's appearance in the photograph (muscular build, arms looked big, medium complexion, clean shaven, medium sideburns, square forehead, and dark brown hair pulled back) and that this description contradicted the description she had given to the police and to the state's paralegal (not muscular, long sleeved coat, no tan, unable to say whether there was facial hair, not long hair, nothing about hair being pulled back, unable to describe weapon, nothing

about earpiece or earmuffs, nothing about Woodard carrying a bag, and saw him only from the side). [Tr. 3861-70]

Woodard's attorney then impeached Conaway with her December, 1992 statements to Investigator Reeder that the shooter "reminded [her]" of Billy Evans and that she thought he was the robber between the time of the robbery and her viewing the June 19th picture. [Tr. 3873-74] He next impeached Conaway with the statements she made to Investigator Reeder when she identified Woodard from the photographic lineup. She said Woodard's photograph "resembles the man" and responded, "Could be" when asked if the person in the photographic lineup was the person. [Tr. 3899] The attorney then pointed out Conaway had never had a view of Woodard that was embodied in the lineup – that she had not seen him from the front, and had been "amazed" that she was able to pick out the robber from the lineup because she had only seen him from the side. [Tr. 3900, 2905-06]

Woodard's attorney was able to deal effectively with Conaway's testimony in final argument. [Exh. 5 at 86-87] He pointed out that no one identified Woodard until the photograph showing him shackled and chained was in the newspaper. [Tr. 8634] The attorney continued:

> This is how police and media focus and influence impacted witnesses and literally started [a] self-fulfilling prophecy that the man [fingered] by the self-admitted perjurer VanHousen was the robber. The perjurer gives Woodard's name, the

              police plant his description in the newspaper,[3] and it takes on
a life of its own.

[Tr. 8635]  Woodard's attorney then specifically identified and described the
inconsistencies between Conaway's initial statement and Woodard's actual
appearance.  [Tr. 8636]  He also identified the similarities between her later
descriptions of Woodard and his appearance in the June 19, 1992 photograph.
[Tr. 8637]  He also asserted that Conaway had identified the robber as Billy
Evans.  [Tr. 8638-39]  He went on to suggest Conaway's identification of
Woodard in the lineup was the product of her having viewed another photograph
of him in the newspaper or having seen him on television.  [Tr. 8640]

     As Judge Mannheimer convincingly explains in his concurring opinion,
exclusion of the three head-on photographs of Woodard was harmless error.
[Exc. 83-88]  Under *Chambers*, the right to present a defense is offended when
critical evidence – all or virtually all of evidence impeaching the government's
case – is excluded.  410 U.S. at 302, 93 S.Ct. at 1049.  All evidence negating
Conaway's identification was not, as was the case in *Chambers*, excluded.  As
has been shown, Woodard offered substantial evidence to impeach Conaway.

     This case fails the *Chia* test as well.  360 F.3d at 1003-04.  The probative
value of the three photos was not high because ample other evidence impeached
Conaway, because the jury knew of Conaway's possible exposure to the three

---

[3]     The police had provided Woodard's description to the media as the
suspect and it was published.  [Tr. 7480, 7580-81]  After it was published, the
police received several calls from the public.  [Tr. 7480]

photographs, and because there was overwhelming evidence of Woodard's guilt. The three photographs were reliable and capable of evaluation by the trier of fact, but would have been cumulative.

Alternatively, Woodard is not entitled to relief because he cannot show that the exclusion of the three photographs "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 622, 113 S.Ct. at 1714 (quoting *Kotteakos,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253 (1946). A habeas petitioner who has shown error is not entitled to relief unless he can show "actual prejudice." *Brecht*, 507 U.S. at 637, 113 S.Ct. 1722. The admission of the three frontal photographs of Woodard would not have made a difference in the outcome of the trial.  Woodard was convicted because of the evidence that the fatal round had been fired from his Glock, the testimony of Pierce, VanHousen, and Bohlin, and the other physical evidence – the fingerprint on the stolen money and his hair on the money and on the ammunition box at Elklutna.

G.    Ground five

Woodard claims that a portion of the videotape of VanHousen being questioned by Anchorage police should have been admitted as it would have impeached VanHousen's credibility, exposed his bias, and shown "that he received favorable treatment from the state." [Docket No. 100 at 11]  He claims the videotape would have been the best evidence that the police used threats to cause VanHousen to change his testimony.

*Proceedings at trial*:  The police videotaped an interview of VanHousen on June 25, 1992.  VanHousen did not admit his full involvement during this interview.  [Tr. 5358-59]  Woodard asked to be permitted to play a portion of the tape "in which the police made threats and put pressure on Mr. VanHousen . . . tell[ing] him he is going to be charged with murder."  [Tr. 5399-5400]  Woodard claimed he had the right to introduce this tape because it was extrinsic evidence of bias.  [Tr. 5400]

The state argued that Woodard would not be prejudiced by exclusion of the tape if VanHousen admitted making the statements attributed to him, that admitting the tape would put irrelevant police opinions before the jury, and that those opinions were more prejudicial than probative.  [Tr. 5400-01]  Judge Hunt, citing Alaska Evidence Rule 613(b), which address the foundation prerequisite to impeachment by inconsistent statement, deferred ruling until Woodard established a foundation.  [Tr. 5403]

The next day, VanHousen testified on cross-examination that the police compelled him to go to the station on June 25, 1992 despite the fact that his attorney was out of town.  [Tr. 5651]  VanHousen said the police put "tremendous pressure" on him and made "threats of prosecution."  [Tr. 5651]  Woodard again argued he should be permitted to play the portion the interview when Woodard was threatened.  [Tr. 5651-5660]  The state argued Woodard did not need to show the tape because VanHousen had admitted the statements were made and argued

Woodard had not established a foundation because he had not given VanHousen an opportunity to address the effect of the statement on him. [Tr. 5652-59] The state also argued the tapes, which included irrelevant opinions of police officers, would be more prejudicial than probative. [*Id*.] Judge Hunt ruled there was nothing to impeach because VanHousen had admitted he had been pressured, intimidated, and threatened. [Tr. 5660]

After a recess, Woodard's attorney questioned VanHousen even more extensively about the videotaped statement. VanHousen agreed he had admitted much, but not all, of his involvement in the crimes after being threatened with prosecution for murder and other crimes in state and federal court. [Tr. 5661-82] VanHousen repeatedly acknowledged that the police had threatened him and agreed that he made statements inconsistent with his trial testimony even after the threats. [*Id*.]

Moreover, Woodard's attorney made effective use of the police threats in his final argument:

> On June 19, VanHousen's confronted. "You're lying." He's threatened with perjury. Prosecution and jail. He feels confused. The police are trying to change things. Telling him this and that. And this, of course, is all the testimony he admitted here in court. Not when he was telling the story that was expected, but on cross-examination.
>
> And then remember this. On June 25, Grimes, when VanHousen's lawyer was out of town, "you perjured yourself in two hearings. That's the least of your problems. You're going down, sitting next to Jon. We're prosecuting you in federal and state court. *You want to go down for murder? Is*

*that what you want to go down for?"*

[Tr. 8565-66 (emphasis supplied)]

*Decision of the Alaska Court of Appeals*:  The court, speaking through Judge Coats, ruled that Judge Hunt had not abused her discretion in refusing to permit Woodard to play the videotape.  [Exh. 5 at 34-36]  The court said that Judge Hunt could properly find that VanHousen's admissions fully established the point the defense was attempting to make and that playing the tape to further establish what VanHousen had already admitted was unnecessary.  [Exc. 5 at 36]

*Standard of Review:*  The Alaska Court of Appeals did not rule on any argument that exclusion the videotape recording of VanHousen's statement violated the federal constitution.  Thus, the issue for this court is whether "contrary to . . . clearly established Federal Law as determined by the Supreme Court of the United States" 28 U.S.C. §2254(d)(1).

*Argument:*  Woodard cites three decisions by the court to support his arguments that the tape should have been admitted.  [Docket No. 100 at 11]  None of the decisions support his position. *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326 (2000), holds that the *Miranda* rule is constitutionally based.  The state does not see how it could support Woodard's position here.  Even if it were relevant, it was decided long after Woodard was convicted and *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060 (1989), would bar its application.

Woodard cites *Gordon v. United States*, 344 U.S. 414, 420-21, 73 S.Ct. 369, 373-74 (1953), without explanation as to how it aids his argument.  In *Gordon*, the court said that a witness's admission of a bare contradiction between a document with the witness's testimony "should not bar admission of the document itself" in evidence.  *Id.*  *Gordon* does not help Woodard because it is not a due process or otherwise constitutionally based case and because it does not defeat the argument that any error was harmless under *Brecht* because VanHousen repeatedly admitted that the police had threatened him.

Woodard also cites *Goldberg v. United States*, 425 U.S. 94, 96 S.Ct. 1338 (1976).  *Goldberg* is not helpful to Woodard because it is a statutory construction case; it construes the word "statement" in the Jencks Act as including a statement to a government attorney.  It is not a due process case.

In sum, Woodard has not shown that the decision of the Alaska Court of Appeals was contrary to any decision of the Court and has failed to show that the exclusion of the tape was not harmless under *Brecht*.

H.    <u>Ground eight</u>

Woodard claims that he was denied due process because he was restrained "during the trial, which was observed and realized by the jury."  [Docket No. 100 at 11-18]  Woodard is not entitled to relief.  The evidence presented to the grand jury and the evidence Judge Hunt heard in connection with Woodard's pretrial motions to suppress the evidence taken from Woodard's trailer warranted the

restraints. Further, Woodard cannot show with competent evidence that the restraints were visible, an essential element of his claim. Finally, the use of the restraints was harmless both because they were not visible and because the evidence was overwhelming.

*Proceedings in state court*:

Woodard was indicted not only for first- and second-degree murder and first-degree robbery for the murder and robbery at Carrs, but also for the first-degree robbery (Count VII) of Chilkoot Charlie's on May 24, 1992 and the first-degree robbery (Count VIII) of the Fireweed Theatre on April 26, 1992. [GJ Tr. 6-7, 43, 60, 113, 542-43]

*Grand jury testimony*: The grand jury transcript, transcribed by the Alaska Court System on August 13, 1992, was available to Judge Hunt prior to her decision to restrain Woodard. The following is a summary of the grand jury testimony[4] bearing on the decision to restrain Woodard:

The robberies of the movie theatre and Chilkoot Charlie's, like the crimes at Carrs, were preceded by unusually careful planning and surveillance; further, substantial efforts were taken to conceal the offenses after they were committed. [GJTr. 113-121; Tr. 64-65]

Woodard had been planning to rob Chilkoot's for a number of years. [GJ Tr. 113] In order to identify employees with access to the Chilkoot's safe,

---

section of the brief. . (Citations to pretrial testimony are not preceded by "GJ.")

Woodard left his credit card at Chilkoot's, telephoned Chilkoot's to recover it, and thereby learned the name of an employee who could open the safe. [GJ Tr. 115-16] On several later occasions, Woodard attempted to get similar information by impersonation – pretending that he had left a credit card at Chilkoot's. [GJ Tr. 116] He then conduced surveillance of employee vehicles in order to learn the names of employees and matched employee names with vehicle license numbers at the Division of Motor Vehicle. [GJ Tr. 113-16] Shortly before May 24th, Woodard thought he knew when someone who could open the safe would be working at Chilkoot's and planned the robbery for that date. [GJ Tr. 118]

During the robbery of Chilkoot's, Sean Pierce acted as the lookout. [GJ Tr. 118-20, 122] Woodard and Pierce were equipped with the scanner and walkie-talkie (which they later used at Carrs) so Pierce could warn Woodard if the police were nearby. [Tr. 119-20] Woodard wore a flak vest during the robbery and was armed with a 10-millimeter Glock. [GJ Tr. 121] Woodard did not obtain any money because he was unable to find anyone to open the safe. [GJ Tr. 124-26] In the course of the robbery, he forced employees into the restrooms at gunpoint. [GJ Tr. 48-49, 124-26]

Woodard obtained about $5,000 in the robbery of the Fireweed Theatre. [GJ Tr. 89-90, 99] Again, Woodard employed surveillance and used Division of Motor Vehicle records to try to figure out who could open the safe and planned the crime to occur at a time when someone would be present who could open the

safe. [GJ Tr. 113-24, 128] Woodard, who had watched the first two employees arrive for work that day, gained entry by knocking on the (same) door where other employees were expected, and forced the employee who had the combination to the safe to open it. [GJ Tr. 71, 77-78] Woodard was familiar with not only the procedure the employees used to enter the business but also the layout of the box office and manager's office. [*Id.*] Woodard wore a wig during this robbery. [GJ Tr. 89]

The Carrs robbery was also carefully planned in advance with the use of inside information. Woodard inquired of David VanHousen, a Carrs employee, and learned that Carrs took in $50,000 a day, Monday would be a good day for a robbery because money from the weekend would be in the store, the days and times the Loomis armored car was scheduled to arrive at Carrs, and the procedures used in the manager's booth. [GJ Tr. 290-91, 448-49]

Woodard also personally "cased" Carrs: he studied approaches to the manager's booth, personally checked on the time of arrival of the armored car, checked to see that the scanner/walkie-talkie he planned to use with Pierce would work, and studied Carrs' operations from the woods across the street. [GJ Tr. 290-91, 453] VanHousen had discussed the escape route through the back door of the store with Woodard and showed it to him when Woodard was checking out exits. [GJ Tr. 291, 451]

Pierce was to inform Woodard via Woodard's transmitter when the

armored car arrived; Woodard, hearing Pierce on the scanner he was carrying, would then kneel down, put on his mask, draw his gun, approach the manager's booth, and get the jump in the guard. [GJ Tr. 293, 341] Woodard looked at and considered four different places before parking the getaway car behind a fence. [GJ Tr. 333-34]

Woodard had of course arranged for Pierce to stay on the catwalk with a good view of the area and to function as a lookout. [GJ Tr. 294] On the day of the crime, Woodard picked Pierce up at his home and dropped him off near the store. [GJ Tr. 296] Woodard then met VanHousen and asked him to stay in the area and to provide an alternative means of escape. [*Id.*] Woodard, who had wiped his bullets clean of fingerprints, purchased clothing to use as a disguise, and planned to wear tennis shoes with different tread on each foot, gloves, a mask, and a bulletproof vest. [GJ Tr. 296-300, 326, 459-60]

As planned, Pierce radioed Woodard when he saw the armored car approaching Carrs. [GJ Tr. 302] After the robbery and the murder, Pierce and Woodard rented a car and drove to Eklutna where they burned incriminating proceeds of the robbery including checks, food stamps, and Woodard's clothing; Woodard then took apart the murder weapon (the Glock) and threw the pieces in the river. [Tr. 312-14, 403-10]

When Woodard became aware that the police suspected him, he had Karl Bohlin pick up the money from his house while he hid in a car and then had

Bohlin hide the money in his (Bohlin's) house. [Tr. 352] Woodard told Bohlin he and Pierce had stolen the money from drug dealers. [Tr. 354-55]

Woodard was a body builder who worked out regularly at a gym and used "supplements" he purchased from the gym. [GJ Tr. 357, 416-17, 422-24] When the Anchorage police searched Woodard's trailer on June 16, 1992, they observed a weight rack and loose weights on the floor of one of the bedrooms. [GJ Tr. 290; Tr. 972-73]

During this search, two Glock handguns, two flak vests, a police scanner that received all the Anchorage Police Department channels and two Alaska State Trooper channels, and a Motorola two-way transmitting and receiving radio were found. [GJ Tr. 391-92, 401-03, 328]

*The pretrial evidentiary hearings:* At the pretrial evidentiary hearing that ended on March 1, 1993, Judge Hunt heard extensive testimony bearing on Woodard's potential dangerousness (all before ruling that Woodard was to be restrained during trial). For instance, on June 16th, an illegal sawed-off .22 caliber rifle, silencer parts, and firing pins for grenades were found near the front door of the Woodard's trailer. [Tr. 403-05, 413-17, 466-68] Possession of the silencer parts found in the arctic entry way is illegal. [Tr. 466-70] A book found in the trailer told how to manufacture silencers. [Tr. 470]

Two illegal homemade 12-gauge shotguns made out of pipe, one of which was a signaling device, were also found in the trailer. [Tr. 471-72, 477-79, 495]

Both devices could be used as "booby-traps." [Tr. 503-04] In a shed, two suspected pipe bombs (sections of pipe with end caps that could be used as pipe bombs) were found. [Tr. 506-10] One officer observed "more than five books regarding how to make bombs, how to make booby-traps, and how to put together explosives, and other weapons – military type weapons." [Tr. 887-88]

The police also found a badge case and a badge for a sergeant of the Anchorage Police Department. [Tr. 906] It appeared to be authentic. [Tr. 906, 918-19] A badge from the Spokane Police Department and one for a "Texas Trooper" were also found in the trailer. [Tr. 907]

When the police learned they had failed to find a crawl space located under Woodard's trailer, they obtained a second search warrant and served it on June 17, 1992. [GJ Tr. 392-94] Access to the crawl space was obtained by removing carpet in a closet and unscrewing a piece of plywood that secured a trap door. [*Id*.] The space was eight feet wide by ten feet long and deep enough so that a person could almost stand up without bumping their head. [GJ Tr. 388; Tr. 521]

In the crawl space, two Anchorage Police Department jumpsuits with "APD" patches were located. [Tr. 303-04] In ammunition cans from the crawl space officers found weapons parts that could be used, in conjunction with additional parts, to convert weapons to fire automatically (to create a machine gun), four or five grenades and grenade launchers (one with a firing pin), and a silencer. [Tr. 306, 310, 315-16, 319-20, 348-49, 359-60, 465-66, 475, 523] The

grenades in the crawl space did not contain explosives but could be combined with other parts and an explosive filler found in the residence so that they would function as true grenades. [Tr. 496-99] Possession of the parts and explosive filler is a violation of federal law. [Tr. 499] Additional illegal military explosive devices that could be used to make an "explosive train" were found. [Tr. 500-01] The crawl space also contained equipment for a marijuana grow, more than two pounds of marijuana in plastic bags, and a triple beam scale. [Tr. 321, 520-27]

During the second search, a large number of weapons were seized, including (1) a MAC 10 machine pistol with magazine in a plastic case, .45 caliber, (2) a Glock semi-automatic pistol, 9 mm., in a nylon holster with a loaded magazine, (3) a 12-gauge semiautomatic multiple-round street-sweeper shotgun, (4) a 9-mm. pistol, manufactured by Cabuanday with a loaded magazine, (5) a semi-automatic pistol model P380, .380 caliber, with a loaded magazine in the gun, (6) a fully loaded FN-223 assault rifle, and (7) a loaded 1300 Winchester shotgun. [Exh. 16; Tr. 370, 372, 529, 933-34] The silencer attached to the MAC 10; it screwed onto the end of the barrel. [Tr. 371-72, 462-63, 542-44] The police also found two 7.62 caliber weapons in boxes, one a semiautomatic rifle with a bayonet. [Tr. 322-23, 366-67, 403] The search also revealed items that:

> indicated a propensity or preoccupation with guerilla tactics, mercenary/survivalist techniques and tactics, and police equipment and paraphernalia. Some of these items were (1) a Kevlar battle helmet with "Police" across the front; (2) Kevlar body armor; (3) military battle dress utility clothing; (4) assorted knives; (5) a gas mask; (6) books and magazines related to mercenary/survivalist gorilla style combat tactics;

(7) police badges and identification; (8) a false identity preparatory to allow Woodard to possess automatic weapons with raised Treasury Department seal on it; (9) multiple weapons and ammunition; and (10) two pairs of coveralls with APD on the front; Police across the back, Anchorage Police patches on the shoulders and flex-cuffs in the pockets. These coveralls along with gloves and ski masks were hidden in a duffel bag under the residence, accessible only by a hidden trap door.

[Exh. 16 at 3]  Also located in the trailer was a video depicting Woodard and others shooting various weapons including automatic weapons and setting off explosive charges.  [Tr. 532-33]

Federal agents, executing a search warrant at Woodard's residence on June 19, 1992, seized from Woodard's trailer a police scanner, a list of frequencies used by police in the Anchorage area, notes indicating Woodard had conducted surveillance on at least one Anchorage Police Department officer, and additional notes outlining military patrol patterns.  [Tr. 600-01, 646, 654-57] Written materials pertaining to paramilitary and mercenary tactics were seized including: "Use and Care of Body Armor," "Fragmentation Protective Vests Ground Troops," "Law Enforcement Secrets," "Disguise Techniques," "New ID in America," "Covert Surveillance and Electronic Penetration," "Inside Kung Fu" (a judo book), a Sports Illustrated judo book, a book on the use of the "Si*" (an oriental martial arts tool), "Combat Knives, Sword, and other Assaultive Weapons" (an instructional manual), ""Bow* Karate Weapon and Self-Defense," "Ninja, The Invisible Assassin," "Use of Electronic Trapping Devices," "Soldier of

Fortune," "How to Get Anything on Anyone," an "Army-Navy Surplus Catalog," a book or brochure from Martin Explosives  that "explains about ordering [an] explosive device," and a book about ATM machines that explains how to rob ATM machines and how to manufacture ATM cards.  [Tr. 603-04, 658-60, 685-86, 698, 700-01, 711-12, 719, 960-61, 962-63]  One of the books discussed intelligence gathering countermeasures, tape recorder transmitter detectors, and the like.  [Tr. 659]  The federal agents also found an envelope with the return address of "National Bounty Hunter's Association."  [Tr. 679]  This organization markets paramilitary equipment and some of the books that were found in Woodard's house.  [Tr. 697]

Federal agents also seized two sets of body armor, an illegal sawed-off shotgun barrel, a video, "Black Medicine," which demonstrates how to kill people, and a backpack containing paramilitary clothing and patches including holsters, transmitters, canteens, a machete, a buck survival knife, a bayonet, a complete intercom system, a bandanna with skulls on it, yellow goggles, walkie-talkies, and a pair of fingerless gloves.  [Exc. 22; Tr. 605, 709-12, 722-26]  The agent who seized the backpack said he found it next to "Karate weapons" and leather gloves and opined that the pack was "outfitted for a military or covert maneuver."  [Tr. 722-27]  Two gas masks and other paramilitary paraphernalia including a shoulder holster, sword, flak vest, and police helmet were also found.  [Exc. 17; Tr. 730]  The agents also seized a card that would identify the carrier

as an undercover police officer and a card entitled "Registered Mercenary." [Tr. 712, 728]

During the pretrial hearing Woodard's attorney made reference to an incident in which Woodard, Pierce, and Bohlin were involved in a "rip off of a grow operation in the valley" or "armed burglary." [Tr. 680, 1015] According to Woodard's attorney, this incident became Count I of a federal indictment returned against Woodard. [Tr. 680, 1015] (Detailed evidence concerning this incident was included in a pretrial offer of proof and introduced at sentencing. [Tr. 1015] Bohlin rented a van [Tr. 9313, 9372-73, 9494-95] The three covered the license plate with tape. [Tr. 9379] Woodard and Pierce impersonated police officers by wearing APD jump suits (like the two found in Woodard's basement) with "police" written on the jump suits and APD patches on the shoulder. [Tr. 9313-17, 9375] Pierce had a police hat and a shotgun; Woodard had a shotgun and a Glock; they both had cinch-tie-type handcuffs. [Tr. 9317; 9375-76] Bohlin was the lookout and was in communication with Pierce and Woodard during the burglary using hand-held CB radios. [Tr. 9318; 9372-77] Woodard sold the proceeds and gave Pierce $250.00 and Bohlin about the same amount. [Tr. 9313, 9379-80])

*Proceedings relating to the restraints:* In November, 1992, Woodard filed a pretrial motion asking Judge Hunt to make various rulings regarding courtroom security and how Woodard would appear before the jury. [Exh. 5 at 88] He also

asked not to be restrained during trial.  [Exh. 5 at 88]

The state responded that Judicial Services was considering requesting additional restraints given the circumstances of the offense and the background of the defendant.  [Exh. 19 at 7]  The state said Woodard had been indicted for a series of well-planned armed robberies and that one (the present case) had culminated in the execution of a Loomis guard – the functional equivalent of a police officer.  [Exh. 19 at 7; GJ Tr. 1-543]  The state also said Woodard was large, a body builder, "obviously a physically strong individual," and that he had "exhibited unusual interest in paramilitary procedures, the use of illegal weapons (including automatic weapons and silencers), the use of false identification, and counter-surveillance techniques."  [Exh. 19 at 7]  The state also noted that Woodard had committed extremely serious crimes and that he posed a threat to potential witnesses and victims as well as to co-defendants who were planning to testify against him.  [*Id.*]  The state said Woodard faced a potential sentence in excess of 99 years, so that he was an extreme flight risk.  [*Id.*]  The state observed that Woodard's "ability to formulate specific and detailed plans before committing a crime also show his potential for a plan to escape custody."  [*Id.*]  The state asserted it was "obvious from the circumstances surrounding the crimes he has committed and his own background [that Woodard] is an extreme danger to public safety."  [*Id.*]

At the same time, the state filed the affidavit of Lieutenant Yakopatz.

[Exh. 18 at 4-5] Lieutenant Yakopatz said he was considering requesting additional restraints, including leg irons, with skirting around the counsel tables in order to conceal the leg irons. [Exh. 18 at 4-5] Lieutenant Yakopatz said that Woodard had committed a cold and calculated murder, made extensive plans prior to the murder, including the use of an "inside person," "a look out," and had alternate escape plans. [*Id*.] Lieutenant Yakopatz also averred that Woodard's extensive interest in paramilitary gear, illegal weapons, surveillance, and fake identification made him a dangerous person and an escape risk. [Exh. 18 at 5]

On February 18, 1993, Woodard appeared for the omnibus hearing. His feet and hands were restrained. [Tr. 14] Woodard's attorney objected that Woodard would be unable to take notes or to communicate with his attorney. [*Id*.] Lieutenant Yakopatz responded that his unit had concluded, based on information received from the United States Marshall's Office, that Woodard met a "high profile security requirement," and said that Woodard's crime involved the use of deadly force, that Woodard was a body builder, and that he practiced martial arts. [Tr. 16-17] Lieutenant Yakopatz stated a security profile was being prepared. [Tr. 17] Judge Hunt ordered the troopers to detach the handcuffs from the waist chain so that he could write.

*Judge Hunt's ruling*: On March 23, 1993, Judge Hunt ruled on the series of requests Woodard had made concerning his appearance during trial. [Exh. 20] Judge Hunt said "several facts [were] pertinent to [Woodard's] requests." [Exh.

20 at 2] She stated, "[Woodard was] accused of planning and executing several armed robberies; he is a bodybuilder with extensive background in using paramilitary weaponry; he faces a 99-year sentence in this case and has other charges pending for later trials which makes him a flight risk." [*Id.*] The judge denied Woodard's request that he not be restrained during trial, stating: "Defendant will be restrained in the usual way during trial with ankle chains hidden from view by table skirting and by a belt chain to which his wrists are attached by chains." [Exh. 20 at 3]

On March 23, 1993, Judge Hunt said the question had arisen whether a metal detector should be erected outside the courtroom and used throughout the trial. [Tr. 1493] No general courthouse screening existed at the time, so the prosecutor asked that spectators be required to pass through a detector once jury selection was completed. [Tr. 1494] The prosecutor said that Woodard, based on his history, could execute a plan to escape from the courtroom and could use others to assist him (as he had with in the robberies). [Tr. 1494-95]

At this point, Woodard objected that his restraints had been imposed without a request by the state and without an opportunity to be heard. [Tr. 1495] Judge Hunt pointed out in response that she had ruled in response to Woodard's specific request for a ruling on security – that the defense had raised the issue. [Tr. 1495-96] Woodard's attorney then said there was no reason to believe Woodard posed a danger beyond "what can be handled by the court's decision to

shackle him." [Tr. 1497]

The prosecutor then stated it concerned the state that spectators clearly connected to the defense had refused to identify themselves. [Tr. 1502] Metal detectors ultimately were not used.

*The security during trial*:  During trial, both counsel tables were "surrounded by table to floor length beige curtains . . . taped to the outer edges of the desks." [Exh. 5 at 91; Tr. 1725] Woodard's feet were chained together (although the chain was wrapped so that it would not make noise), and his left hand was handcuffed to a chain around his waist. [*Id.*] His right hand was free. [*Id.*] "The skirting . . . [hid the] shackles from the jury, and skirting was placed around the prosecution table so that the jury's attention would not be drawn to the defense table." [Exh. 5 at 45-46, 91-92] Further, all the parties remained seated when the court recessed and reconvened. [Exh. 5 at 91]

*Decision of the Alaska Court of Appeals:*

Judge Coats concluded that Judge Hunt had given sufficient reasons to justify the security restraints. [Exh. 5 at 46] Judge Mannheimer concluded that Judge Hunt's *sua sponte* decision to restrain Woodard violated Alaska law since he did not have an opportunity for a hearing, irrespective of whether the circumstances warranted the restraints. [Exh. 5 at 92-93] He also stated that Judge Hunt's stated justification for restraining Woodard was "unconvincing"

since Woodard did not have a felony record[5] and had never attempted to escape or resist law enforcement officers.  [*Id.*]

Judge Mannheimer next observed that Judge Hunt had taken several precautions to insure that the jury was unaware that Woodard was restrained and that there "was nothing in the record to suggest that these precautions were ineffective."  [Exh. 5 at 97]   Rejecting a rule of automatic reversal, Judge Mannheimer concluded the use of the restraints was harmless beyond a reasonable doubt since no juror observed them.  [Exc. 5 at 95 n.31, 98]

*Argument:    Visible* restraints violate the Fifth and Fourteenth amendments unless there is adequate justification for their use.  *Larson v. Palmateer*, ___ F.3d ___ ___, 2008 WL 375203 *2 (9th Cir. 2008) (quoting *Deck v. Missouri*, 544 U.S. 622, 630-31, 125 S.Ct. 2007, ____ (2005); *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.C. 1057, 1061 (1970)).  Visible restraints are permissible when they are justified by a state interest specific to a particular trial such as the interest in courtroom security specific to the defendant on trial.  *Id.* at *3 (citing *Deck*, 544 U.S. at 624, 125 S.Ct. at ____ (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568-69, 106 S.Ct. 1340, 1345 (1986)).  However, the use of restraints that are not visible does not violate the constitution.  *Id.  See also United States v. Fernandez*, 388 F.3d 1199, 1145 (9th Cir. 2004); *Morgan v. Bunnell*, 24 F.3d 49, 50 (9th Cir. 1994) (per *curiam*).

---

[5]       Woodard had two convictions for driving under the influence.  [Tr. 9644-45]

In *Larson*, the court held the trial court's reference to a staff shortage failed to provide the required individualized determination of necessity to justify the use of visible shackles and also acknowledged that the record may make clear that there are indisputably good reasons for shackling so that it can be upheld. *Larson*, at *4 (quoting *Deck*, 544 U.S. at 635, 125 S.Ct. at ____).

Woodard cannot properly show the restraints used in his trial were visible. For that reason alone, he is not entitled to relief. His affidavit and that of his family friend citing instances when jurors could have seen and/or did see the restraints are insufficient to gain him any relief because (1) Woodard does not qualify for an evidentiary hearing to present this evidence to this court and (2) he is not entitled to have the record expanded to include the affidavits.

Woodard could have asked in state court for a new trial or a mistrial if the restraints were ever visible on account of any incident in which jurors saw that he was restrained. He failed to do so. He was also free to claim in his state post-conviction action that a juror saw his restraints. He failed to do so.

Under 28 U.S.C. §2254(e)(2), a federal habeas court "shall not hold an evidentiary hearing on the claim" when the petitioner has failed to develop the factual basis for the claim in state court. A habeas applicant may avoid 2254(e)(2) if the factual predicate for the claim could not have been previously discovered through the exercise of due diligence. But Woodard, if one credits his affidavit, was necessarily aware of the facts supporting his claim that the

restraints were visible during his trial and while his state post-conviction action was pending.  Woodard's failure to present the visible restraints claim to the state courts precludes consideration of it now because Woodard was not diligent. *Williams v. Taylor*, 529 U.S. 420, 437, 120 S.Ct. 1479, 1490 (2000) ("Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law"); *see also Holland v. Jackson,* 542 U.S. 649, 652-53, 124 S.Ct. 2736, 2737 (2004) (applying *Williams*); 7 Wayne R. Lafave, *Criminal Procedure* §28.7(c), at 268-271 (3d ed. 2007) (discussing *Williams*).

Woodard cites *Parrish v. Small,* 315 F.3d 1131 (9th Cir. 2003), as indicating that he is entitled to an evidentiary hearing.  In *Parrish*, the court ordered a remand for an evidentiary hearing to determine whether a defendant had been shackled.  But the state in *Parrish* failed to argue that the petitioner had not been diligent, as the state has argued here, and *Parrish* court noted the absence of such an argument when it ordered the remand and evidentiary hearing.  315 F.3d at 1135 n.3.  In another case that Woodard cites, *Rhoden v. Rowland,* 10 F.3d 1457, 1460 (9th Cir. 1993), the court ordered an evidentiary hearing because the habeas petitioner's attorney in state court "took all steps possible to make a timely record of prejudice."  Here, Woodard's highly regarded attorney made no claim that the restraints were visible.

Moreover, since Woodard is not eligible for an evidentiary hearing, he is

not entitled to expand the record to include the affidavits so that they can be considered. *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (refusing to consider affidavit that could have been filed in state court and citing *Holland*, 542 U.S. at 652-53; 124 S.Ct. at 2737).

Woodard argues alternatively that the jurors saw Woodard's restraints when they entered the courtroom "to the rear of the table at which Woodard was seated." [Docket No. 100 at 15]  The record does not support this claim. Woodard's first citation is to Judge Hunt's description of how *voir dire* was to proceed. [Docket No. 100 at 15 (citing Tr. 1572-75)]  At this point, Judge Hunt asked spectators to make room for the first 50 prospective jurors who would be entering the courtroom to begin the selection process. [Tr. 1573-74]  Woodard's attorney did not at this point or at any later time claim prospective jurors could see Woodard's restraints and the record does not show that they did.

Woodard next cites pages 1612 and 1617-18 of the transcript.  Nothing relevant happened at page 1612.  At the latter pages, the attorneys introduced Woodard and the investigators to the jurors. [Tr. 1617-18]  The record does not show the jurors saw the restraints and no participant in the trial made such claim.

Woodard also cites pages 1712-14.  Individual *voir dire* was being conducted in one courtroom while the jury panel waited in another courtroom. At the pages Woodard has cited, jurors were brought into the courtroom where

the parties and Woodard were located so that they could be admonished at the end of the day.  There is no suggestion in the record that the jurors saw the restraints and Woodard's attorney did not claim that they had.

Woodard next cites pages 1838-43.  During that time a juror was excused from the courtroom temporarily while Judge Hunt and the parties discussed whether he could be excused from attending the trial while the remaining jurors were chosen.  [Tr. 1842-43]  Woodard would apparently have the reader infer that the juror saw the restraints when he returned to the courtroom.  Nothing in the record suggests that he did.  Woodard also never made such a claim in state court.

Woodard cites pages 2428-30 and 2673-75, where the jurors were all brought into the courtroom where individual *voir dire* was being conducted and then excused.  [Tr. 2428-30, 2673-75]  Again, the record does not suggest a juror saw the shackles and Woodard never made such a claim in state court.

Finally, Woodard cites pages 2755-56.  At that point, Judge Hunt brought the jury back into the courtroom so that the parties could exercise peremptory challenges.  [Tr. 2755-56]  Again, the record does not suggest a juror saw the shackles and Woodard never made such a claim in state court.

Woodard also cites statements of prospective jurors during *voir dire* "who admitted observing and recognizing Mr. Woodard, as shackled, when they entered the courtroom."  [Docket No. 100 at 15 (citing Tr. 1703, 1771, 2378,

2379)]  This is not true.  One prospective juror had seen Woodard on television when he was being arrested; a second had seen a face shot; and a third had not seen a photograph of Woodard.

Juror Ord said he recognized Woodard in the courtroom.  [Tr. 1703]  Ord recognized Woodard because he had seen Woodard on television (in handcuffs) when he was arrested, but Ord did not say he saw restraints in the courtroom. [Tr. 1703]  When asked how he felt about having seen Woodard in custody, Ord said Woodard was "innocent until proven guilty." [Tr. 1704]  (It should be noted that Woodard, not the state, introduced the photograph of Woodard in restraints during trial.  Exh. 15; Tr. 3859)

Juror Daley said he believed he had seen a picture of Woodard because he recognized him when he entered the courtroom.  [Tr. 1771]  Daley said he had seen "a face picture." [*Id.*]  Daley did not say he saw Woodard in restraints in or out of the courtroom.  [Tr. 1771-72]

Juror LaPiad recognized Woodard in the judge's chambers because she had seen him in the courtroom at the beginning of *voir dire*.  [Tr. 2378-79]  She did not say she had seen restraints.  In short, these statements of jurors do not show they saw Woodard's restraints during trial.

In addition, Woodard claims that jurors saw his restraints during power outages.  [Docket No. 100 at 15]  But Woodard made no such claim during the state trial nor in the state post-conviction action.  *Williams* and *Cooper-Smith*

preclude the claim at this point.

Judge Mannheimer found there was no evidence in the record that any juror saw the restraints. [Exh. 5 at 97] Since Woodard is not entitled to an evidentiary hearing, he can neither overcome the strong presumption that Judge Mannheimer properly concluded there was no evidence the jurors saw the restraints nor show that his factual determination was unreasonable. *See* 28 U.S.C. §2254(d)(2); *Lambert v. Blodgett*, 393 F.3d 943, 971 (2004) (federal judge applying the unreasonable factual determination clause of §2254(d)(2) must be particularly deferential to [his] state court colleagues; mere doubt concerning the adequacy of the state court's findings is not sufficient).

Alternatively, the evidence adduced at the pretrial suppression hearing fully warranted restraining Woodard during trial, as Judge Coats held. The American Bar Association (ABA) Standards list factors that may be considered in determining whether to restrain a defendant at trial. The factors listed by the standards are: "the seriousness and nature of the charge; the defendant's age, physical attributes, temperament and character, past record, escapes, threats to harm others or to escape or to cause a disturbance; the size and mood of the audience; the physical surroundings; the security of the courtroom; and the adequacy and availability of alternative remedies." *Commentary*, ABA Standards for Criminal Justice, Standard 15-3.2 at 190 (3d ed. 1996).

Woodard qualified for restraints under the standards. He was charged

with he most serious state offense in existence – first-degree murder. He had carefully planned three armed robberies using a lookout and obtained inside information concerning the target businesses. He had the coveralls and badges at his home to enable him to impersonate law enforcement. Multiple illegal weapons were found in his residence – automatic weapons, sawed-off weapons, silencers, and booby-traps. He had many publications at his home demonstrating interest in paramilitary matters, counter-surveillance, and the like. It was reasonable to infer there was substantial danger that Woodard, with or without the assistance of associates like those who helped him commit the robberies at issue in his federal and state indictments, would make an attempt to escape attempt during trial. He certainly had a great deal of information and knowledge about how to negate security and the crimes for which he had been indicted showed that he had no regard for society's rules. The planned robbery of and subsequent murder of the Loomis guard, the functional equivalent of a police officer, demonstrated a profound absence of respect for authority. Moreover, when Judge Hunt ordered Woodard restrained, there was no weapons screening at the Anchorage courthouse.

Having heard the evidence adduced pretrial and having read the grand jury transcript, it is small wonder that Judge Hunt ordered Woodard restrained; her decision to do so was reasonable and should be sustained because she took steps to insure that the restraints would not be visible. *See, e.g., Morgan*, 24

F.3d 49, 50 (9th Cir. 1994) (upholding use of restraints when judge took precautions to ensure that jury did not know defendant was restrained); *Fernandez*, 388 F.3d at 1245.

Alternatively, the decision to restrain Woodard with restraints that were not visible was harmless error because Woodard cannot show the error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 626, *Rhoden v. Rowland*, 172 F.3d 633, 637 (9th Cir. 1999). It is established that restraints are harmless under *Brecht* if they are not visible. *Castillo v. Stainer*, 997 F.3d 669, 669 (9th Cir. 1993).

Alternatively, any error was harmless under *Brecht* because the state's evidence was overwhelming. *See Larson*, 2008 WL 375203 at *4 (use of visible restraint of during trial was harmless when evidence was overwhelming).

I.    <u>Grounds ten and eleven</u>[6]

In Ground ten, Woodard claims he is entitled to relief because the state failed to disclose to him that William Turlington, whom he alleges could have been presented as a witness or as an alternative suspect at his trial, had a criminal record for robbery, drug offenses, and theft, and probation violations, a favorable plea bargain, and a relationship with VanHousen and his father. [Docket No. 100 at 18-19]  He claims that information about Turlington, his

---

[6]    Woodard asserts that the state did not lodge the transcripts of the post-conviction evidentiary hearing.  [Docket No. 100 at 19]  The state believes that he is mistaken.  *See* Docket No. 52.  If the transcripts did not reach the court, then the state requests an opportunity to lodge the transcripts again.

robbery convictions, rewards, and "association with the VanHousen family" was relevant and material under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963), and *Banks v. Dretke*, 540 U.S. 668, 124 S.Ct. 1256 (2004). Woodard is mistaken. The state did not fail to disclose any material evidence.

In Ground eleven, Woodard claims the prosecutors improperly suppressed John VanHousen's statements, revealed by William Turlington through his attorney John Murtagh, that David VanHousen set up the robbery and that no one was to be killed. [Docket No. 100 at 19-20]

*Background*: David VanHousen talked about the robbery with his father, John VanHousen, who told Turlington that no one was supposed to get hurt and that David had set up the robbery. [PCR Tr.[7] 53-54; MTr.[8] 13, 40] Turlington reported the statements to his lawyer, John Murtagh. [PCR Tr. 53-54, 63-64] On June 10, 1992, Murtagh informed a prosecutor of the statements and the prosecutor called the police and told them what Murtagh had said. [PCR Tr. 53-54] As a result, the police contacted David VanHousen, who then identified Woodard as the murderer.

*The Amended Application*: Woodard filed an amended application for post-conviction relief in a state post-conviction action. [Exh. 25] In the amended application, Woodard alleged that the state failed to disclose Turlington's

---

[7]    The transcript of the post-conviction evidentiary hearing is in a separate volume. It will be cited "PCR Tr."

[8]    The transcript of the testimony of John Murtagh is in a separate volume and will be cited "MTr."

identity and background so that his attorney could not develop a defense based on the possibility that Turlington framed Woodard. [Exh. 25 at 3-5] Woodard also stated that it was "not possible now to reconstruct the impact" of the state's failure to investigate and disclose Turlington's identity and the background information. [Exh. 25 at 4]

*The state's answer*: The state admitted that Anchorage Police Department Detective Reeder had testified about "defendant X" (Turlington) at the search warrant application hearing for the *Glass* warrant to record conversations between VanHousen and Woodard. The state asserted that the testimony was provided solely to explain why the police came to view David VanHousen as a suspect. [Exh. 24 at 50-51] The state alleged in its answer that Turlington "was not a witness and [that] his reliability was not an issue." [*Id*.] The state denied that Turlington was an "informant-witness" in the Woodard case, denied that Turlington's December 1992 plea bargain was conditioned on Turlington providing information to the state, and asserted that it was not required to disclose the terms of Turlington's "standard plea agreement" to Woodard. [Exh. 24 at 50-51]

The state alleged that information regarding Turlington's criminal behavior and/or his relationship with the VanHousens was irrelevant and immaterial to the Woodard case and denied that disclosure would have affected the trial or caused a different outcome. [Exh. 24 at 52] The state admitted that

Turlington had violated his probation and that it had, after Woodard's trial, filed a petition to revoke. [*Id*.] The state alleged that Woodard's attorney was aware through discovery that Turlington had reported overhearing the statement of VanHousen's father. [Exh. 24 at 53]

*Evidence introduced at the post-conviction trial:* In September of 1991, approximately nine months before the Carrs murder/robbery, William Turlington was charged with multiple counts of third-degree and fourth-degree misconduct involving a controlled substance. [Exh. 24 at 57-60]

Before the murder and robbery, John Murtagh, representing Turlington in connection with the foregoing charges, had won an order suppressing cocaine found in Turlington's office on account of a "knock and announce" violation. [MTr. 5, 10, 17-18; PCR Tr. 116-17] The state filed a petition for review and Murtagh had filed an opposition. [MTr. 12, 18, 58-60] The state's petition had been accepted by the Alaska Court of Appeals and briefing had been ordered. [PCR Tr. 129] Murtagh was worried about losing in the court of appeals, but he and the prosecutor shared the belief that the state could not prevail at trial without the evidence that had been suppressed. [MTr. 16-17, 54, 56, 58-60]

On June 10, 1992, Turlington, truly appalled by the murder, told Murtagh that John VanHousen had said that his son, David VanHousen, had "set up" the robbery – that the police should check out the VanHousens. [MTr. 13-14, 19, 40, 57, 61] Murtagh, hoping to benefit Turlington, telephoned Assistant District

Attorney Steven Branchflower at the District Attorney's office and told him that a client named "X" involved in a drug case had provided the foregoing information. [MTr. 10-11, 15, 41, 74] Branchflower and Assistant District Attorney Mary Ann Henry realized that "X" was Turlington, telephoned the Anchorage Police Department, and passed on the information. [MTr. 13; Tr. 9, 53-54]

The police viewed Turlington's information much as a "[C]rime [S]toppers[9] . . . tip"; Turlington was unwilling to wear a wire and no government agent ever interviewed or asked to interview Turlington in connection with this case. [MTr. 58; Tr. 64, 68-69, 74, 76, 80-81] Further, Turlington and David VanHousen had not talked to each other, and John VanHousen refused to speak with the police. [*Id.*] The police did not check to see if Turlington had a criminal record and the chief detective, William Reeder, was not aware that Turlington had prior robbery convictions. [PCR Tr. 81, 93-94]

At the application hearing for the *Glass* warrant to permit the state to record conversations between David VanHousen and Woodard, the prosecutor asked Detective Reeder the following question:

> [I]s it true that what initially focused your attention on [David] VanHousen was some information you received through an attorney here in town who represents an individual who is charged with a drug offense, and let's call that person defendant X. That the information you received

---

[9]    *See Ballantine v. State*, 707 P.2d 922, 926-927 (Alaska App. 1985), for a general description of the Crime Stoppers program.

> through the District Attorney's Office was that the attorney who represents defendant X had talked to Mr. VanHousen's father, and that according to defendant X Mr. VanHousen's father was lamenting the fact that his son, David VanHousen, had told him of possibly being involved. And I can't recall exactly what was said. Words to the effect, however, that no one was supposed to get killed, and generally telling defendant X that he was worried about his son.

[Exh. 24 at 27-28; PCR Tr. 51-56] Reeder responded, "Yes, that is correct."

[Exh. 24 at 28] Detective Reeder's contemporaneous police report identifies both the attorney (Murtagh) and defendant X (Turlington):

> APD received information from the DA's office that Attorney *John Murtagh* had a client, *William Turlington*, who had information on [the] Carrs murder. Apparently *Turlington*'s friend, John VanHousen, had told him his son worked at Carrs and knew who the shooter was. We also received information that the son had made the comment that "no one was supposed to get hurt," and was upset.

[Exh. 24 at 1 (emphasis supplied); PCR Tr. 57-64] The police report was later provided to Woodard's attorney, James McComas. [MTr. 66-68; Tr. 62, 91-93]

On July 27, 1992, McComas telephoned Murtagh. [Exh. 24 at 2-3] McComas, who said Turlington's name was "familiar," memorialized the call:

> RE:   The tip that led to [David VanHousen]
>
> Today [July 27, 1992] I spoke with John Murtagh (274-8664) after reading in discovery that it was he who passed along the name of [David VanHousen's] father. It has been represented in search warrant hearings that a defense attorney representing a client in a drug case provided information to the Anchorage D.A.'s office concerning this lead, in hope of obtaining benefit for his client. The search warrant testimony is to the effect that no benefit was provided and it was made clear that no deals would be

made.[10]  The way Murtagh explains it, it sounds like no specific deal or agreement was reached, but that representations were made by prosecutors and/or police to the effect that if the information turned out to be good, the state would take that into account and confer appropriate benefits in the future.  In fact, Murtagh's case has not been resolved. He got some evidence suppressed and the state filed a petition for review.  John has a subjective belief that he was reasonably led to conclude that if the information provided was important [it] would return to the ultimate benefit of his client in terms of how the state dealt with the case.  However, so far, no agreements have been reached.

[Exh. 24 at 2; PCR Tr. 133-34]

On December 17, 1992, the state replaced the 1991 indictment with an information charging Turlington with third-degree misconduct involving a controlled substance in two consolidated counts.  [Exh. 24 at 64-65]  At the same time, Turlington, Murtagh, and the state entered into a written plea agreement. [Exh. 24 at 33-35]  The agreement provided that Turlington would plead to the information and receive concurrent sentences of four years with four suspended on condition that he successfully complete a four-year term of probation.  [Exh. 24 at 33]  The agreement provided it is Turlington's "understand[ing] that [the] agreement is conditioned upon [Turlington] having no previous criminal history of felony convictions."  [Exh. 24 at 34]  On December 17, 1992, Turlington was sentenced in accordance with the agreement.  [Exh. 24 at 66-71]

---

[10]     McComas's reading of the testimony at the search warrant application hearing is mistaken.  The testimony at the warrant application hearing did not address what benefits defendant X (Turlington) might receive. [Exh. 24 at 27-28]  But Murtagh, of course, provided the information to McComas during the telephone conversation.

In December of 1994, more than a year-and-a-half after Woodard's trial, Turlington was charged with third-degree misconduct involving a controlled substance for new cocaine offenses in Case No. 3AN-S94-8516.  [Exh. 24 at 47, 72, 78-79]  And on December 1, 1994, a petition to revoke probation was filed with respect to the 1991 charges.  [*Id.*]  The petition alleged that Turlington had failed to appear for urinalysis on May 13, 1993 and on five occasions after Woodard's trial in 1994. [Exh. 24 at 45]  It also alleged that Turlington had tested positive for the use of cocaine on February 4, 1993 and on three occasions after Woodard's trial in 1994.  [Exh. 24 at 45]

The state also alleged that the City of Anchorage had charged Turlington with shoplifting after Woodard's trial and that he was later convicted.[11]  [Exh. 24 at 45]  Finally, the state alleged that that Turlington had a 1962 New York conviction for conspiracy to commit robbery and a 1964 New Jersey conviction for armed robbery.  [Exh. 24 at 45, 75]

On August 24, 1995, the state filed a "supplemental" sentencing memorandum in connection with new charges against Turlington and the petition to revoke.  [Exh. 24 at 43-46]  The state also filed an information reducing the new charges in case no. 3AN-S94-8516 to two counts of fourth-degree misconduct involving a controlled substance.  [Exh. 24 at 80-81]

At the revocation/sentencing hearing, the prosecutor said that the state had entered into the original plea agreement with Turlington because (1) the

evidence obtained during the search on account of a purported "knock and announce" violation had been suppressed (although the petition for review was pending), (2) Turlington provided the information that led ultimately to Woodard's conviction, (3) Turlington said that he was elderly and intended to conduct himself lawfully in the future. [Exh. 24 at 44-45]

On September 27, 1995, in a disposition hearing that covered both the 1991 case and the 1994 case, Judge Andrews found that Turlington had violated the terms and conditions of probation in the 1991 case and extended his probation for an additional year. [Exh. 24 at 72] Judge Andrews sentenced Turlington on the 1994 offenses to a term of three years with two suspended on condition that he complete a six-year term of probation. [Exh. 24 at 82-87] On January 20, 1998, Turlington's 1991 conviction was set aside. [Exh. 24 at 74]

*Argument at the conclusion of the state evidentiary hearing:* Woodard's post-conviction attorney admitted that what McComas would have done with the Turlington evidence was "theoretical and high – and speculative." [PCR Tr. 143] The attorney said that McComas might have developed the argument at trial that Turlington and others had conspired to shift the blame for the crime to Woodard. [PCR Tr. 143-46]

*Judge Bolger's findings of fact:* Judge Bolger made the following findings:

> On June 10, 1992, an Anchorage attorney, John Murtagh, called Assistant District Attorney Steve Branchflower and

---

[11]    On March 23, 1994, this conviction was set aside. [Exc. 77]

said that he had a client who had information about the Carrs investigation.

Murtagh said that his client had a friend named John VanHousen whose son David VanHousen was the produce manager at Carrs. John VanHousen told the client that he was concerned because his house was close to Carrs, that David had "set it up" and that David had "made the call." He may have said that no one was supposed to get killed in the robbery. The authorities quickly determined that the client was William Turlington.

The authorities contacted David VanHousen based on this tip. VanHousen initially lied about his own responsibility for the robbery. But he eventually admitted to playing a major role in the crime and identified Woodard as the robber. . . James McComas was retained to represent [Woodard] at trial.

Woodard alleges that the State failed to disclose the tipster's identity and the details surrounding the information he provided. The evidence does not clearly establish this assertion. Former Detective William Reeder's testimony suggests that sometime after July 20, 1992, the state provided McComas with a copy of Reeder's report that included information about the tip.

The report stated that on June 10, 1992 the Anchorage Police Department had received information from the district attorney's office that attorney John Murtagh had a client William Turlington, who had information on the Carrs investigation. The report also stated that Turlington had a friend named John VanHousen who told Turlington that his son worked at Carrs, knew who the shooter was, and had stated that "no one was supposed to get hurt."

At the hearing, McComas could not say whether or not he received Reeder's report in discovery. But there is no dispute that McComas did receive discovery materials stating that Murtagh was the person who passed along the information from VanHousen's father.

McComas called Murtagh on July 27, 1992, and Murtagh told him that he had learned the information from his client who

90

was facing charges of misconduct involving a controlled substance. He said that the client did not receive any initial deal or benefit for the information. But Murtagh also said that the authorities told him that if the information turned out to be good, the State would take that into account and confer appropriate benefits in the future.

On December 17, 1992, the State entered into a plea agreement with Turlington. One of the reasons for the plea agreement was the tip that Turlington provided in the Woodard investigation. Turlington agreed to plead no contest to two charges of misconduct involving a controlled substance in the third degree in return for a sentence of four years imprisonment, all suspended.

One condition of the agreement was that Turlington have no prior felony convictions. But, in fact, Turlington had previously been convicted of conspiracy to commit robbery in the first degree in New York in 1962, and armed robbery in New Jersey in 1964. The state discovered and relied on this information in a probation revocation proceeding in 1995.

Turlington had very poor performance on probation. His urine tested positive for use of cocaine beginning on February 4, 1993. He also failed to appear for urine testing beginning on May 13, 1993. He was picked up for shoplifting in June of 1993. But the state did not file any petition to revoke Turlington's probation until he again was arrested for cocaine sales in 1994. And in 1998, the court set aside Turlington's conviction despite the fact that it was originally a judgment of record.

Neither the police nor prosecutors ever interviewed Turlington as a witness in the Woodard case. At the hearing, Reeder explained that he felt no need to question Turlington after the tip panned out, because David VanHousen clearly did have information about the Carrs robbery. Consequently, the State did not provide any pretrial discovery to McComas regarding Turlington's prior record, his plea agreement, or the circumstances of his probation.

Turlington did not testify at the [Woodard] trial. . . .

[Exh. 9 at 1-5]

*Judge Bolger's conclusions of law*:  Judge Bolger pointed out that the failure to disclose an informant violates due process if a defendant shows "a reasonable possibility that the anonymous informant could give evidence on the issue of guilt or innocence that might result in the defendant's exoneration." [Exh. 9 at 6]  However, the balance weighs in the opposite direction if "the informant is only a tipster who has played no part in the criminal act." [*Id.*] The decision continues:

> The information about Turlington's identity, the details of the tip, his prior record and the plea bargain is not favorable exculpatory evidence.  Turlington was only a tipster; there is no convincing evidence that he played any part in the Carrs robbery.   His prior robbery convictions would not be admissible to show that he was involved in the Carrs robbery. [citing Alaska R. Evid. 404(a)]  And the tip itself did not even mention Woodard's name.  Woodard has not shown that Turlington could give any helpful testimony on the issue of guilt or innocence.
>
> Woodard could have impeached Reeder by asking about why he did not interview or investigate Turlington.  But Woodard has not identified any other favorable impeaching use of Turlington's identity, his prior record, or the plea bargain, and this court cannot imagine any.  The prior record and the plea bargain could not be used to impeach Turlington unless he testified at trial.  And this information could not have been used to impeach David VanHousen, because there is no evidence that VanHousen had any contact with Turlington.
>
> The state did not suppress Turlington's identity and the details of the tip.  This information was probably provided to McComas in Reeder's report.
>
> The prosecution's duty to investigate and disclose records of criminal convictions is limited to the witnesses the prosecutor

intends to call as witnesses at trial. [citing Alaska R. Crim. P. 16(b)(v)] Thus, the state's failure to discover and disclose Turlington's New York and New Jersey convictions did not amount to suppression of evidence.

The prosecution did not have a duty to discover and disclose Turlington's probation violations prior to the Woodard trial. There is no evidence that the police or the Woodard prosecutors were aware of the violations at the time of the trial.

The prosecution did suppress the information about Turlington's plea bargain. But, as noted above, this court cannot identify any favorable use for this evidence.

In order to establish prejudice (sometimes called materiality in this context), Woodard must show there is a reasonable probability that the result of the trial would have been different if the suppressed information had been disclosed to the defense. [citing *Strickler v. Greene*, 527 U.S. 263, 289, 119 S.Ct. 1936, 1952 (1999)]

One possibility that is that Woodard could have impeached Reeder by asking about why he did not interview or investigate Turlington. But McComas had sufficient information to ask these questions, even if they were based only on his discussion with Murtagh. And Reeder's explanation at the [post-conviction] hearing sounded logical; there is no reasonable probability that this impeachment could have changed the result of the trial.

Woodard has not shown any other reasonable possibility that any of the information about Turlington could change the result of the trial. Any error by the State in its failure to disclose further information about Turlington was harmless beyond a reasonable doubt.

[Exh. 9 at 6-9]

*Decision of the Alaska Court of Appeals*: The Alaska Court of Appeals, concluding Judge Bolger's findings were not erroneous and that the findings

supported his decision, affirmed. [Exh. 9] The court said Judge Bolger had properly concluded (1) the details of the lead provided by Murtagh, Turlington's record, and Turlington's plea agreement did not constitute exculpatory evidence, (2) Turlington's tip did not even mention Woodard's name, and (3) Judge Bolger found Woodard had not shown Turlington could give any helpful testimony on the issue of Woodard's guilt or innocence. [Exh. 9 at 5]

The court further concluded that the state would have been justified in refusing to reveal Turlington's identity under *Rovario v. United States*, 353 U.S. 53, 77 S.Ct. 623 (1957), since the information he provided (1) "only pointed the authorities to David VanHousen," (2) and because VanHousen, not Turlington, revealed Woodard's identity and participation in the crime. The court also held that Judge Bolger properly found there was no evidence Turlington had any part in the crime, and that there was no evidence Turlington had any knowledge other than the hearsay report he received from John VanHousen that David VanHousen may have been involved. [Exh. 9 at 7-8] The court concluded that since the state would have been justified in refusing to reveal any information about Turlington, the state did not breach its duty to disclose exculpatory evidence. [Exh. 9 at 8]

*Standard of review*: Under 28 U.S.C. §2254(d)(2), Woodard must show the finding that the evidence was not exculpatory resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding.

Woodard must also show that the decision of the Alaska Court of Appeals that the *Rovario* decision warranted non-disclosure of the Turlington information "involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

*Argument*: Woodard does not address the findings of the Alaska courts that the information the state had knowledge of was not exculpatory and has not shown that the finding was unreasonable.  His failure to do show should preclude relief.  Moreover, the record demonstrates the finding is fully supported by the record.

Woodard does argue that the Alaska court of appeals misapplied *Rovario* because the information about Turlington was relevant and helpful to the defense.  [Docket No. 100 at 18-19]  He makes the conclusory claim that Turlington's record of prior robberies, rewards for providing information in this case, and associations with the Woodard family "were clearly relevant and material under *Brady*."  [Docket No. 100 at 19]  But he has completely failed to show how the information would be helpful to Woodard, particularly since, as both Alaska courts found, none of it would have been admissible.

Under *Brady*, evidence is not material and subject to disclosure unless it is *admissible*.  *Wood v. Bartholomew*, 516 U.S. 1, 5, 116 S.Ct. 7, 10 (*per curiam*) (1999) (fact that witness flunked polygraph test was inadmissible evidence and

did not constitute *Brady* material); *United States v. Kennedy*, 890 F.3d 1056, 1059 (9th Cir. 1989) (exculpatory hearsay evidence is not *Brady* material) (citing *United States v. Ranney*, 719 F.2d 1183, 1190 (1st Cir. 1983) ("Inadmissible evidence is by definition not material [for *Brady* purposes], because it never would have reached the jury and therefore could not have affected the trial outcome)).  Similarly, a showing that promising leads were not disclosed is insufficient to warrant relief under *Brady*. *Downs v. Hoyt*, 232 F.3d 1031, 1036-37 (9th Cir. 2000) (promising leads that do not rise to the level of impeaching evidence are not grounds for relief under *Brady*).  Finally, information concerning other suspects is insufficient to warrant relief under *Brady* unless there is significant evidence linking the "other suspect" to the crime. *Coleman v. Calderon*, 150 F.3d 1105, 1116-17 (9th Cir. 1998) (leads relating to other suspects are not material evidence under *Brady* because of absence of direct or circumstantial evidence linking third persons to crime), *rev'd on other grounds*, 525 U.S. 141, 119 S.Ct. 500 (1998).

Further, since Turlington was not called as a witness and since Woodard has not shown a legitimate reason to call him, his prior robbery convictions and the alleged leniency he received before Woodard's trial – the plea bargain and the failure to move to revoke probation on account of one positive drug test and one refusal to provide a urine sample – were obviously not admissible to impeach him, or for any other purpose.

Finally, John VanHousen's statements that David VanHousen "set up" the robbery and that no one was supposed to get hurt were hearsay and not exculpatory.

In sum, Woodard has not produced evidence that would have been admissible at his trial and is not entitled to relief. *Downs*, 232 F.3d at 1036-37; *Coleman*, 150 F.3d at 1116-17. *Accord Wood*, 516 U.S. at 5, 116 S.Ct. at 10 (insufficient showing when "*The information withheld only possibly could have led to some admissible evidence.*" (emphasis in Court's opinion)).

Moreover, a person seeking relief under *Brady* because exculpatory evidence has not been disclosed must show not only show that that the evidence is either exculpatory or impeaching, but also that it was suppressed by the state, either willfully or inadvertently, and that prejudice ensued. *Banks*, 540 U.S. at 691, 124 S.Ct. at 1272; *Strickler*, 527 U.S. at 281-82, 119 S.Ct. at 1948; *Wood,* 516 U.S. at 5, 116 S.Ct. at 10.

The necessary showing of prejudice was cogently explicated by Justice Stevens in *Strickler* when he wrote that there is "never a real '*Brady* violation' unless the nondisclosure was so serious that there is a *reasonable probability* that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 282, 119 S.Ct. at 1948 (emphasis supplied). A reasonable probability is established if the new evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the

verdict." *Strickler*, 527 U.S. at 290, 119 S.Ct. at 1952.

Judge Bolger correctly concluded that the Turlington information – the information concerning Turlington's identity, the tip details, Turlington's prior record, the plea and sentence bargain, and the leniency "[was] not favorable exculpatory evidence."[12]    [Exh. 9 at 7]   He also found there is no credible evidence that Turlington played any part in the Carrs robbery and that Woodard had failed to show that Turlington could give any helpful (or relevant) testimony on the issue of guilt or innocence and that he could not identify any favorable use for evidence of Turlington's leniency – particularly the plea bargain.  [Exh. 9 at 95]

Alternatively, any error was harmless under *Brecht*.

J.    <u>Conclusion</u>

This court should dismiss Woodard's petition and enter judgment against Woodard.

DATED March 18, 2008 , at Anchorage, Alaska.

TALIS J. COLBERG
ATTORNEY GENERAL

<u>s/ W. H. Hawley</u>
Assistant Attorney General
State of Alaska, Dept. of Law
Office of Special Prosecutions

---

[12]    Judge Bolger found that Turlington's prior New York and New Jersey felony convictions, Turlington's February 4, 1993 positive urinalysis test for cocaine and his May 13, 1993 failure to appear for urine testing, were not known to the state until after Woodard's trial.  [Exh. 9 at 4, 8]

and Appeals
310 K St., Suite 308
Anchorage, Alaska 99501
Telephone: (907) 269-6250
Facsimile: (907) 269-6270
e-mail: william.hawley@alaska.gov
Alaska Bar. No. 6702008

## Certificate of Service

I certify that on March 18, 2008, a copy of the foregoing **Respondent's response to Woodard's brief on the merits** was served electronically on **Hugh Fleischer**
<u>s/ **W. H. Hawley**</u>