IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

STATE OF ALASKA,                    )
                                    )        Filed in the Trial Courts
            Plaintiff,              )     STATE OF ALASKA THIRD DISTRICT
                                    )            IN ANCHORAGE
    v.                              )
                                    )          APR 3, 1993
                                    )
JON WOODARD,                        )        Clerk of the Trial Courts
                                    )     By _____ Deputy
            Defendant.              )
_____)
Case No. 3AN-S92-5238 Cr.


### DECISION AND ORDER: DEFENDANT'S MOTION TO SUPPRESS S-3


    Defendant Jon Woodard has moved this court for an order suppressing all pretrial and in-court identifications stemming from three separate armed robberies.[1] Because this court has granted defendant's severance motion, it will consider only the parties' contentions with respect to the pre-trial and in-court identifications of the defendant as the man seen fleeing the scene by witnesses Robin Conaway and Lori Jansen.

    Defendant contends that in-court identification of the defendant by Conaway and Jansen are irreparably tainted by their exposure to the press coverage prior to trial. Defendant attributes the press coverage to the Anchorage Police Department because it disseminated information about the Carr's robbery/homicide to the press which in turn disseminated

_____

[1] See: February 16, 1993 order severing two robbery counts from the Carr's robbery/homicide count of defendant's indictment. To the extent, if any, that defendant's motion addresses witness identification not resolved in this Decision and Order, his motion to suppress pre-trial and in-court identifications regarding the two severed counts of eye-witnesses is preserved.

DECISION AND ORDER: DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT
IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 1 of 28

EXHIBIT 2
PAGE 1 OF 28

information to the public which included witnesses Conaway and Jansen. Thus, Defendant argues, there is a substantial likelihood of irreparable misidentification by Conaway and Jansen and any in-court identification of the defendant as the individual they saw leaving the scene will violate his 14th amendment due process rights.

In response, the state contends (1) that because it was not responsible for the media coverage or the witnesses' exposure to it, there is no "state action,"  for which it can be held accountable; (2) the media coverage was not unduly suggestive; (3) even if the media coverage was suggestive, the eyewitness' descriptions are nevertheless reliable because they are derived from an independent source.

The parties' contentions raise the following issues:

1. <u>Does the dissemination of information to the public constitute "improper state action?"</u>

2. <u>Was Suggestive news coverage seen by Conaway and Jensen?</u>

3. <u>Is mere suggestiveness sufficient to suppress the identifications?</u>

4. <u>Are the identifications by Conaway and Jansen reliable?</u>

The following facts were established by a preponderance of the evidence at the March 22 - 23, 1993 evidentiary hearing on defendant's motion.

On June 8, 1992, Carr's Aurora Village store was robbed and a homicide occurred during the robbery.

Employee Robin Conaway was working at the Deli section of Carr's Aurora Village at the time the crime was committed.  While

DECISION AND ORDER:  DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IDENTIFICATIONS:  CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 2 of 28

EXHIBIT 2
PAGE 2 OF 28

. 2320

working at the cashier's station in the Deli, she heard a gun go off near the manager's station and saw smoke in the air. She saw a man's arm extended above the half wall surrounding the manager's station and then she saw him jump over it. In response to the shot, Conaway ducked down, and motioned to other employees to leave the store through a rear exit. They exited and crossed Benson Boulevard heading south. They began walking toward the parking lot of the Princess restaurant located on the northeast corner of Minnesota and Benson.

Conaway stopped at the curb and turned around to see if she could help other employees cross Benson. As she turned around, she saw a man with his arm extended. She thought he had exited from a rear door of the Carr's store. She watched as he crossed the employee's rear parking lot. The man appeared to be yelling for people to get out of his way. He crossed Benson and walked southwest at an angle to her. She watched him for less than a minute. Conaway then aided another Carr's employee across Benson. After the man walked off, she motioned for others to return to Carr's.

Conaway was interviewed in the snack bar area of the store by Anchorage Police Department Officer Hollingsworth. She indicated that she was confused and disoriented by the commotion following the shooting, and felt nervous and a little overwhelmed during her interview with the police.[2] She described the suspect as very big

---

[2] The court notes that Conaway was easily flustered on the witness stand. However, despite her lack of careful attention to the wording of the question and her eagerness to get her testimony out and ended, the court finds her to be both a sincere and a credible witness.

DECISION AND ORDER: DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN COURT IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 3 of 28

EXHIBIT 2
PAGE 3 OF 28

2321

and tall, 6'4", over 220 pounds, a white, light-complexioned, adult male with straight, short, dark hair, and wearing a royal blue jacket or windbreaker and blue work pants. In response to questions, she indicated there was nothing unusual or distinctive about the suspect's voice; that he did not look muscular. She did not know whether the suspect had a mustache or a beard because she only saw the side of his face.

Case Officer Reeder estimated that Conaway was approximately 100 feet from the suspect according to the positions she gave of herself and the suspect using an aerial photograph of the area.

Duane Utland, Deputy Chief of the Anchorage Police Department, received several phone calls from the media regarding the Carr's robbery/homicide. He could not recall any specific comments made to specific media persons regarding this case during June, 1992. He agreed that quotations which appeared in the newspaper before defendant was arrested were statements he probably made. He neither assisted the press to take any photographs of the defendant following his June 18, 1992 arrest on federal charges nor did he provide the full length color photograph which appeared in the newspaper the next day, June 19, 1992. The color photograph showed a full length, side view of the defendant, a large muscular individual, with long, dark hair pulled back in a ponytail. He was in hand and ankle cuffs along with another prisoner.

Conaway saw the photograph in the paper in the break room of the Carr's store. The paper was folded such that only the photograph was visible. She could not see the headline accompanying it. When she first saw the photograph of the

DECISION AND ORDER: DEFENDANT'S MOTION TO SUPPRESS PRI
IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 4 of 28

EXHIBIT 2
PAGE 4 OF 28
2322

defendant, Conaway said that "looks like the man who robbed Carr's." Other Carr's employees in the break room said "It is," and told her to "read it." She felt certain that it depicted the man who robbed the store because in the photograph, the person's stride, physique and hair color were similar to the man she had seen leaving Carr's the day of the robbery. She had seen no other photographs nor television views of the suspect alleged to have committed the Carr's robbery/homicide and did not know anyone had been arrested. After identifying the defendant from the newspaper, Conaway did not contact the police because they already arrested the defendant and she saw no need to contact them.

According to Conaway, co-worker Linda Verfaille disagreed that the man in the newspaper photograph "looked like" the Carr's robber. Conaway saw no reason to argue with Verfaille.

Linda Verfaille was working in the bakery at Carr's the day of the robbery/homicide. Although she had not heard Conaway describe the suspect prior to the day the photograph appeared in the newspaper, Conaway, upon seeing the photograph, immediately told her she was certain the person in the photograph was the same person whom she had seen fleeing from Carr's after the robbery/homicide. Previously, Conaway had told her that the suspect reminded her of a person named "Billy" from home but that the suspect could not have actually been "Billy" because "Billy" did not live in Alaska.[3] When discussing the photograph with Verfaille, Conaway expressed the view that the man she saw and the

EXHIBIT 2
PAGE 5 OF 28

---

[3] Conaway testified that the suspect reminded her of an ex-Carr's employee named Billy Evans. She wondered for a while if Evans could have been the robber, but concluded that he probably was not.

**DECISION AND ORDER: DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)**
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 5 of 28

man in the photograph had the same "stride" and looked like her friend "Billy" from home.

Conaway seldom watches the television news and rarely reads the newspaper. She neither read nor heard any news about the event after it occurred except for the newspaper photo and story when defendant was arrested on federal charges.

On December 8, 1992, Inv. Reeder Conaway and asked her to describe the man she had seen. In addition to her earlier description immediately after the robbery/homicide, she changed some details and added others. She now described the man as muscular and medium complexioned. When questioned as to the difference between a "light" and a "medium" complexion, Conaway explained that "tan" meant very dark. She recalled other details such as the man's hair was pulled back; he had a gun with a square barrel in his right hand; and he was carrying a bag. Conaway indicated that seeing the photograph of the defendant in the newspaper had jogged her memory and helped her to recall details.

Reeder then showed Conaway a six-person black and white photographic line-up which included a picture of the defendant. He followed the typical line-up procedure using six Department of Motor Vehicles photographs which have similar characteristics as the witnesses have described. DMV photographs are used because, first, they were more readily accessible than "mug" shots. Second, "mug" shots, unless properly cropped, suggest that the person depicted has a criminal record and that would make the photographic lineup less fair.

EXHIBIT 2
PAGE 6 OF 28

The photographs were put together on a sheet of paper with

2324

three at the top and three at the bottom.  A printed form is usually read to the identifying witness explaining the source of the photographs.  This printed form is not always used and APD departmental policy does not require it.  The witnesses are handed the photographic lineups and asked if they can identify the suspect.

A photographic lineup was first prepared in this case on June 10 or 11, 1992 and two duplicate lineups were also generated.  No photographic lineups were used prior to the defendant's arrest on federal charges on June 17, 1992.  According to Reeder, photographic lineups were not used because of the distance the suspect was from the witnesses and witnesses might unreliably implicate an innocent person.  He suggested that photographic lineups in cases such as this where the perpetrator wore glasses and a mask are typically "more trouble than they're worth."

When Reeder showed her the photo lineup, Conaway pointed to defendant's photograph stating that it "resembles" the suspect she saw.  Reeder inquired as to Conaway's level of certainty on a 1 to 10 scale, 10 being absolutely certain.  Conaway paused and stated that her level of certainty would be "8 or 9 if she could see him from the side."  Conaway then asked Reeder whether she had identified the man.  Inv. Reeder nodded affirmatively.  Conaway explained that she asked Inv. Reeder if she was right because she did not want to pick the wrong person.  She was surprised that she could identify the suspect from front view photographs.

Inv. Reeder thought that Conaway was the first person to be shown the photographic line-up.  He was concerned about using a

DECISION AND ORDER:  DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT
IDENTIFICATIONS:  CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S.)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 7 of 28

EXHIBIT 2
PAGE 7 OF 28

2325

photographic lineup after the newspaper picture of the defendant and accompanying article with defendant's name had been published because the photograph suggestively depicted defendant in hand and ankle cuffs.

Conaway told Reeder that she had been approached by defense investigator Taylor for an interview and asked if he would be present at the interview. Taylor showed Conaway four photographs which included Sean Pierce, Karl Bohlin, and David VanHousen. Although she did not recognize any of the men depicted in the photographs as the man with the gun from the robbery, she "sort of" recognized one of them as former Carr's employee David VanHousen. She was certain that none of the photographs presented to her by Taylor were of the man she had seen.

In March of 1993, a couple of weeks prior to the evidentiary hearing, Conaway was given a transcript of her description of the man she saw. She corrected portions of the suspect description regarding shoes and the "earmuffs" she seemed to recall the suspect was wearing. Conaway thought that she had been incorrect about the suspect wearing "earmuffs" until she spoke with Kyle, an assistant manager in the Carr's Aurora Village seafood department. According to Conaway, Kyle had actually bumped in the suspect when he was exiting Carr's. Kyle indicated that the suspect was wearing a headset. Conaway then understood that what she believed had been "earmuffs" were in fact a headset.

Lori Jansen, the Carr's Health food manager, was working in her office located behind the dairy section next to a fire exit near the south side of the Carr's store on June 8, 1992. Jansen

DECISION AND ORDER: DEFENDANT'S MOTION TO SUPPRESS PRETRIAL IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 8 of 28

EXHIBIT 2
PAGE 8 OF 28

6

saw four women running toward the exit near her office yelling "Get out! Get out! Someone is shooting." She and a coworker (Dennis) exited through the fire exit and ran across Benson. Once across Benson, she stopped and turned around. She watched a man walk across Benson at an angle to her left. He stared at her and Dennis. He was wearing a dark blue or black one-piece jumpsuit and sunglasses with yellowish orange lenses; had a black hat pulled down on his head; was muscular on "top" with a slim waist. To Jansen, he looked like a body builder. The suspect was carrying a canvas bag with handles and wearing green work gloves. When the suspect saw Jansen looking at him, he pointed his right hand at her and said "Go the other way. Go the other way." He then walked slowly behind the mall located at the southwest corner of the intersection of Benson and Minnesota. Jansen followed him around the corner of the mall, but he disappeared. She then attempted to flag down a police car.

In a recorded witness statement, Jansen later described the man's height as medium to tall. She was asked to compare the suspect's height to that of Detective Spadafora, who is 5'9" tall. Jansen opined that the suspect and Spadafora were approximately the same height.

Approximately a week to ten days after the robbery, two officers showed Jansen photographs which included defendant's picture. She could not positively identify any of the photographs as the man she had watched exit the store. However, she did point to one of the photographs and state that it "sorta' looks like him." In court, Jansen did not recall which photograph she had

DECISION AND ORDER: DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 9 of 28

EXHIBIT 2

2327

pointed to.

Although APD officer Spadafore recalled an interview with Jansen which yielded no new information, he did not recall the line-up at all. He testified that if Jansen had made a positive identification of the defendant as the suspect, he would have made a written note of it and reported it to the case officer. Federal Special Agent Neidringhaus did recall the line-up and that it occurred prior to the defendant being arrested on federal charges. Because Jansen did not positively identify any of the individuals in the photographic lineup, no record of it was made.

After her initial interview, but before being shown the photographic line-up, Jansen probably saw the June 14, 1992, Channel 2 news story, without any photographs, which described the suspect of the Carr's robbery/homicide as a body builder, 6'4" tall, with an olive complexion and brown eyes who was familiar with guns. She recalls seeing the June 17, 1992 newspaper photograph of defendant when he was arrested on federal charges and reading the accompanying article. She does not remember where she read the article but thinks it was probably at the gym where she works out. When asked to recall specifics about the photograph, Jansen was unable to recollect whether the article was a head shot or a full view shot. She did not know whether the newspaper picture was of the man she saw exiting Carr's on June 8, 1992.

EXHIBIT 2
PAGE 10 OF 28

On March 2, 1993, Inv. Reeder learned that a photographic lineup had been shown to Jansen prior to June 17, 1992. Reeder contacted Jansen, and asked if she could identify the suspect she had seen crossing Benson on June 8, 1992. Jansen responded that

2328

she had already tried to do so and could not.  Jansen could not
remember which officer(s) had shown her the photos.  Reeder then
attempted to ascertain which officer had shown Jansen the
photographic lineup.  Ultimately, he was informed by Federal SA
Neidringhaus that Officer Spadafora had done so.

Jansen regularly watches local television news on Channel 2.
She watched the media coverage of the defendant's arrest and
recalled full view still and video photographs of the defendant on
the television news.  These depictions resembled the build of the
man she saw across Benson on June 8, 1992.  The news footage of the
defendant shown on channel 2 from date of robbery until October,
1992 were as follows.

(a)    On June 17, Channel 2 News reported verbally that a
suspect in the Carr's robbery/homicide had been arrested on federal
weapons charges.  The report included the defendant's name and age
and stated that he fit the description of the killer.

(b) On June 18, 1992, Channel 2 News reported that 27-year-
old Jon Woodard had been arrested on federal weapons charges.  In
the report, a video image depicted the defendant's torso and face
while the defendant was accompanied by two officers.  The defendant
was in handcuffs.

EXHIBIT 2
PAGE 11 OF 28

(c)    On June 23, 1992, Channel 2 News presented a still
photograph of the defendant's torso and face.  An additional video
report showed a full body shot of the defendant in handcuffs.  The
still photograph was repeated at the close of the story.

(d)    Similar reports showing the same still and video
photographs of the defendant restrained were aired by Channel 2

DECISION AND ORDER:  DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT
IDENTIFICATIONS:  CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 11 of 28

2329

news on July 7, 8, 18, 20, 21 and September 2 and 3 of 1992.

The court, at defendant's request, incorporates the court's earlier findings of fact regarding the police department using information supplied by VanHousen as a part of the suspect description released to the press.

### DISCUSSION

1. **Does the dissemination of information to the public constitute "improper state action?"**

Defendant contends that the Anchorage Police Department acted improperly by disseminating information to the press which permitted it to take still pictures and video footage of the defendant and publish stories about defendant's alleged involvement in the Carr's robbery/homicide. News coverage was seen/heard/read by witnesses who may make an in-court identification of the defendant as the person they saw fleeing the scene of the June 8, 1992 robbery/homicide. Defendant contends that an in-court identification of the defendant by witnesses who have seen news coverage of the defendant creates a substantial likelihood of irreparable misidentification which violates his 14th amendment due process rights. Defendant also renews his claim that APD acted improperly by using information about the defendant that it received from VanHousen as a part of the suspect description.

In response, the state contends that it is not to blame for the media coverage and that APD did not act improperly either in responding to press inquiries or in disseminating a suspect description which was based upon information it had received from reliable sources. Thus, there was no improper state action.

DECISION AND ORDER:   DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT
IDENTIFICATIONS:  CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 12 of 28

EXHIBIT 2
PAGE 12 OF 28                    2330

It is undisputed that the Anchorage Police Department disseminated information about the defendant which resulted in media coverage which was seen by witnesses. The dissemination was twofold. (1) Police released a suspect description to the news media which included facts learned from sources in addition to eyewitnesses to the robbery/homicide. Three facts learned from former co-defendant VanHousen on June 10th and 11th, 1992[4] were included in the suspect description: (a) the suspect was a body builder; (b) the suspect was familiar with guns; and (c) the suspect had brown hair and an olive complexion.

The second dissemination of information was response to news media inquiries by Deputy Police Chief Utland. The photo seen by Conaway after defendant was arrested on federal charges, but before he was arrested for the Carr's robbery/homicide may have resulted from such information.

The police engaged in no improper conduct by disseminating information collected during the course of a homicide investigation to the press. The information supplied by VanHousen was based on his personal knowledge. He was familiar with the defendant and represented to the officers that the defendant may have been involved in the robbery/homicide. Likewise, responding to press inquiries about the investigation of the robbery/homicide was not improper.

The state contends that such a finding concludes the court's inquiry and requires denial of the defendant's motion to suppress.

EXHIBIT 2
PAGE 13 OF 28

---

[4] See DECISION AND ORDER: DEFENDANT'S S-1 AND S-2 MOTIONS TO SUPPRESS issued March 6, 1993.

DECISION AND ORDER: DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 13 of 28

2331

The court agrees that such a result is appropriate under Alaska constitutional doctrine, but concludes that such a result is contrary to federal constitutional requirements. The stricter federal standard must be applied in this case.

In 1967, the United States Supreme Court issued two significant decisions involving suggestive pre-trial identification. In <u>United States v. Wade</u>, 388 U.S. 218 (1967) the Court held that post-indictment lineup is a critical stage at which defendants have a 6th Amendment right to counsel. The test adopted to determine admissibility of subsequent in-court identifications where counsel was not present at the identification is whether the state establishes by clear and convincing evidence that the in-court identification is based upon an independent source. That determination must be based on the following factors: prior opportunity to observe alleged criminal conduct; any discrepancy between pre-lineup description and actual description of the defendant; any identification prior to the lineup of another person; identification by picture of the defendant prior to the lineup; failure to identify the defendant on another occasion; and lapse of time between the alleged act and the lineup.

In the second case, <u>Stovell v. Denno</u>, 388 U.S. 293 (1967), the court distinguished between the suppression of <u>Wade</u> pre-trial identifications made without counsel present and the suppression of pre-trial identifications made from an unnecessarily suggestive confrontation which is conducive to mistaken identification. The latter is independent of a 6th Amendment right-to-counsel claim and is grounded in the 14th Amendment due process right to a fair

DECISION AND ORDER: DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 14 of 28

EXHIBIT 2
PAGE 14 OF 28

2338

trial. The test adopted to determine admissibility of such pre-trial identification and/or subsequent in-court identification was "totality of the circumstances."

Subsequently, in <u>Neil v. Biggers</u>, 409 U.S. 188, 198 (1972), the Court explained that the evil to be avoided in suggestive confrontation cases is a substantial likelihood of misidentification. The court stated the test is whether under the totality of the circumstances, there is a substantial likelihood of misidentification. That determination requires examination of the following factors: witness' opportunity to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the criminal; the level of certainly demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation.

In <u>Manson v. Braithwaite</u>, 432 U.U. 108, 97 S.Ct. 2243, 53 L.Ed. 140 (1977), the court reiterated that "reliability is the linchpin in determining the admissibility of identification testimony" resulting from suggestive confrontations between witness and the accused. 432 U.S. at 116.

These decisions establish that federal constitutional due process does not require state involvement in the suggestive circumstances that result in pre-trial identification. As the court cogently explained in <u>U.S. v. Bouthot</u>, 878 F. 2d 1506, 1515 (1st Cir. 1989):

EXHIBIT 2
PAGE 15 OF 28

> Whereas coerced confessions may violate an independent
> constitutionally protected interest, the suggestive
> identification of a suspect <u>per se</u> does not violate any

DECISION AND ORDER:  DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT
IDENTIFICATIONS:  CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 15 of 28

2333

constitutionally protected interest. In the latter scenario, a constitutional violation, if any, occurs only when testimony regarding the suggestive pretrial identification (or an in-court identification based upon i) is introduced at trial (cites omitted). Whereas a coerced confession is suppressed primarily to deter future violations of the constitution, overly suggestive identifications are suppressed primarily to avoid an unfair trial (cite omitted). In the later scenario, the Due Process Clause protects an evidentiary interest: reliability. See Manson v. Braithwaite, 432 U.S. 98, 113-14, 97 S.Ct. 2243, 2252-53, 53 L.Ed.2d 140 (1977) ("[R]liability is the linchpin in determining the admissibility of identification testimony...."); (cites omitted). There is no per se rule excluding identification tainted by impermissibly suggestive procedures; such identifications will be admitted at trial if the totality of the circumstances indicates that they are reliable. See Braithwaite, 432 U.S. at 114, 97 S.Ct at 2253. Because the due process focus in the identification context is on the fairness of the trial and not exclusively on police deterrence, it follows that federal courts should scrutinize all suggestive identification procedures, not just those orchestrated by the police, to determine if they would sufficiently taint the trial so as to deprive the defendant of due process. See Thigpen v. Cory, 804 F.2d 893, 895 (6th Cir.1986) ("[O]nly the effects of, rather than the causes for, preidentification encounters should be determinative of whether the confrontations were unduly suggestive."), cert. denied, 482 U.S. 918, 107 S.Ct. 3196, 96 L.Ed.2d 683 (1987); (cites omitted).

In contrast, Alaska constitutional due process is triggered by state action. The first Alaska decision to address the issue of non-state generated pre-trial identification of a defendant is Kimble v. State, 539 P.2d 73 (Alaska 1975). In Kimble, the eyewitness victim of the crime, while at police headquarters to pick up a subpoena, saw the defendant in prison clothes and handcuffed being lead into a holding cell with another prisoner. Later that same day, the eyewitness watched defendant for 15-20 minutes as he sat restrained with other prisoners in a courtroom waiting to be arraigned on unrelated charges. The eyewitness asked

DECISION AND ORDER:  DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & ]
IDENTIFICATIONS:  CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 16 of 28

EXHIBIT 2
PAGE 16 OF 28

2334

a police officer for the name of the defendant and was told that it was "Kimble."

After explaining that it applied a "Wade-Stovall" analysis to determine whether there is sufficient evidence of an independent origin of the in-court identification such that any suggestive pretrial contacts could not substantially lessen the dependability of an in-court identification, the Alaska Supreme Court distinguished between those cases involving confrontation arranged by the police or the prosecutor for the purpose of affording opportunity for a pretrial identification of the defendant and accidental confrontations that occur. At page 77, the court stated that "to extend the Wade-Stovall line of cases to purely accidental pretrial controntations would place too great a burden on police and prosecutors to isolate witnesses and defendants." The court held that "whan (sic) a pretrial confrontation is purely accidental and is not prearranged by the state, we will not ordinarily inquire into whether a denial of due process is the result." id.

However, the court went on to determine that if it were to reach the question of a due process violation in a case of an accidental confrontation, it would apply the Wade list of factors it had cited in the first decision in which the issue of suggestive pre-trial identifications arose:  Davis v. State, 499 P.2d 1025 (Alaska 1972).

Cox v. State, 575 P. 2d 297 (Alaska 1978), also raised the issue of non-police arranged pretrial identifications by witnesses. Although in a footnote the court observed that a police officer could have prevented the pre-trial suggestive identification, the

DECISION AND ORDER:  DEFENDANT'S MOTION TO SUPPRESS PRETRIAL
IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 17 of 28

EXHIBIT 21
PAGE 17 OF 28
2335

court did not conclude that improper police procedure had resulted in the identification. Nonetheless, the court analyzed the issue as an accidental pre-trial confrontation. In Cox, a high school gym teacher who had observed the defendant just prior to an attempted rape upon a student in a locker room was asked by a school official to come to the principal's office where police were questioning the suspect. When he arrived at the office, he saw the defendant and agreed that he was the man he had observed just prior to the attempted rape.

In Cox, the court first applied the test set out in Bell v. State, 519 P.2d 804, 807-08 (Alaska 1974) to determine that the school officials were not agents of the state for purposes of the fourth amendment. However, because the court thought there was sufficient doubt as to the 'accidental' quality of the confrontation to distinguish it from Kimble, it decided to address the issue whether Cox had been denied due process by subsequent in-court identification by the same witness.

Significantly, the court applied the Wade denial-of-right-to-counsel-at-post-arraignment-identification test and not the Stovall due process totality-of-the-circumstances test to determine admissibility of subsequent in-court identification.

In the third similar case in which the Alaska Supreme Court addressed the issue, without comment, it returned to the Stovall test to determine admissibility. Walker v. State, 652 P.2d 86 (Alaska 1982). In Walker, the rape victim sat in the patrol car and was able to see inside the window of the apartment where the incident occurred. She testified that she was asked by police if

DECISION AND ORDER: DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 18 of 28

EXHIBIT 21
PAGE 18 OF 28

she could identify any of the occupants as the assailant. She did so.

In determining admissibility, the supreme court stated that even if the police had asked her the identify question, the analysis would be the same and quoted Stovall that the determination must be based on the 'totality of the circumstances.' The court then applied the factors it set forth in Holden v. State, 602 P.2d 452, 455-56 (Alaska 1979). After concluding that the Holden factors favored reliability of the witness identification of the defendant, the court suggests that the next step in the analysis is to weigh the Holden reliability factors against the possibility that the police suggested the identification:

> The only consideration to weight against the foregoing factors is the possibility that the police suggested that M.M. attempt an identification.

id. 95. The court concluded that no evidence suggested that the identification was set up by the police and the admission of the identification was affirmed.

This court concludes that above-referenced cases hold that state action is required to trigger Alaska constitutional due process protection re: admissibility of identifications whether suggestive pre-trial controntations between the witness and the defendant has occurred. However, the stricter federal constitutional standard requiring a due process analysis regardless of whether state action triggered the suggestive pre-trial confrontation must be adhered to in this case.

1. Was suggestive news coverage seen by Conaway and Jansen?

DECISION AND ORDER:   DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT
IDENTIFICATIONS:  CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 19 of 28

EXHIBIT 21            2337
PAGE 19 OF 28

Defendant contends that news coverage of him in custody and publication of a suspect description which includes information supplied by VanHousen is unduly suggestive and requires suppression of both pretrial and in-court identifications by witness' who see or heard any of the coverage.

The parties do not serious dispute that photographs (still or video) which depict defendant restrained and in custody are suggestive that he is guilty of the crimes charged. The court finds that the newspaper photos and articles and the television news coverage were suggestive.

Having determined that the news coverage was suggestive, this court also concludes that Conaway and Jansen actually read the newspaper stories and that Jansen saw and heard television newscasts as well as read additional newspaper stories.[5] Conaway saw the newspaper photo in the break room of Carr's and read the accompanying article. She did not watch television newscasts. Jansen was unable to recall whether she had read the article and saw the accompanying picture, but stated that she probably had because it was her practice to read the newspaper while exercising. Jansen did regularly view Channel 2 news reports about the robbery/homicide.

Defendant contends that if the eyewitnesses were exposed to suggestive news coverage, their pre-trial and in-court identification of defendant must be suppressed.

---

[5] The Daily News photograph at issue depicted a full-length profile of the defendant in physical custody, either coming from or going to the federal court building and chained to another person. Defendant is clean shaven with straight, dark hair pulled back in a ponytail. The accompanying article mentions that defendant is a suspect in the Carr's robbery/homicide and matches the physical characteristics of the shooter.

DECISION AND ORDER: DEFENDANT'S MOTION TO SUPPRESS PRETRIAL
IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 20 of 28

EXHIBIT 21
PAGE 20 OF 28

Defendant's position would result in a "**per se**" rule barring all eyewitness in-court identification in any case in which witnesses saw or heard news coverage of either descriptions or photo depictions of the defendant. Such a rule, taken to its logical extreme, would result in virtually no subsequent pre-trial or in-court identifications of the accused in any case where there has been any news coverage viewed by a witness to the crime. Such a rule would deprive the trier-of-fact of relevant and possibly reliable evidence.

The United States Supreme court rejected a <u>per se</u> rule in <u>Manson v. Braithwaite</u>, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed. 140 (1977) and the Alaska Supreme Court rejected such a <u>per se</u> rule in <u>Viveros v. State</u>, 606 P. 2d 790 (Alaska 1980). The United States Supreme Court identified the competing interests at issue: (1) the distortion of the witness' recollection of the encounter under circumstances of emergency or emotional distress; (2) deterrence of government wrongdoing; and (3) the effect of suppression on the administration of justice. Addressing the first interest, the Court concluded that a <u>per se</u> rule of exclusion goes too far because "its application automatically and peremptorily, and without consideration of alleviating factors, keeps evidence from the jury that is relevant." 97 S.Ct. at 2252.

As to the second interest, deterrence, the Court conceded that the <u>per se</u> approach has the more deterrent effect. However, it concluded that the "totality" approach also had an influence on the police which would keep them from using unnecessarily suggestive

DECISION AND ORDER:  DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT
IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY G̶R̶O̶U̶N̶D̶S̶ (S.2)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 21 of 28

EXHIBIT 21
PAGE 21 OF 28

2339

procedures.  97 S.Ct. at 2252 & n.12.

Addressing the third interest, the Court stated that the <u>per se</u> rule of exclusion suffers serious drawbacks because it denies the trier-of-fact reliable evidence.

Further, an examination of the cases cited by defendant does not reveal a different analysis or a contrary conclusion.  <u>See</u> <u>Commonwealth v. Porter</u>, 569 A.2d 942 (Pa. 1990), <u>Lannom v. State</u>, 464 So.2d 492 (Miss. 1985), <u>United States v. Monsour</u>, 893 F.2d 126 (6th Cir. 1990), <u>State v. Campbell</u>, 711 P.2d 1357 (Mont. 1985), <u>People v. Barnett</u>, 414 N.W.2d 378 (Mich App. 1987), and <u>Gray v. State</u>, 568 So.2d 381 (Ala.Cr.App. 1990).  In each of these cases witnesses were exposed to photographs or news accounts of the defendant prior to an in-court identification.  In each case, the appellate courts either evaluated the defendants' contentions under <u>Manson v. Braithwaite</u>, 432 U.S. 108, 97 S.Ct. 2243 (1977) and <u>Neil v. Biggers</u>, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), or they performed the independent source analysis articulated in <u>United States v. Wade</u>, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

Instead of a <u>per se</u> rule, to determine whether admission of a pre-trial or in-court identification violates a defendant's due process rights, a two-step analysis is required.  The court must first determine whether the identification circumstance is unnecessarily suggestive.  If yes, the court must determine whether the identification is nevertheless reliable based upon the totality of the circumstances.  <u>Manson v. Braithwaite</u>, 432 U.S. 98, 108-

EXHIBIT 21
PAGE 22 OF 28

DECISION AND ORDER:  DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT IDENTIFICATIONS:  CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 22 of 28

2340

09, 97 S.Ct. 2243, 2250, 53 L.Ed. 140 (1977)[6]

    4.   **Is the identification testimony reliable despite the suggestivity of the news coverage?**

The test articulated by the United States supreme Court in <u>Stovall</u> and <u>Manson</u>, (and by the Alaska Supreme Court in <u>Holden</u>) requires that the following factors to be considered to determine reliability:  (a) the witness' opportunity to view the criminal at the time of the crime; (b) the witness' degree of attention; (c) accuracy of the witness' prior description of the criminal; (d) the level of certainty demonstrated at the confrontation; and (e) the time between the crime and the confrontation.

    a.   <u>Opportunity to view the suspect</u>

      i.   Conaway

On June 8, 1992, Conaway saw the man at the courtesy booth when the crime occurred.  She ran from the Deli section of Carr's and exited the store through a rear door.  Crossing the parking lot and Benson Boulevard, she stopped when she got to the other side.  When she turned to see whether other Carr's employees had followed her, she watched a man exit through the rear door of Carr's and walk across Benson at an angle to her until he disappeared between two buildings.  At that time, she observed him for "less than a minute" from a distance of approximately 100 feet.  Both her views of the man were unobstructed in lighted areas.  She deliberately

---

    [6]  In <u>Holden v. State</u>, 602 P.2d 452, 455-56 (Alaska 1979), (a case involving suggestive police procedure) the Alaska Supreme Court adopted the due process standards promulgated in <u>Manson</u> to exclude pre-trial identifications and their "fruits" (in-court identifications of the defendant) due to the likelihood that suggestive procedures could give rise to a substantial likelihood of irreparable misidentification and thus deprive an accused of due process of law.  See also <u>White v. State</u>, 773 P.2d 211 (Alaska Ct.App. 1989).

**DECISION AND ORDER:  DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT IDENTIFICATIONS:  CONSTITUTIONAL AND EVIDENTIARY GROUNDS** is a
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 23 of 28
EXHIBIT 21
PAGE 23 OF 28
#2341

watched the man for a period of time sufficient to observe his physical characteristics, clothing and walking mannerisms.

### ii.    Jansen

Jansen was working in her office near another Carr's employee when four co-workers approached yelling "get out." Jansen and the other employee followed the others across Benson Blvd. She then stopped and turned around. The suspect crossed Benson at an angle to her. She did not estimate how long she observed the suspect. However, she followed him around the corner of the building before losing sight of him. Her view was unobstructed in daylight. The time necessary for the man to walk (not run or jog) across a one-way street is sufficient for her to mote his physical appearance, clothing and movement mannerisms. She was also able to hear and understand his statements.

### b.    The degree of attention

### i.    Conaway

Conaway indicated that she was confused and disoriented by the commotion following the shooting, but did not testify that she was confused or disoriented while she watched the man either inside the store, in the area behind the store, or as he crossed Benson Blvd. The nature of her observations indicate that her attention was focused on him. She saw the side of the suspect's face and noted his size, cloth, hair and his actions.

### ii.    Jansen

Jansen carefully and deliberately watched the man cross the street. She was paying such close attention that she was able to understand the words he spoke as he crossed. She also followed him

DECISION AND ORDER:  DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT
IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 24 of 28

EXHIBIT 21

until he disappeared around a building. She described in detail the clothing he was wearing including sunglasses.

### c. The accuracy of the description

#### i. Conaway

Conaway's first description accurately describes defendant as a tall, approximately 220 pound, light-complexioned white man with straight, dark hair (now permed or curled for trial). She indicated he did not have an accent or anything unusual about his voice. Her descriptions of the suspect's clothing is similar to other eyewitness accounts. She inaccurately described the defendant's hair as short. The rest of her description fits the defendant.

During a subsequent interview with Inv. Reeder on December 9, 1992, before she picked him out of a 6 photo lineup, Conaway again described the suspect's hair as dark, and that he was wearing a dark blue jacket. In her second interview, she added his "hair being sort of in a smooth back position" with "kinda' short sideburns;" he had on sunglasses; and that he was carrying a square gun and a bag. She modified her description of his complexion from "light" to "medium." She attributed these changes to the commotion and confusion during her interview immediately after the shooting and to the Anchorage Daily News photograph of the defendant jogging her memory as to additional details which she then related to Inv. Reeder prior to seeing the 6 photo lineup.

#### ii. Jansen

Jansen described the man as medium to tall (about 5'9"), and wearing a black or dark blue one piece jumpsuit, sunglasses and hat

**DECISION AND ORDER: DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS (5.2)**
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 25 of 28

EXHIBIT 21
PAGE 25 OF 28

2343

pulled down on his head.  He was muscular on the "top" with a slim
waist.  He was wearing green gloves and carrying a canvas bag with
handles.  Although her estimates of the defendant's height are low,
the rest of her physical description is accurate.

### d.    The level of certainty

#### i.    Conaway

Conaway's certainty in her original description was affected
by the excitement of the event itself.  When she first saw only the
side view, full length picture of the defendant in the newspaper,
she immediately expressed her certainty that it was a picture of
the man she had watched leaving Carr's on June 8, 1992,

On December 9, 1992, when asked by Inv. Reeder whether any of
the photos in a 6 person photographic lineup was of the man she
saw, Conaway pointed to the photograph in middle of the bottom row,
stating that it "resembled" the suspect she saw fleeing from
Carr's.[7]  When asked her level of certainty, she responded that
she would be 80 to 90 percent sure if she could see a side view of
his face. She then asked Inv. Reeder whether she had identified the
shooter and he nodded affirmatively.  She testified at the hearing
that she was "amazed" she had been able to identify the suspect
from a front view photo.  Her ability to identify defendant from
a front view photo enhances the certainty of her identification
because she had never before seen a front view of the defendant.

#### ii.  Jansen

Jansen was presented with a photographic lineup of the

---

[7] Defendant does not contend that the photographic lineup presented to Conaway was suggestive.  It consisted of 6 photographs taken from department of motor vehicle driver's licenses displaying the full face view of a white male with long dark hair.

DECISION AND ORDER:  DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT
IDENTIFICATIONS:  CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 26 of 28

EXHIBIT 21
PAGE 26 OF 28

2344

defendant within 10 days of the robbery and could make no positive identification. The defendant's picture was included in the lineup.

  e.  <u>The time between the crime and the confrontation</u>

   i.  Conaway

Conaway was interviewed immediately after the Carr's robbery/homicide. She saw the article and the picture of the defendant 11 days later in the break room of the store. Six months later, she was presented with a photographic line-up in which she identified the defendant as the person she had seen fleeing from Carr's.

   ii.  Jansen

Jansen's confrontation with the defendant would purportedly occur during the trial of this case approximately 9 to 10 months after the robbery/homicide.

  <u>The totality of the circumstances.</u>

Considering the totality of the circumstances, Conaway's pre-trial and in-court identifications of the defendant as the man she saw fleeing from Carr's on June 8, 1992 have sufficient indicia of reliability to be admissible and to permit her to make an in-court identification of the defendant. She has consistently described major features of the man she saw and has done so with confidence. She first recalled these features just shortly after the robbery/homicide. Inv. Reeder's affirmative nod after she identified defendant from the photo lineup was not a corrupting influence on the identification already made.

Jansen gave a inaccurate description of the height, but her

**DECISION AND ORDER:** **DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S.3)**
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 27 of 28

EXHIBIT 21
PAGE 27 OF 28

2345

description of the suspect's clothing is consistent with other witness' descriptions. Further, her description has consistently been detailed. However, when presented with a photographic lineup a few weeks after the robbery/homicide, she was unable to identify the defendant as the person fleeing from Carr's. Jansen has consistently read the newspaper and watched Channel 2 News which carried numerous subsequent stories depicting the defendant and explaining the Carr's robbery/homicide. Thus, the corruptive influence is greater with Jansen than it is with Conaway.

The court concludes that Jansen's proffered in-court identification of the defendant as same individual she saw fleeing from Carr's after the robbery/homicide must be suppressed because the totality of the circumstances do not indicate that her identification of the defendant in court would be reliably based upon her recollection of the man she saw fleeing Carrs' after the robbery/homicide. She was not asked to make an identification until weeks after the incident which was also after she had read and viewed repeated still and video pictures of the defendant. She was unable to do so.

THEREFORE, IT IS ORDERED that defendant's motion to suppress pre-trial and in-court identifications (S-3) is GRANTED as to witnesses Lori Jansen and DENIED as to witness Robin Conaway.

DATED at Anchorage, Alaska, this 3rd day of April, 1993.

Karen L. Hunt
Superior Court Judge

I certify that on 4-4-93
a copy of the above was personally
handed to each of the following: by leaving in
Henry J McConol law library
Secretary/Deputy Clerk
K.L.H.

DECISION AND ORDER: DEFENDANT'S MOTION TO SUPPRESS PRETRIAL & IN-COURT
IDENTIFICATIONS: CONSTITUTIONAL AND EVIDENTIARY GROUNDS (S-3)
State v. Woodard Case No. 3AN-S92-5238 Cr.
Page 28 of 28

EXHIBIT 21
PAGE 28 OF 28

2346