LAW OFFICES OF HUGH W. FLEISCHER, L.L.C.
310 K. Street, Suite 200
Anchorage, Alaska 99501
907-264-6635
907-264-6602
hfleisch@aol.com


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA


JON ARNOLD WOODARD,            )
                               )    CASE NO: A05-0089 CIV (RRB)
          Plaintiff,           )
                               )
                               )    **PETITIONER'S REPLY TO
                               )    RESPONDENT'S RESPONSE**
JOHN (CRAIG) TURNBULL          )
                               )
          Defendant.           )
_____)

        Plaintiff, Jon A. Woodard, through his undersigned
counsel, Hugh W. Fleischer, hereby files his Reply to the
State's response to Mr. Woodard's Brief on the Merits.

**A. Introduction**

        As this Court is well aware, the "Proposed Respondent's
Response to Woodard's Brief on the Merits" is 99 pages [Dkt.
No. 108-2].  In this reply, Mr. Woodard shall show, in the
sections that follow, that this was a most close case at trial
and on appeal.  The evidence against Mr. Woodard is not
overwhelming, that the Respondent cannot reasonably dispute
that Rob Kane is the perpetrator, that error in this case

violates 28 U.S.C. § 2254 (d)(1) and (d)(2) and that prejudice is the result.

Mr. Woodard also submits a second affidavit to assist clarification of several issues before this Court, just as the prior affidavits, which were similarly offered.  All of the said affidavits have reliability and genuine efficacy.

As will be seen from the discussion below and after careful review of the State record, petitioner is assured the Court will find error and prejudice, which warrants the issuance of Mr. Woodard's writ of habeas corpus.

**B. The Woodard case was close at trial and on appeal.**

**<u>1. Trial</u>**

**(a) Waiver of Two Jurors**

Jury tampering and the subsequent removal of two jurors during deliberations impacted Mr. Woodard's right to a unanimous verdict of twelve persons.  The juror tampering resulted in Mr. Woodard's reluctant and unintelligent waiver of his right to a unanimous verdict by twelve jurors.  *See, e.g.*, **United States v. Gomez-Lepe**, 207 F.3d 623, 630 (9th Cir. 2000) (The right to a unanimous verdict cannot be waived.)

During deliberations, allegations surfaced that an unknown male, without authorization, spoke to two jurors at the hotel

where the jury was sequestered. (Tr. 8940-8941) The trial court, the State and the defense made efforts to determine precisely what had occurred. The parties had the jury bailiff, Ms. Walsh, testify as to her knowledge of the incident, reporting that two jurors, Cheryl Workman and Natalie Fifield were approached by the unknown male and spoken to. [Tr. 8954-8971, 8982-8988]

The information as to what exactly occurred, and the effect on the two jurors was vague to Mr. Woodard's understanding. Nevertheless, the trial court and the parties chose to excuse the two jurors. This required Mr. Woodard waiving his right to a unanimous jury of twelve. Although the court and defense counsel attempted to explain the legal aspects of the waiver process, Mr. Woodard was confused and reluctant. [Tr. 9015-9016] Mr. Woodard's reluctant waiver was a product of his diminished physical and mental state due to the weeks of excessive shackling. [Woodard 2@ ¶ 2] Furthermore, as the record shows, Mr. Woodard made his waiver before hearing the testimony of the two jurors. Cheryl Workman testified that her medication made her confused as to the events surrounding the unknown male. [Tr. 9028, 9051, 9053]

After hearing Workman's and Fifield's testimony, Mr. Woodard questioned why he had made a waiver. Again, his mental and

3

physical state, due to the weeks of excessive shackling, discouraged and intimidated Woodard from asserting his rights. [Woodard 2 @ ¶ 2]

**b. Inconsistent Verdict**

On June 7, 1993, the ten-person jury returned an inconsistent verdict. Judge Hunt asked the State and defense counsel to approach the bench after receiving the verdict forms. The judge asked the attorneys if the verdict was inconsistent. [Tr. 9083-9084] Judge Hunt suggested not publishing the verdict and sending the jury out of the courtroom for the parties to discuss the verdict. [Tr. 9084] After a short discussion at the bench, the parties chose to publish the verdict.

Although the States entire case was premised on the theory of intentional murder under AS 11.41.100, Mr. Woodard was acquitted of that charge and found guilty of felony murder under AS 11.41.110(a)(3). The evidence offered by the State during trial alleging that Mr. Woodard intentionally caused the death of the v9ctim was rejected by the jury. Therefore, any assertions by the Respondent that Mr. Woodard intentionally caused the death of the victim should not be considered by this Court.

**(2) Alaska Court of Appeals**

This case was seriously disputed by three judges of the Court

4

of Appeals in Mr. Woodard's direct appeal M.O. & J. No. 3933, December 9, 1998. [See Ex. 5]  This Court should that the Court of Appeals was close to a reversal of Mr. Woodard's conviction.  This conclusion is made clear by Chief Judge Bryner:

> I disagree with the court's decision and would find error on six points raised by Woodard.  I would conclude that the first error requires additional consideration by the court.  I would further conclude that the cumulative impact of the remaining five errors requires a new trial. [Ex. 5 @ 100]

Moreover, aside from the errors in Judge Mannheimer's harmless error analysis covered below in this brief, the following shows that he had doubt and uncertainty deciding whether of not reversible error had occurred:

> Woodard's appeal presents several difficult issues and the proper resolution of these is not altogether free from doubt….I conclude either that Woodard's claims of error are meritless or that the identified errors caused him no significant prejudice….With some hesitation, I conclude that the defendant must demonstrate prejudice. [Ex. 5 @ 49]

**(3) Alaska Supreme Court**

Four justices ruled on Mr. Woodard Mr. Woodard's petition for hearing, instead of the normal five.  This Court should take notice that had all justices ruled, three would have favored granting Woodard's petition.  As Chief Judge Bryner of the Alaska Court of Appeals voted to reverse, so too would have Justice Eastaugh granted the petition based upon the exclusion of the five tapes (Ground Two).  Also, Justice Carpeneti would have granted the petition on the aforementioned tapes issue and

5

on the polygraph issue (Ground 3) [*See*, Ex. 6]

**c. The Evidence Against Mr. Woodard Was Not "Overwhelming"**

The Respondent takes one sentence of Chief Bryner's ruling to reverse Mr. Woodard's conviction out of context in an attempt to convince this Court that the evidence against Mr. Woodard was "overwhelming." [Dkt. No. 108-2 @ 5]. There follows the actual passage from Judge Bryner:

> The evidence presented against Woodard at trial was unusually strong and undeniably compelling. As to any single error, the chance of actual prejudice would seem slight. I am convinced, however, that the cumulative impact of the errors was significant and worked to deprive Woodard of his fundamental right to a fair trial, and cannot be ignored. ***Drumbarger v. State***, 716 P.2d 6 (Alaska App. 1986). Accordingly, I would reverse Mr. Woodard's conviction and remand for a new trial. [Ex. 5 @ 147]

**1. Expenditures**

The Respondent is incorrect that the record shows that Mr. Woodard repaid a $1,800.00 loan from Mr. Bohlin after the robbery and, alleged with robbery proceeds. To the contrary, the record shows that Mr. Woodard deposited $1,800 in his bank on June 11, 1992. [Tr. 6121-6123; 6133-6135] The State's own witness, who testified about Mr. Woodard's financial condition confirms the deposit. [Tr. 7434] The issue in dispute is whether Woodard received a "loan" from Bohlin or whether Bohlin

was in debt to Woodard. [Woodard 2, ¶ 3]

The Respondent also incorrectly alleged that Mr. Woodard
purchased a television with robbery money.  Rather information
could have been provided that showed the sources of money used
to purchase the television.   This question is related to
testimony that showed Bohlin attempting to "sell Mr. Woodard a
used television in early 1992, which Mr. Woodard did not
purchase. [Tr. 6379-6380]  Information could have been provided
that showed that the television was supposed to be partial
payment for a loan owed by Mr. Bohlin to Mr. Woodard. [Woodard
2, ¶ 4]

The State is also incorrect in alleging that Mr. Woodard paid
either Vanhousen or Pierce any money from the robbery.  As to
Vanhousen, the admission of the wire recording, (Ground Two)
that depicted Vanhousen asking Mr. Woodard for money shows
Woodard declining his request, remarking: "{I}s this some kind
of sick joke?" [Ex. 3 @ 90].  Moreover, this Court should take
notice that Vanhousen could have, but did not mention the
State's payment to Vanhousen to attempt to ensnare Woodard into
an inculpatory statement.  The fact is that Mr. Woodard did not
have any money fro the robbery to give to Vanhousen or Pierce.
[Woodard 2, ¶ 7]

This Court also should take notice of the fact that the items alleged by the State to have been purchased with robbery money, were neither seized by the authorities, nor was Woodard ever ordered to pay restitution. [Woodard 2, ¶ 6]

**2. Woodard/Bohlin Robbery Money Exchange**

The record negated the State's assertion that Mr. Woodard gave Bohlin any money for the robbery on June 11, 1992. During cross-examination of Mr. Bohlin by defense counsel, Mr. Bohlin attempted to explain how he went to Mr. Woodard';s residence to retrieve money.  However, in his June 6, 1992 statement to police, Bohlin admitted to serious inconsistencies in his story. [Tr. 6166-6170]  Mr. Bohlin further attempted to explain and demonstrate the impossible feat of stuffing a large volume of money, amounting to approximately 2,265 bills, in his tight leather coat, and go unnoticed by Mr. Woodard's girlfriend. [Tr. 6371-6376]  Furthermore, this stuffing event occurred in the direct observation of FBI stationary surveillance units posted across form the Woodard residence.  At trial Special Agent Kevin Neinaber testified that he did not see Bohlin carrying or hiding money when departing Mr. Woodard's residence. [Tr. 6720-6721]

This Court also should take notice that the authorities found Mr. Bohlin in possession of the robbery money.  The record also shows that Mr. Bohlin and Robert Kane after the robbery.  [Tr. 6313-6314]

### 3) Woodard's Fingerprints on Money

The State is mistaken that Woodard left his fingerprint on any robbery money. At trial, the State showed that Mr. Woodard's fingerprint was discovered on money found in Mr. Bohlin's residence. However, the record shows that Woodard and Bohlin exchanged money prior to and after June 8, 1992, in unrelated transactions. [Tr. 6469-6471, 6396-6397, 6479-6481] In addition, Ms. Monfreda, who testified as a fingerprint expert, admitted that she could not accurately determine if the money that contained the fingerprint came from the robbery, and could not testify when the fingerprint was deposited, i.e. before or after June 8, 1992, stating that a fingerprint could be on a bill for years. Ms. Monfreda also noted that out of the 2,265 bills examined, only the one aforementioned latent fingerprint was found and that Mr. Woodard's fingerprints were not on the bags that contained the money. [Tr. 7206-7210]

### 4) Woodard's Hair

Mr. Bohlin testified the Mr. Woodard and the latter's friend, Chris Presley, came to Bohlin's residence, in early June, 1992, where there was money on the floor. [Tr. 6133-6135] Other information could have been provided the Woodard was at Bohlin's residence on many other occasions. [Woodard 2,¶ 8]

Lt. Bill Gifford testified that he and at least three other officers searched Woodard's residence for hours before

searching Bohlin's home.    [Tr. 7115-7119]    Lt. Gifford acknowledged that the money found in Bohlin's residence  was laid out on a carpet, without him examining for the presence of hair and without his laying a lining or some other barrier between the carpet and the money. [Tr. 7123-7124]  Lt. Gifford also admitted that the lack of precautions risked contamination of the money. [Tr. 7132-7133]

When Ms. Monfreda was questioned on the issue of the money-contamination question, she stated that in order to prevent contamination, she would not have laid the money on the carpet. [Tr. 7204-7205]

When State criminalist Ms. Fair testified as to the identification of the hair found in the money from Bohlin's residence, she admitted that she could not make a positive identification that the hair belonged to Mr. Woodard. Tr. 7329-7330]  Ms. Fair also admitted that she would not wear the same clothing when different evidence and admitted laying the money directly on the carpet would not be a good procedure and could result in contamination. [Tr. 7339-7342]

This Court should take notice of the fact that, in 1992, Mr. Woodard had very long hair, which was prone to break and fall out. [ Woodard 2, ¶ 9]

**5) 10 mm Bullet/Glock Pistol**

Although the characterization of the Glock 10 mm pistol used in

the Carrs shooting were not directly compared with the bullet fragments or casing found at Carrs, the State firearms examiner concluded that the bullet was likely a 10 mm hollow point. [Tr. 4132-4139]  Subsequent testimony by Mr. McDaniel, a co-owner of a firearm store in Anchorage, stated that he sold Mr. Woodard 10 mm 200 metal jacket ammunition, not the 10 mm hollow point. [Tr. 4256, 4262-4263]  The State did not offer evidence that the brand and type of the 10 mm casing and bullet recovered from Carrs was of a type that Mr. Woodard purchased or possessed, which supported the inference that someone other than Mr. Woodard purchased 10 mm hollow point ammunition, used in the robbery.

6) The Missing Glock Pistol

Extensive testimony and other evidence was presented by the State and the defense that Mr. Woodard legally sold, loaned or exchanged firearms with persons, who testified at trial.  For example, Mr. Vanhousen purchased  a semi-automatic 9 mm from Mr. Woodard in February, 1992. [Tr. 5625, 5632].  Vanhousen also showed interest in a Glock 10 mm.

Prior to June 8, 1992, others expressed interest in purchasing firearms from Mr. Woodard, including Bohlin, Booher and Kane. The record shows that Booher, a friend of Bohlin, expressed interest in purchasing a 10 mm Colt pistol. [Tr. 6133-6135] Mr. Woodard advised Bohlin that the model of pistol that Booher

11

requested was not available.  Woodard also advised Bohlin that New Jersey State and local laws could restrict or preclude Booher from purchasing a firearm.  At Bohlin's request, Presley provided Bohlin a video tape of Presley and Woodard shooting several firearms, including a Glock, so the Booher could see a demonstration of the pistol. [Tr. 6031-6032, 6134-6135] [Woodard 2, ¶ 10, 11]

Mr. Bohlin also testified to his gaining access to Mr. Woodard's residence to borrow firearms, on at least one occasion. [Tr. 6365-6366]  Mr. Pierce expressed interest in purchasing a Glock of other pistol from Woodard, even though Pierce informed Woodard that Pierce was on felony probation for check fraud.  Because of such fact, Woodard informed Pierce that he was ineligible to purchase any firearm from Woodard. [Woodard 2, ¶ 12]  Pierce's testimony that Mr. Woodard disposed of the Glock in the Knik River is patently false. [Tr. 5009, 5090]  Although the State offered testimony that the Glock could not be retrieved from the river, witness Boone Daniels testified that he and his crew had retrieved objects from the river before June 8, 1992. [Tr. 5119-5121]  Therefore, the State could have, but did not confirm Pierce's false story.

D. The Respondent Cannot Reasonably Dispute the Robert Kane Committed the Carrs Robbery-Homicide

12

The State is incorrect to assert that Mr. Woodard did not address Kane's culpability.  In Mr. Woodard's Amended Petition [Dkt. 33, @ 2-3], His Memorandum in Opposition to Response to Show Cause [Dkt. 35 @ 14] and his Opening Brief on the Merits [Dkt. 100 @ 2-3], he asserted that Kane is the person responsible for the Carrs robbery-homicide and conspiring with others.

As stated in the aforementioned Opening Brief, despite the clear and unambiguous assertion that Kane was responsible, the State failed to respond to such assertion.  Given these facts, this Court should deem the Kane assertions admitted due to the non-response of the State.

In his statement to KTUU-TV, tom Rayfield, an associate of Kane in 1992, stated:

> He had this duffel bag he said he had full of money and that he needed some place to put it so they wouldn't find him or find it.  And slowly it came out that he was the pick up man or something that had to do with the Carrs robbery.  [*See*, www. Ktuu.com, 02/13/06, "Man recognizes Kane form Artist's Sketch."]

Anchorage Police Department Detective Spadafora testified that while conducting mobile surveillance of Bohlin on June 16, 1992, Detective Spadafora and others watched Bohlin dispose of several trash bags.  Spadafora and others followed Bohlin to Huffman Road, where he saw Bohlin in a pickup truck with Robert Kane. [Tr. 6745-6747]  Cheri Sherman, Bohlin's then-fiance', testified that she saw Bohlin bring a brown trash bag

13

containing money into their residence on either Tuesday, June
16 of Wednesday, June 17, 1992. [Tr. 6669-6673]

Interactions between Bohlin and Kane prior to and after June 8,
1992, show their involvement in a counterfeiting scheme.
Although Bohlin originally stated the he merely loaned Kane
$5,000.00 in May of 1992, Bohlin later changed his story.  In
Bohlin's statement to the authorities he said that the
$5,000.00 was to lauder and/or purchase counterfeit money with
Kane.  State prosecutors moved to preclude questioning of
Bohlin about counterfeit currency during the trial. [Tr. 6067-
6068]

Information again surfaced about Kane's counterfeiting
activities.  In news reports it was stated the Kane was
"detained by Philippine customs agents there and accused [Kane]
of smuggling counterfeit U.S. Cuurency." [See,
http://kommanderrobkane.blogspoy.com, 09/03/07, "Trouble in the
Philippines"]

In addition to the instances of financial difficulty listed in
the Amended Petition and the Opening Brief, on April 30, 1992,
the First National Bank of Anchorage received a default
judgment against Kane, in Alaska Superior Court, for $48,003.13
[Tr. 7851-7852]  Kane also owed about $31,000 in child support
in May, 1992, according to his ex-wife Tammy Wilts. [Tr. 7869]
 Information obtained after trial, shows that judgments
totaling about $200,000.00 were obtained against Kane before

14

the robbery. [*See*, www.ktuu.com, 02/09/06. "Some say Kane was a Con Man"]

Kane's propensity for violence and capabilities with firearms in 1992 were also established.  In addition to threatening Tom Rayfield at gun point when confronted about a loan, Tammy Wilts described Kane as a good shot with a hand gun, based upon her observations during his target practice. [Tr. 7865-7866]  In July, 1992, Kane used a bad check to obtain two pistols from Gun Traders in Anchorage.  [Tr. 7909]

Kane's interests and capabilities with firearms and special military training was outlined in a June 25, 2006 Anchorage Daily News article entitled, "Mystery Man."  The article provided sources who stated that Kane taught anti-terrorist techniques to police in the Philippines, that included military tactics, combat shooting and martial arts. [*See,*

www.adn.com/news/alaska/security_aviation]

Although the State, during trial, asserted that Kane was incapable of carrying out the Carrs robbery/homicide, citing weeks if not months-old collar bone injury, the treating physician as well as Ms. Wilts, testified that, on the day of his accident and the day after, his injuries were mild enough for him to drive a truck. [Tr. 7868, 8154]  Furthermore, Kane's interactions with Bohlin in day prior to and after June 8, 1992, indicate that he was observed driving, drawing a handgun

and threatening others and carrying a large bag of money. It is undisputed that these capabilities were exhibited by the Carrs gunman.

Furthermore, in a meeting between Bohlin and Kane on June 16, 1992, Kane told Bohlin that Kane had sources at the Anchorage Police Department ("APD") that told him that Bohlin was under surveillance by authorities in connection with the Carrs robbery/homicide. [Tr. 6014-6022, 6445-6446] This was one of the meetings observed by APD Detective Spadafore. The Bohlin-Kane meeting followed the Bohlin-Woodard meeting at the Northway Mall, where Mr. Woodard stated to Bohlin that he, Woodard, was going to the APD to clear his name in connection with the Carrs robbery/homicide. [Tr. 6160]

Also established at trial was the Bohlin-Kane-Vanhousen connection. Bohlin testified that he had numerous interactions with Kane since childhood and around June 8, 1992. [Tr. 6007, 6014-6022, 6397-6408] The record also shows that Bohlin and Vanhousen were friends, aside from them knowing Mr. Woodard. [6389-6390, 6645-6646] In addition, the record shows that Kane knew Vanhousen's wife, Jocelyn. [Tr. 7922]

**E. The State Trial and Appellate Courts Did Commit Violations of 28 U.S.C. § 2254 (d)(10 and (2).**

The State asserts that Mr. Woodard cannot show that the

16

decisions of the trial court or the Court of Appeals were either "contrary to…clearly established federal law as determined by the Supreme Court of the United States," or were "unreasonable determinations of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d)(1) and (2) [Dkt. No. 108-2@ 27, 40, 47, 57]

As shown in the Opening Brief, as well as in each ground presented below, the trial court's erroneous rulings, as well as the decision by the Court of Appeals to affirm Mr. Woodard's convictions, was, indeed, in violation of 28 U.S.C. § 2254 (d)(1) and/or (d)(2).

The Supreme Court defined the meaning of 28 U.S.C § 2254 (d) in *Williams v. Taylor*, 529 U.S. 362 (2000). The term "contrary" should be accorded its dictionary definition of "diametrically different," "opposite in character or nature," or "mutually opposed.: 529 U.S. @ 406. In construing the "unreasonable application" clause, the majority opinion stated:

> A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision of …clearly established Federal law. [Id. @ 409]

The Supreme Court has found an "unreasonable determination of facts" to include a state court misconstruing or misstating the record or overlooking evidence. *See*, *Miller-El v. Cockrell*,

17

537 U.S. 322, 346 (2003); *Wiggins v. Smith*, 539 U.S. 510, 528 (2003). The Ninth Circuit has found "if …a state court makes evidentiary findings without holding a hearing…such findings clearly result in an 'unreasonable determination' of the facts. *Taylor v. Maddox*, 366 F. 3d 922, 1001 (9th Cir. 2004).

Furthermore, the Supreme Court has held that a state court can violate due process through the combined effect of multiple erroneous rulings. *Chambers v. Mississippi*, 410 U.S. 284, 290 & n.3, 298 (1973) Such cumulative can be found even if no single mistake rises to the level of an independent constitutional violation. Id. The combined effect of individually harmless errors can render a criminal defense far less persuasive, and violate due process. 410 U.S. @ 294, 302-303.

As presented below, Chief Judge Bryner found at least five points of error, the cumulative effect of which warranted reversal of Mr. Woodward's convictions and Judge Mannheimer found at least three points of error, find each error harmless without assessing the cumulative nature of the errors. Mr. Woodard submits that there were more errors than those identified by the Court of Appeals, which should result in this Court granting his writ for habeas corpus.

18

F. The State Failed to Prove the Lack of Prejudice

The State asserts that Mr. Woodard cannot show that he was prejudiced by the numerous errors in his State proceedings. [Dkt. No. 108 @ 22, 33, 42, 54, 58 and 81] The Respondent erroneously asserts that Mr. Woodard cannot show, or has the burden of showing, that the errors did not result in a "substantial and injurious effect or influence in determining the jury's verdict." **Brecht v. Abrahamson**, 507 U.S. 619, 622 (1993)

However, it is clearly established federal law that the State has the burden of showing the lack of prejudice. *Brecht*, 507 U.S. @ 640(Sevens, J. concurring); *O'Neal v. McAnich*, 513 U.S. 432, 438 (1995) (constitutional error casts on someone other than the person prejudiced by it a burden to show that it was harmless); *Payton v. Woodford*, 436, 346F.3d 1204, 1216-1217 (9th Cir. 2003)(Petitioner does not bear the burden of showing harm.

The decision whether an alleged error is harmless is one of federal law, which is subject to independent federal habeas review. *Brecht*, 507 U.S. @ 636. *Brecht* adopted the standard of assessing harmlessness in a federal habeas corpus proceeding from *Kotteakos v. United States*, 328 U.S. 750 (1946). In describing the *Kotteakos* standard, it is important to keep in

19

mind the statement of Justice Rutledge:

> [t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase effected by the error.  It is rather, even so, whether the error itself had substantial influence, conviction cannot stand.  *Kotteakos*, 328 U.S. @ 764-765.

It is important to note that in determining the harmlessness of an error that the court does not embark in a sufficiency of evidence test.   The *Kotteakos* Court stated that it i.e. not whether the evidence offered by the State would be sufficient to sustain the conviction.  Rather, "the question is … rather what effect the error had or reasonably may be taken to have upon the jury's decision.  The crucial thing is th4e impact of the thing done wrong on the minds of [the jurors]…" *Kotteakos*, 328 U.S. @ 764.

Thus, under *Kotteakos* and *Brecht* and their progeny, a constitutional error is not harmless if the court is in "grave doubt" as to whether the error(s) had a substantial and injurious effect or influence in determining the jury's verdict.  *O'Neal*, 513 U.S. 432 @ 436.

"Grave doubt" exists when, "[I]n the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." Id. @ 435
In addition, the State did not meet its burden of showing the cumulative effect of the errors found by the Alaska Court of

Appeals did not have a prejudicial effect.  The Supreme Court has clearly established that the combined effect of multiple trial errors may amount to a due process violation, even when a single error would not require reversal.  *Chambers*, 410 U.S. @ 290, n.3, 298, 302-303; *Parle v. Runnels*, 505 F. 3d 922, 927-928 (9th Cir. 2007); *Killian v. Poole*, 282 F. 3d 1204, 1211 (9th Cir. 2002).

The errors below, either alone, or in combination, had a ":substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. @ 622.


G. Expansion of the Record and/or a Evidentiary Hearing is Warranted

This Court has the authority to expand the record or to order an evidentiary hearing on its own motion, or at the request of a party. D. AK, HCR 7.1 and 8.1.  Due to the trial court denying Woodard a continuance to obtain additional disclosure via a subpoena, this Court should require the State to obtain the files from the Anchorage District Attorney's office in William Turlington. [*See*, Ground Ten, below.]

**H. Grounds**

**Ground One**

The State contends that this Court should not consider Grounds one and four in combination [Dkt. No. 108-2 @ 12].  Although

21

Judge Coats wrote the opinion for the Court of Appeals on ground one, both Judge Mannheimer and Chief Judge Bryner made independent findings that doe effect the Court of Appeals assessment of the reliability of witness Robin Conaway under the five-factor test set forth in *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977) and *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972) ("Manson-Biggers factors").

More specifically, Judge Mannheimer and Chief Judge Bryner made findings negating two of the five *Manson-Biggers* factors: the opportunity to view, and the accuracy of the description, identified in Mr. Woodard's Opening Brief. [Dkt. No. 100 @ 4-5]. In addition, both Grounds One and Four involve Conaway seeing newspaper articles in the Anchorage Daily News.

In Ground Four, photographs in the Anchorage Daily News depicted frontal face views of Mr. Woodard, which Mr. Woodard's defense attorney attempted to utilize to otherwise impeach Conaway's testimony that she had not seen the front of Mr. Woodard's face prior to her identifying Mr. Woodard in a photo array months later. Whether she saw these photos has impact on the Manson-Biggers factor pertaining to the accuracy of her description. Even Judge Coats considered aspects of Ground One when considering Ground Four. [Ex. 5 @ 39]

When this Court makes its assessment under federal law whether there was an error under 28 U.S.C. § 2254 (d)(1) and (2),

cumulative error and prejudice, Mr. Woodard that Grounds One and Four be considered in combination. Since the Judges of the Court of Appeals discussed the facts of Ground One in relation to Ground Four, the grounds are sufficiently intertwined to consider together for purposes of error and prejudice.

The State is also incorrect in contending that Mr. Woodard cannot show that the adjudication of the claim was an "unreasonable determination of the facts… under 28 U.S.C. § 2254 (d)(2) [ Dkt. No. 108-2@ 6] To the contrary, Mr. Woodard will show that the Court of Appeals decision was an "unreasonable application" of the Manson-Biggers factors, and other Supreme Court authorities under 28 U.S.C. § 2254 (d) (1) and in violation under (d) (2).

Judge Coats stated in his opinion that "having independently reviewed the record, we agree with {Judge Hunt's finding that Conaway's identification was sufficiently reliable to admit at trial." [Ex. 5 @ 21] Judge Coats also acknowledged that Judge Hunt concluded that Conaway's identification was tainted due to her seeing and reading the June 9, 1992 Anchorage Daily News article depicting Mr. Woodard in restraints. [Ex. 5 @ 19]

Although Judge Coats did not make any independent findings as to the reliability of Conaway's identification applying the *Manson-Biggers* factors, this Court should note that Judge Mannheimer and Chief Judge Bryner did make independent findings that negate the reliability of Conaway's identification under

23

two of the **Manson-Biggers** factors: the opportunity to view and the accuracy of description.

Regarding the fist Manson-Biggers factor, Conaway's opportunity to view, Judge Mannheimer found that "Conaway admitted that she got only a brief view of Woodard from across Benson Boulevard (a multi-lane street).  Chief Judge Bryner also found that Conaway had only briefly observed the robber at a distance and in profile. [ Ex. 5 @ 134]  Thus, these findings are contrary to Judge Hunt's findings and negate Conaway's opportunity to view.

?Regarding the second Manson-Biggers factor, Conaway'a degree of attention, Conaway was disoriented, nervous and overwhelmed. [Ex. 21 @ 3; Tr. 1091, 1109-1110.  See, United States v. Russell, 522 F.2d 1063, 1066 (6th Cir. 1976)(risk of misidentification increased when a witness identifies a stranger at a time of stress or excitement).

Regarding the third Manson-Biggers factor, Conaway's accuracy of description, Judge Mannheimer and Chief Judge Bryner made findings negating accuracy.  Judge Mannheimer found "her initial description of the robber varied in many particulars from her later description." [Ex. 5 @ 86]  Chief Judge Bryner found, " she had subsequently provided a description that did not closely fit Woodard." [Ex. 5 @ 134]

Moreover, Conaway stated, I didn't see the [suspect's] face." [Tr. 28 25-3827]  Furthermore, the tainted Anchorage Daily News

24

article showed Mr. Woodard in restraints, arrested on federal charges, and a suspect in the Carrs robbery/homicide, which infected the accuracy of Conaway's description, a fact the Court of Appeals should have considered. Although Judge Hunt found the article tainted, she relied on the article showing Woodard restrained to find that it "jogged" Conaway's memory. {Ex. 21 @ 25]

Judge Hunt's finding that Mr. Woodard's hair was described as "straight" and "(now permed or curled for trial)" is an inaccurate finding of fact. Mr. Woodard's hair was, and is brown and very curly. [Woodard 2] *See*, ***Tomlin v. Meyers***, 30 F. 3d 1235, 1241-1242 (9th Cir. 1994) ( witness stating perpetrator has a two-inch Afro, when defendant had shoulder length hair style, deemed identification inaccurate).

As to the Fourth Manson-Biggers factor, Conaway's level of certainty and contrary to the State's contentions, the suggestive aforementioned news article tainted her level of certainty. The finding by Judge Hunt that it aided Conaway's memory is erroneous. Courts have found that identification based on defendant's being in custody as unduly suggestive. *See*, ***Thigpen v. Cory***, 804 F. 2d 893, 896 (6th Cir. 1986). As stated above, her level of certainty must have been low since she did not see the suspect's face. [Tr. 3825-3827, 3829-3830] Also, before the suggestive news article, Conaway specifically

25

named a former co-worker, "Billy" as the perpetrator.  Thus, Conaway's level of certainty was the product of her seeing Mr. Woodard in restraints in the suggestive news article.

As to the Fifth Manson-Biggers factor, time which passed between the witness observation and the identification of the accused, again, Judge Hunt and the State assert that the time was eleven days, the time when Conaway viewed/read the news article. [Ex. 21 @ 27}  Mr. Woodard submits that the news article influenced her line-up identification six months later. The Court of Appeals should have assessed the Manson-Biggers factors and applied them to the facts in this case.  Mr. Woodard submits that the Court of Appeals erred and Conaway's unreliable identification should have been suppressed.

The trial and appellate courts violated 2254 (d)(1) when they unreasonably applied the ***Manson-Biggers*** factors and concluded Conaway's identification was reliable, as follows:

1) As stated above, the Court of Appeals failed to consider the suggestivity of the June 19, 1992 article and how it infected and negated ***Manson-Biggers*** factors three, four and five, resulting in an unreliable identification.

2) That although Judge Coats stated that he and other judges agreed with Judge Hunt's ruling, Judge Mannheimer and Chief Judge Bryner made findings that negated ***Manson-Biggers*** factors one and three, resulting in an unreliable

26

identification.

The State is mistaken in that there was no error. The trial court and the Court of Appeals violated 2254 (d) (2), as their holding that the June 19, 1992 article did not render Conaway's identification unreliable " resulted in a decision that was based in an unreliable determination of the facts…"

As stated above, the fact that Conaway based her identification on the news article is evidence alone that her identification of Mr. Woodard should have been excluded. Miller-El v. Cockrell, 537 U.S. 322, 346 (2003) (state court ignored crucial evidence before it in rendering a decision).

As stated above, the State has the burden of showing lack of prejudice and the burden of showing a suggestive event was harmless. *Cossel v. Miller*, 229 F. 3d 649, 655 (7th Cir. 2000)

This Court should also consider the following authority that explains the prejudicial effect of unreliable eyewitness testimony on a proceeding. Article: Manson v. Brathwaite revisited: towards a new rule of decision for due process challenges to eyewitness identification procedures, 41 Val. U. Law Rev. 109, 110 (2006) (mistaken eyewitness identification was a leading cause of wrongful convictions, accounting for 50% of false murder convictions).

?This Court also should consider the effect on the jury. *Kotteakos*, 328 U.S. @ 764. Indeed, the jury focused on

27

Conaway's identification during deliberations, requesting playback of Conaway's testimony, which Mr. Woodard suggests probably influenced jurors to find Woodard guilty or seriously undermine Mr. Woodard's defense. [Tr. 8888]

Finally, if this Court is in "grave doubt" as to the prejudicial effect of the unreliable eyewitness testimony of Ms. Conaway, the error should be considered as if it affected the verdict, *O'Neal*, 513 U.S. 432, 435-436 (1995). Mr. Woodard requests that if error is found on this ground, and there is question as to the prejudicial effect, then the error should be combined with other errors to assess the prejudicial effect.

**Ground Two**

The State attempts to minimize the fact that Chief Judge Bryner and Judge Mannheimer found harmless error. It is important to note that years after the Court of Appeals decision in this case, Judge Mannheimer acknowledged that the Court found error and gave credence to Chief Judge Bryner's holding on Ground Two that it "echoes the analysis of the three evidence law textbooks" he discussed. *Kelly v. State*, 116 P. 3d 602, 611-612 (Alaska App. 2005)

The State references Judge Mannheimer's unreasonable finding that Vanhousen's admission on cross-examination that Woodard "didn't give Vanhousen a dime" was a factor ion rendering the

error harmless. [Dkt. No. 108-2 @ 25] However, this did nit suffice for what Woodard actually said, in his own words in two of the recorded conversations.

On June 14, 1992, when Vanhousen asked Woodard for money to leave town, Woodard said that he did not have any money.  In a second meeting that day, when Vanhousen asked for $10,000.00 for the Carrs robbers, Woodard responded, "[I]s this kind of a sick joke?" [Ex. 3 @ 90]  Thus, the jury was not allowed to hear Woodard's responses, in his own words, to truly understand the nature of what transpired.  The error that excluded this tape was not harmless.

The State does not address the fact that Judge Mannheimer did not factor in his harmless error analysis the prejudicial effect of the State's spin that Woodard's reference to "the thing" meant the Carrs robbery.  Admission at trial of the second June 14, 1992 recorded conversation, which involves Vanhousen asking Woodard what he meant by "the thing." Woodard clarified that "the thing" had absolutely nothing to do with the Carrs robbery. {Ex. 3 @ 90]

The State ignores Chief Judge Bryner's finding that Woodard had no other means to refute the State's characterization  that "the thing" was consciousness of guilt. [Tr. 8801-8802]

Moreover, during closing argument, the prosecutor took advantage of this error, placing great emphasis on "the thing" being Woodard's consciousness of guilt. [Tr. 7223-7743; Ex. 3 @

93]

Again, the defense was not allowed to present the second recording to show that Woodard made no statements about being under surveillance, or any incriminating statements at all. In fact, in response to some of Vanhousen's bizarre questions, Woodard advise Vanhousen to cooperate with the authorities, tell the truth and to take a polygraph exam. {Ex. 3 @ 88-89] The State doe not address the error or the prejudicial effect that "the thing" had on the verdict, nor did Judge Mannheimer factor this into his harmless error analysis. The defense had no way to minimize or otherwise to refute the allegation the Woodard's non-incriminating conduct was masqueraded as evidence of guilt by the State. This issue was emphasized by the prosecutor during closing argument. [Tr. 8515-8516]

This issue is closely associated to an aspect of ***Chia v. Cambra***, 360 F.3d 997 (9th Cir. 2004), where the Court held due process was denied when the State of California was allowed to present expert testimony that Chia allegedly exhibited criminal behavior when he engaged in "counter surveillance driving", without allowing Chia to present defense evidence to the contrary. 360 F3d @ 1003, 1008.

The State also failed to address the finding made by Chief Judge Bryner that under Evidence Rule 106, the codified completeness doctrine discusses by the Supreme Court in Beech

Aircraft Corp. v. Rainey, 488 U.S. 153 (1988), other tapes or portions thereof were admissible to place into a correct context the reference made by Woodard to "the thing" [ex. 5 @ 116]  Both judge Coats and Mannhiemer failed to recognize the holding that Evidence Rule 106 allows a party to introduce another portion of a statement to put it into a correct context, because the "danger that an out-of-court statement may create such prejudice…" 488 U.S. @ 171-172 & n. 14.

Thus, failing to apply this principle was "contrary to … clearly established federal law… 2254 (d)(1).  Failing to apply this body of law "[c]ontradicts the governing law set forth in our cases." *Williams*, 529 U.S. 362, 405-406.

The State attempts to distinguish the case at bar from *Chambers* [Dkt. No. 108-2 @ 28-29].  As argued throughout the State proceedings, the right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.  *Chambers*, 402 U.S. 284 @ 302.

The State failed to meet its burden that exclusion of the five tapes was harmless.  Thus, the exclusion of the tapes alone, or in combination with other errors, had a "substantial and injurious effect or influence in determining the jury's verdict. *Brecht*, 507 U.S. @ 622.

If this Court is in "grave doubt" as to the prejudicial effect

31

of this error, then the error should be viewed as if it affected the verdict. *O'Neal*, 513 U.S. @ 435-436 (1995).

**Ground Three**

The State attempts to divert this Court's attention from the issue that the exclusion of evidence surrounding the polygraph exams of Vanhousen and Pierce infringed in Woodard's federal constitutional right to confront and cross examine these witnesses. The State's assertion that Vanhousen and Pierce were thoroughly impeached by other evidence is incorrect. Also, the State fails to recognize the potential admissible uses of the evidence found by Judge Bryner. [Ex. 5 @ 127-130] The State cites U.S. v. Scheffer, 523 U.S. 303 (1998), which was decided five years after Woodard's trial, to hold that the results of the polygraph did not violate federal law. [Dkt. No. 100 @ 8-9] and in Judge Bryner's opinion [Ex. 5 @ 127-130, the request to admit the results of the polygraph was only one aspect of the useful evidence that was sought.

The State asserts that the decisions of the trial and appellate courts to exclude such evidence, did not deny Woodard's right to confront those witnesses. [Dkt. No. 108-2@ 40-41] The exclusion was in violation of *Delaware v. Arsaall*, 475 U.S. 673 (1986)

The State asserts that the defendant had plenty of evidence to

32

confront these witnesses.   However, as to Vanhousen, other evidence of "intimidation by police," (e.g. the video interrogation) was also erroneously excluded.   As to Pierce, other evidence of "prior actual convictions and current probationary status:" was also erroneously excluded.

This Court should agree the exclusion of the polygraph violated Woodard's constitutional rights.

**Ground Four**

See the discussion in Ground One.

The State is mistaken to assert that Judge Mannheimer's harmless error findings are reasonable because Woodard's attorney had ample evidence to impeach Conaway, the three photos were cumulative and the evidence was overwhelming. [Dkt. No. 108-2 @ 52-54]

As explained above, the three photos were not cumulative and the evidence against Woodard was not overwhelming. See Section C above.

Therefore, standing alone, or in combination with Ground One or other errors found in this case, the exclusion of the three photos was a violation of *Brecht*, 507 U.S. @ 622.

**Ground Five**

The State is mistaken to assert that Vanhousen's admissions to being under pressure and threatened with prosecution adequately explained what actually occurred during the June 25, 1992 post-

33

polygraph interrogation. [Dkt. No. 108-2 @ 55-56]

Contrary to the State's assertion, **_Gordon v. United States_**, 344 U.S. 414 (1953) does govern this case. The **_Gordon_** Court held that the defendant was entitled to introduce a tape recording of prior statements made by a state's witness, which were inconsistent with trial testimony, even though the witness admitted the prior statement. The Court made the statements admissible. **_Gordon_** fully support Woodard's position in this Ground.

**Ground Eight**

The State cites numerous allegations in an attempt to justify Judge Hunt's decision to shackle Woodard, during trial. {Dkt. No. 108-2 @ 58-68] However, the State overlooks the fact that even the trial prosecutors, who could have made these allegations, determined that shackling Woodard was not necessary. [Ex. 19 @ 9-10, 12] The State should be precluded from taking a position contrary to the trial prosecutors. Moreover, a majority of the Court of Appeals concluded the Judge Hunt's decision to shackle was unjustified. [Judge Mannheimer, Ex. 5 @ 48, 89, 92-93; Judge Bryner @ 139, 144] The allegations by the State were not subjected to full adversarial testing by the defense. Judge Hunt denied Woodard a full and fair opportunity to oppose the shackling order, and even present facts to show the prejudicial effects on the jury

34

and Woodard.

A majority of the Court of Appeals found thwart Woodard was denied a hearing. [Ex. 5 @ 145]

Had a hearing been ordered, Woodard could have testified as to the distracting physical pain he endured and the ongoing emotional and mental problems caused y the shackling. The negative effects increased over the two-month trial.

[Woodard 2, 14, 15] also at such a hearing Woodard could have testified to the many legitimate, law abiding activities in which Woodard was involved. [Woodard 2, 13, 15]

Contrary to the State's contentions, post conviction relief statutes preclude the re-litigation of issues Woodard raised on direct appeal. AS 12.72.020 *See*, ***Mooney v. State***, 167 P. 3d 81 (Alaska App. 2007) enforces such statute.

The affidavits of Woodard and Ms. Shorthill clarify for this Court what is indicated in the record, but unclear from the transcript. The affidavits are provided to help this Court clarify the relevant facts. Vasquez v. Hillery, 474 U.S. 254, 258 (1986). Also, "the Court may order expansion of the record either in its own motion or the motion of a party." D. AK HCR 7.1 (a) (4).

Additionally, if the affidavits do not sufficiently assist this Court on this ground, a hearing is warranted. Generally a petitioner needs only to allege facts, which if proven, would entitle him to relief and show that he did not receive a full

35

and fair hearing in the state court.  *See*, ***Gonzalez v. Pliler***, 341 F. 3d 897, 903 (9th Cir. 2003)

Contrary to the State's position, the references cited in the Merit Brief show that the entire jury pool, on more than one occasion, was positioned directly behind a fully shackled Woodard.  Some of the jurors were within a few feet of Mr. Woodard.

Again and contrary to the State's assertions, a fair reading if the record supports that one or more jurors saw or were otherwise aware of Woodard's shackles.  The Supreme Court's decision in ***Riggins v. Nevada***, 504 U.S. 127, 142 (1992) stated that " it is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand of sitting at the defense table."

Judge Hunt took the mere precaution to hide Woodard's leg restraints, from a frontal view.  Whereas, her Order did nothing to hide the waist of wrist restraints.

The petitioner has explored the Court of Appeals decisions regarding shackles in its prior briefs.  Just let it be said that Judge Mannheimer ignored the fact of the effects of the "inherently prejudicial "practice of shackling, on many occasions " cannot be shown from a trial transcript." ***Deck v. Missouri***, 544 U.S. @ 635 In ***Deck***, the Court found that the

defendant was visibly shackled, despite the fact that the transcript did not reflect jurors expressly stating that th4ey saw the defendant in shackles.   Rather, a brief exchange between defense counsel and the judge suggested that one or more jurors may have seen the defendant's shackles in the courtroom.

"Woodard's appeal presents several difficult issues, and proper resolution of these is not altogether free from doubt…"[Ex. 5@ 49] The Decision to shackle Woodard encompasses two errors, one procedural and one substantive.  The hard question is what this court should do about these errors.[Ex. 5 @ 93]

In assessing prejudice, if this Court is in "grave doubt" as to the prejudicial effect of this error alone, or combined with other errors, this Court should treat the error as if it affected the verdict. *O'Neal*, 513 U.S. @ 435-436.

**Ground Ten**

As an initial matter, Mr. Woodard requests that this Court review the "Turlington/Woodard Time Line." [Ex. 11 @ 11-13] The State suggests that the State trial and appellate courts reviewed of the suppressed information re Turlington.  O the contrary, Judge Bolger, who presided over post-conviction relief proceedings, denied Woodard's "Subpoena to Appear and Produce All Records in the possession of the District Attorney's office pertaining to Mr. Turlington."[Ex. 24 @ 58]

37

The information is still undisclosed in the District Attorney's "Turlington File" This Court should order its disclosure, or at least review it in camera for material information. Woodard was denied a full and fair opportunity to present this information to the State courts.

The Turlington file should be disclosed in this proceeding, for several reasons:

1) To determine if state prosecutors had knowledge of Turlington's prior convictions for robbery in June, 1992 (See Ex. 24 @ 38-44) and did not disclose this information;

2) To determine if Turlington disclosed additional information that could have been used to impeach Vanhousen;

3) To determine if State prosecutors had additional undisclosed information of an exculpatory or impeaching nature that was and is material for Woodard's defense.

In addition, the State is incorrect that they failed to disclose to the defense the material information that could have impeached Vanhousen, that he "set up" the Carrs robbery/homicide.

Mr. Woodard submits that the requirement of disclosure includes information pertaining to informants. *U. S. v. Bagley*, 473 U.S. 667 (1985). An informant's

38

(Turlington)leniency agreement must also be disclosed. *Giglio v. U.S*., 405 U.S. 150 (1972) information affecting the credibility of Vanhousen and Turlington must be disclosed, even though they do not testify, or the information is not presented at trial. *Kyles v. Whitley*, 514 U.S, 419 (1995).

Contrary to the State's assertions, the Alaska Court of Appeals decision was an "unreasonable application of *Roviaro v. U.S.*, 353 U.S. 53 (1957). The key principle is that the State may not claim the privilege not to disclose the contents of an informant's communication, when it will be helpful to the defense. *Banks v. Dretke*, 540 U. S. 688, 697-698 (2004).

Contrary to the State's assertions, even if inadmissible, the Turlington file would have led to admissible, material evidence. The State id mistaken to rely on *Wood v. Bartholomew*, 516 U.S. 1, 5 (1999) Several circuit courts had found that federal law requires the disclosure of inadmissible evidence that could lead to admissible evidence. *Paradis v. Arave*, 240 F. 3d 1169, 1197 (9th Cir. 2001); *Ellensworth v. Warden*, 333F.3d 1 (1st Cir. 2003)( en banc).

## I.   Conclusion

Because this was a close case, and the evidence against Mr. Woodard was not overwhelming, this Court should treat the

errors found by the Court of Appeals and other errors stated above, as prejudicial, which warrants the issuance of Mr. Woodard's writ for habeas corpus.

This Court should pay special attention to Ground Eight, in that the shackling of Mr. Woodard was prejudicial, which commands the expeditious issuance of Mr. Woodard's writ.

Dated this 15th day of July, 2008.

LAW OFFICES OF HUGH W. FLEISCHER

By: _S/Hugh W. Fleischer
        Hugh W. Fleischer
        Attorney for Mr. Woodard
        310 K. St., Suite 200
        Anchorage, AK 99501
        907-264-6635
        907-264-6602-Fax
        hfleisch@aol.com

CERTIFICATE OF SERVICE

I hereby certify that on the 15$^{b}$ day of July, 2008, a true copy of JON WOODARD'S foregoing Reply was electronically delivered to:

William H. Hawley, Jr.
Assistant Attorney General

Office of Special Prosecutions and Appeals
310 K. St., Suite 308
Anchorage, AK 99501


S/Hugh W. Fleischer


9114.1/569